1  RICHARD RANDALL HEFNER

2  P.O. BOX 80173

3  SAN DIEGO, CA 92138

4  (619) 224-1811

5  PRO SE PLAINTIFF

6

7

8

9

10

11              UNITED STATES DISTRICT COURT

12            SOUTHERN DISTRICT OF CALIFORNIA

13

14                        '08 CV 1586 L BLM

15

16  RICHARD RANDALL HEFNER              CASE NO.

17

18           V.

19

20  1. ELAINE CHAO (SECRETARY OF LABOR)

21  (DEPARTMENT OF LABOR)

22

23  2. UNITED STATES MARINE CORP.

24

25  3. GEORGE WALKER BUSH

26  (PRESIDENT OF THE UNITED STATES OF AMERICA)

27

28

FILED

2008 AUG 29 AM 10: 04

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

COMPLAINT

PLAINTIFF ALLEGES:

1.  SCOTT STANFORD PERFORMS NEGLIGENT ACTION

Mr. Stanford acting as the supervisor of shop 6889 on Camp Pendleton committed negligent actions when he instructed me to work outside of my job description.  Mr. Stanford and I met on February 28, 2000.  I let Mr. Stanford know that I had a class A Virginia Driver's license with air brakes only.  He instructed me to operate a heavy vehicle, which was blatantly outside my job description.  My job description instructed me to be able to operate vehicles up to 3 tons.  Mr. Stanford was acting as a federal employee at the time of the negligent action.

2.  SCOTT STANFORD'S OMISSION OF INFORMATION AND NEGLIGENCE

On February 28, 2000, Mr. Scott Stanford acting as the supervisor of shop 6889 knowingly omitted information, which led to the unsafe action of April 7, 2000.  He instructed me that I did not require any additional endorsements or training other than the Class A driver's license with air brakes that I possessed at the time.  Mr. Stanford also instructed me that I did not need any endorsements on Government property due to the fact I would be operating a government vehicle.

3.  SCOTT STANFORD'S NEGLIGENCE OF THE BASE SAFETY COURSE

Mr. Stanford as a supervisor of shop 6889 and as a federal employee for 15 years was fully aware of the base safety requirement prior to operating any heavy vehicle.  Mr. Stanford was perfectly aware of the requirements of all employees operating heavy vehicles to attend a class at base safety.  This class would inform personnel with the improper endorsements or

licenses of the proper requirements prior to operating the vehicles.  Mr. Stanford did not inform me of this class in order to improve his declining work accomplishment rate.  This negligence was confirmed by the letter from the Inspector General's Office at Camp Pendleton and the Safety Officer in charge of this case GySgt Flanders.  The FMD Officer Col. Nelson also confirmed this negligence.

4.  SCOTT STANFORD'S NEGLIGENCE OF THE BASE LICENSING REQUIREMENTS

Mr. Stanford as a supervisor of shop 6889 and as a federal employee for 15 years was fully aware of the base licensing requirements prior to operating any heavy vehicle.  Mr. Stanford was perfectly aware of the requirements of all employees operating heavy vehicles to attend a class at base licensing.  This class would inform personnel with the improper endorsements or licenses of the proper requirements prior to operating of the vehicle.  Mr. Stanford did not inform me of this class in order to improve his declining work accomplishment rate.  This negligence was confirmed by the letter from the Inspector General's Office at Camp Pendleton and the Safety Officer in charge of the case GySgt. Flanders.  The FMD Officer Col. Nelson also confirmed this negligence.

5.  SCOTT STANFORD'S ACT OF COERCION

Mr. Stanford had instructed me to drive another heavy vehicle.  He also recommended that I go to the DMV and obtain a CA driver's license.  Another driver, Ted Scott, had instructed me that I might be driving these trucks illegally.  I questioned Mr. Stanford.  He asked very forcefully if I was refusing to perform the task I was instructed.  As I hesitated he informed me that my term could be cancelled at any time and I would be out of job.  When I stated, "no", about the refusing to do the job, I was instructed to "shut the hell up and go to work." Mr. Stanford threatened to have me removed from that job and the base if I did not perform the tasks that I demanded to perform.

6. SCOTT STANFORD GIVES FALSE STATEMENT TO GOVERNMENT OFFICIALS

Mr. Stanford knowingly and willingly gave false information to the safety department of Camp Pendleton. He told the Safety Department on more than one occasion that he never authorized me to drive any heavy vehicle. This information is proven incorrect by the 15 other driving jobs that Mr. Stanford authorized. One was even requested by Mr. Stanford, completed by me and supervised by Mr. Stanford. GySgt. Flanders and the safety department have documented this information.

7. INJURY TO NECK

On April 7, 2000, I was driving the Ford Dominator from the 62831 to 33831 on Camp Pendleton. I was operating under the speed limit a hill known as "dead man's curve." The rear end of the truck fishtailed and the truck became uncontrollable. The truck hit the shoulder of the road and rolled over. The police did an investigation and discovered that I was not speeding and was wearing my seat belt. As I exited the vehicle I lost feeling in my legs. I was taken to Mission Viejo Hospital. I was later informed that I had a spinal cord injury and would need surgery on my neck and spinal cord. On April 10, 2000, Dr. Gross performed emergency surgery on my neck. He performed a discetomy of the C6-C7 discs to elimination the herniation. This surgery allowed me walk again but also left several other injuries. The discetomy of the C6-C7 has permanently placed a titanium plate in the back of the neck and has limited the range of motion in my head by 20%. This is also caused an amazing amount of pain. This injury is not covered as far as compensation purposes with the FECA.

8. SCOTT STANFORD HARRASSMENT AT MISSION VIEJO HOSPITAL

-4-

1    On April 10, 2000, Scott Stanford phoned me while I was in Intensive Care Unit at Mission

2    Viejo Hospital.  I was informed him of the surgery and about how concerned I was

3    considering the fact I was paralyzed.  Mr. Stanford's comments were to the effect,

4    "Considering you put my best truck OOC, how long will you be out?"  He had other

5    comments such as, "so when will you be back to work?"  Mr. Stanford's comments of

6    harassment made a horrific situation into an even more horrible one.  These comments right

7    before major surgery were uncalled for.  He also made comments such as, "why were you in

8    the truck anyway" and "well, where is the work order?"  I found out later that the work order

9    that I was working on at the time of the accident had disappeared while I was in the hospital.

10

11   9.  JALYNN PETERSON'S COERSION

12   On April the 13th 2000, the hospital informed me that I would be discharged to recover at

13   home.  I had made arrangements to be picked up from the hospital.  At about 12:00 p.m. the

14   hospital informed me that the doctor had authorized a walker for my assistance.  Jalynn

15   Peterson, who was the Workman's Compensation Representative on Camp Pendleton, needed

16   to approve the funds for the walker, since it was a take home item.  Ms. Peterson called me in

17   the hospital and informed that she needed an authorization for release of medical information

18   before any such would be released.  I told her that I would sign the document with no

19   problems.  She informed that it was a good thing I was willing to release of information

20   considering I was term employee.  She stated, "You would not want to be fired before

21   leaving the hospital."  Of course I filled out and signed the document.  The nursing staff

22   declared this was the first time they encountered such as ordeal.

23

24   10. JALYNN PETERSON ABUSE OF AUTHORITY

25   Jalynn Peterson abused her authority by forcing me to sign he authorization of release of

26   information (medical) and by forcing me to stay in the hospital an additional night.  Once I

27   signed the document, Ms. Peterson was unavailable for the rest of the evening.  She

28

1  purposely abused her authority in my release and caused additional stress after a major

2  surgery.  This endangered my safety and recovery from the accident.  This additional stress

3  could have been prevented or avoided if Ms. Peterson had not purposely abused her authority

4  as the only individual that could have authorized the funds for the walker and my discharge.

5

6  11. JALYNN PETERSON'S NEGLIGENCE IN THE ARENA OF THE WALKER

7  Ms. Peterson had the authority to authorize the walker when the hospital made the initial

8  phone call to Camp Pendleton.  According to the Workman's Compensation Program on

9  Camp Pendleton, the only information that a representative needs is the emergency room

10  report, ambulance report and police report.  Ms. Peterson was negligent in the release of the

11  walker.  She had the necessary information and showed malice disregard for regulation.  Ms.

12  Peterson received the initial phone call from the Mission Viejo Hospital at about 12 p.m.

13  (noon).  The exchange of the phone calls from the nursing staff to Ms. Peterson lasted for

14  about two hours.  Ms. Peterson then, without the authorization, disappeared for the remainder

15  of the day.

16

17  12. JAYLYNN PETERSON'S NEGLIGENT IN THE RELEASE OF RICHARD
18      RANDALL HEFNER FROM MISSION VIEJO HOSPITAL

19  Ms. Peterson knowingly and willingly became unavailable to the hospital staff on the 13th of

20  April 2000.  After the hospital staff communicated the need for a walker, Ms. Peterson was

21  unavailable to the hospital from the hour of 2:00 p.m. until the rest of the day.  This action

22  cost the United States Government $5,000 for me to stay in the hospital for an additional day.

23  This negligence continued until the next day.  Ms. Peterson made very specific instructions to

24  Felicia Baker that my release must be done with her.  This release was dependent on the sole

25  action of the medial release form being in the possession of Ms. Peterson.  I was released

26  from the Mission Viejo Hospital at 10:00 p.m. on the night of the 14th of April.  Ms. Peterson

27  and the hospital staff knew I had a three hour trip to get home.  This knowledge did nothing

28

1    to make my discharge any quicker or to reduce the amount of stress caused by the

2    circumstances behind my release.

3

4

5    13. JALYNN PETERSON'S BLATANT DISREGARD FOR CAMP PENDLETON
         REGULATION

6

7    Jalynn Peterson phoned my home at about 10:00 a.m. on the morning of the 20th of April

8    2000.  She instructed me that there were few Workman's Compensation documents to be

9    signed.  She asked if she could drive down to my home ANOTHER day at a prearranged

10   time.  I commented that I was recovering from major surgery and we could arrange a time

11   and another day.  About two and a half hours later, exactly the amount of time it takes to get

12   from Camp Pendleton to Borrego Springs (my home).  Ms. Peterson and two safety officers

13   from the base knocked on my door.  They presented pictures of the accident to disturb me.

14   They interrogated me for about two or three hours. During that time, I was told that the

15   interview with the safety officers was confidential and private.  However first of all, Ms.

16   Peterson was present and made no attempt to leave the room.  Second, the information

17   disclosed at that interview according to safety regulations and Camp Pendleton (United

18   States Marine Corp.) policy was private.  Ms. Peterson chose to disclose all of the

19   information at the meeting with various personal on Camp Pendleton.  The most important

20   disregard for regulation was the fact that she even came to my home.  According to the

21   Workman's Compensation Representative Regulations and the Camp Pendleton regulations,

22   the Workman's Compensation Representative is not allowed to conduct or hold an

23   investigation of the incident.  Any investigation is to be conducted by a trained Workman's

24   Compensation Investigator which Ms. Peterson was not.

25

26   14. JALYNN PETERSON'S ATTEMPT TO COERCE ME AT MY HOME

27

28

1    While at my home on the 20th of April 2000, Ms. Peterson gave me another medical release
2    form and asked me to sign it. I was not comfortable with this release form and asked about
3    the first release form, which held up my release from the hospital. She stated that if I wanted
4    to have a job to go back to, I would sign the release form. I again questioned where the
5    initial form was. She commented something to the effect "It would be in everyone's best
6    interest if you would just sign the form." At the advice of several persons at the time, I did
7    not sign the form. She made several comments on this date that my job would not be there
8    upon my recovery if I did not sign the second medical release form
9
10   15. JALYNN PETERSON'S HARASSMENT AT MY HOME
11   While at my home on the 20th of April 2000, Ms. Peterson made several harassing comments.
12   She made comments about where the work order was at the time of the accident. She
13   questioned where the work order was at that moment. These were the same comments that
14   Scott Stanford made on the phone on the 10th of April 2000. Ms. Peterson made several
15   comments about me making up the work order. She suggested that I "took" the keys and had
16   not work order for the job. She also made several comments to the effect that Scott Stanford
17   "NEVER" authorized that job or any other driving job since my employment. She suggested
18   to the safety officers at this meeting that a lock box must be maintained so individuals do not
19   have the opportunity to take the keys to major vehicles and "just drive away." Bear in mind
20   that Scott Stanford and Ms. Peterson have been close personnel friends for ten years. This
21   action was an attack on my character and me just after having major surgery only 10 days
22   earlier. Also my doctors had informed Camp Pendleton and me that I was to have NO stress,
23   so the injury could heal properly.
24
25   16. JALYNN PETERSON'S NEGLIGENCE OF THE INITIAL MEDICAL RELEASE
26       FORM
27
28

-8-

1    Ms. Peterson was so determined about the second medical release form at my home on the

2    afternoon of the 20th of April 2000, because I found out later Ms. Peterson misplaced the first

3    release form.  During a telephone conversation with Ms. Peterson and me, she admitted that

4    she misplaced the first medical release form and needed to have another release form to be

5    added to the records.  I instructed Ms. Peterson that I would sign another medical release

6    form the next time I was at Camp Pendleton, but for medical reasons I would not drive up to

7    the base immediately.  Once again Ms. Peterson instructed me that if I wanted to have a job

8    when I returned to the base, I would get up to Camp Pendleton immediately.

9

10   17. JALYNN PETRSON NEGLIGENCE TO MINIMIZE STRESS FROM THE INJURIED
         PARTY
11

12   Ms. Peterson was instructed from the hospital staff at Mission Viejo Hospital and Dr. Gross'

13   office to eliminate all forms of stress due to the injuries that I sustained in the accident.  Ms.

14   Peterson did everything but that up to this date.  She lost the first medical release form and

15   threatened to have me fired from this job several times.  She showed up at my house with no

16   warning and continued to interrogate me for hours.  She suggested to the safety officers and

17   my family that I deliberately caused this accident.  She called me several times with threats.

18   All of this caused outrageous stress to me.  I was attempting to recover from a broken neck at

19   the time and was bed ridden for weeks.  All of this deliberate stress was a direct reciprocal of

20   the doctor's orders and was blatantly negligent.

21

22   18. JALYNN PETERSON HARRASSMENT WITH SEVERAL PHONE CALLS

23   On April 28, 2000, I was supposing receive a benefit called the "Continuation of Pay (COP)"

24   that pay that pay did not appear on this day.  Considering my family had not received any

25   pay since the 14th of April 2000, these lacks of funds were tragic.  I telephoned Ms. Peterson

26   at 8:30 a.m. to inquire on the status of this pay, considering I had call the previous two days

27   about the same issue.  At 10:40 a.m., I left an additional message. I called several more times

28

1    during the day with no answer. I was told by Suzanne the receptionist that Ms. Peterson was

2    in her office all day. I final got a hold of her at the end of the day. I talked to her about the

3    status of the COP. She said she had not received a note from the doctor. She also stated that

4    if a note had been sent that is must "have been destroyed in the fax machine." She said that

5    with a giggle. As I asked if she had authorized the COP, she stated "no." I asked why not

6    considering I had inquired on this issue for days. She said that all of the information was not

7    in such as the doctor's note, forms, MEDICAL RELEASE FORMS, etc. I was also

8    instructed to enjoy my vacation while I had the time off.

9

10   19. JALYNN PETERSON'S NEGLIGENCE WITH THE COP

11   Ms. Peterson sole task between the time of the accident and the 28th of April 2000 was to

12   insure the COP was placed into effect. She left a note with me the day she visited my home.

13   This note listed two requirements needed to receive the benefit COP. I went to the doctor's

14   office and telephoned him several times to get the requirements. I found out later that the list

15   given to me was incorrect. I also found out that NOW she found the initial medical release

16   form. I found out Ms. Peterson had the initial note from the doctor's office about five days

17   prior to the 28th of April 2000. According to Ms. Peterson "someone must have destroyed it

18   at the fax machine." I told her that I had spoken to the doctor's office and she stated that it

19   was okay and to remember that COP would not be authorized until everything was in order.

20   This contradicts that purpose of the COP considering this is designed to pay until the

21   paperwork is final. I gave Ms. Peterson three notes from the doctor's office including the

22   requirements that she left at my home. According to her, all notes were proper enough for

23   the benefit of the COP.

24

25   20. MS. PETERSON'S NEGLIGENCE ON 4/20/2000 (CA-1)

26   I found out about this time that Ms. Peterson was suppose to have me sign the CA-1 form at

27   my home. I can only assume that since I did not sign the medical release form, I did not

28

receive the opportunity to file a CA-1. She made several comments to me through out this time that if I had been cooperative and signed the second medical release form that the CA-1 would have been easier to submit. This action and statement just shows how negligent Ms. Peterson really is. On April 10, 2000, my work center filed and signed a CA-1 form in my absence. This form was given to Ms. Peterson on the 10th of April. The CA-1 form that Ms. Peterson was mandated to bring to me on the 20th was not delivered. This negligent action caused several more problems in the future.

## 21. JALYNN PETERSON'S NEGLIGENCE ABOUT THE DOCTOR REQUIREMENTS

As I previously stated, Ms. Peterson left a hand written note with the requirements from my doctor's office to continue my pay. I called the doctor's office about the 21st and 22nd of April. I instructed them of the requirements that I needed for the base. They sent Ms. Peterson and me copies of the notes from Dr. Gross. On the 28th, when the pay problems started, I called the doctor's office again for a different requirement dictated by Ms. Peterson. Monica at Dr. Gross' office had told me that they sent that via fax five days earlier. She stated that she knew it was received due to the completed transmission report. I called Ms. Peterson and she stated that someone must have destroyed it at the fax machine. The requirements for the doctor changed so many times that Dr. Gross threatened Ms. Peterson to file a formal complaint with the base against her.

## 22. JALYNN PETERSON'S NEGLIEGNCE WITH THE COP AND OWCP

Once Ms. Peterson had received the several documents from the doctor and the forms from my work center, I had still not received my COP. I have since found out that Ms. Peterson negligence to inform the disbursing department and the OWCP of the accident. This negligence halted the COP, which did not allow the disbursing department to file a pay order. With the proper doctor requirements and the CA-1 being delivered to my residence, my pay

would have continued as mandated in the Workman's Compensation regulations and the Camp Pendleton rules.

## 23. JALYNN PETERSON'S NEGLIGENCE OF THE DOCTOR'S ORDERS

Dr. Gross made it very clear to Ms. Peterson, my nurse, my wife, and I was to be under minimal stress due to the SPINAL CORD INJURY, muscular strain, titanium plate in my neck and the incision area. With the blatant disregard for the procedures mandated by Camp Pendleton and the rules, which mandate all Workman Compensation Representative, this doctor's order was impossible to follow. Ms. Peterson made several comments such as "Enjoy your vacation,""have a nice time off,""if you value your job, you will return quickly." These comments show the blatant negligence and malice demeanor this person has towards the injured.

## 24. JALYNN PETERSON'S NEGLIGENCE IN ANSWERING HER TELEPHONE

Throughout this ordeal with the COP and the injury, I called Ms. Peterson on several occasions. The majority of the occasions I did not receive a phone call back. I had to call the front desk of the Human Resource Office and ask Suzanne if she had seen Ms. Peterson. I was told several times and it was documented several times that I would call Ms. Peterson at her office to no avail. I would call many many times throughout the day with no answer. Suzanne would inform me on more than 10 occasions that Ms. Peterson was a t her desk. This disregard for the injured to hide at a desk and avoid calls from the injured individuals in against the Camp Pendleton rules and the certain code of human ethics is disgraceful. Ms. Peterson knew that she did not do the proper paperwork, did not make the proper calls, did not send the papers to her supervisor and for those reasons was avoiding my calls. This is a blatant act of negligence and a blatant wrongful act.

## 25. JALYNN PETERSON'S NEGLIGENCE IN THE TIMELY SUBMISSION OF THE CA-1

According to the FECA rules, Camp Pendleton's guidelines and the OWCP rules (which she is mandated by), Ms. Peterson had 10 days to submit the CA-1 form to the OWCP. This was not done. This negligence is even documented by Randy York of the OWCP, MSgt Monroe from the Inspector General's Office, Carol Costner from the Human Resource Office, GySgt Flanders from the safety department and Col. Scott Nelson, FMD Officer. The CA-1 form was supposed to be at the OWCP office not later than 10 days from a major traumatic accident or 30 days from a minor accident. This rule is dictated by a document from the head of the Human Resource Office. Ms. Peterson did not follow this rule, and caused several additional problems in the future. When the CA-1 is filed, it is in a sense, informing the OWCP of the injury.

## 26. JALYNN PETERSON'S NEGLIGENCE TO INFORM THE OWCP OF THE ACCIDENT

The CA-1 form is filed to inform the OWCP and the Human Resources Office that an employee has been injured. When Ms. Peterson negligent to file the CA-1 forms, she failed to notify the OWCP of the accident. This is a direct conflict with the rules of the FECA. Ms. Peterson acted in a highly unprofessional manner. This behavior has been shown several times and will continue to demonstrate, Ms. Peterson's negligence towards my recovery was hindered. I was not given the opportunity for a nurse in a timely fashion; I was denied medial treatment for a time and I was receiving calls from the hospital and doctors for payments that I was not responsible for. I was forced to endure all of this additional stress because one person was highly negligent in her functions.

## 27. JALYNN PETERSON'S NEGLIGENCE WITH HOSPITAL BILLS
Since Ms. Peterson was negligent in her other functions, the bills for the medical services were coming to me. The FECA is suppose to handle a;; medical bills; however, since Ms.

1   Peterson did not inform the FECA of the accident, the hospital, doctors, surgeon, medial

2   staff, operating room, hospital room, ambulance rides, MRI, CAT SCAN, x-ray were all

3   calling my house.  The pressure and STRESS from this combined with the no COP was

4   staggering.  Ms. Peterson could have handled the medical bills herself but she chose not to do

5   her prescribed job.

6

7   28. JALYNN PETERSON'S NEGLIGENCE OF A VOLUNTARY STATEMENT

8   Ever since the 20th of April, I was in contact with Ms. Peterson.  She informed me of doctor's

9   notes.  She informed me of rude comments.  She even mocked me a time or two.  Now on the

10  2nd of May, twelve days after I was suppose to get paid and over three weeks since my final

11  paycheck, Ms. Peterson informed me that if I wish to get paid I will produce a voluntary

12  statement for the FECA.  Since my investigation of the FECA and the OWCP, I have yet to

13  find such a requirement. Due to the fact that the food in the house was desperately thin, I

14  agreed to write the statement.  Why didn't I have to write the statement on the 20th of April?

15  Why between the 20th of April and the 2nd of May haven't I heard about this?  Why was my

16  COP held up for a request that is not in the FECA or the OWCP regulations?  Ms. Peterson

17  showed her disregard for procedure and her insistence on creating a more stressful life for the

18  disabled and the injured.

19

20  29. JALYNN PETERSON'S NEGLIGENCE (DENIED MEDICIAL TREATMENT)

21  Ms. Peterson's negligence directly affected my treatment of the 2nd of May 2000.  I drove for

22  three hours to see my neurosurgeon (Dr. Gross).  When I arrived I was instructed to go down

23  to x-ray so the doctor could see the plate in my neck and check to ensure it was healing.  I

24  went down to x-ray and was told that I would have to pay since the Workman's

25  Compensation Representative on Camp Pendleton was unavailable; I was told that the x-ray

26  series would be about $399.  I did not have the funds considering I did not get paid.  I called

27  Ms. Peterson and once again could not reach her.  I went up and talked to the doctor's staff to

28

-14-

no avail. I was instructed that those x-rays were very important and I needed to find a way to get them. I finally called the OWCP and talked to Oscar Ramirez. He informed me that he has NOT received the CA-1 from Ms. Peterson but he DID receive the one I sent. He gave me the OWCP number and I got the x-rays. If I had not done Ms. Peterson's job, I would have been denied medical treatment on the basis of negligence. This was the first visit after the surgery and could have been crucial to the healing of the plate and the spinal cord.

30. JALYNN PETERSON'S WRONGFUL ACT (DENIED MEDICAIL TREATMENT)

The fact that Ms. Peterson chose not to do her job and force me to go through the additional stress of wondering if my doctor would see me was a wrongful act. After a surgery of this magnitude, I was dependent on the opinion of the doctor towards the recovery of my arms and legs. The fact that Ms. Peterson could not be reached and furthermore that she did not have the proper documentation from the visit is wrongful. This malice towards the disabled and the injured is uncalled for. The only thing that Ms. Peterson needed to do was call the OWCP, or the hospital, the doctor's office or even the x-ray center that she knew I needed to go three weeks earlier. This wrongful act was totally avoided by one or two phone calls. She could have even been near her phone around the time of the appointment. This entire situation was wrong.

31. JALYNN PETERSON'S NEGLIGENCE TO AVOID STRESS UP TO MAY 2, 2000

Ms. Peterson had a standing order from the emergency room, the hospital, and my doctor that I could not have any undue stress due to the bone healing together and the delicate nature of the surgery. The acts of May 2, 2000, violated that request. When Ms. Peterson failed to notify the x-ray center, doctor's office or to even be available, she willingly and knowingly caused additional stress on me. Ms. Peterson knew I would not have the money to pay for the x-rays out of packet. She knew I would get denied necessary medical treatment without the

-15-

1    proper payment. With all of this knowledge and knowing the stress this would cause, she

2    still chose not to perform her duties.

3

4    32. TIM NICHOLS' NEGLIGENCE (SUPERVISOR)

5    After the doctor's visit on the 2nd of May, my wife and I stopped by the office of Tim Nichols

6    is the supervisor of Jalynn Peterson. According to the Department of Defense rules for

7    supervisors, supervisors are responsible for the action of their employees. This rule would

8    make Mr. Nichols as negligent as Ms. Peterson for the action or lack of action performed by

9    Ms. Peterson. Ms. Nichols was mode aware of the COP problems and the trouble at the

10   doctor's office that day. I informed him of the CA-1 and the time limit for the filing of the

11   document. Basically I was instructed that if I liked my job when I returned that I would just

12   "roll with the punches". I informed him that he was in direct conflict with the FECA rule that

13   was dispersed by the same office he worked out of. The ending to the meeting was that Mr.

14   Nichols would be looking into the affair.

15

16   33. TIM NICHOLS' NEGLIGENCE (LETTER TO THE DOCTOR)

17   Mr. Nichols' responded from our meeting asking Dr. Gross for another letter. This letter

18   demanded information that was not pertinent according to the OWCP guidelines, which

19   mandated Mr. Nichols actions. The letter in question demands information, which is not

20   necessary to process to claims. The grounds for processing the claim are on the OWCP

21   website. The grounds for processing the claim are on the OWCP website. These few

22   requirements are on the first doctor's report and the emergency room report. Once again the

23   Workman's Compensation Representative was harassing me and the doctor's office. The test

24   results, treatment provided, prognosis (all of this Ms. Peterson had) were not necessary. The

25   doctor's office was calling to ask what was going on. I was trying to smooth things over and

26   to add to the negligence. After the Workman's Compensation Representative had from the

27   7th of April until the 4th of May, why did the doctor only get 10 days? This negligence from

28

the Employee Relations Officer (Mr. Nichols) just increases the level of mistakes and negligence from this office.

## 34. JALYNN PETERSON'S ABUSE OF AUTHORITY (HOLDING PAY)

After the letter was out by Mr. Nichols, I called Ms. Peterson and requested when I would be receiving the COP. She once again giggled and stated that when the doctor "feels" like answering the letter, the COP may be authorized. I explained to her that the food in the refrigerator had run out and I was borrowing money. She explained that maybe I should have not gone to her boss. She hung up on me several times that day.

## 35. TIM NICHOLS' ABUSE OF AUTHORITY (HOLDING PAY)

After I discussed this issue with Ms. Peterson, I called Mr. Nichols. The conversation with Mr. Nichols' went about the same avenue as Ms. Peterson. He kept stating until all the documents were in order that the COP would be authorized I questioned him on CA-1 and the letter was told that if I wanted the COP to happen quickly I would be quiet. Mr. Nichols basically told me that he could hold the COP indefinitely. This was a total abuse of authority and a blatant form of harassment.

## 36. JALYNN PETERSON'S HARASSMENT (LETTER TO STOP COP)

I received a letter for my COP to stop four days after I received the COP. This letter was followed by a phone call to verify that I understood the letter. This was a blatant mocking of the fact I had received my COP but just a few days earlier. Ms. Peterson decided to explain to me that I needed to return to work because the OWCP does not payout that well. She explained to me about the money situation on the OWCP rolls. Immediately, I called my nurse and told her the situation. I was instructed to have NO contact with the Workman's Compensation Representative on Camp Pendleton. The nurse called this blatant attempt to harass an injured employee after living 37 days without pay.

-17-

1

2    **37. JALYNN PETERSON'S WRONGFUL ACT (LETTER TO STOP COP)**

3    Ms. Peterson chose to call an employee who had not been paid on 37 days. She explained

4    the employee might want to return to work while recovering from a broken neck because the

5    pay on OWCP rolls was not pleasant. The act of the letter was wrong enough considering

6    she just authorized the COP. But the additional call was uncalled for. The fact that the letter

7    was sent out just after the payment was authorized was harassing and wrong. The additional

8    phone conversation was unspeakable.

9

10   **38. JALYNN PETERSON'S NEGLIGENCE (LOST CA-7's)**

11   Over the next four months, I sent in the CA-7 forms that I received from the OWCP nurse.

12   These forms continued my pay with the OWCP. These forms needed to be signed by the

13   Workman's Compensation Representative and returned to the OWCP. I sent in about 30 of

14   these forms. I was told at least twice a month that the forms were misplaced. I was also

15   required to turn in leave forms to Scott Stanford. The forms were sent certified mail.

16   According to Scott Stanford, he personally hand delivered the forms to Ms. Peterson and

17   again they were misplaced. I received comments like "someone lost them" at her desk. Her

18   negligence to return a document affected my pay several times. This is exactly what she

19   warned me about with the letter informing of the stoppage of my COP.

20

21   **39. INJURY TO LEFT SHOULDER**

22

23   Throughout the time from the initial injury to the time I first saw Dr. Maywood, I was having

24   trouble with my left shoulder. I was told by Dr. Maywood that an injury can come up due to

25   the degrees of the injury. In other words, when the neck began to heal, my brain told me that

26   the shoulder was hurt. After cortisone shots, it was determined that surgery would be needed

27   on my shoulder. He shaved the bone spurs and cleaned the inside of the shoulder. He

28   attempted to repair the muscle in the back. He attempted to repair the muscle in the back.

-18-

1   He was forced to remove the majority of the cartilage in my shoulder. He also corrected a

2   problem with the tendons, which connects the range of motion in that shoulder. The

3   muscular pain in the back is still present not to mention the muscular damage in the shoulder

4   where the neck is connected. This injury and surgery have given me a permanent disability

5   in my shoulder and the left arm.

6

7   40. JALYNN PETERSON'S NEGLIGENCE WITH DOCUMENTATION

8   Jalynn Peterson would continually lose or misplace documentation such as the necessary

9   leave papers to complete the Workman's Compensation Package. Her negligence in this area

10  was demonstrated approximately four times. I would mail Ms. Peterson leave papers via

11  certified mail. A few days after receiving the green card from the post office with a signature

12  on it, Ms. Peterson called and told me she could not find the papers. "They must be lost," she

13  would say. This delay in the proper documentation once again delayed my pay from being

14  processed. This negligence is in direct conflict with the guidelines set forth by the Human

15  resource Office and the OWCP.

16

17  41. SCOTT STANFORD NEGLIGENCE WITH DOCUMENTATION

18  Scott Stanford would continually lose or misplace documentation such as the necessary leave

19  papers for the Workman's Compensation Office and the Human Resources Office. His

20  negligence in this arena was demonstrated several times. I would mail Mr. Stanford leave

21  papers via certified mail. Several times Mr. Stanford could not locate the proper leave or pay

22  paperwork in a timely fashion. I would receive comments to the effect of, "See what could

23  happen, don't ruffle the feathers, just go with the flow and shut up." This negligence is in

24  direct conflict with the guidelines set forth by the Human Resource Office and the Rules and

25  regulations of supervisors on Camp Pendleton.

26

27  42. CAMP PENDLETON'S NEGLIGENCE IN THEIR OWN REGULATIONS

28

-19-

I received a letter dated 6 October 2000.  The letter was from the Inspector General's office on Camp Pendleton.  The letter stated, "How sorry I am about your husband's accident and the major disruption, stress, and the terrible inconvenience."  The base recognizes the undue stress placed on me by Jalynn Peterson and Scott Stanford.  The letter goes on to say that the Inspector General has "looked into the issues of supervisory oversight and the control.  The Base Inspector General and the Major General Hanlon (the CO on the base) have recognized and acknowledged the supervisory oversights on Mr. Stanford and Mr. Nichols.

43. SCOTT STANFORD'S COERSION TO FORCE ME TO DRIVE PUMPER TRUCKS

"Please rest assured that upon your husband's return to work, he will not be asked to drive the Ford dominator, not will anyone else who is not properly trained and licensed to do so."  This is a direct quote from the Inspector General's letter dated 6 October 2000.  In November of the same year, Scott Stanford instructed me to ride and drive the pumper truck.  He then asked if I was refusing to do my job.  I stated "No", but I did have a problem.  Not only is this a direct violation in the letter previously mentioned, but also is still not in my job description.  Additionally, as of this date, I had not received the proper training from the base safety office or the base licensing office.  Mr. Stanford interrogated me to find out if I was refusing to follow this order.  When I refused to ride or drive ion the pumper truck on that day, my employment was threatened several times and I was sent to the base doctor for a psychological evaluation.  This was a total violation of supervisor orders, base orders, the order in the letter from the IG and a violation of my job description.

44. SCOTT STANFORD COERSION TO FIRE ME FOR NOT RIDING IN PUMPER
      TRUCKS

Mr. Stanford asked me if I was refusing to drive in the pumper truck.  I stated that I had a problem.  He told me to go to the base doctor.  This action followed by the verbal threat to have me removed from the base if I was not willing to get into the pumper truck. I asked very

1   frankly if this was an attempt to fire me. He stated that I should take it as I see it. I was then

2   sent to the base doctor for a psychological evaluation.

3

4   **45. TIM NICHOLS HARASSMENT ABOUT THE POST TRUMATIC STRESS**
        **DISORDER**
5

6   I went to the base doctor for the psychological evaluation. I was told by the base doctor that I

7   probably had/have a post traumatic stress disorder. This disorder would make it hard maybe

8   impossible to do the same tasks again due to the psychological difficulties. The base doctor

9   (Dr. Sullivan) called Tim Nichols at his office and asked what the coursed of action would be

10  recommended. Mr. Nichols stated that this disorder was fictional and the employee was too

11  lazy to perform the duties. I was then instructed to go to Mr. Nichols office for further

12  explanation about administrative action for failing to follow an order.

13

14  **46. TIM NICHOLS COERSION TO TERMINATE**

15  I went to the office of Mr. Nichols after the discussion with the base doctor for a

16  psychological evaluation. The doctor told me at the doctor's office as he was discussing the

17  situation with Mr. Nichols on the phone. The Human Resources office told me that if I did

18  not get an independent evaluation that administrative action would be done against me. I

19  asked exactly what administrative action would consist of. I was instructed that

20  administrative action meant immediate termination. I questioned once again about the

21  termination. Mr. Nichols made it very clear that immediate termination was exactly what it

22  sounded like.

23

24  **47. SCOTT STANFORD'S BLATANT NEGLIGENCE WITH THE THEFT OF**
        **PERSONAL TOOLS.**
25

26  When I was injured all of my personal tools were in the back of a fellow employee's work

27  truck. When I returned I inquired of the whereabouts of the tools, Mr. Stanford told me that

28  the tools were never left in the building. This comment made me think about the building

1    and the tools. I then asked the employee (Lawrence Payne) about the tools considering the

2    tools were in the back of his truck. Mr. Payne told me that in April he and another employee

3    were instructed to place the tools in the closet. Mr. Stanford being the supervisor was

4    responsible for that closet and the contents. When I returned to work in October the tools

5    were gone. Mr. Stanford harassed me continually about the tools when I would go to the job

6    site. Comments like, "how are you going to do the job without any tools?" this harassment

7    went on for months.

8

9    48. SCOTT STANFORD'S HARRASSMENT AND COERSION

10   I went to work at camp Pendleton with the understanding that the work center should not be

11   hostile or offensive. Everyday that I was at work with Mr. Stanford as my supervisor was

12   hostile and offensive. "When I get rid of your dumb ass how will you fed your children?"

13   were comments that I lived with daily. I would live with the threat to be terminated on a

14   constant basis. I repeated these comments to Mr. Stanford's boss, Mr. Stepani. I was told on

15   several occasions, with witnesses, that if I valued anything such as this job, the food for my

16   family's mouth, or money, I would stop talking and just "bite the bullet." These comments

17   wet on for months.

18

19   49. CAMP PENDLETON'S COERSION FOR THE EXTENSION

20   I requested an extension for the period of time that I lost when I was injured. When I turn in

21   the request, Mr. Stanford instructed me to just leave on the date I was supposing to. I was

22   told that things could get a lot worse if I insisted on pushing this. I turned in the request and

23   after receiving several bad comments from Mr. Stanford and the majority of the command. I

24   received a letter from Mr. Hird. This letter dictated the request was inappropriate. I went to

25   see Mr. Hird to find out why the request was inappropriate. I was told this time I contacted

26   Duncan Hunter's office, within a week the extension was approved. During that week, I

27   received malice comments like, "how does it feel to have a job, uh you won't know in a

28

-22-

week." Other comments would be "your ass is hanging in the wind, you are mooning people, you are not doing things right, you are not doing anything right, you are such a piece of shit!"

## 50. MS. PETERSON'S NEGLIGENCE OF THE RE-INJURY

I was working on a piece of machinery when I re-injured my shoulder and the back region. I contacted Ms. Peterson and inquired on what steps to perform so this injury would be covered. She stated that I needed to file an additional CA-1. As a Workman's Compensation Representative for the base, Ms. Peterson should have known that the CA-1 was only for new injuries. By having me file that paper the medical attention for my shoulder was held up again. I was not allowed to receive proper medical attention until the OWCP had a number. The proper paper to file was the CA-2B "Re-Injury Documentation" Once again her negligence in the ability to perform her job cost me valuable time at the doctor's office. It also caused additional pain and suffering for the time I was not allowed to receive medical care.

## 51. SCOTT STANFORD'S HARASSMENT ABOUT THE RE-INJURY

When I was re-injured, on Camp Pendleton, Scott Stanford was my direct supervisor at the time. When I told him of the injury I receive a bombardment of insultive comments and threats. He also instructed me to file the wrong paperwork, which cost me valuable time and money. His harassment continued every time I needed to go to the doctor's office.

## 52. SCOTT STANFORD HARRASSMENT IN THE MONTH OF MARCH

I was scheduled to be terminated on the 19th of March. As the month of March progressed I received comments everyday form Mr. Stanford. These comments ranged form "How are you going to eat without a job, how will your kids eat?" Or comments like "what are you doing for work next week, oh the disabled pipefitter may have a hard time finding a job." These comments were continued until the 17th of March when I received an email

transmission stating that my extension would be granted until August. From the 1st to the

17th of March was a living hell at work.

### 53. JALYNN PETERSON CONTINUED HARASSMENT IN THE MONTH OF MARCH

I would call Ms. Peterson continually to find out what I could do not to be terminated on the

19th of March. I would receive a lot of comments to the effect of "We are finally getting rid

of you and there is nothing you can do about it." "Oh, did you request a conference with the

Director of the Human Resources Office? I must have forgotten to tell her." She stated on

more then one occasion. She continued to ask me if I had found a job considering I was hurt.

These comments were totally unprofessional and inappropriate.

### 54. SCOTT STANFORD'S HARRASSMENT WITH THE EXTENSION

I received the word that the extension was approved and that I could stay on the base for

another six months. As soon as I received the copy of the email, Mr. Stanford went ballistic.

He threw papers and made several inappropriate comments in front of fellow co workers. He

insulted me and badgered me in the presence of my coworkers. His next action was to pick

up the phone and call the supervisor of the dump. He explained to Ray Brengarth that my

services were lacking, I was worthless and I needed to be transferred. This was after I

worked for Mr. Stanford on light duty in the office for five months. I was immediately

transferred to the base landfill division. Mr. Stanford also told my Union steward and various

others that the "sent the shit to the dump."

### 55. SCOTT STANFORD COERCION WITH THE TRANSFER TO THE DUMP

Scott Stanford came to the 43-area landfill and asked me how I enjoyed my job now that I

opened my mouth. He made it clear that if I continued to discuss the negligence and

unfairness with the officials of the base that I would no longer be employed. "I moved you

here and I can certainly move you to the other side of the gate," was just one of the

comments. Mr. Stanford would come to the dump and blatantly harass me to the point that the landfill supervisor was forced to ask him to leave on several occasions. Scott Stanford and Lou Stephani also called Ray Brengarth and discussed how worthless I was. The fact that Scott Stanford and Mr. Stephani called the manager of the landfills shows the harassment and coercion that I suffered on a regular basis.

## 56. CAMP PENDLETON WAS NEGLIGENT IN THE RECOVERY OF PERSONAL TOOLS

In December, I was instructed that if I wanted to get my tools back I would need to go to the PMO office and file a complaint. I went to the PMO office and got laughed at about the crime that happened over six months ago. I talked to Special Agent Salazar from the NCIS, who went down to the FMD building and talked to Ron Henry who was the temporary supervisor at the time. After some time Lou Stephani talked to the Special Agent. It was determined that I would receive the tools within six weeks, that never happened. I complained to the Inspector General's office and the PMO office. Nothing was done and I hold the command responsible for the failure of control their employees. This violates the supervisory code that is laid out in the federal guidelines.

## 57. TIM NICHOLS AND MS. PETERONS COERCION AT THE LANDFILL

Mr. Nichols and Ms. Peterson came to the landfill occasionally and asked if I enjoyed the light duty duties that were chosen for me. Ms. Peterson came to the landfill on several occasions with the remarks hat she happened to lose certain documents and asked if I could make certain phone calls. I was also moved from one location at the landfill to another location because I was making many phone calls to certain people on certain base officials. Mr. Nichols' instructed me that if I wanted to still be employed on Camp Pendleton or even have the benefits from the OWCP that I was entitled to that I would stop making the phone calls to the base officials.

**58. SCOTT STANFORD AND LOU STEPHANI COERCION IN MARCH**

After trying for several months, I had been told that I would be able to discuss the issues on the base with the Commanding Officer of the Base, Major General Hanlon. Scott Stanford, in front of Lou Stephani, told me that if I continued this action and wanted to see the Commanding Officer so bad, he would personally ensure that I would have this job or any other federal employment for the rest of my life. Mr. Stephani's only comment at the time was to just watch my back and watch my actions.

**59. JALYNN PETERSON'S NEGLIGENCE TOWARDS THE COMPENSATION**

I was attending doctor's appointments a great deal. I was told that I had to use my own leave time to go to the doctor. This is a violation of the FECA rules. I asked what I would do if I did not have any more leave time. She instructed me that I would have to go on a leave without pay status. Her comments were to the effect that if it were so important to me to go on a leave without pay status. Her comments were to the effect that if it were so important to me to go to the doctor then it would be okay not to get paid. I went to the doctor several times and did not receive any compensation for the time I was receiving medical treatment. I got comments like how are feeding yourself and your family if you are at the doctor's. This harassment and constant bombardment made me address this issue with the OWCP and the base Inspector's office.

**60. SCOTT STANFORD'S NEGLGIGENCE TOWARDS THE COMPENSATION**

I was attending doctor's appointments a great deal. I was told that I had to use my own leave time to go to the doctor. This is a violation of the FECA rules. I asked what I would do if I did not have any more leave time. She instructed me that I would have to go on a leave without pay status. His comments were to the effect that if it were so important to me to go on a leave without pay status. His comments were to the effect that if it were so important to

-26-

me to go to the doctor then it would be okay not to get paid. I went to the doctor several times and did not receive any compensation for the time I was receiving medical treatment. I got comments like how are feeding yourself and your family if you are at the doctor's. This harassment and constant bombardment made me address this issue with the OWCP and the base Inspector's office. Mr. Stanford increased the negligence by not filling out the bank of my time card in an appropriate fashion. This negligence allowed payroll to hold my checks until the corrections were made. This happened several times.

61. JALYNN PETERSON HARRASSMENT IN THE ARENA OF COMPENSATION

Ms. Peterson knew that my pay was directly inversely affected by the amount of time I spent in the doctor's office. I was questioned about the welfare of my family if I was at the doctor's office where was the money coming from the rent. I was also harassed to the point that Ms. Peterson being the base Workman's Compensation Specialist for the base would know of the buy back policy and never informed me. She also knew that with the CA-7 form I would be able to receive benefits for the time I was at the doctor's. With all of this knowledge, I was never informed of the benefits while attending medical appointments. I was told in a later meeting that this must have been a misunderstanding or she must have "forgot".

62. SCOTT STANFORD'S HARRASSMENT IN THE ARENA OF COMPENSATION

Not only did Mr. Stanford fail accurately document time cards, he was informed by Tim Nichols and Ms. Peterson of the pay policy for injured employees. Also Mr. Stanford had been injured in the past and had gone through the same procedure. The fact that the command instructed him on the policies and the he failed to do them is harassment. The comments that were administered were a form of harassment. The ongoing comments were a blatant form of harassment. At another meeting, Mr. Stanford admitted that he knew the policies and procedures of the FECA and the OWCP but failed to inform me.

63. COLONEL SCOTT NELSON NEGLIGENCE AS A SUPERVISOR

Colonel Nelson admitted to me and Phil Nelson that he knew of the order to work outside the
job description. He also stated that Scott Stanford's comments and actions could not be
approved of. He could not approve of it due to the fact I was operating outside of my job
description and especially because I was operating a heavy vehicle without the base being
notified through the proper channels. According to the rules of supervisory in the federal
arena, the supervisor is just as responsible as the individual that committed the act. So
Colonel Nelson was negligent in the fact that he knew I was breaking the safety rules without
the proper training by direct of order of Scott Stanford an he is responsible due to the fact he
had first hand knowledge that Mr. Stanford broke the rules of the base and endangered lives
on a regular basis.


64. SCOTT STANFORD COERCION WITH THE COMPENSATION INFORMATION

Scott Stanford on several occasions told me that if I wanted to have my time cards logged
correct I would stop trying to talk to the base Inspector general of the Pacific Fleet. I was
told several times that I did not know whom I was messing with. I was asked about my
financial status and if I needed anything from him. Or if he could help as long as I would
shut up and go away. "I bet life would be easier with a full paycheck," would be told to me
several times. Scott Stanford attempted to disrupt my financial status to save his won butt for
the wrongs in which he committed. He threatened my pay and my job when I confronted
him or went to his supervisor.


65. JALYNN PETERSON COERCION WITH THE COMPENSATION INFORMATION

Ms. Peterson would come to my work and tell me if I did not want any more pay "accidents"
that I would just deal with the present situation. I would just avoid the doctor and go to
work. I was instructed by Ms. Peterson that she accidently negligent to inform me of
information that would have avoided pay problems. I was instructed at this meeting from

Ms. Peterson that if I wanted "what little job" I had would stop complaining and live with the fact that she controls the pay and the hours and the location that I work. That sounded like at the time and does now sound like coercion.

## 66. TIM NICHOL'S COERCION WITH COMPENSATION INFORMATION

At a meeting with Mr. Stanford, Ray Brengarth, Ms. Peterson, Mr. Nichols and Mr. Hird, I was instructed by Mr. Nichols that I needed to stop "airing out people's mistakes." I was told that me performance evaluations would be directly affected by the way I voiced my opinion in the way the Human Resource Office performed their tasks. Mr. Nichols also instructed me that if I fail to overlook certain shortcomings of individuals that my life on Camp Pendleton could get more miserable. The negative vibrations and comments of this meeting lead Mr. Brengarth to make comments to me after the meeting. These comments were to the effect of "don't let them bother you."

## 67. TIM NICHOLS BLATANT NEGLIGENCE OF THE JOB OFFER

On the morning of June 27, Tim Nichols and Jalynn Peterson presented me with a job offer with the sole intention that after ninety days I would be terminated. This job offer is in direct violation of the permanent and stationery reports from my doctors. There were tasks in this offer that I could not do such as carry an eighteen valve over my head, using a suicide saw, and working on scaffolding. I explained to Mr. Nichols that I had vertigo and could not work on scaffolds. The comments were made that is I wanted to save my job I would sign the paper accepting this job. This job offer presented to me was for a pipefitter position. It states very specifically on the permanent and stationery report given by Dr. Maywood on April 5, 2001 that I was unable to conduct any pipefitting duties. As a supervisor, Mr. Nichols was fully aware of all of my limitation. He chose to give me a job offer in some else's name.

## 68. JALYNN PETERSON'S NEGLGIENCE OF THE JOB OFFER

At the meeting that Ms. Peterson attended the offer was presented to me, Ms. Peterson made several comments like, "well if you try hard enough, I'm sure you could do the job." The fact that Ms. Peterson presented the offer shows her blatant negligence in her performance of her job. If Ms. Peterson was unable to read the limitations of the doctor's and present an offer within the limitations. Then how did she perform all her other tasks with professionalism and honesty?

## 69. TIM NICHOLS HARASSMENT WITH THE JOB OFFER

Mr. Nichols presented me with the job offer on June 27th. This offer was with the understanding that after I signed the offer I would be fired after ninety days. This stipulation was determined between the OWCP, Ms. Peterson and Tim Nichols prior to him presenting me with the offer. Mr. Nichols made several comments in this meeting to the fact I was not really hurt and I could perform the tasks asked if I tried hard enough. I was also told that he had tried to get rid of me for a long time and this offer was the way. I questioned about the ninety days and my future. "You don't have one!" was his only comments. Tim Nichols presented me with a letter of rescinding the offer the next day. He admitted in the letter that he did not follow medical regulations and policy and this job was inappropriate. This proves that Mr. Nichols only presented the job as a form of harassment and coercion.

## 70. JALYNN PETERSON' S HARASSMENT WITH THE JOB OFFER

Ms. Peterson presented me with a job offer on June 27th. This offer was with the understanding that after I signed the offer I would be fired after ninety days. This stipulation was determined between the OWCP, Ms. Peterson and Tim Nichols prior to him presenting me with the offer. Ms. Peterson stated in the meeting that if I tried hard enough that I could perform the tasks in the job description even though they violated the medical reports. This proves that Ms. Peterson only presented the job as a form of harassment and coercion.

70. CAROL COSTNER'S NEGLIGENCE AS A SUPERVISOR

Mr. Nichols presented me with a job offer with Carol Costner's signature on it. I found out late that Ms. Costner was not fully aware of the tasks in the offer. As Human Resources Director it was her job to know the job, job description, and medical requirements before offering an employee with the disability a position.

71. TIM NICHOLS NEGLIGENCE AND VIOLATION 10-DAY RULE

Mr. Nichols violated the 10-day rule from the Human Resources office when he failed to ensure his employee did not file the CA-1 form within 10 days of the accident. The policy dictates that the command must be file the CA-1 form to the OWCP within ten days of the accident. Mr. Nichols fails to ensure this task was done.

72. JALYNN PETERSON'S NEGLIGENCE AND VIOLATION OF THE 10-DAY RULE

Ms. Peterson violated the 10-day rule from the Human Resource Office when she failed to file the CA-1 form within 10 days of the accident. The policy dictates that the command must file the CA-1 form to the OWCP within ten days of th4e accident. Ms. Peterson not only failed to perform this task but several others. The 10-day requirement was the exact day that Ms. Peterson was at my home. When she failed to perform this simple task, which is set out in the OWCP, FECA, and the HRO rules, a whirlwind of other tragedies occurred. This blatant negligence of the simple rules this whole evolution.

73. CAROL COSTNER NEGLIGENCE AS THE HUMAN RESOURCE DIRECTOR

Ms. Costner set forth a rule to be followed. This rule was the exact same as the OWCP and the FECA. Ms. Peterson or Mr. Nichols did not follow the rule. According to the supervisory guidelines the supervisor is responsible for the actions of the employees under him/her. As a supervisor, she is responsible for the failures of Mr. Nichols and Ms. Peterson.

**74. TIM NICHOLS HARRASSMENT AS FAR AS THE SCHEDULE AWARD**

Mr. Nichols was fully aware of the employment requirements when the DOL called him to verify employment. Mr. Nichols told the DOL that I was gainfully employed until the month of October. This was untrue. Mr. Nichols was preparing to fire me on the 25th of September. His harassment continued when he ensured me of employment past September. He verbally harassed, emotionally harassed me, and psychologically harassed me by guaranteeing employment and the withdrawing it at will.

**75. TIM NICHOLS' COERCION AT THE TIME OF THE SCHEDULE AWARD**

Mr. Nichols told Charlene Leary from the OWCP that I had employment until the 25th of October, which was blatant lie. The following day after I received my schedule award I received a letter from Mr. Nichols stating that I would be terminated on the 25th of August. Mr. Nichols knew (because I told him) that the money from the schedule awards had been used and I needed the employment. His comments were that he controlled my life, my pay, and my TERMINATION. He told me that I was powerless and I was fired. As I tried to fight for employment, I was again by money, food for my family and security.

**76. TIM NICHOLS WRONGFUL ACT AND FALSIFYING RECORDS**

Mr. Nichols knowingly and willingly lied to the OWCP. When Charlene Leary called and confirmed employment, he told her that I was employed through the time of the schedule award. This was a blatant and willful false statement. In falsifying this record, he ensured that I would have no option to stay at the current job. This act of falsifying government records was not only wrongful but also illegal.

**77. SCOTT STANFORD FALSIFIED RECORDS TO THE SAFETY DEPARTMENT**

Scott Stanford reported to the base safety department and all the supervisors on Camp Pendleton that he NEVER authorized me to drive ANY heavy vehicle in the time I was

employed. This is a blatant lie as the work orders show Scott Stanford's initials on the corners of many completed work order in which I drove heavy vehicles. These initials not only show that Scott Stanford knew about the jobs but authorized the jobs. I had 15 driving jobs prior to the day of the accident. Mr. Stanford also knew that I had an out of state license and had not been to the base safety and licensing departments.

78. SCOTT STANFORD FALSIFING INFORMATION ABOUT THE WORK ORDER

Scott Stanford made several reports that he did not know where the work order came from. As a matter of fact the work order was missing. This is untrue. I have a document that states according to Mr. Stanford the work orders are placed in the worker's box for the next day. This example of falsifying has had a lot of psychological effects over the past two years. Mr. Stanford knew where the work orders were kept and how each employee received them. He lied to the PMO, JAG and safety to cover the fact I had not been properly trained for the task at hand.

79. MS. PETERSON'S NEGLIGENCE IN MEDICAL COVERAGE

When I fell and hit the back of my head, I was taken to the hospital by my wife. I was asked by the OWCP to cover the medical bills for the emergency room stay. I was instructed to go through Ms. Peterson. Ms. Peterson declared that she could not understand the relationship between my post concussive disorder, which has a main symptom of vertigo, and the fact I got dizzy and fell. She refused to process the claim for the fact of this misunderstanding. Her job is not to understand the medical problems. According to her job description, her job is filing the appropriate paperwork so the injured worker may get the medical treatment. This was not done.

80. TIM NICHOLS FALSIFIED INFORMATION TO THE OWCP

1    I took off for a period of time under the family leave act. My wife was having a baby and I

2    had all the documentation for a hazardous delivery. I informed the OWCP that I would be

3    out for two to three weeks. I informed Mr. Nichols and Ms. Peterson of the same

4    information. Mr. Nichols called the OWCP and informed Mr. Ramirez (claims adjuster), Ms.

5    Leary (supervisor) and Mr. Payne (manager) that I would be out of employment for a

6    minimum of twelve weeks. This action was done to stop the schedule award from coming at

7    this time. This action was wrong and the information given to a government official was

8    truly false. It was due to these actions that the OWCP placed me on an ineligible status for

9    an award.

10

11    81. INJURY TO THE BACK

12    According to the MRI reports and the massive amount of pain in my back, I have a few

13    bulging discs down my spine. The FECA does not cover for compensation for the back,

14    brain and heart injuries. The discs cause me continuous pain and suffering everyday. The

15    MRI reports show the discs and their status. In addition, I will always suffer from the

16    multileveled degenerative disc disease in the spine. Once again, this injury is not covered.

17

18    82. INJURY TO THE BRAIN

19    According to the MRI report and Dr. Bakst, I have permanent brain damage form the impact

20    of my head on the window of the truck. The FECA does not cover the brain or any damage

21    to the brain in a compensation fashion. The MRI report and the doctor's notes show the area

22    of the brain that is damaged from this accident.

23

24    83. INJURY TO OTHER VERTEBRAE IN THE SPINE

25    According to the MRI reports there are several other vertebrae with problem due to the fact

26    that a plate is screwed into the other vertebrae. The C-4 is missing a piece of the vertebrae

27    and the rest of the spine is suffering from the additional stain from the plate in the neck. The

28

MRI report is the documentation for these injures that are not covered for compensation by the FECA.

84. COMPENSATION FOR PAIN AND SUFFERING

According to the FECA, the federal government's insurance company (the OWCP) does not cover compensate for pain and suffering. The massive injuries and the pain that I endure everyday is not cover for compensation from the OWCP. Due to the federal statue then the only other recourse is this suit.

85. TIM NICHOLS VIOATES WHISTLEBLOWING POLICY

On May 3rd, 2000, I had a meeting with Mr. Nichols to discuss the unfair actions of Ms. Peterson and the negligence of his workers. I was told that I was being a troublemaker and needed to stop with the accusations because of the CA-1 was filed. That statement was false. I was told that if I wanted my old job back I would stop causing problems. The fact of the matter is I went to Mr. Nichols for assistance and received disciplinary actions for informing him of the discrepancies in the performance of his workers.

86. TIM NICHOLS COERCION OF EMPLOYMENT

I wrote a letter to the Naval Safety Center to ask for answers to our questions. The email was returned to the Major General of Camp Pendleton and filtered back to Mr. Nichols office. When I call to inquire about returning to work in October, I was told I would not have a job if I continued to write letters. He was threatening my employment for whistle blowing which is in direct violation of federal statue.

87. TIM NICHOLS' WHISTLE BLOWING VIOLATION

In November, Mr. Nichols told me that if I valued my term and needed an extension or to be hired on permanent that I should stop telling accusations and just receive benefits as they are given. This was the third time they Mr. Nichols threatened my employment or me.

88. SCOTT STANFORD AND TIM NICHOLS' COERCION OF EMPLOYMENT

On January 31, 2001, I re-injured my back and shoulder. I was told that I could not perform the duties described in my job description that I would be terminated. When I commented about my injures and the highly likelihood of me never being able to perform the tasks as prescribed.    Mr. Stanford told me to stop complaining and go to work or I was out. I went to Tim Nichols and inquired over what course to take. I was told to stop complaining about people and go to work before administrative actions were conducted and I did not have a job to go to.

89. OWCP REFUSAL TO PROVIDE MEDICAL TREATMENT FOR ONGOING BACK
    ISSUES

A series of doctors to include Dr. Bakst, Dr. Robert Maywood and Dr. Sam Maywood have provided the information through progress reports, permanent and stationary reports and evidence to the Department of Labor that additional medical treatment would be needed for thoracic spine. Upon the recommendation from the primary physician in this case (Dr. Robert Maywood), I went to see a specialist for the continuous thoracic spine issues. I went to see Dr. Sam Maywood who recommended spinal epidurals for the disc and spinal damage. The proper documentation was submitted to the Department of Labor. This proper documentation was replied by refusal letter for the necessary treatment. This letter is in direct conflict with the aforementioned injures. The Department of Labor is responsible for the injures that were sustained on April 7, 2000. This refusal to is only another way to demonstrate the continued harassment to the injured by the Department of Labor and the representative within.

90. RESPONSIBILITY OF THE DEPARTMENT OF LABOR

The Department of Labor and Elaine Chao as the acting director are responsible for the lack of sufficient coverage in regards to injured employees within the employment of the United States Government. According to the federal statue which dictates that the Department of Labor is responsible for the management and execution of the FECA. This inability in coverage for necessary parts of the body including the head, back and heart is not only a disgrace but an insult to all injured federal employees. The Secretary of Labor has knowingly and willingly eliminated the options for the injured federal employees to receive compensation for head, back and heart trauma.

91. NEGLIGIENCE OF BEHALF OF THE SECRETARY OF LABOR (Elaine Chao)

The Secretary of Labor is responsible for the actions of the employees that work for the Department of Labor. The employees for Ms. Peterson, Mr. Nichols work in direct connection with the rules and guidelines of the Department of Labor. Ms. Chao is responsible for the actions of these employees according to the federal statues. I have written to Elaine Chao (Secretary of Labor) with the concerns of the negligence. These letters for attention to actions were disregarded and shuffled to representatives for action. These representatives included Andrew Tharp and the Appellate Board who continued in the act of coercion and abuse of authority. Elaine Chao is responsible for the lack of responsibility accepted from the Department of Labor in consideration of injured which include head, neck, brain, back and heart.

92. RESPONSIBILITY OF THE PRESIDENT OF THE UNITED STATES OF AMERICA

The United States of America president George W. Bush appointed this secretary of labor in 2001. This action made the President of the United States of America the direct supervisor of the Secretary of Labor. According to the federal statues, the direct supervisor of ANY

1   federal employee is as responsible for the actions of the employee.  The President of the

2   United States of America is responsible for the actions and negligence of all federal

3   employees including Mr. Nichols, Ms. Peterson, Mr. Stanford, Ms. Chao and the Department

4   of Labor failures.

5

6   93. PRESENTATION OF THE ISSUE TO CONGRESS

7   One of my demands for resolution of this case is for me to present to Congress the

8   negligence of the FECA.  All of the federal employees have the right and the need to be

9   aware of the lack of coverage.  The FECA does not cover for the head, back and heart issues

10  of the federal employees.  This would include all and any federal employee issues due to

11  stress of the employment, accident, trauma or any and all other issues.  This failure to cover

12  the head, back and heart issues for all federal employees under the OWCP\FECA in

13  compensation purposes needs to convey to federal employees for the protection of the federal

14  employee.

15

16  94. CONCLUSION FOR SCOTT STANFORD

17  Mr. Scott Stanford violated several federal statues.  He violated the statue that states

18  employees should be in a safe not hostile work environment.  With Mr. Stanford's negligence,

19  omission of information and wrongful acts, he violated 28 USC 1346 (b).  His massive

20  amounts of coercion were a direct violation of 5 USC 6101 and 6132.  Mr. Stanford

21  knowingly and willingly violated several federal statues and as 28 USC 1346 (b) and 10 USC

22  2733 state that the federal government is as liable as a private party is when the employee

23  was acting in the scope of their employment.

24

25  95. CONCLUSION FOR JALYNN PETERSON

26  Ms. Jalynn Peterson violated several federal statues.  She violated the statue that states

27  employees should be in a safe not hostile work environment. With Ms. Peterson's negligence,

28

1    omission of information, wrongful acts, and blatant disregard for policies and procedures, she

2    violated 28 USC 1346 (b).  Her massive amounts of coercion were a direct violation of 5

3    USC 6101 and 6132.  Ms. Peterson knowingly and willingly violated several federal statues

4    and as 28 USC 1346 (b) and 10 USC 2733 state that the federal government is as liable as a

5    private party is when the employee is acting in the scope of their employment.

6

7    96. CONCLUSION FOR TIM NICHOLS

8    Mr. Nichols violated many supervisor rules set out by the Department of Defense in the S.C.

9    rules and procedures.  His disregard for policies and procedures created an unsafe working

10   environment.  His threats and coercion on the twelve attempted terminations were a direct

11   violation of 5 USC 6101 and 6132.  Mr. Nichols violated 28 USC 1346 (b) with his

12   negligence as a supervisor and his omission of information.  He again violated 5 USC 6101

13   and 6132 with his abuse of authority in regards to pay problems and hold ups.  With the

14   emotional damage and discord that I endured, Mr. Nichols falls directly into 10 USC 2733.

15

16   97. CONCLUSION FOR ELAINE CHAO (Secretary of Labor for the United States of
        America)
17

18   Ms.Chao violated many supervisor rules set out by the Department of Defense in the S.C.

19   rules and procedures.  Her disregard for policies and procedures created an unsafe working

20   environment.  Her threats and coercion on the twelve attempted terminations were a direct

21   violation of 5 USC 6101 and 6132.  Ms. Chao violated 28 USC 1346 (b) with his negligence

22   as a supervisor and his omission of information.  He again violated 5 USC 6101 and 6132

23   with his abuse of authority in regards to pay problems and hold ups.  With the emotional

24   damage and discord that I endured, Ms. Chao falls directly into 10 USC 2733.

25

26   98. CONCLUSION FOR GEORGE W. BUSH (President of the United States of America)

27

28

1    The President of the United States of America is responsible for all of the actions of all

2    federal employees according to the federal statues.  The FECA and the OWCP along with

3    federal statues obligate federal employees to use the FECA as the United States of America's

4    Workman's Compensation Insurance program.  However under the guidelines of the federal

5    statues, the employee must use the FECA.  The FECA does not cover the head, back and

6    brain.  The federal government is as responsible as a private party if the OWCP does not

7    cover the injuries.  The President of United States as the Commander in Chief and the "CEO"

8    of the Executive branch of the government is responsible for the actions whether negligent or

9    not of the federal employees.  The President of the United States acting as a supervisor is

10   responsible under the federal statues as a private party.

11

12   99. CONCLUSION FOR MONETARY COMPENSATION DUE TO THE INJURES

13   My injuries have been traumatic and never will be eliminated.  Due to the action of a few

14   individuals, I will always have a plate in my neck, bulging discs down my spine, multilevel

15   degenerative disc disease and live without the feeling in fifty percent of my legs.  I have also

16   not mentioned the extreme pain and suffering from the above injures.  My shoulder was

17   covered for disability, but not covered for the pain and suffering of the injury.  For the above

18   reasons and from some advice from individuals, I am demanding monetary compensation.

19   These injured could have been avoided.  Since the above individuals acted in the scope of

20   their employment at the time of the injury that puts the liability on the shoulders of the

21   federal government, according to the federal statues (28 USC 1346 (b), 10 USC 2733 and

22   Feres v. U.S. (1950).

23

24   100.       CONCULSION FOR MONETARY COMPENSATION FOR ALL OTHER
25            ACTIONS.

26   According to federal statue 5 USC 6101 and 6132, it is illegal to coerce an individual.

27   According to federal statue 28 USC 1346 (b), a federal employee may not be negligent, omit

28

-40-

1    information, conduct wrongful acts, or violate safety procedures, the above individuals did

2    all of those actions.  Mr. Stanford's actions were a direct violation of all of the incidences.  A

3    memo was sent out by the FMD officer stating that facts were vey clear "Weekly safety

4    meetings, departmental safety stand-down, safety training classes, in house and OSHA

5    inspections and countless dollars spent on safety equipment has not effectively improved the

6    awareness of our personnel concerning safety practices."  He goes on to say "supervisors are

7    reminded of their responsibility to perform their duties in a safe manner and help eliminate

8    accidents and health hazards."  For all of the above reasons, for the emotional abuse, the lack

9    of enjoyment of life, mental anguish, the blatant disregard to safety, and the coercive actions,

10    the verbal abuse and bombardment, I am demanding monetary compensation.  The sum will

11    be generated from the reading of the federal tort guidelines, training procedures and the

12    safety guidelines.  This sum will be generated by the research into all the broken safety

13    violations, which caused an emotional disturbance.

14

15                                         Respectfully Submitted,

16

17                                         Richard R. Hefner

18                                         Pro Se

19

20

21                         Index of Exhibits (in numerical order)

22    Exhibit 1 – Position Description for Pipefitter

23    Exhibit 2 – Notification of Personnel Action for Pipefitter

24    Exhibit 3 – 8 – Job Description for Pipefitter Position

25    Exhibit 9 – 29 – List of Previous Driving Jobs for Scott Stanford

26    Exhibit 30 – 34 – Pictures of the Accident

27    Exhibit 35 – Picture in the Camp Pendleton Scout

28

                                         -41-

1    Exhibit 36 – Request for Record from the PMO

2    Exhibit 37 – Preliminary Traffic Accident Report

3    Exhibit 38 – 41 – Request for Records from Others

4    Exhibit 42 – Record of Photographs from the Accident

5    Exhibit 43 – 50 – Accident Report

6    Exhibit 51 – Authorization for and Consent for Surgery

7    Exhibit 52 – Consent to Blood Component Therapy

8    Exhibit 53 – Blood Donor Services

9    Exhibit 54 – Release of Medical Information for Doctor's Note

10    Exhibit 55 – OWCP Evidence of the Claim

11    Exhibit 56 – Release of Information for Jalynn Peterson at My Home

12    Exhibit 57 – Note by Jalynn Peterson Left at My Home

13    Exhibit 58 – pay Stub Showing Pay for Leave Not COP

14    Exhibit 59 – Claim Processing for the OWCP

15    Exhibit 60 – COP Requirements for the CA-1 Time Line

16    Exhibit 61 – Official OWCP Submit Claim for COP

17    Exhibit 62 – 65 – CA – 1 faxed to OWCP from Richard Hefner

18    Exhibit 66 – Letter By Doctor Gross for COP

19    Exhibit 67 – Request for the Nurse from the OWCP

20    Exhibit 68 – Request from Kilcher Rehabilitation

21    Exhibit 69 – Pay Stub of Typical Pay Period

22    Exhibit 70 – 71 – Letter from Jalynn  Peterson- Stopping the COP

23    Exhibit 72 – 75 – Letter to Colonel Leif Larsen

24    Exhibit 76 – 77 Letter to Larry Describing the Incident

25    Exhibit 78 – 80 Report of Operation from Doctor Gross

26    Exhibit 81 – 82- Letter from the Inspector General of Camp Pendleton

27    Exhibit 83 – Licensing Requirements for Camp Pendleton

28

1    Exhibit 84 – 85 – Neurological Surgery Report

2    Exhibit 86 – Fear of Riding in Pumper Trucks Medical Report

3    Exhibit 87 -88 – Request for the Extension of the Term

4    Exhibit 89 – 94 – Complaint with the Union

5    Exhibit 95 – Limited Liability for New Injury (Done Improperly)

6    Exhibit 96 – Extension of Term in Email

7    Exhibit 97 – Safety Notice to Eliminate Accidents

8    Exhibit 98 – 100 – Bakst Permanent and Stationary Report

9    Exhibit 101 – 107 – Doctor Maywood Permanent and Stationary Report

10    Exhibit 108 – Invalid Job Offer

11    Exhibit 109 – Doctor Maywood Portion of the Permanent and Stationary Report which Makes

12    the Job Offer Invalid

13    Exhibit 110 – Position Description for the Invalid Job

14    Exhibit 111 – 116 – Invalid Job Offer Description

15    Exhibit 117 – Rescinded Job Offer Letter

16    Exhibit 118 – RMG of the Thoracic Spine on 8/8/01

17    Exhibit 119 – RMG of the Lumbar Spine

18    Exhibit 120 – 121 - RMG Cervical Spine

19    Exhibit 122 – FECA Time Submission of Claim

20    Exhibit 123 – 125 – Memo of Conference 6/14/01

21    Exhibit 126 – Memo of Conference 6/26/01

22    Exhibit 127 – Expiration of Term of Appointment

23    Exhibit 128 – Invalid Job Offer Notification of Personnel Action

24    Exhibit 129 – Letter from C. Leary for Lump Sum Payment

25    Exhibit 130 – Scout Picture

26    Exhibit 131 – 136 Doctor Gross Notes

27    Exhibit 137 – 138 – Doctor Gross Permanent and Stationary Report

28

1   Exhibit 139 – 142 – Doctor Gross Notes

2   Exhibit 143 – Letter from Doctor Gross

3   Exhibit 144 – Vehicle Accident Report Description

4   Exhibit 144a – Back of Vehicle Report Description

5   Exhibit 145 – Email Stating Where I Got Service Order

6   Exhibit 146 – Email Stating Mr. Stanford Put Assignments in Box on Thursday

7   Exhibit 147 – 148 – Paragraph 7  1) Location of Where Next Day Work Order Was

8   Exhibit 149 – CA -1 Sent By Jalynn Peterson (Late)

9   Exhibit 150 – Picture Given to Me by Jalynn Peterson

10  Exhibit 151 – Statement from Witness

11  Exhibit 152 – 154 – CA-7 Form Sent to Jalynn Peterson

12  Exhibit 155 – Stanford CA – 7

13  Exhibit 156 – CA – 7 Sent From Richard Hefner

14  Exhibit 157 – Notice of Traumatic Injury by Jalynn Peterson on 20 April (Late)

15  Exhibit 158 – 163 – Doctor Gross Notes

16  Exhibit 164 – Confirmation of Hospital Stay

17  Exhibit 165 – Letter Tim Nichols to Doctor Gross

18  Exhibit 166 – Leave Pay Stub Given to Me by Jalynn Peterson

19  Exhibit 167 – Letter from Randy York Confirming I Sent the CA – 1 Form

20  Exhibit 168 – 169 – Doctor's Portion of CA -1 from Richard Hefner to Randy York

21  Exhibit 170 – Head Injury Emergency Room Visit to SHARPS Hospital

22  Exhibit 171 – 172 - Memo of Conference Informing Me of the Job Offer Which was Invalid

23  according to the OWCP

24  Exhibit 173 – 174 – Memo of Conference with Invalid Job Offer

25  Exhibit 175 – Paperwork for Invalid Job Offer

26  Exhibit 176 – 177 – Letter from Jennifer Hefner (doctor about out of work)

27  Exhibit 178 – Letter from C. Leary showing Tim Nichols falsified papers

28

1  Exhibit 179 – Letter from Tim Nichols to Department of Labor Stating 25 August

2  Exhibit 180 – Action of Termination

3  Exhibit 181 – 206 – Progress Notes From D.G. Kilcher

4  186 – Post Concussive Symptoms

5  199 – Living in a Tent

6  202 – Riding in Pumper Truck

7  Exhibit 207 – MRI Lumbar Spine

8  Exhibit 208 – MRI Pelvis

9  Exhibit 209 – MRI Lumbar

10  Exhibit 210 – MRI Cervical

11  Exhibit 211 – X-Ray Chest

12  Exhibit 212 – CT Scan of Abdomen and Pelvis

13  Exhibit 213 – CT of Brain

14  Exhibit 214 – CT Cervical

15  Exhibit 215 – 217 – Report of Consultation for Neurosurgical Emergency

16  Exhibit 218 – RAD of the Chest

17  Exhibit 219 – 220 Thoracic Injury Documented in Scan Dated 4/8/00

18  Exhibit 221 – 224 – Report of the Operation

19  Exhibit 225 – RAD Chest

20  Exhibit 226 – Pathology Report

21  Exhibit 227 – 242 – Progress Reports in the Hospital

22  Exhibit 243 – Letter from Dr. Gross

23  Exhibit 244 – Follow-up Reports from Doctor Gross

24  Exhibit 245 – 246 – Follow-up Report to Jalynn Peterson

25  Exhibit 247 – Post Operative Report

26  Exhibit 248 – 249 – Follow-up Reports to Oscar Ramirez

27  Exhibit 250 – Work Report Form Doctor Gross

28

1    Exhibit 251 – 260 – Follow-up Reports

2    Exhibit 261 – 268 – Initial Orthopedic Exam (thoracic included)

3    Exhibit 269 – MRI of the Left Shoulder

4    Exhibit 270 – 271 – Interim Report from Doctor Maywood

5    Exhibit 272 – 300 – Maywood Reports

6    Exhibit 301 – 303 – Bakst Reports

7    Exhibit 304 – 305 – MRI of the Brain

8    Exhibit 306 – Bakst Revisit Report

9    Exhibit 307 – 309 Permanent and Stationary Report from Doctor Bakst

10   Exhibit 310 – Letter from Roger Atkins

11   Exhibit 311 – Additional MRI Done of the Thoracic Spine

12   Exhibit 312 – Refusal Letter from the Department of Labor for Medical Treatment of the

13   Thoracic Spine

14

15   AND NOT OTHERS

16

17

18                                        Respectfully Submitted,

19

20                                        Richard Randall Hefner

21                                        Pro Se

22                                        Plaintiff

23

24

25

26

27

28

# POSITION DESCRIPTION (Please read Instructions on the Back)

Document 1

| 1. Agency Position No. | JD#6889-0890 |

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
| Redescription ☐ New ☐ | Hdqtrs. ☐ Field ☐ | FAC MAINT DIVISION | CAMP PENDLETON, CA | |
| Reestablishment ☐ Other ☒ | | | | |

Explanation (Show any positions replaced)

WORK CENTER CHANGE DUE TO T/O CHANGE APPROVED 11FEB97 LN1388

| 7. Fair Labor Standards Act | Exempt ☐ Nonexempt ☒ |
| 8. Financial Statements Required | Executive Personnel Financial Disclosure ☐ Employment and Financial Interests ☐ |
| 9. Subject to IA Action | Yes ☒ No ☐ |
| 10. Position Status | Competitive ☒ Excepted (Specify in Remarks) ☐ SES (Gen.) ☐ SES (CR) ☐ |
| 11. Position is: | Supervisory ☐ Managerial ☐ Neither ☒ |
| 12. Sensitivity | 1-Non-Sensitive ☒ 2-Noncritical Sensitive ☐ 3-Critical Sensitive ☐ 4-Special Sensitive ☐ |
| 13. Competitive Level Code | 0F00 |
| 14. Agency Use | |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | PIPEFITTER | WG | 4204 | 10 | GTJ | 10-10-97 |
| e. Recommended by Supervisor or Initiating Office | PIPEFITTER | WG | 4204 | 10 | | |

16. Organizational Title of Position (if different from official title)

17. Name of Employee (if vacant, specify)

| 18. Department, Agency, or Establishment | c. Third Subdivision |
| AC/S FACILITIES | WATER & ELECTRICAL DISTRIBUTION SECTION |
| a. First Subdivision | d. Fourth Subdivision |
| FACILITIES MAINTENANCE DIVISION | PREVENTIVE MAINTENANCE UNIT |
| b. Second Subdivision | e. Fifth Subdivision |
| UTILITIES BRANCH | |

19. Employee Review-This is an accurate description of the major duties and responsibilities of my position.

Signature of Employee (optional)

20. Supervisory Certification. I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

a. Typed Name and Title of Immediate Supervisor

MICHAEL E. ELLISON, DEPUTY FAC MAINT OFFICER
Signature *Michael E. Ellison*  Date 4-7-97

b. Typed Name and Title of Higher-Level Supervisor or Manager (optional)

ROBERT L. HIRD, FACILITIES RESOURCE MANAGER
Signature  Date 4-7-97

21. Classification/Job Grading Certification. I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.

Typed Name and Title of Official Taking Action

RICHARD D. CRAWFORD
EMPLOYMENT/CLASSIFICATION OFFICER
Signature  Date 10-10-97

22. Position Classification Standards Used in Classifying/Grading Position

Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee (optional) | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks

EVALUATION BROUGHT FORWARD

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date Of Birth | 4. Effective Date |
|---|---|---|---|
| HEFNER RICHARD R | 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 | 07-01-70 | 02-28-00 |

| FIRST ACTION | | | SECOND ACTION | |
|---|---|---|---|---|
| 5-A. Code | 5-B. Nature Of Action | | 6-A. Code | 6-B. Nature of Action |
| 108 | TERM APPT NTE 03-24-01 | | | |
| 5-C. Code | 5-D. Legal Authority | | 6-C. Code | 6-D. Legal Authority |
| BWA | DD-NV-135-HRSC-SW | OPM DELEGATION AGR | | |
| 5-E. Code | 5-F. Legal Authority | | 6-E. Code | 6-F. Legal Authority |
| | DEA-222-99, MCB-02, CERT 3 | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | PIPEFITTER |
| | PK08900005 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | WG | 4204 | 10 | 01 | $16.12 | PH |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | $16.12 | $ 0 | $16.12 | $ 0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | AC OF S FACILITIES |
| | FACILITIES MAINTENANCE DIVISION |
| | UTILITIES BRANCH |
| | WATER & ELEC DIST SEC/PREV MAINT UNIT |
| | MCB CAMP PENDLETON CA 92055 |

| EMPLOYEE DATA | | | | | |
|---|---|---|---|---|---|
| 23. Veterans Preference | 1 - None  3 - 10-Point/Disability  5 - 10-Point/Other | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
| 2 | 2 - 5-Point  4 - 10-Point/Compensable  6 - 10-Point/Compensable/30% | 3 | 0 - None  2 - Conditional / 1 - Permanent  3 - Indefinite | | X YES | NO |
| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
| C0 | BASIC ONLY | 9 | NOT APPLICABLE | 0 |
| 30. Retirement Plan | | 31. Service Comp. Date(Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
| K | FERS AND FICA | 06-13-91 | F | FULL TIME | |

| POSITION DATA | | | | |
|---|---|---|---|---|
| 34. Position Occupied | 1 - Competitive Service  3 - SES General | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
| 1 | 2 - Excepted Service  4 - SES Career Reserved | N | E - Exempt / N - Nonexempt | | 0850 |
| 38. Duty Station Code | 39. Duty Station (City-County-State or Overseas Location) | | CAMP PENDLETON |
| 06-0543-073 | SAN DIEGO     CA | | |

| 40. Agency Data | 41. UIC: 00681 | 42. ORG CODE: 6889 | 43. COST CNTR: 68896E | 44. PAYROLL OFF ID: DE  LOC ID: |
|---|---|---|---|---|

**45. Remarks**

EMPLOYEE IS AUTOMATICALLY COVERED UNDER FERS.

CONDITIONS OF EMPLOYMENT STATEMENT DATED 01-18-00

OPF MAINTAINED BY: HRSC-SW, 525 B STREET, SUITE 600, CODE 517,

SAN DIEGO, CA 92101-4418.

THIS ACTION MAY BE TERMINATED AT ANY TIME PRIOR TO THE NOT-TO-EXCEED

DATE SHOWN.

SERVICING HRO: MCCHROW, BOX 555026, CAMP PENDLETON,

CAMP PENDLETON, CA 92055-5026.

APPOINTMENT IS SUBJECT TO COMPLETION OF ONE YEAR TRIAL PERIOD BEGINNING

02-28-00.

SELECTED FROM DEA-222-99, MCB-02, CERT#3 DATED 12-16-99.

APPOINTMENT AFFIDAVIT EXECUTED 02-28-00.

REMARKS CONTINUED ON NEXT PAGE

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPT OF THE NAVY | Electronically Signed |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | Valdez, Norma |
| NV27 | 2414 | 02-24-00  JMM | Supvy Personnel Management Specialist |

## PIPEFITTER, WG-4204-10

### A.    INTRODUCTION

This position is located in the Utilities Branch, Maintenance & Repair/Utilities Division, Facilities Maintenance Department.  The purpose of the position is the installation, replacement, and report of building plumbing, water mans, service lines, gas mains and laterals, sewage mains and laterals, various heating and steam processing equipment, gas (natural and propane) hot air furnaces, space heaters, wall heaters, overhead heating units, boilers, hot water tanks with emphasis on component equipment such as gas burners, pilots, igniters, thermostat controls, automatic controls and gas driers and gas vaporizing units.

### B.    TYPICAL WORK PERFORMED

1.  The work involves the maintenance, repair and replacement of existing piping.

Building piping consists of all the plumbing normally installed within a building, such as all types of plumbing fixtures, galley equipment, medical and dental equipment. Approximately 25% of the time is devoted to this type of work.

Utilities pipefitting consists of all outside utilities such as water main distribution lines, pumping plants, automatic valves, water treatment plants, training tanks, sewage mains and laterals, sewage disposal plants, sewage effluent purification, water storage reservoirs, and gas lines.  Approximately 25% is devoted to this type of work.

2.  The journeyman pipefitter plans, lays out and requisitions materials for completion of the proposed job.

He/She lays out drainage pipe and fittings at job site (i.e. soil pipe - DWV, polyvinyl chloride (PVC)), determines depth and grade of soil and waste lines and route openings, cuts soil drainage vent pipe to proper lengths and connects to pipe fittings using no-hub couplings, installs piping in trench to proper grade, backfills trench to ground level, extends vent pipes 5 feet above floor level, installs test plugs in piping, fills system with water and inspects system for leaks.

He/She installs plumbing fixtures when building is in the finished stage (i.e. water closet, urinals, lavatories, service sink, water coolers, shower fixtures, floor drains, laundry tray, floor sink, hot water heaters, dental equipment, X-ray developers and film processing units), connects water supply to fixture, and tests fixtures for proper operation.

He/She modifies, repairs or replaces piping in all types of buildings using different piping materials (i.e. black iron, galvanized, copper, cast iron, polyvinyl chloride).

He/She performs preventive maintenance on the piping and fixtures mentioned in the preceding paragraphs by repairing or replacing items worn out in service (i.e. faucet washers

with seats, supply tubing, angle stops, flushometer valves, ballcocks, tankballs, lift wires, shower valves, pressure regulators, and other related valves).

He/She clears stoppages in the drainage piping systems by using a power sewer snake and a rubber force cup.

He/She uses power sewer rodder to clear stoppages and roots from sewer mains, laterals and storm drains. These power rodders are gasoline powered and function through a hydraulic system to operate and control the 1000 feet of continuos rod. The operation required skill to operate properly without causing damage to either the sewer lines or the rod. He/She is also responsible for the maintenance and repair to the rodder and its accessories.

He/She lays out water mains and services as job site (i.e. cast iron, asbestos cement, polyvinyl chloride, chlorinated polether, polypropylene, polyvinyl dichloride, polyethylene, copper, steel, wrought iron, concrete cylinders, and brass pipe). Determines depth and grade of lines and route openings; locations of valves, blow-offs, pressure reliefs, pressure regulators. After mechanical excavation, digs trench to fine grade. Tests with hydrostatic pressure, checks for leakage, superchlorinate, flushes out lines, and places into service. Makes field drawings for records. Lays out gas mains and laterals at job site (i.e. black steel pipe, polyvinyl chloride); determines depth and grade of pipe lines, and route and location of vaporizers, pressure controlling, sectionalizing, and service valves, and regulators. Cuts pipes to lengths and connects to pipe and fittings and equipment using threads and couplings, colvent weld cement, arc welding or acetylen welding; installs piping in trench to proper grade; install all fittings equipment and pressure test pneumatically for leaks. After all leaks are eliminated, backfills trench to ground level, extends valve cans to grade, fills systems with gas and connects to buildings, laterals and main lines. Then rechecks the new gas system for leaks with a Barton Gastron.

He/She lays out sewer mains and laterals at job sites (i.e. vitrified clay pipe, terra cotta clay pipe, asbestos cement, cast iron, polyvinyl chloride). Determines depth and grade of lines, location of manholes and laterals. Cuts pipe to lengths and connects pipe to fittings using no-hub and flexible couplings, tyton, mechanical, caulk type, fluid tite, and ring tite joints. and solvent weld; installs piping in trench to proper grade; backfills trench to ground level; installs test plugs in piping and fills system with water and inspects system for leaks.

He/She makes emergency repairs to water, gas and sewer mains, laterals and services; must respond quickly to such emergency jobs to prevent damage to structures, roads, and pipelines; must be able to determine the location of the broken pipes by using Geophone, Detectron, Barton Gastron, probes, blueprints, and field drawings; must be familiar with the other underground utilities, such as telephone and electric, to avoid damage to them during excavation of broken pipe; must determine the necessary assistance required for other trades to make complete repairs, and make arrangements for them; must make such repairs without interruption of the utilities services to buildings in the area, if possible; if this is not possible, he/she must notify the tenants of the building, Base Fire Department, Base Utilities Officer, and his/her supervisor, prior to making the outage; direct the operator of the excavation equipment as to where to dig

and of the existing underground utilities in the immediate area; closely supervises the excavation to avoid damage to the broken pipe; then complete the excavation with a pick and shovel; makes the repairs using redwood plugs, stainless steel and cast steel clamps, flexible cast steel couplings, and epoxy, or, when necessary, by replacing the defective fitting or short length of pipe. Many times he/she required the assistance of excavation equipment operator, welders, laborers, and masonry tradesmen in the completion of the permanent repairs of these systems. The journeyman pipefitter directs the work of these tradesmen. He/She must be extremely cautious at all times of not contaminating the water system, and of not causing an explosion with gas fumes. Must work quickly, with little or no supervision, in order to complete the job in the least possible time.

In the installation of piping and fixtures, employees in this rating determine layout of pipe systems using blueprints, sketches, and following written and oral instructions. This involves establishing locations for systems or sections in relation to walls, passageways, obstructions, tunnels, etc; drilling necessary holes and setting locations of pipe support hangers. Employees cut, bend, thread, and flare pipe according to established layout and specifications using hand tools and power operated pipe cutting and threading machines. Depending upon the type of installation involves, employees work with materials such as half-inch copper tubing used for water, oil and propane lines, up to 8" iron pipe which supports maximum pressures of approximately 340 psi at temperatures up to 412 degrees F. They install pipe hangers, securing them to various surfaces with appropriate drilling tools and hardware. Pipe roll stands and pipe sections are clamped to walls or tunnels with expansion joints to compensate for temperature expansion and contraction. Employees position and align pipe sections and fittings for welding operations as required. System fittings such as strainers, high pressure gauges, by pass and relief valves, steam traps, return lines, condensate tanks, etc, are installed, maintained and repaired. This includes packing and adjustment of various types of valves.

Employees position, secure and connect fixtures such as radiators, hot water heaters, small heating boilers, tanks, steam tables, coffee urns, dishwashing machines to main lines and return systems or to individual boiler installations as appropriate. They install and maintain various hand controlled and automatic devices such as thermostats, temperature and pressure gauges, water level indicators, etc. Employees test installations for leaks and other defects, using hydrostatic water pressure or compressed air.

Employees in this rating also cover steam, hot water heating, oil and gas lines with prefabricated insulation materials, or mix and apply insulating materials to surfaces of hot water tanks, joints, fittings, valves, and other irregular shapes.

Incumbent of this rating will analyze operation of gas equipment (natural or propane), disassemble, make repairs, replace parts, put equipment in operation. employees clean units, replace refractory in fire boxes, check and adjust thermostats. Work involves disassembly, cleaning, parts replacement and reassembly of all gas equipment, automatic safety devices, and regulating controls, also, removing and installing electric motors and burner units. Employee in this rating must be familiar with different types of vaporizers and their repair and replacement.

The work performed on gas fired hot water boilers, low pressure steam boilers, hot air units, hot water tanks, involves installation, repair and maintenance to units and all component parts associated with such units, including ducts, stacks, pumps, gauges, meters, relief valves, etc.

Employees in this category may be required to perform various other tasks such as boiler cleaning, pumping and cleaning oil tanks, cleaning overhead heaters units and tasks assigned to heating repair shop, but will be utilized in this week less than 5% of the time.

## C.    SKILLS AND KNOWLEDGE

Employee working under this classification must be a quality journeyman pipefitter. They also must have knowledge of the following codes:

National Plumbing Code
San Diego County Plumbing Code, including that portion pertaining to natural, liquified and petroleum gas.
National Fire Protection Association, as pertaining to automatic fire protection sprinkler system and controls.
American Water Works Association Standards for Water Systems, Piping and Fittings.
General order No. 112-B, California Public Utilities Commission Standard Code for Gas Pressure Piping and Gas Transmission and Distribution Systems.

A journeyman must have knowledge of shop mathematics, blueprint reading and training in mechanical drawing in order to show location and scope of work he/she has installed or modified and future replacements. Journeyman must have the ability to read and write and understand simple English language and to interpret blueprints, sketches and work from same. He/She must understand and carry out oral instructions, must be able to interpret technical guides for the installation of new or complex equipment.

He/She must have an intense knowledge of the trade, must know and apply necessary codes when installations are made. He/She must have the ability and dexterity to install, maintain and repair piping systems connected to complicated mechanical equipment incidental to the trade such as: dishwashing machines, steam kettles, bakery equipment, medical and dental equipment, large stationary pumping equipment (water and sewage), large pressure reducing stations, backflow preventor, pump pressure control stations, reservoir water level control valves, fire hydrants and fire sprinkler systems.

Employee in this position must have the necessary skill to install and repair large size water mains up to 18" diameter and work with pressure up to 300#psi with all necessary valving, air and vacuum breakers at proper elevations. All above installations are in all types of terrain, such as: river crossings, canyons and etc. Pipefitter must be able to install all types and sizes of sewer lines such as: building waste lines, building laterals, traps, vents, floor drains, large sewer mains up to 18" diameter. He/She must be able to install and repair high pressure gas mains up to 100#psi and must be able to install, repair and adjust large gas regulators.

*Hefner 7*

The journeyman must possess a wide variety of knowledge and skill due to the complexity and diversification of work that is dispersed over a wide expanse equal to ten cities. Each camp is self-contained (water, sewage, gas, plumbing, etc).

He/She must be able to use all tools of the trade: hand tools, power tools, power equipment, pipe machines, portable pumps, sewer rodding machines, emergency chlorination machine.

He/She must be mentally alert at all times, have the ability to use good judgment in planning and laying out work in case of emergencies or injuries, accidents, etc.

Incumbent must possess a valid California state operator's permit and must be able to obtain a U.S. Government operator's permit to operate a truck up to 3 ton.

Employee uses basic arithmetic to measure pipe and tubing. Employee must have trade knowledge of steam space heating, steam processing and hot water heating pipe systems with ability to identify, select and install all fittings, valves, controls, etc. They must be able to use all hand and power trade tools including pipe cutters, benders, threaders, flanges, vises, pipe, strap, crescent, and open end machinists' wrenches, pneumatic star drills, and measuring tools such as steel tapes, folding rules, levels, plumbbobs, and calipers.

Employee in this rating are required to have a wide background of trade experience in repair and installation of gas fired equipment outlined in the introduction above. They must possess a thorough knowledge of many type phases of gas burners, (natural and propane), pipe lines, installation and repair storage tanks maintenance. Must know proper gas equipment to be installed in boilers, heating units, galley equipment, etc.

Employee must be able to use hand and power operated tools of the trade, must have been trained in the installation and repair of low pressure gas and natural gas lines, must be able to repair gas leaks in main line.

## D.   RESPONSIBILITY

The employee is supervised by the Maintenance Supervisor. He/She receives instructions in the form of written, oral, sketches, prints, etc. He/She is responsible for the quantity and quality of work performed. He/She is responsible for the accuracy of work and for adhering to the previously mentioned codes. Often, he/she is on a variety of jobs where no supervision is immediately available due to the wide expanse of the installation. He/She is responsible for the selection of the proper tools and materials to complete the job. When no supervision is available, he/she will make decisions as to layouts, installations, etc. The work is checked while in progress and after completion by his/her supervisor. He/She is responsible for performing the work in a safe manner and adhering to all Safety Regulations. He/She is responsible for all shop tools and equipment assigned to him/her. He/She is required to furnish his/her own tools-of-the-trade as listed by the organization.

### E.    PHYSICAL EFFORT

Incumbent may lift and carry weights of 45 pounds or more for short distances.  Work requires a limited amount of crawling, pulling, pushing, reaching above the shoulders, walking, standing, kneeling, repeated bending, climbing and the ability for rapid mental and muscular coordination simultaneously.  Employee may perform work from ladders and scaffolding at various heights.  Such work required the use of arms and legs in climbing.  Incumbent must have normal vision and hearing with or without corrective devices, depth perception and the ability to distinguish basic colors to differentiate color coded valves, etc.

### F.    WORKING CONDITIONS

Employee works inside and outside with occasional exposure to excessive intermittent noise.  Exposure to dust, asbestos, fumes, gases, cuts, bruises, oils, grease, solvents, slippery or uneven walking surfaces and working around machinery with moving parts/objects or vehicles.  Occasionally works below ground.  Protective equipment such as safety glasses, goggles, gloves, hard hats and tow guards are furnished as required.  Employee works on assigned shifts but is subject to call 24 hours a day, seven days a week.

DOCUMENT 9

# DAILY LABOR SHEET

TUE

1.5

**Date:** 3/21/00

chard R Hofner
nter: 6885
55745748

qV

| # | Facility # | CAC | RON/RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|---|---|---|---|---|---|---|---|---|---|---|
| | 27920 | EJB6 | | LEMB28 | 1.5 | | | ✓ | | |
| | 20861 | EJB0 | | LEMB28 | 1.5 | | | ✓ | | |
| | 51056 | EJB0 | | LEMBR | 6.0 | 4.0 | ED | ✓ | DRIVE JOB ① | |
| | | | | | | | | | | |

Total: 9.0    11.0    Total:

*10*  

WO: 1105051                    **SERVICE TICKET**                    REQ: 51

| ACTIVITY CODE | WORK ORDER NUMBER | BUILDING NUMBER | ISSUE DATE | REQ. CODE | WORK REQUES NUMBEI |
|---|---|---|---|---|---|
| | 1105051 | 51056 | 03/21/2000 | 51 | 51 |

REQUESTER NAME:      SCOTT STANFORD                    (W) PHONE: 0599
REQUESTER ADDRESS:   51056                             (H) PHONE:
JOB ORDER SERIAL:    6EMBRA          *COMPLETE*        COST ACCOUNT CODE: EJCO
WORK TYPE:           EM                                SHOP NUMBER: 6889
EQUIPMENT:                                             PTE:
WORK TO BE                           *COMPLETE*
PERFORMED: PUMP OUT GREASE, NEW LIFT STATION, SAN ONEFRE

## LABOR

WORK
PERFORMED: Pumped Grease, took to sludge Pit at 53
area x 2, Routine maintenance on lems!

| FIRST 3 SSN, LAST NAME, FI | LABOR HOURS | CUSTOMER CHARGES |
|---|---|---|
| 1) 557 Hefner R | 4.0 | |
| 2) 557 Hefner R | 5.0 | |
| 3) | | |
| 4) | | |
| 5) | | |

JOB START DATE: 3/22/00            JOB COMPLETION DATE: 3/22/0

## MATERIALS

| NSN | QTY | TRUCK # | NSN | QTY | TRUCK # |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

REMARKS: _____

//

WED   15

**DAILY LABOR SHEET**

Richard R Hebner
Center: 6889
#: 557457148

Date: 3/22/00

| ler # | Facility # | CAC | RON/ RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|-------|-----------|-----|----------|-------|---------|---------|----------|----------|------------|-------------|
| 26 | 51049 | 20730 | | 66M828 | 4.0 | 2.0 | ED | | ✓ DRIVE JOB | 2 |
| 27 | 51056 | 2300 | | 66M82A | 5.0 | 3.0 | ED | | DRIVE JOB | 1 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

12

# DAILY LABOR SHEET

Richard R Hefova

Center: 6884

#: 557457148

EM 91

Date: 3/10/60

| er # | Facility # | CAC | RON/RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|------|-----------|-----|---------|-------|---------|---------|----------|----------|------------|-------------|
| | 51049 | EJBO | | 6EMALS | 6.0 | | | | | |
| 29 | 17831 | EJBO | | 66MBRA | 2.0 | ✓ | DROVE JOB ② | | | |



WO: 1100766       # SERVICE TICKET       REQ: 51

| ACTIVITY CODE | WORK ORDER NUMBER | BUILDING NUMBER | ISSUE DATE | REQ. CODE | WORK REQUE NUMBE |
|---|---|---|---|---|---|
| | 1100766 | 51049 | 03/06/2000 | 51 | 51 |

REQUESTER NAME:   WOODALL

REQUESTER ADDRESS:   51049

JOB ORDER SERIAL:   6EMBR8

WORK TYPE:   EM

EQUIPMENT:

WORK TO BE PERFORMED:   PUMP WELL

(W) PHONE:   4008

(H) PHONE:

COST ACCOUNT CODE: EJB0

SHOP NUMBER: 6889

PTE:

# COMPLETE
## LABOR

WORK PERFORMED: Pumped well down Panel not working properly King Vac broke on the way to 51049, Dumped King Vac and Fill. Pumped wells and Flushed line.

| FIRST 3 SSN, LAST NAME, FI | LABOR HOURS | CUSTOMER CHARGES |
|---|---|---|
| 1) 557 Hefner R | 6.0 | |
| 2) 557 Hefner R | 6.0 | |
| 3) 557 Hefner R | 4.0 | |
| 4) | | |
| 5) | | |

JOB START DATE: 3/9/00      JOB COMPLETION DATE: 3/22/00

## MATERIALS

| NSN | QTY | TRUCK # | NSN | QTY | TRUCK # |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

REMARKS: _____

_____

14

Richard R Hefure

Center: 6889

#: 55745748

Thur 21

**Date:** 3/9/00

# DAILY LABOR SHEET

| er # | Facility # | CAC | RON/RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|------|-----------|-----|---------|-------|---------|---------|----------|----------|------------|-------------|
| P | 3-AREA | EFAO | | 6EMB16 | 2 | | | | | ☑ |
| P | 61049 | EJBO | | 6EMB28 | 65.5 | 4 | ED | DRIVE JOB | ② | |
| 2 | 13150 | EJBO | | 6EMB28 | 1.5 | 1 | ED | 2.75 | 2.25 EDV | ③ |
| | | | | | | | | DRIVE JOB | ③ | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | **Total:** a Ꭷ | | 5 | | | Ꭷ | | **Total:** |

15 ③

WO: 1102052        # SERVICE TICKET        REQ:

| ACTIVITY CODE | WORK ORDER NUMBER | BUILDING NUMBER | ISSUE DATE | REQ. CODE | WORK REQU NUMB |
|---|---|---|---|---|---|
| | 1102052 | 13150 | 03/10/2000 | | |

REQUESTER NAME:     WILLIAMS        **(W) PHONE:** 763-1840
REQUESTER ADDRESS: 13150        **(H) PHONE:**
JOB ORDER SERIAL:    6EMBR8        **COST ACCOUNT CODE:** EJBQ
WORK TYPE:        EM        **SHOP NUMBER:** 6889
EQUIPMENT:        **PTE:**
WORK TO BE
PERFORMED: MAIN LINE

# COMPLETE

## LABOR

WORK
PERFORMED: *Helped emergency maintenance, clean main sewag-*
*line with hose on camel*

FIRST 3 SSN, LAST NAME, FI        LABOR HOURS        CUSTOMER CHARGES
1) *557 Hefner R*        *4.25*
2)
3)
4)
5)

JOB START DATE: *3/9/00*        JOB COMPLETION DATE: *3/9/0*

## MATERIALS

| NSN | QTY | TRUCK # | NSN | QTY | TRUCK # |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

REMARKS:

16

TUE  15

## DAILY LABOR SHEET

Richard R Hefner

nter: 6889

5574 57148

Date: 3/28/00

| # | Facility # | CAC | RON/ RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 62631 | EJCO | | 65MB2A | 9.0 | 1 | | DAVE JOB | | 5 |
| 6 | 51MS | EFAO | | 6CMB16 | | 30 | | 7.0 | DAVE JOB B | 4 |
| | | | | | | | | | Stanford with input Conf | |
| | | | | | | | | | 3/30 0800 | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

17

mon 15

# DAILY LABOR SHEET

**Date:** 3/27/60

Richard R. Hebun

Center: L889

#: 55745748

| er # | Facility # | CAC | RON/ RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|------|-----------|-----|----------|-------|---------|---------|----------|----------|------------|-------------|
| | | LRHO | | 6EA89 | 2.5 | | | | | |
| | 17831 | ETCO | | 6EM8EA | 1.5 | | | | | |
| 4 | L283l | ETCO | | 6EM8EA | 5.0 | 3.0 | ED | ✓ | DRIVE TO L6 | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | Total: | 9.0 | 3.0 | | | | Total: |



WO: 1108066    # SERVICE TICKET    REQ: EM

| ACTIVITY CODE | WORK ORDER NUMBER | BUILDING NUMBER | ISSUE DATE | REQ. CODE | WORK REQUES NUMBEI |
|---|---|---|---|---|---|
| | 1108066 | 51MS | 03/29/2000 | EM | EM |

REQUESTER NAME:      DERRICK
REQUESTER ADDRESS:   51MS
JOB ORDER SERIAL:    6EMB16
WORK TYPE:           EM
EQUIPMENT:
WORK TO BE
PERFORMED:  CLEAN UP TRANSMISSION OIL THAT WAS SPILL FROM THE
            CAMEL HYDRULIC HOSE.

*COMPLETE*

(W) PHONE:
(H) PHONE:
COST ACCOUNT CODE: EFA0
SHOP NUMBER: 6889P
PTE:

## LABOR

WORK
PERFORMED: _Cleaned up transmission oil_

| FIRST 3 SSN, LAST NAME, FI | LABOR HOURS | CUSTOMER CHARGES |
|---|---|---|
| 1) 557 Hefner R | 2.0 | |
| 2) | | |
| 3) | | |
| 4) | | |
| 5) | | |

JOB START DATE: 3/28/00                    JOB COMPLETION DATE: 3/28/00

## MATERIALS

| NSN | QTY | TRUCK # | NSN | QTY | TRUCK # |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

REMARKS:

*19*

WO: 1106114

# SERVICE TICKET

REQ: 0899A16

| ACTIVITY CODE | WORK ORDER NUMBER | BUILDING NUMBER | ISSUE DATE | REQ. CODE | WORK REQUEST NUMBER |
|---|---|---|---|---|---|
| | 1106114 | 62831 | 03/23/2000 | 08 | 0899A16 |

REQUESTER NAME:     SANDOVAL                    (W) PHONE: 7854
REQUESTER ADDRESS:   62831                       (H) PHONE:
JOB ORDER SERIAL:    6EMBRA                      COST ACCOUNT CODE: EJC0
WORK TYPE:           EM          *COMPLETE*       SHOP NUMBER: 6889P
EQUIPMENT:                                        PTE:
WORK TO BE
PERFORMED: PUMP OUT SLUDGE FROM PRIMARY CLARIFIER

## LABOR

WORK
PERFORMED: *Pumped sludge, King Vac Broke 1/27/00, pumped sludge X3 until Canel had a transmission leak*

| FIRST 3 SSN, LAST NAME, FI | LABOR HOURS | CUSTOMER CHARGES |
|---|---|---|
| 1) *557 Hebner R* | *5.0* | |
| 2) *557 Hebner R* | ~~*H.0*~~ *9.0* | |
| 3) | | |
| 4) | | |
| 5) | | |

JOB START DATE: *3/27/00*            JOB COMPLETION DATE: *3/28/00*

## MATERIALS

| NSN | QTY | TRUCK # | NSN | QTY | TRUCK # |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

REMARKS: _____

_____

Hetner 20

Richard R Hefner
enter: 6887
: SS7457148

**DAILY LABOR SHEET**

Thur

15

Date: 3/30/00

JAR

| r # | Facility # | CAC | RON/RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|-----|-----------|-----|---------|-------|---------|---------|----------|----------|-----------|-------------|
| 5 | | EJAO | | GEMB15 | 3.0 | | | | | |
| 5 | 52831 | EJCO | | GEMBRA | 3.0 | 1.0 | | ✓ | ✓ DRIVE JOB 6 | |
| 6 | 52831 | EJCO | | GEMBRA | 3.0 | 1.0 | | ✓ | ✓ DRIVE JOB 7 | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |



WO: 1107295

# SERVICE TICKET

REQ: 99A168

| ACTIVITY CODE | WORK ORDER NUMBER | BUILDING NUMBER | | ISSUE DATE | REQ. CODE | WORK REQUE NUMBI |
|---|---|---|---|---|---|---|
| | 1107295 | 52831 | | 03/28/2000 | 99 | 99A168 |

REQUESTER NAME:       HOOTS/REID
REQUESTER ADDRESS:   52831
JOB ORDER SERIAL:     6EMBRA
WORK TYPE:            EM
EQUIPMENT:
WORK TO BE
PERFORMED:   CLEAN PUMP FLY LAUG. AT DIVERSION SPLINTER BOX
             BETWEEN SECONDARY CLARIFIERS.

(W) PHONE:  7783
(H) PHONE:
COST ACCOUNT CODE: EJC0
SHOP NUMBER: 6889
PTE:

## COMPLETE

## LABOR

WORK
PERFORMED: *Dumped Section, Dumped, maintanence on Camel*

| FIRST 3 SSN, LAST NAME, FI | LABOR HOURS | CUSTOMER CHARGES |
|---|---|---|
| 1) *557 Hefner R* | *3.0* | |
| 2) | | |
| 3) | | |
| 4) | | |
| 5) | | |

JOB START DATE: *3/30/00*          JOB COMPLETION DATE: *3/30/00*

## MATERIALS

| NSN | QTY | TRUCK # | NSN | QTY | TRUCK # |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

REMARKS: _____



WO: 1107296      # SERVICE TICKET      REQ: 99A1684

| ACTIVITY CODE | WORK ORDER NUMBER | BUILDING NUMBER | | ISSUE DATE | REQ. CODE | WORK REQUES NUMBEF |
|---|---|---|---|---|---|---|
| | 1107296 | 52831 | | 03/28/2000 | 99 | 99A1684 |

REQUESTER NAME:     HOOTS/REID        (W) PHONE: 7783

REQUESTER ADDRESS:   52831             (H) PHONE:

JOB ORDER SERIAL:    6EMBRA            COST ACCOUNT CODE: EJC0

WORK TYPE:        EM      SHOP NUMBER: 6889

EQUIPMENT:            PTE:

## COMPLETE

WORK TO BE PERFORMED: CLEAR GRIT CHANNEL

## LABOR

WORK PERFORMED: *cleared grit, Dumped, maintenance on Camel*

FIRST 3 SSN, LAST NAME, FI      LABOR HOURS      CUSTOMER CHARGES

1) *557 Hefner R*      *3.0*

2) _____

3) _____

4) _____

5) _____

JOB START DATE: *3/30/00*      JOB COMPLETION DATE: *3/30/00*

## MATERIALS

| NSN | QTY | TRUCK # | NSN | QTY | TRUCK # |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

REMARKS: _____

2

SAT  15

Date: 4/1/00

# DAILY LABOR SHEET

Richard R Hefork
Center: 6889
#: 55245 7148

| er # | Facility # | CAC | RON/RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|---|---|---|---|---|---|---|---|---|---|---|
| | 32 SIARCA | EHCO | | CE5091 | | | | 9 | DRIVE JOB | B (8) |
| | | | | | | | | | NO TICKET | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Total:                    Total: 9

TUG

2

# DAILY LABOR SHEET

Richard R. Hefner

Center: 6899

: 557457148

Date: 2/29/00

| r # | Facility # | CAC | RON/RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|-----|-----------|-----|---------|-------|---------|---------|----------|----------|-----------|-------------|
|  | 510049 | EHFO |  | GE 87185 | 2 | ● |  | ✓ | DRUG JOB | Ⓖ NO TICKET |
|  | H2O | EFAO |  | GEMB11 | 4 |  |  |  |  |  |
|  | 53505 | EJLO |  | GEMB2H | 1.5 |  |  | ✓ |  |  |
| 1 | 520420 | EJLO |  | GEMBEH | 1.5 |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |

2ⁿ

# DAILY LABOR SHEET

icAcod R Hobart

nter: 6889

557457148

MBW    Date: 3/30/10

922

| # | Facility # | CAC | RON/RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|---|-----------|-----|---------|-------|---------|---------|----------|----------|------------|-------------|
|   | BASE WIDE | EHP | | 6E7145 | 9.0 | 6.0 | ED | DRIVE JOB | B | ✓ |
|   | | | | | | | | | 10 | |
|   | | | | | | | | | | |
|   | | | | | | | | | | |
|   | | | | | | | | | | |
|   | | | | | | | | | | |
|   | | | | | | | | | | |
|   | | | | | | | | | | |
|   | | | | | | | | | | |
|   | | | | | | | | | | |
|   | | | | | | | | | | |
|   | | | | Total: | 9.0 | 6.0 | Total: | | | |
|   | | | | | | | | | | |

26

# DAILY LABOR SHEET

Richard R Heford

enter: 68889
: 5 5 7 4 5 7 1 4 8

MON 15 21
Date: 5/13/60

| r # | Facility # | CAC | RON/RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|-----|-----------|-----|---------|-------|---------|---------|----------|----------|-----------|-------------|
| 69 | BASE OTDE | Erro | | 6E 7185 | 9.0 | 7.0 | ED | ✓ | DRIVE JOB (11) | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Total: ___    Total:

THUE 21

# DAILY LABOR SHEET

Richard R Hefner

enter: 66885

5574571448

Date: 3/2/00

| # | Facility # | CAC | RON/RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|---|---|---|---|---|---|---|---|---|---|---|
| | 51-84110 | EHFO | | 667185 | 9.0 | 8 | ED | DRICETOB | | D |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | **Total:** | 9.0 | 0.0 | | **Total:** | | |

28

heel R Hefeire
ter: 6909
5745748

Date: 3/4/00  SAT

888

| Facility # | CAC | RON/RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|---|---|---|---|---|---|---|---|---|---|
| 218210 | EJCO | | GEMBRO | 9.0 | 9.0 Reg | | 9.0 | DRIVE JOB | (3) |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | Total: | | | Total: 9.0 | | |

29

# DAILY LABOR SHEET

Richard R. Hefner

enter: 6889

: 5574574148

mo ~

21

Date: 3/6/00

| r # | Facility # | CAC | RON/RBC | Jon # | Reg Hrs | Exc Hrs | Exc Code | O.T. Hrs | Exc OT Hrs | Exc OT Code |
|---|---|---|---|---|---|---|---|---|---|---|
| ~ | | EFAD | | GEMB11 | 4 | | | | | |
| | 618410 | EHFD | | GE7185 | 5 | 2 | 2N | DRIVE JOB | | (14) |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Total:

Document 30





31







32





33



3-4





34 35

# Out of control

## your fire les

**Staff**

efore this
,700 arson
he United.

for setting
high last
as become
teen and
erica.
Protection
hat 55 per-
ted for ar-
of 18, and
dren every
more.
ne-third of
ire set the
untreated,
le fire-set-
ns.
to repeat
rough 7 is
wareness
hild that
t a toy. Ed-
ntion pro-
n prevent-
ting. The
s fire and
rams year-




A sewage truck traveling on Basilone Road overturned across from the 52 Area Landfill April 7. "Apparently the truck's load shifted, causing the driver to lose control of the vehicle," said Chief Frank Blair, incident commander, Camp Pendleton Fire Department. "From that point, the driver was not able to regain control, and the truck struck a tree and rolled." The driver was treated for minor back and shoulder injuries and transported to Mission Trauma Center.

LCpl. Brian J. Griffin

Letter Pendleton Paper

36

**PROVOST MARSHAL'S OFFICE**
**POLICE RECORDS**
**MCB BOX 555007**
**CAMP PENDLETON, CA 92055-5007**

# RECORDS REQUEST

**INSTRUCTIONS:**

1. Please complete all information in black ink, legibly printed, sign and date the request.
2. Some of the contents of the requested report(s) may be edited in compliance with the Privacy Act of 1974, the Freedom of Information Act (FOIA), and orders and directives pertaining to the release of information.
3. Processing of this request may take 7-10 working days. Please contact the Records Clerk at 725-5161 prior to coming in to pick up the requested report. Office hours are Monday through Friday, 0730-1630, closed weekends and holidays.

**REQUESTED INFORMATION:**

Date of Incident: *April 7, 2000*   Time of Incident: *1210*

Location of Incident: *Basilone Rd across from 43 Area*

Type of Incident: *motor vehicle accident*

Requester's Name: *Hefner, Richard*   SSN: *557 45 7148*

Unit/Address: *FMD Shop 89*   Phone #: *725-4008*

Requester's Involvement/Relation to Requested Report(s) [please ~~circle~~ one category]: *circle*

| | | | |
|---|---|---|---|
| Command | Court Official | Suspect | Parent |
| JAG Investigator | Background Invest. | (Victim) | Legal Guardian |
| Legal Counsel | Insurance Co. | Witness | Other (explain below) |
| LE Agency | Rental Agency | Complainant | |

**Information of Person Involved (if different from Requestor):**

Last Name: *Same as above*   First Name: _____   MI: _____

Rank: _____   SSN: _____   Phone #: _____

Unit/Address: _____

I declare, under penalty of perjury, that the information requested information will not be used to harass, degrade or humiliate any person, and that the information will not be released to others. I hereby agree to indemnify and hold harmless the Provost Marshal's Office, Marine Corps Base, Camp Pendleton, and all of its agents for any liability arising from the improper use of the information provided.

Requestor's Signature: *[signature]*   Date of Request: *12/6/00*

**• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •**

## RECORDS OFFICE USE ONLY:

Processed By: _____   CCN: *1617*   Release Date: _____

Information Released:

☐ Full Report (non-redacted)   ☐ Statement of Witness (only)   ☐ Other (explain below)
☐ Full Report (redacted)   ☐ Statement of Suspect (only)

CERTIFIED

00M33122012804

## PRELIMINARY TRAFFIC ACCIDENT REPORT
MARINE CORPS BASE CAMP PENDLETON

000401    01617

CASE CONTROL NUMBER
147-1181-00

| DATE OF ACCIDENT | | | TIME (Use 2400 Hours) | DAY OF ACCIDENT | TYPE OF ACCIDENT | AREA |
|---|---|---|---|---|---|---|
| YR 2000 | MO 04 | DAY 07 | 1210 | Friday | GOV-SOLO / PI X I / PD-MAJOR | 43 Are |

**Location**

| MARINE CORPS BASE | ROAD OR STREET ON WHICH ACCIDENT OCCURRED | NAME AND LOCATION OF BASE, CITY, STATE, ETC. |
|---|---|---|
| ☒ ON ☐ OFF | Basilone Rd | MCB Camp Pendleton, CA 92055 |

| AT INTER-SECTION | NAME OF INTERSECTING STREET N/A | NOT AT INTER-SECTION | NAME OF NEAREST INTERSECTING ST, HIGHWAY, OR OTHER PERMANENT IDENTIFYING LANDMARK 43 Area Land fill access Rd | NO. OF FEET 150 | DIRECTION east |

**Vehicle 1**

| USN REGISTRATION OR LICENSE NO. | MAKE | YEAR | BODY TYPE |
|---|---|---|---|
| GSA / MC291465 | Ford | 99 | Semi |

| MARKINGS/DECAL NO. None | VEHICLE COLOR White | ☐ PRIVATELY OWNED ☒ GOVERNMENT |
|---|---|---|

| REGISTERED OWNER OR SPONSOR |
|---|
| U.S. Government |

| ADDRESS OF OWNER OR SPONSOR |
|---|
| Facilities Maintenance Division, Camp Pendleton, CA 92055 |

**Vehicle 2**

| USN REGISTRATION OR LICENSE NO. | MAKE | YEAR | BODY TYPE |
|---|---|---|---|
| | | | |

| MARKINGS/DECAL NO. | VEHICLE COLOR | ☐ PRIVATELY OWN ☐ GOVERNM |
|---|---|---|

| REGISTERED OWNER OR SPONSOR |
|---|
| |

| ADDRESS OF OWNER OR SPONSOR |
|---|
| |

**Driver 1**

| NAME (Last, First, M.I.) AND ADDRESS | | SSN |
|---|---|---|
| HEFNER, Richard R.    WG-10 | | 557457148 |
| Facilities Maintenance Division | AGE 29 | SEX ☒ MALE ☐ FEMALE |
| Camp Pendleton, CA 92055 | | |

| DRIVER'S LICENSE/PERMIT NUMBER T62116014 | STATE VA |
|---|---|

| LIMITATION OF LICENSE/PERMIT ☐ YES (Specify) ☒ NO | DRIVING EXPER-IENCE (Years) 13 years |
|---|---|

| NAME AND POLICY NO. OF INSURANCE COMPANY |
|---|
| Self insured: U.S. Government |

| RACE W | HT 68 | WT 190 | EYES Blue | HAIR Blonde | DOB 700701 |
|---|---|---|---|---|---|

**Driver 2**

| NAME (Last, First, M.I.) AND ADDRESS | | SSN |
|---|---|---|
| | AGE | SEX ☐ ☐ FEMA |

| DRIVER'S LICENSE/PERMIT NUMBER | STATE |
|---|---|

| LIMITATION OF LICENSE/PERMIT ☐ YES (Specify) ☐ NO | DRIVING EX-IENCE (Year |
|---|---|

| NAME AND POLICY NO. OF INSURANCE COMPANY |
|---|
| |

| RACE | HT | WT | EYES | HAIR | DOB |
|---|---|---|---|---|---|

**DAMAGED VEHICLE NO. 1**

| SEVERITY OF DAMAGE TO VEHICLE |
|---|
| ☒ MAJOR ☐ MINOR |
| ☐ MODERATE ☐ NONE |

DISPOSITION towed by
Base Motor Transportation

| SEAT BELTS |
|---|
| ☒ IN USE ☐ NOT USED |

**DAMAGED VEHICLE NO. 2**

| SEVERITY OF DAMAGE TO VEHI |
|---|
| ☐ MAJOR ☐ MINOR |
| ☐ MODERATE ☐ NONE |

DISPOSITION

| SEAT BELTS |
|---|
| ☐ IN USE ☐ NOT USE |

**DESCRIPTION OF ACCIDENT** (Continue on Reverse if necessary)

Investigation revealed that Vehicle 1 was traveling south on Basilone Road when it's Driver for unknown reasons failed to maintain his lane of travel. Vehicle 1 drifted off the west shoulder of Basilone Road Driver 1 attempted evasive action by steering right but over corrected causing Vehicle 1 to rotate clockwise and off the west shoulder of the roadway. As a re the front of Vehicle 1 struck a tree causing the vehicle to continue to rotate left. Due to the weight shift of the load, Vehic began to overturn left over right coming to an uncontrolled final rest on it's left side facing east.

INJURIES: Driver 1 was transported via military ambulance to Mission Viejo Hospital for evaluation of neck and back pai Driver 1 was admitted for evaluation, Driver 1 has no internal injuries or broken bones only muscle pain.

INVESTIGATOR NOTE: Second GOV accident with HEFNER as the operator of the vehicle in less than 30 days.

**WITNESS(ES)**

| NAME AND ADDRESS | TELEPHONE NO. |
|---|---|
| SISK, Rhiannon M. / D/W | |

| NAME OF PERSON(S) Pending | CHARGES |
|---|---|
| Pending | |

| TIME POLICE NOTIFIED (Hour) 1230 | TIME POLICE ARRIVED AT SCENE OF ACCIDENT (Hour) 1245 |
|---|---|

CERTIFIE

INVESTIGATOR (Typed Name and Signature)

58

## OFFICE OF THE PROVOST MARSHAL
## POLICE RECORDS
## PO BOX 555051
## CAMP PENDLETON, CA 92055

TODAYS DATE: 5/12/00

REQUESTERS NAME: Hefner Richard          SSN: 557457 1

UNIT: FMD SLOP 6889          TELEPHONE: (760) 414 6234

HOW INVOLVED:   VICTIM X          WITNESS          SUSPECT          NOT INVOLVED

INTEREST OF REQUESTER:   COMMAND          LAWYER          INSURANCE CO.

PERSON INVOLVED X     RENTAL AGENCY          LEGAL GUARDIAN          LEGAL DEPT

OTHER

DATE/TIME OF INCIDENT: 1200 4/7/00

LOCATION: Basilone Rd

TYPE OF INCIDENT: Rollover

NAME OF PERSON INVOLVED (IF DIFFERENT FROM REQUESTER)

SSN:          UNIT:          TELEPHONE:

**REQUEST***

NOTE: SOME OF THE CONTENTS OF SOME REPORTS MAY BE EDITED OR CENSORED. (IN COMPLIANCE WITH THE PRIVACY ACT OF 1974 AND THE FREEDOM OF INFORMATION ACT. (REFERENCES: SECNAVINST 5720.8A, MCO 5720.56, and BO 5720.14A.)

I DECLARE UNDER PENALTY OF PERJURY, THAT THE INFORMATION REQUESTED WILL NOT BE USED TO HARASS DEGRADE, OR HUMILATE ANY PERSON. I HEREBY AGREE TO INDEMNITY AND HOLD HARMLESS THE OFFICE OF THE PROVOST MARSHAL, MARINE CORPS BASE, CAMP PENDLETON FOR ANY LIABILITY ARISING OUT OF THE IMPROPER USE OF THE INFORMATION PROVIDED.

A **7-10 WORKING DAY** PERIOD IS REQUIRED FOR A SPECIAL REQUEST TO BE SUBMITTED AND PROCESSED. ALSO, IT IS ASKED THAT THE INDIVIDUAL REQUESTING A REPORT PLEASE **CONTACT CPL WEILMEIER OR LCPL SEILER AT 725-5161 PRIOR TO COMING IN AND PICKIN UP THE REPORT** TO ASSURE THAT THE REPORT IS READY.

SIGNATURE OF APPLICANT          CERTIFIE

39

# OFFICE OF THE PROVOST MARSHAL
## POLICE RECORDS
### PO BOX 555051
### CAMP PENDLETON, CA 92055

TODAYS DATE: 4/7/00

REQUESTERS NAME: Hefner, Richard R    SSN: 557457148

UNIT: FMO  shop 6889    TELEPHONE: 725-4008

HOW INVOLVED:  VICTIM X    WITNESS____    SUSPECT____    NOT INVOLVED____

INTEREST OF REQUESTER:    COMMAND____    LAWYER____    INSURANCE CO____

PERSON INVOLVED X    RENTAL AGENCY____    LEGAL GUARDIAN____    LEGAL DEPT____

OTHER_____

DATE/TIME OF INCIDENT: 4/7/00

LOCATION: Basilone Rd

TYPE OF INCIDENT: Pumper Truck

NAME OF PERSON INVOLVED (IF DIFFERENT FROM REQUESTER)_____

SSN:_____    UNIT:_____    TELEPHONE:_____

**ALL INFORMATION MUST BE FILLED OUT TO PROPERLY PROCESS
REQUEST***

NOTE:  SOME OF THE CONTENTS OF SOME REPORTS MAY BE EDITED IN COMPLIANCE WITH THE
PRIVACY ACT OF 1974 AND THE FREEDOM OF INFORMATION ACT.  (REFERENCE SECNAVINST.
5720.8A, MCO 5720.56, AND BO 5720.14A.)

I DECLARE UNDER PENALTY OF PERJURY, THAT THE INFORMATION REQUESTED WILL
NOT BE USED TO HARASS DEGRADE, OR HUMILIATE ANY PERSON. I HEREBY AGREE TO
INDEMNIFY AND HOLD HARMLESS THE OFFICE OF THE PROVOST MARSHAL, MARINE CORPS
BASE, CAMP PENDLETON FOR ANY LIABILITY ARISING OUT OF THE IMPROPER USE OF THE
INFORMATION PROVIDED.

A **7-10 WORKING DAY** PERIOD IS REQUIRED FOR A SPECIAL REQUEST TO BE SUBMITTED AND
PROCESSED.  ALSO, IT IS ASKED THAT THE INDIVIDUAL REQUESTING A REPORT PLEASE
**CONTACT CPL WAHLMEIER OR LCPL SEILER  AT 725-5161 PRIOR TO COMING IN AND PICKING
UP THE REPORT** TO ASSURE THAT THE REPORT IS READY.

_____
SIGNATURE OF APPLICANT

CERTIFIED

*Hefner 40*

## OFFICE OF THE PROVOST MARSHAL
## POLICE RECORDS
## PO BOX 555051
## CAMP PENDLETON, CA 92055

TODAYS DATE: *4-12-00*

REQUESTERS NAME: *Scott P Stanford*                    SSN: ▮▮▮▮▮▮▮

UNIT: *FMD*                                TELEPHONE: *725-0559*

HOW INVOLVED:   VICTIM____   WITNESS____   SUSPECT____   NOT INVOLVED ✓

INTEREST OF REQUESTER:   COMMAND____   LAWYER____   INSURANCE CO____

PERSON INVOLVED____   RENTAL AGENCY____   LEGAL GUARDIAN____   LEGAL DEPT____

OTHER *Supervisor*

DATE/TIME OF INCIDENT: *4-7-00   12:00*

LOCATION: *43 AREA AND BASELINE Rd*

TYPE OF INCIDENT: *CRASH DOMINATOR*

NAME OF PERSON INVOLVED (IF DIFFERENT FROM REQUESTER): *RICHARD HEFNE*

SSN:_____   UNIT: *FMD 0889*   TELEPHONE: *725-0559*

### *ALL INFORMATION MUST BE FILLED OUT TO PROPERLY PROCESS REQUEST*

NOTE: SOME OF THE CONTENTS OF SOME REPORTS MAY BE EDITED IN COMPLIANCE WITH THE PRIVACY ACT OF 1974 AND THE FREEDOM OF INFORMATION ACT. (REFERENCE: SECNAVINST 5720.8A, MCO 5720.56, AND BO 5720.14A.)

I DECLARE UNDER PENALTY OF PERJURY, THAT THE INFORMATION REQUESTED WILL NOT BE USED TO HARASS DEGRADE, OR HUMILIATE ANY PERSON. I HEREBY AGREE TO INDEMNITY AND HOLD HARMLESS THE OFFICE OF THE PROVOST MARSHAL, MARINE CORPS BASE, CAMP PENDLETON FOR ANY LIABILITY ARISING OUT OF THE IMPROPER USE OF THE INFORMATION PROVIDED.

A 7-10 WORKING DAY PERIOD IS REQUIRED FOR A SPECIAL REQUEST TO BE SUBMITTED AND PROCESSED. ALSO, IT IS ASKED THAT THE INDIVIDUAL REQUESTING A REPORT PLEASE CONTACT CPL WAHLMEIER OR LCPL SEILER AT 725-5161 PRIOR TO COMING IN AND PICKING UP THE REPORT TO ASSURE THAT THE REPORT IS READY.

SIGNATURE OF APPLICANT

CERTIFIED

41

## OFFICE OF THE PROVOST MARSHAL
## POLICE RECORDS
## PO BOX 555051
## CAMP PENDLETON, CA 92055

TODAYS DATE: 4/12/00

REQUESTERS NAME: Jennifer Hefner          SSN: ████████

UNIT: _____          TELEPHONE: _____

HOW INVOLVED:    VICTIM___    WITNESS___    SUSPECT___    NOT INVOLVED X

INTEREST OF REQUESTER:    COMMAND___    LAWYER___    INSURANCE CO___

PERSON INVOLVED X    RENTAL AGENCY___    LEGAL GUARDIAN___    LEGAL DEPT___

OTHER Wife 4/husbands personal info.

DATE/TIME OF INCIDENT: 4/7/00

LOCATION: Basilone Rd.

TYPE OF INCIDENT: Traffic Accident

NAME OF PERSON INVOLVED (IF DIFFERENT FROM REQUESTER): Richard Hefner

SSN: 557 45 7148 UNIT: FMR          TELEPHONE: 760)267-465

### *ALL INFORMATION MUST BE FILLED OUT TO PROPERLY PROCESS REQUEST*

NOTE: SOME OF THE CONTENTS OF SOME REPORTS MAY BE EDITED IN COMPLIANCE WITH THE PRIVACY ACT OF 1974 AND THE FREEDOM OF INFORMATION ACT. (REFERENCE: SECNAVINST 5720.8A, MCO 5720.56, AND BO 5720.14A.)

I DECLARE UNDER PENALTY OF PERJURY, THAT THE INFORMATION REQUESTED WILL NOT BE USED TO HARASS DEGRADE, OR HUMILIATE ANY PERSON. I HEREBY AGREE TO INDEMNITY AND HOLD HARMLESS THE OFFICE OF THE PROVOST MARSHAL, MARINE CORPS BASE, CAMP PENDLETON FOR ANY LIABILITY ARISING OUT OF THE IMPROPER USE OF THE INFORMATION PROVIDED.

A 7-10 WORKING DAY PERIOD IS REQUIRED FOR A SPECIAL REQUEST TO BE SUBMITTED AND PROCESSED. ALSO, IT IS ASKED THAT THE INDIVIDUAL REQUESTING A REPORT PLEASE CONTACT CPL WAHLMEIER OR LCPL SEILER AT 725-5161 PRIOR TO COMING IN AND PICKING UP THE REPORT TO ASSURE THAT THE REPORT IS READY.

Jennifer C Hefner
SIGNATURE OF APPLICANT

CERTIFIEI

  
42

AI/BCN: 147-1181-00 / 01617

<u>Photograph Log</u>

Photographer: Sergeant Scott E. Stallman 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
                    Military Police Company, Security Battalion, MCB Camp Pendleton, CA
                    (760) 725-5928
Camera: Epson Photo PC
Lens: 37 mm
Film: Digital
Time/Date taken: 1245-1345, 07 April 2000

| | |
|---|---|
| 1 | Facing southwest. This photograph depicts the front and top of Vehicle 1, as well as, the position of Vehicle 1 at final rest. |
| 2 | Facing west. This photograph depicts the front of Vehicle 1, as well as, the position of Vehicle 1 at final rest. |
| 3 | Facing northwest. This photograph depicts the front and bottom of Vehicle 1, as well as, the position of Vehicle 1 at final rest. |
| 4 | Facing south. This photograph depicts the direction of travel as well as, the position of Vehicle 1 at final rest. |
| 5 | Facing south. This photograph depicts the direction of travel and the point Vehicle 1 first left the roadway. As well as, the position of Vehicle 1 at final rest. |
| 6 | Facing south. This photograph depicts the direction of travel and the point Vehicle 1 first left the roadway. As well as, the position of Vehicle 1 at final rest. |
| 7 | Facing south. This photograph depicts the direction of travel and the point Vehicle 1 first left the roadway. As well as, skidmarks on the roadway and on the dirt shoulder. |
| 8 | Facing south. This photograph depicts the direction of travel and the point Vehicle 1 first left the roadway. As well as, skidmarks on the roadway and on the dirt shoulder. |
| 9 | Facing south. This photograph depicts the direction of travel and the point Vehicle 1 first left the roadway. As well as, skidmarks on the roadway and on the dirt shoulder. |
| 10 | Facing west. This photograph depicts the point the top of Vehicle 1 struck the bush when it first left the roadway. |

Photographs 1-5 are contained on a single diskette, which is maintained in this case
by the Police Records Section at (760) 725-5162.

CERTIFIED

43



OFFICE OF THE PROVOST MARSHAL
MARINE CORPS BASE
CAMP PENDLETON, CALIFORNIA 92055

# ACCIDENT INVESTIGATION REPORT

## IF CLASSIFIED-OPNAVINST 5510.1 APPLIES

AI/BCN: 147-118J-00 / 01617

### REPORT NUMBER

This document must not be left unattended or where an unauthorized person may have access to it. When not in use, it must be stored in a safe place. While this document is in your possession, it is your responsibility that the information herein is not released to unauthorized persons.

# FOR OFFICIAL USE ONLY

FROM: Provost Marshal                                    DATE  000504

TO: Director
    Facilities Maintenance Division
    Camp Pendleton, CA 92055

1. This document is furnished for your information and action as deemed appropriate.

2. Items of evidence as set forth in this document as exhibits not attached will be returned to their rightful owners or disposed of after a period of 120 days from the date of this document. If the Commanding Officer or his direct representative (i.e. legal officer), requires this evidence be retained for a longer period of time, a written request to the Provost Marshal is necessary.

| 3. ENCLOSURES: | 4. EVIDENCE: |
|---|---|
| See Page 3 of ICR | None |

| 5. DISTRIBUTION: | 6. REVIEWING OFFICER |
|---|---|
| Copy to: Director, FMD, MCB | S.F. EDWARDS SSGT |
| Original to Files | |

CERTIFIFI

44

## DEPARTMENT OF THE NAVY

# INCIDENT /COMPLAINT REPORT

**1. FROM**
Provost Marshal, Marine Corps Base, Camp Pendleton, CA 92055

**2. TO**
Director, Facility Maintenance Division, MCB, Camp Pendleton, CA 92055

**3. VIA**

| 4. CASE CONTROL NUMBER (CCN)<br>AI: 147-1181-00<br>BCN: 01617 | 5. DATE SUBMITTED TO ADDRESSEE | 6. RETURN TO POLICE ADMIN NOT LATER THAN |
|---|---|---|

**7. TYPE REPORT**
☐ Info (No reply required)   ☐ Supplemental (No reply required)   ☒ Report of Action (See page 3)

**8. INCIDENT/COMPLAINT** (Specify type and location)
TRAFFIC ACCIDENT ( GOV-SOLO / PI X 1 / PD-MAJOR )

Basilone Rd adjacent to the 43 Area Land Fill Access Road, MCB Camp Pendleton, CA 92055

| 9. WHEN & HOW RECEIVED | Hour<br>1230 | Date<br>20000407 | ☐ Crimestop Call   ☐ In Person   ☒ By Telephone   ☐ By Radio   ☐ By Mail |
|---|---|---|---|

| 10. INVOLVEMENT<br>☐ Other (List)   N/A   ☐ Drugs   ☐ Alcohol | 11. ASSUMED BY NIS?<br>☐ Yes   ☐ No   ☒ N/A | 12. HOUR<br>1210 | 13. DATE<br>2000040 |
|---|---|---|---|

| 14. RECEIVED BY (Typed or printed name, rank and position)<br>LCPl CRAMER<br><br>Military Police Dispatcher | 15. TYPE OF INCIDENT<br>☐ Misdemeanor   ☐ Felony<br>☐ Complaint   ☐ Military Offense   ☒ Traffic |
|---|---|

**16. PERSONS RELATED TO REPORT** (Continue on Page 2 or add pages, if necessary)
(Insert appropriate category letter before each name) A - SUSPECT  B - VICTIM  C - COMPLAINANT  D - WITNESS  E - POLICE  F - SPONSOR

| A | HEFNER, Richard R. / WG-10 / 557457148 / Facilities Maintenance Division, Camp Pendleton, CA 92055<br><br>700701 / Fresno, CA / M / W / 68 / 190 / Blonde / Blue / None noted |
|---|---|
| B | U.S. Government |
| E | STALLMAN, Scott E. / Sgt / USMC / ⬛⬛⬛⬛⬛ MP Co, Scty Bn, MCB, Camp Pendleton, CA 92055 |
|  |  |
|  |  |
|  |  |

CERTIFIE

45

## DEPARTMENT OF THE NAVY INCIDENT / COMPLAINT REPORT (Continued) AI/BCN: 147-1181-0

**17. DETAILS OF INCIDENT** (Who, what, when, where, how, why? Attach revelant statements.)

Investigation revealed that Vehicle 1 was traveling south on Basilone Road when it's Driver for unknown reaso
failed to maintain his lane of travel. Vehicle 1 drifted off the west shoulder of Basilone Road Driver 1 attempt
evasive action by steering right but over corrected causing Vehicle 1 to rotate clockwise and off the west shoul
the roadway. As a result, the front of Vehicle 1 struck a tree causing the vehicle to continue to rotate left. Due
weight shift of the load, Vehicle 1 began to overturn left over right coming to an uncontrolled final rest on it's l
side facing east.


INJURIES: Driver 1 was transported via military ambulance to Mission Viejo Hospital for evaluation of neck a
back pain. Driver 1 was admitted for evaluation, Driver 1 has no internal injuries or broken bones only muscle

INVESTIGATOR NOTE: Second GOV accident with HEFNER as the operator of the vehicle in less than 30 da



CERTIFIE

46

# DEPARTMENT OF THE NAVY INCIDENT / COMPLAINT REPORT *(Continued)*

AI/BCN: 147-1181-00

| 18. ENCLOSURES *(Statements and receipts)* | 19. EVIDENCE *(List and describe)* |
|---|---|
| (1) Traffic Accident Report | None |
| (2) Diagram | |
| (3) Voluntary Statement / HEFNER | |
| (4) Photograph Log | |
| (5) 3.5 inch diskette containing photos 1- 10 | |

**20. REFERRED TO**

☐ Patrol  ☐ Investigations

☐ NIS  ☒ File

☐ Other Agency *(specify)*

**21. DISTRIBUTION**

ORIG: Files

COPY 1: NISHQ via NISRA  N/A

COPY 2: Director, Facility Maintenance Division,

**22. REPORTING OFFICIAL TYPED NAME, RANK/TITLE & SIGNATURE**

SGT S.E. STALLMAN
Accident Investigator

**23. APPROVING OFFICIAL TYPED NAME, RANK/TITLE & SIGNATURE**

S.F. EDWARDS SSGT
Chief Accident Investigator

**24. REPORT OF ACTION TAKEN**

*(To be completed by the addressee, when so indicated in block 7. Return one copy to originator to meet suspense date indicated in block 6)*

| a FROM | | | b. DATE |
|---|---|---|---|
| c. TO | | | |
| d. VIA | | | |
| e. SUBJECT | | f. RANK | g. SSN |
| h. ACTION TAKEN  ☐ ADMINISTRATIVE | | ☐ NON-JUDICIAL | ☐ JUDICIAL |
| i. DATE ACTION COMPLETED | | | |

j. DETAILS *(Specify type administrative action taken, non-judicial punishment imposed, or judicial results, as applicable.)*

CERTIFIED

*(For multiple subjects, use additional page(s) to reflect action taken)*

# DEPARTMENT OF THE NAVY TRAFFIC ACCIDENT REPORT

(SUPPLEMENT TO INCIDENT/COMPLAINT REPORT)

**CASE CONTROL NUMBER**

AI/BCN: 147-1181-00

| DATE OF ACCIDENT | | | TIME (USE 2400 HOURS) | DAY OF COLLISION | |
|---|---|---|---|---|---|
| YR 2000 | MO 04 | DAY 07 | 1210 | ☐ SUNDAY ☐ WEDNESDAY | ☐ MONDAY ☐ THURSDAY |

☐ TUESDAY ☐ FRIDAY (X) ☐ SATURDAY

**LOCATION**

| NAVY BASE (X) ON ☐ OFF | ROAD OR STREET ON WHICH ACCIDENT OCCURRED Basilone Rd | NAME AND LOCATION OF NAVY BASE, CITY, STATE, ETC. MCB Camp Pendleton, CA 92055 |
|---|---|---|

| AT INTER-SECTION | NAME OF INTERSECTING STREET N/A | NOT AT INTER-SECTION | NAME OF NEAREST INTERSECTING ST HIGHWAY, OR OTHER PERMANENT IDENTIFYING LANDMARK 43 Area Land fill access Rd | NO OF FEET 150 | DIRECTION east |
|---|---|---|---|---|---|

IF ACCIDENT OCCURRED OFF NAVY BASE AND OUTSIDE CITY LIMITS INDICATE N/A _____ MILES ☐N ☐S ☐E ☐W FROM ☐CITY LIMITS ☐CENTER OF CITY OR TOWN

KIND OF LOCALITY ☐ BARRACKS ☐ RESIDENTIAL ☐ MFG. OR (X) OPEN COUNTRY ☐ SCHOOL OR PLAYGROUND ☐ BUSINESS ☐ OTHER

**TYPE OF ACCIDENT**

TYPE ACCIDENT
☐ VEHICLE-VEHICLE   ☐ VEHICLE-PEDICYCLE   ☐ STOLEN VEHICLE   ☐ OTHER
☐ VEHICLE-OBJECT   ☐ VEHICLE-RR TRAIN   (X) SINGLE VEHICLE (NON COLLISION)
☐ VEHICLE -PEDESTRIAN   ☐ HIT & RUN

| TOTAL NO. OF VEHICLES IN-VOLVED 01 | SEVERITY |
|---|---|

| 00 | NO. KILLED | 01 |

☐ PROPERTY DAMAGE O

**WEATHER, LIGHT AND ROAD CONDITIONS**

| DRIVING LANES | VEHICLE 1 | VEHICLE 2 | CHAR ACTER | VEHICLE 1 | VEHICLE 2 | SURFACE | VEHICLE 1 | VEHICLE 2 | CONDI-TIONS | VEHICLE 1 | VEHICLE 2 | DEFECTS | WEATHER | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ONE | | | STRAIGHT | | | CONCRETE | | | DRY | | | HOLES, RUTS, BUMPS, ETC. | CLEAR | X | |
| TWO | X | | CURVE | X | | BLACK TOP | | | WET | | | LOOSE MATERIAL OR SURFACE | RAIN | | |
| THREE OR MORE | | | LEVEL | | | BRICK | | | MUD | | | DEFECTIVE SHOULDER | FOG | | |
| DIVIDED HIGHWAY | | | GRADE | | | GRAVEL | X | | SNOW | X | | NO DEFECTS | SNOWING | | |
| OTHER | | | OTHER | | | OTHER | | | OTHER | | | OTHER | OTHER | | |

**TRAFFIC CONTROL**

| VEHICLE 1 2 | | | VEHICLE 1 2 | VEHICLE 1 2 | | VEHICLE 1 2 | | |
|---|---|---|---|---|---|---|---|---|
| STOP & GO SIGNAL | | | FLASHING LIGHT | WARNING SIGN | | | | OTHER (EXPLAIN) |
| X | NO TRAFFIC SIGNAL | | MANNED | SOLID CENTER LINE | ONE WAY STREET STOP SIGN | | | |

**VEHICLE NO. 1**

| USN REGISTRATION OR LICENSE NO. GSA / MC291465 | MAKE Ford | YEAR 99 | BODY TYPE Semi |
|---|---|---|---|

MARKINGS/DECAL NO.
None

☐ PRIVATELY OWNED (X) GOVERNMENT

REGISTERED OWNER (IF NOT DRIVER) (LAST, FIRST, M.I.)
U.S. Government

ADDRESS OF OWNER
Facilities Maintenance Division, Camp Pendleton, CA

NAME AND ADDRESS OF INSURANCE COMPANY OR AGENT
Self insured: U.S. Government

**VEHICLE NO. 2**

| USN REGISTRATION OR LICENSE NO. | MAKE | YEAR | BODY |
|---|---|---|---|

MARKINGS/DECAL NO.

☐ PRIVATELY ☐ GOVERN

REGISTERED OWNER (IF NOT DRIVER) (LAST, FIRST, M.I.)

ADDRESS OF OWNER

NAME AND ADDRESS OF INSURANCE COMPANY OR AGENT

**DRIVER NO. 1**

| NAME (LAST, FIRST, M.I.) AND ADDRESS HEFNER, Richard R.    WG-10 Facilities Maintenance Division Camp Pendleton, CA 92055 | SSN 557457148 |
|---|---|

| | AGE 29 | SEX (X) MALE ☐ FEMALE |
|---|---|---|

| DRIVER'S LICENSE/PERMIT NUMBER T62116014 | STATE VA |
|---|---|

| LIMITATIONS ON LICENSE/PERMIT (X) NO ☐ YES (SPECIFY) | DRIVING EXPERI-ENCE (YEARS) 13 years |
|---|---|

| CODES | (1) CAT E | (2) INJ E | SEAT BELT (3) C | SEAT POS (4) 1 |
|---|---|---|---|---|

**DRIVER NO. 2**

| NAME (LAST, FIRST, M.I.) AND ADDRESS | SSN |
|---|---|

| | AGE | SEX ☐ M ☐ FEN |
|---|---|---|

| DRIVER'S LICENSE/PERMIT NUMBER | STATE |
|---|---|

| LIMITATIONS ON LICENSE/PERMIT ☐ NO ☐ YES (SPECIFY) | DRIVING EXPE-ENCE (YEARS) |
|---|---|

| CODES | (1) CAT | (2) INJ | SEAT BELT (3) | SEAT POS (4) |
|---|---|---|---|---|

**OCCUPANTS**

NAME AND ADDRESS

None

| | VEH. NO. | CODES AGE | SEX | CATE-GORY (1) | IN-JURY (2) | SEAT BELT (3) |
|---|---|---|---|---|---|---|

**PEDESTRIAN**

NAME AND ADDRESS
None

PEDESTRIAN WAS GOING: ☐N ☐S ☐E ☐W ALONG/ACROSS/INTO (STREET, ROAD OR HIGHWAY)
FROM (NW TO SW CORNER, OR EAST TO WEST SIDE, ETC) _____ TO _____

| CROSSING WITH SIGNAL | CROSSING NO SIGNAL | STANDING ON ROADWAY | WALKING IN ROAD AGAINST TRAFFIC |
|---|---|---|---|
| CROSSING AGAINST SIGNAL | HITCHING ON VEHICLE | COMING FROM BEHIND PARKED | WALKING IN ROAD WITH TRAF |
| CROSSING NOT AT INTERSECTION | PLAYING ON ROADWAY | PUSHING OR WORKING ON VEHICLE | OTHER |
| (1) CATEGORY | (2) INJURY CLASS | (3) SHOULDER/LAP BELTS | (4) SEAT POSITION |

A. NAVY OFFICER    A. NO INJURY



# DEPARTMENT OF THE NAVY TRAFFIC ACCIDENT REPORT *(Continued)* AI/BCN: 147-1181-00 / 01617

**WITNESSES**

| NAME AND ADDRESS | TELEPHONE NUMBER |
|---|---|
| SISK, Rhiannon M. / D/W ▓▓▓▓▓▓▓ | |
| PITTMAN, Christopher T. / PFC / USMC ▓▓▓▓ Comm Co, 1/5, 1st Mar Div | |
| PRATT, Christopher P. / PFC / USMC ▓▓▓▓ Comm Co, 1/5, 1st Mar Div | 763-1536 |

**VEHICLE DAMAGE INSTRUCTIONS**

1. In each box, circle the number of each damaged area.
2. Shade area of severest impact.
3. Draw arrow(s) to show principal direction of force.

| DAMAGED VEHICLE NO. 1 | DAMAGED VEHICLE NO. 2 | DAMAGED TRAILER, MOTORCYCLE, ETC. |
|---|---|---|
| 13. HOOD 14. ROOF 15. TRUNK 16. UNDERCARRIAGE 17. OVERTURN | 11. HOOD 14. ROOF 15. TRUNK 16. UNDERCARRIAGE 17. OVERTURN | SKETCH DAMAGE |

| SEVERITY OF DAMAGE: VEHICLE NO. 1 | SEVERITY OF DAMAGE VEHICLE NO. 2 | SEVERITY OF DAMAGE: (OTHER VEHICLE) |
|---|---|---|
| ☒ DISABLING DAMAGE   ☐ OTHER M.V. DAMAGE  ☒ FUNCTIONAL DAMAGE   ☐ NO DAMAGE | ☐ DISABLING DAMAGE    ☐ OTHER M.V. DAMAGE  ☐ FUNCTIONAL DAMAGE    ☐ NO DAMAGE | ☐ DISABLING DAMAGE   ☐ OTHER M.V. DAMAGE  ☐ FUNCTIONAL DAMAGE   ☐ NO DAMAGE |

| TOWED BY Base Motor Transportation | TOWED BY | TOWED BY |
|---|---|---|
| to base lot | TO | TO |

**DAMAGE TO PROPERTY (OTHER THAN VEHICLE).**

None

**Sketch**

1. Identify:
   - Roadway & roadway features
   - Vehicles
   - Pedestrians
   - Objects on/off roadway
   - Traffic controls
   - Skidmarks
   - Unusual temperature conditions (ice patch, construction area, etc)
2. Locate probable point of impact
3. Show vehicle, pedestrian or object positions at impact
4. Show probable vehicle or pedestrian paths before and after collision

DRAW ARROW SHOWING NORTH IN CIRCLE

**See attached diagram**

**DESCRIPTION OF COLLISION** — In Block 17, Incident/Complaint Report, (OPNAV 5527/1), indicate what probably happened before, during and after the crash. Include information not on sketch, e.g., driver disability, reduced visibility, pedestrian clothing color, construction or repair work, etc.

**DRIVERS ACTION BEFORE ACCIDENT**

| DIRECTION HEADED | DRIVER 1 2 | CHECK ONE OR MORE | DRIVER 1 2 | CHECK ONE OR MORE | VEHICLE 1 2 | SPECIFY FEET/MPH |
|---|---|---|---|---|---|---|
| N S E W | | BACKING | | OVERTAKING OR PASSING | Unk | ESTIMATED DISTANCE WHEN DANGER WAS FIRST NOTICED (FEET) |
| VEH 1 ☐ ☒ ☐ ☐ | | GOING STRAIGHT AHEAD | | AVOIDING VEH/OBJ | 35 | ESTIMATED SPEED WHEN DANGER WAS FIRST NOTICED (MPH) |
| VEH 2 ☒ ☐ ☐ ☐ | ☒ | MAKING LEFT TURN | | SLOWING OR STOPPING | 35 | ESTIMATED SPEED AT IMPACT (MPH) |
| | | SKIDDING | | STOP IN TRAFFIC LANE | 358 | DISTANCE TRAVELED AFTER IMPACT (FEET) |
| | | MAKING RIGHT TURN | | OTHER (SPECIFY) | | |
| | | MAKING "U" TURN | | ) | 35 | LAWFUL SPEED (MPH)  **Driver's Estimates** |

**CONTRIBUTING CIRCUMSTANCES**

| DRIVER 1 2 | CHECK ONE OR MORE | DRIVER 1 2 | CHECK ONE OR MORE | DRIVER 1 2 | CHECK ONE OR MORE | DRIVER 1 2 | CHECK ONE | VEHICLE 1 2 | CHECK ONE OR MORE |
|---|---|---|---|---|---|---|---|---|---|
| | EXCEEDING SPEED LIMIT | | NO OR IMPROPER SIGNAL | | ALCOHOL INVOLVED | | CHEMICAL TEST GIVEN | | DEFECTIVE BRAKES |
| ☒ | SPEED EXCESSIVE FOR CONDITIONS | | DISREGARDED TRAFFIC SIGNAL | | DRUGS INVOLVED | | CHEMICAL TEST REFUSED | | DEFECTIVE HEAD LIGHTS |
| | FAILED TO YIELD | | IMPROPER TURN | | ABILITY IMPAIRED | TEST RESULTS | | | DEFECTIVE REAR LIGHTS |
| | DISREGARDED STOP SIGNAL | | UNKNOWN | | ABILITY NOT IMPAIRED | DRIVER NO. 1 | DRIVER NO. 2 | | TIRES WORN OR SMOOTH |
| | VISION OBSTRUCTED | | OTHER (SPECIFY) | | UNKNOWN | % N/A BAC | % BAC | | TIRE PUNCTURES OR BLOWN |
| | FOLLOWING TOO CLOSE | | | | SEE ATTACHED DD FORM 1920 "ALCOHOLIC INFLUENCE REPORT" | | | ☒ | OTHER (SPECIFY) None noted |
| | IMPROPER OVERTAKING | | | | | | | | |

**POLICE ACTIVITY**

| NAME OF PERSON(S) Cited | CHARGES |
|---|---|
| HEFNER, Richard R. | CVC 21655b- Failure To Maintain Control Of Vehicle  DD Form 1408 # NI3588726 |

| TIME POLICE NOTIFIED (HOUR): 1230 | TIME POLICE ARRIVED AT SCENE OF ACCIDENT (HOUR): 1245 |
|---|---|
| WHERE ELSE WAS INVESTIGATION MADE  Building 1233 | DID MILITARY OPERATOR COMPLETE DD FORM 518 "ACCIDENT IDENTIFICATION CARD" |
| IF OFF BASE, WHO ELSE CONDUCTED AN INVESTIGATION (IF OTHER AGENCY CONDUCTED COMPLETE INVESTIGATION, SO INDICATE) | DID MILITARY OPERATOR COMPLETE STANDARD FORM 91 "OPERATOR'S REPORT OF MOTOR VEHICLE ACCIDENT" |

CERTIFIED

49



Case Number: 147-1181-00 / 01617
Case Title: GOV-SOLO / PI X 1 / PD MAJOR
Location: Basilone Rd adjacent to 43 Area land fill Access Rd ( 43 Area )
Time/Date: 1210 / 000407
Investigator: Sgt STALLMAN, S.E. #0027
Photographs were taken
Clear/Dry/No Defects/Day
Not to scale

Basilone Rd

43
Lai

LEGEND

Vehicle 1 in motion

Vehicle 1 at final rest

Probable Points of Impact

Basilone R

CERTIFIE

50

DEPARTMENT OF THE NAVY

# VOLUNTARY STATEMENT

1. PLACE  BLDG 1233
2. DATE 4/24/00

I, Richard R Hefner make the following free and voluntary statement to SGT Alsheimer, D. J. whom I know to be a Military Policeman. I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of accid on April 7, 2000. I was transporting sludge from Area 62 to Area 33. I was traveling South on Basilone. The ponder truck fishtailed to the left. I saw a car heading towards me. I turned into the skid. The load shifted to the Right. The Back tires hit something. I correc to the Left. The load shifted to the left It caused the truck to turn 180°. The truck started to turn 180°. I struck a tree and continue to turn. The truck's lo shift to the Passenger side again. The tru then Rolled from Passenger to top to driver's side. I saw the tank move at the first fistail. END OF STATEMENT RRH

RRH

CERTIFIE

*Document 51*

MISSION HOSPITAL REGIONAL MEDICAL CENTER
(949) 364-1400  •  (949) 582-2300

(94-)

27700 Medical Center Road  •  Mission Viejo, California 92691

## AUTHORIZATION FOR AND CONSENT TO SURGERY OR SPECIAL DIAGNOSTIC OR THERAPEUTIC PROCEDURES

To _Hefner Richard_
**Name of Patient**

Your attending physician is ___m. Bonzatta_____, M.D.

Your supervising physician is ___J. Gross_____, M.D.

1.  The hospital maintains personnel and facilities to assist your physicians and surgeons in their performance of various surgical operations and other special diagnostic or therapeutic procedures. These operations and procedures may all involve risks of unsuccessful results, complications, injury, or even death, from both known and unforeseen causes, and no warranty or guarantee is made as to result or cure.

    You have the right to be informed of such risks as well as the nature of the operation or procedure, the expected benefits or effects of such operation or procedure, and the available alternative methods of treatment and their risks and benefits. This form is not a substitute for such explanations which are provided by the above-named physicians. You also have the right to be informed whether your physician has an independent medical research or economic interests related to the performance of the proposed operation or procedure. Except in cases of emergency, operations or procedures are not performed until you have had the opportunity to receive this information had have given your consent. You have the right to consent to or refuse any proposed operation or procedure at any time prior to its performance. To make sure that you fully understand the operation or procedure your physician will fully explain the operation or procedure to you before you decide whether or not to give consent. If you have any questions you are encouraged and expected to ask them.

2.  Your physicians and surgeons have recommended the operations or procedures set forth below. Upon your authorization and consent, this operation or procedure, together with any different or further procedures which in the opinion of the supervising physician or surgeon may be indicated due to any emergency, will be performed on you. The operations or procedures will be performed by the supervising physician or surgeon named above (or in the event that that physician is unable to perform or complete the procedure, a qualified substitute supervising physician or surgeon), together with associates and assistants, including anesthesiologists, pathologists and radiologists from the medical staff of Mission Hospital Regional Medical Center/Children's Hospital at Mission to whom the supervising physician or surgeon may assign designated responsibilities. The persons in attendance for the purpose of performing specialized medical services such as anesthesia, radiology or pathology are not agents, servants or employees of the hospital or your supervising physician or surgeon. They are independent contractors, and therefore are your agents, servants or employees.

3.  By your signature below you authorize the pathologist to use his or her discretion in the disposition or use of any member, organ or other tissue removed from your person during the operation(s) or procedure(s) set forth below.

4.  During this procedure an authorized member of the medical staff or any representative thereof, may photograph you or any part of your body for purposes directly related to the medical care rendered.

5.  During this procedure a product representative may be present. The product representative will not assist in the procedure.

6.  Your signature on this form indicates (1) that you have read and understood the information provided in this form, (2) that the operation(s) or procedure(s) set forth below has been adequately explained to you by your physician, (3) that you have had a chance to ask questions, (4) that you have received all of the information you desire concerning the operation(s) or procedure(s) and (5) that you authorize and consent to the performance of the operation(s) or procedure(s).

Operation(s) or Procedure(s) _anterior cervical fusion / discectomy cervical six-seven with plate_

Date

Time

Signature _____
**Patient / Parent / Legal Guardian**

If signed by other than patient, indicate relationship:



| MISSION HOSPITAL REGIONAL MEDICAL CENTER | Children's Hospital at Mission |
|---|---|
| (949) 582-2300  •  (949) 364-1400 | (949) 347-8400 |

27700 Medical Center Road     •     Mission Viejo, California  92691

## CONSENT TO BLOOD COMPONENT THERAPY

Your signature below indicates that: (1) you have received a copy of the brochure, *If You Need Blood: A Patient's Guide to Blood Transfusions*, (2) you have received information concerning the risks and benefits of blood transfusion and of any alternative therapies, (3) you have had the opportunity to discuss this matter with your physician, including predonation, and (4) subject to any special instructions listed below, you consent to such blood component therapy (including, but not limited to, whole blood, packed red or white blood cells, fresh frozen plasma, cryoprecipitate or platelets) as your physician may order during this hospitalization.

Special instructions: _Donation from Jennifer Hefner or_

_any other source of extreme emergency._

_____

|Describe here any specific instructions for patient's blood transfusion, e.g., predonation, directed donation, etc.|

Date: _17:15_ _____ Time: _April 10 2000_ ........A.M./P.M.

Signature: _____
     |patient/parent/conservator/guardian|

If signed by other than patient, indicate relationship: _____

Witness: _____

**350-1**

**ADDRESSOGRAPH**

10792893 BORZATTA, MARCELLO
HEFNER, T69055 RICHARD
04/07/00 MR 532984 IN
DOB 07/01/70 29Y   M OC

**CONSENT TO BLOOD COMPONENT THERAPY**

| MISSION HOSPITAL REGIONAL MEDICAL CENTER<br>(714) 582-2300  •  (714) 364-1400 | Children's Hospital<br>at Mission          (714) 347-8400 |

27700 Medical Center Road  •  Mission Viejo, California  92691

## BLOOD DONOR SERVICES

# IF YOU NEED BLOOD . . . .
# A PATIENT'S GUIDE TO BLOOD TRANSFUSIONS

Many surgeries do not require blood transfusions. However, if you need blood, you have several options. Although you have the right to refuse a blood transfusion, this decision may hold life-threatening consequences. Please carefully review this brochure and decide with your doctor which option(s) you prefer.

PLEASE NOTE:  Your options may be limited by time and health factors, so it is important to begin carrying out your decision as soon as possible.

## THE SAFEST BLOOD IS YOUR OWN – USE IT WHENEVER POSSIBLE.

* ASK YOUR PHYSICIAN ABOUT DEVELOPMENTS IN TRANSFUSION MEDICINE.

* CHECK WITH YOUR INSURANCE COMPANY FOR THEIR REIMBURSEMENT POLICY.

This brochure was developed by
**California Department of Health Services**
714/744 P Street
Sacramento, CA 95814
*Kenneth W. Kizer,* M.D., M.P.H., *Director*

This brochure is distributed by
**Mission Hospital Regional Medical Center**
Blood Donor Services
29770 Medical Center Rd.
Mission Viejo, CA 92691

---

TO ORDER ADDITIONAL COPIES, PLEASE CALL:
**BLOOD DONOR SERVICES**
MISSION HOSPITAL REGIONAL MEDICAL CENTER
**(714) 364-7768**
Request Publication:  "If You Need Blood, A Patient's Guide to Blood Transfusion"

---

I have read and understood the information contained in this brochure entitled **"If You Need Blood, A Patient's Guide to Blood Transfusion"**. I have received all the information I need on the available sources of blood and the possible risks associated with blood transfusion.

54

Document 4

# AUTHORIZATION TO RELEASE MEDICAL INFORMATION

Patient Name: _RICHARD HEFNER_    Date of Birth: _7/01/70_

Phone Number: _760 - 767 - 4996_    Date of Treatment: _4/7/00 to present 4/1._

I hereby authorize: [✓] Mission Hospital Regional Medical Center

[ ] Children's Hospital at Mission

[ ] _____
(Name of facility or physician)

to disclose records obtained in the course of my evaluation and/or treatment to:

Name: _Human Resources    Atten: Worker's Compensation_

Address: _PO Box 555026_

_Camp Pendleton, Ca   72055_

The following information is to be released: _History + Physical, OR Report_
_Physical therapy Notes, Dr's progress note_

I understand that I have the right to limit the type of information released. If I choose to limit the information released, I understand that it may be necessary for Mission Hospital/Children's Hospital to inform the requestor that portions of the record have been withheld.

Unless otherwise indicated below, my signature authorizes the release of medical information, without exception, including any information concerning AIDS or results of HIV testing, psychological or psychiatric treatment, and/or alcohol or drug abuse. _____

_____

[✓] I have no limitations on information to be released: _____
                                                        PATIENT'S INITIALS

This consent is subject to written revocation by the undersigned at any time except to the extent that action has been taken, and if not earlier revoked, this consent shall become invalid six months from the date of signature.

I hereby release all parties from any/all legal liability that may arise from the release of this information to the party named above.

Copy of this form requested and received. [ ] Yes   [ ] No

Signed: _____    Date: _4/13/00_
Signature of Patient/Spouse/Parent/Guardian/Conservator/
Patient's Legal Representative*

If signed by other than the patient, indicate relationship:_____

*Authorized representative must submit copies of legal documents supporting assignment of this

se

*Hewer*

OWCP REGION IX - INJURED WORKER INFORMATION                                      Page 2

*Document 5*        DOCUMENT 55

*Traumatic Injury and Claim for Continuation of Pay/Compensation*, if you sustained a traumatic injury. Submit written notice of injury on Form CA-2, *Notice of Occupational Disease and Claim for Compensatic* if the injury was an occupational disease or illness. Obtain claim forms from your Federal employing agency (may also be obtained from OWCP). Complete the front page of the claim form and submit it to your employing agency. Your employing agency will complete the back page and forward the claim to OWCP. Click here to link to Form CA-1 and Form CA-2.

## IV. Evidence Needed for Your Claim



**Traumatic injury**. Form CA-1 should describe clearly how the injury occurred using a supplemental statement, if necessary. A medical report that includes a history of how the injury occurred, findings, diagnosis, and an explanation of how your condition is related to the injury must be submitted with the clair

**Occupational disease or illness**. Occupational diseases or illnesses are usually more complex than traumati injuries and require more extensive evidence. A narrative statement and a comprehensive narrative medical report should be submitted along with the CA-2. Your statement should describe in detail specific work factors that you believe caused your medical condition. For example, if you do a lot of lifting, describe the types of material lifted, weights, how often lifting is required, and the type of lifting. For emotional conditior describe specific events, dates the events occurred, those involved, and how the event(s) caused your condition. Vague and general statements should be avoided.

Medical reports for occupational disease or illness claims must include a history, findings, a diagnosis and explain how specific work factors are related to your medical condition. Medical reports for emotional conditions should be from a psychiatrist or licensed psychologist (**note: an MFCC is not considered a licens psychologist under FECA**). Psychiatric reports should be in narrative form and include a history, findings, a diagnosis, and explain how your condition is related to **specific factors of your employment**. It is insuffici for the treating physician to merely state that your condition is work related. The physician should provide a narrative report which contains a rationalized opinion on how your condition is related to specific factors of employment.

## V. How Claims are Processed

Your employing agency forwards claims to OWCP within 10 working days. Claims are entered into our computer and file numbers are assigned at that time. You will receive a card with your file number on it. Claims are then routed to the Claims Sections for processing. Our goals are to process traumatic injury clai within 45 days, basic occupational disease or illness claims within 90 days and extended occupational diseas claims within 180 days. In order to process claims in a timely manner, it is important for injured workers to submit a detailed statement on how the injury occurred and a complete medical report (see **Evidence Need for your Claim** above).

## VI. Medical Care

If your claim is accepted, FECA provides a broad range of medical benefits and services needed to treat the accepted injury.

**Initial choice of physicians**. You have the right to choose your physician. If that physician refers you to a specialist, OWCP will honor that referral, as long as it is for the work-related condition. If you wish to cha

56

Document #11

UNITED STATES MARINE CORPS
Marine Corps Civilian HRO-West
Box 555026
Camp Pendleton, California  92055-5026

# AUTHORIZATION FOR RELEASE OF INFORMATION

**NAME:**     RICHARD HEFNER

**SSN:**     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

**ADDRESS:**     3455 Swinging V Road

     Borrego Springs, CA  92004

I, the undersigned, hereby authorize any physician or hospital, and any person, institution, corporation, or Government activity, to furnish all records of my medical care, treatment and history, and all payroll and other records and information regarding my employment, to the Injury Compensation Department, Marine Corps Base, Camp Pendleton. This authorization permits the representative of such office to examine and copy any such records.

A photocopy of this form shall be as valid as the original.

Information collected will be maintained within the guidelines as established by the Privacy Act of 1974. Authority to gather information including Social Security Number is granted by Sections 133, 1071-87, 3012, 5031 and 8012, Title 10, United States Code and Executive Order 9397.


**PRINT NAME**


**SIGNATURE**

**DATED:**   ___/___/___

(760) 725-3728     JaLynn PETERSON

(760) 725-0058     Fax

Need note from physician
with diagnosis + work status.

Have attorney provide written
info that he is rep.

# DEPARTMENT OF DEFENSE
# CIVILIAN LEAVE AND EARNING STATEMENT
### Visit the DFAS Web Site at www.dfas.mil

| | | |
|---|---|---|
| 1. PAY PERIOD END | 04/22/00 | |
| 2. PAY DATE | 04/28/00 | |

| 3. NAME | 4. PAY PLAN/GRADE/STEP | 5. HOURLY/DAILY RATE | 6. BASIC OT RATE | 7. BASIC PAY | LOCALITY ADJ | ADJUSTED BASIC PAY |
|---|---|---|---|---|---|---|
| HEFNER RICHARD R | WG 10 01 | 16.12 | 24.18 | | | |

| 8. SOC SEC NO | 9. LOCALITY % | 10. FLSA CATEGORY | 11. SCD LEAVE | 12. MAX LEAVE CARRY OVER | 13. LEAVE YEAR END |
|---|---|---|---|---|---|
| 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 | | N | 06/13/91 | 240 | 01/13/01 |

| 14. FINANCIAL INSTITUTE - NET PAY | 15. FINANCIAL INSTITUTION - ALLOTMENT #1 | 16. FINANCIAL INSTITUTION - ALLOTMENT #2 |
|---|---|---|
| CALIFORNIA COAST CREDIT UNI | | |

| 17. TAX | MARITAL STATUS | EXEMPTIONS | ADD'L | 18. TAX | MARITAL STATUS | EXEMPTIONS | ADD'L | TAXING AUTHORITY | 19. CUMULATIVE RETIREMENT | 20. MILITARY DEPOSIT |
|---|---|---|---|---|---|---|---|---|---|---|
| FED | M | 3 | | | | | | | FERS: | |
| CA | M | 11 | | | | | | | 51.73 | |

| 21. | CURRENT | YEAR TO DATE | 22. |
|---|---|---|---|
| GROSS PAY | 411.06 | 4849.12 | |
| TAXABLE WAGES | 411.06 | 4849.12 | |
| NONTAXABLE WAGES | | | |
| TAX DEFERRED WAGES | | | |
| DEDUCTIONS | 115.49 | 1008.74 | |
| AEIC | | | |
| NET PAY | 295.57 | 3840.38 | |

## CURRENT EARNINGS

| TYPE | HOURS/DAYS | AMOUNT | TYPE | HOURS/DAYS | AMOUNT | TYPE | HOURS/DAYS | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| REGULAR PAY | 25.50 | 411.06 | | | | | | |

## DEDUCTIONS

| TYPE | CODE | CURRENT | YEAR TO DATE | TYPE | CODE | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|---|---|
| FEGLI | Z5 | 5.58 | 22.32 | FEGLI OPTNL | ABC | 6.75 | 20.25 |
| FEHB | 105 | 66.78 | 133.56 | MEDICARE | | 5.96 | 70.31 |
| OASDI | | 25.49 | 300.65 | RETIRE, FERS | K | 4.93 | 51.73 |
| TAX, FEDERAL | | | 408.69 | TAX, STATE | CA | | 1.23 |

## LEAVE

| TYPE | PRIOR YR BALANCE | ACCRUED PAY PD | ACCRUED YTD | USED PAY PD | USED YTD | DONATED/ RETURNED | CURRENT BALANCE | USE-LOSE/ TERM DATE |
|---|---|---|---|---|---|---|---|---|
| ANNUAL | | 6.00 | 24.00 | 21.50 | 24.00 | | | |
| SICK | | 4.00 | 16.00 | 4.00 | 16.00 | | | |
| INJURY (COP) | | | | | 1.00 | | | 04/07 |
| LWOP | | | | 54.50 | 54.50 | | | |

## REMARKS

BUY US SAVINGS BONDS
NATIONAL ASIAN-PACIFIC AMERICAN HERITAGE OBSERVANCE IS MAY 1 - 31, 2000
CONTACT YOUR CUSTOMER SERVICE REPRESENTATIVE FOR INFORMATION ON THE NEW SERIES I BONDS
PLEASE CUSTOMIZE YOUR TEMPORARY E/MSS PIN. IF YOU DID NOT RECEIVE A PIN CALL 800-390-2348.

*Traumatic Injury and Claim for Continuation of Pay/Compensation*, if you sustained a traumatic injury. Submit written notice of injury on Form CA-2, *Notice of Occupational Disease and Claim for Compensation*, if the injury was an occupational disease or illness. Obtain claim forms from your Federal employing agency (may also be obtained from OWCP). Complete the front page of the claim form and submit it to your employing agency. Your employing agency will complete the back page and forward the claim to OWCP. Click here to link to Form CA-1 and Form CA-2.

## IV. Evidence Needed for Your Claim

**Traumatic injury**. Form CA-1 should describe clearly how the injury occurred using a supplemental statement, if necessary. A medical report that includes a history of how the injury occurred, findings, diagnosis, and an explanation of how your condition is related to the injury must be submitted with the claim.

**Occupational disease or illness**. Occupational diseases or illnesses are usually more complex than traumatic injuries and require more extensive evidence. A narrative statement and a comprehensive narrative medical report should be submitted along with the CA-2. Your statement should describe in detail specific work factors that you believe caused your medical condition. For example, if you do a lot of lifting, describe the types of material lifted, weights, how often lifting is required, and the type of lifting. For emotional conditions, describe specific events, dates the events occurred, those involved, and how the event(s) caused your condition. Vague and general statements should be avoided.

Medical reports for occupational disease or illness claims must include a history, findings, a diagnosis and explain how specific work factors are related to your medical condition. Medical reports for emotional conditions should be from a psychiatrist or licensed psychologist (**note**: an MFCC is not considered a licensed psychologist under FECA). Psychiatric reports should be in narrative form and include a history, findings, a diagnosis, and explain how your condition is related to **specific factors of your employment**. It is insufficient for the treating physician to merely state that your condition is work related. The physician should provide a narrative report which contains a rationalized opinion on how your condition is related to specific factors of employment.

## V. How Claims are Processed

Your employing agency forwards claims to OWCP within 10 working days. Claims are entered into our computer and file numbers are assigned at that time. You will receive a card with your file number on it. Claims are then routed to the Claims Sections for processing. Our goals are to process traumatic injury claims within 45 days, basic occupational disease or illness claims within 90 days and extended occupational disease claims within 180 days. In order to process claims in a timely manner, it is important for injured workers to submit a detailed statement on how the injury occurred and a complete medical report (see **Evidence Needed for your Claim** above).

## VI. Medical Care

If your claim is accepted, FECA provides a broad range of medical benefits and services needed to treat the accepted injury.

**Initial choice of physicians**. You have the right to choose your physician. If that physician refers you to a specialist, OWCP will honor that referral, as long as it is for the work-related condition. If you wish to chang physicians, you must request approval from OWCP. Send a letter to OWCP stating your reasons for wanting this change, along with the name, address, and specialty of the physician to whom you wish to change. OWC

6C

Document 6

will not pay bills from physicians whom we have not approved, other than your first choice of physicians.

**Chiropractic care.** The FECA recognizes chiropractors as physicians only to the extent that their reimbursable services are limited to treatment consisting of manual manipulation of the spine to correct a subluxation as demonstrated by X-ray to exist, and the X-ray must be taken within a reasonable time after the injury.

**Physical therapy.** If your injury requires physical therapy, OWCP can authorize it for 120 days from the date of injury. We will need further medical support for physical therapy beyond 120 days.

**Surgery.** OWCP must approve in advance any surgery other than emergency surgery (that is, a procedure which must be performed right away to preserve life or the function of an organ or body part).

For additional information about authorization and reimbursement for medical services, click here.

## VII. Continuation of Pay (COP)

If you suffered a traumatic injury, you may be entitled to receive continuation of your regular pay (COP) for up to 45 days. Your employing agency pays COP with all the usual deductions from your salary. In order to be entitled to COP, a traumatic injury claim must be filed using Form CA-1 within 30 days of the injury. The employing agency may controvert COP in certain circumstances. If you suffered an occupational disease or illness, you are not entitled to receive COP - COP is for traumatic injury only.

## VIII. Compensation for Temporary Total Disability

If you lose, or expect to lose, pay (beyond 45 days for traumatic injury) because of your injury, you should:

Obtain Form CA-7, *Claim for Compensation*, from your employing agency.

Complete the front of the form. In Section 2, you may claim the period that your doctor thinks you will be disabled for work, or until your next medical appointment, up to 30 days of wage loss into the future. Claims for compensation must be supported with medical evidence of work related disability.

Give the form to your supervisor or injury compensation specialist for completion of the back of the form. T minimize any interruption of income, your employing agency should submit the completed Form CA-7 to th FEC District Office on the 40th day of COP and should include any medical evidence in its possession concerning the injury.

If you continue to lose pay because of work-related disability after the dates claimed on Form CA-7, you should:

Obtain and complete another Form CA-7, *Claim for* Compensation, and complete the appropriate sections.

Ask your physician to complete Form CA-20, *Attending Physician's Report* (attached to Form



(6)

# What A Federal Employee Should Do When Injured At Work



| | |
|---|---|
| **Report to Supervisor** | Every job-related injury should be reported as soon as possible to your supervisor. Injury also means any illness or disease that is caused or aggravated by the employment as well as damage to medical braces, artificial limbs and other prosthetic devices. |
| **Obtain Medical Care** | Before you obtain medical treatment, ask your supervisor to authorize medical treatment by use of form CA-16. You may initially select the physician to provide necessary treatment. This may be a private physician or, if available, a local Federal medical officer/hospital. Emergency medical treatment may be obtained without prior authorization. Take the form CA-16 and form OWCP-1500/HCFA-1500 to the provider you select. The form OWCP-1500/HCFA 1500 is the billing form physicians must use to submit bills to OWCP. Hospitals and pharmacies may use their own billing forms. On occupational disease claims form CA-16 may not be issued without prior approval from OWCP. |
| **File Written Notice** | In traumatic injuries, complete the employee's portion of Form CA-1. Obtain the form from your employing agency, complete and turn it in to your supervisor as soon as possible, but not later than 30 days following the injury. For occupational disease, use form CA-2 instead of form CA-1. For more detailed information carefully read the "Benefits ..." and "Instructions ..." sheets which are attached to the Forms CA-1 and CA-2. |
| **Obtain Receipt of Notice** | A "Receipt" of Notice of Injury is attached to each Form CA-1 and Form CA-2. Your supervisor should complete the receipt and return it to you for your personal records. If it is not returned to you, ask your supervisor for it. |
| **Submit Claim For COP/Leave and/or Compensation For Wage Loss** | If disabled due to traumatic injury, you may claim continuation of pay (COP) not to exceed 45 calendar days or use leave. A claim for COP must be submitted no later than 30 days following the injury (the form CA-1 is designed to serve as a claim for continuation of pay). If disabled and claiming COP, submit to your employing agency within 10 work days medical evidence that you sustained a disabling traumatic injury. If disabled beyond the COP period, or if you are not entitled to COP, you may claim compensation on form CA-7 or use leave. If disabled due to occupational disease, you may claim compensation on form CA-7 or use leave. A claim for compensation for disability should be submitted as soon as possible after it is apparent that you are disabled and will enter a leave-without-pay status. |

The Federal Employees' Compensation Act (FECA) is administered by the U.S. Department of Labor, Employment Standards Administration, Office of Workers' Compensation Programs (OWCP). Benefits include continuation of pay for traumatic injuries, compensation for wage loss, medical care and other assistance for job-related injury or death. For additional information about the FECA, read pamphlet CA-11, "When Injured at Work" or Federal Personnel Manual, Chapter 810, Injury Compensation, available from your employing agency. The agency will also give you the address of the OWCP Office which services your area.

### Post on Employees' Bulletin Board

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs



U.S. GOVERNMENT PRINTING OFFICE: 1991 0—888-435

6 2

jchefner                    (760) 767-4697      04/28/2000 05:02:22 PM  P.2
  04/28/00   15:24 FAX        U.S. LABOR DEPT.                    Document 001

**Federal Employee's Notice of**                 **U.S. Department of Labor**
**Traumatic Injury and Claim for**                 Employment Standards Administration
**Continuation of Pay/Compensation**              Office of Workers' Compensation Programs

Employee: Please complete all boxes 1 - 15 below.  Do not complete shaded areas.
Witness: Complete bottom section 16.
Employing Agency (Supervisor or Compensation Specialist): Complete shaded boxes a, b, and c.

| 1. Name of employee (Last, First, Middle) | 2. Social Security Number |
|---|---|
| Hefner, Richard Randall | 557 45 7148 |

| 3. Date of birth Mo. Day Yr. | 4. Sex | 5. Home telephone | 6. Grade as of date of injury Level 10 Step 1 |
|---|---|---|---|
| 07 01 79 | ☒ Male ☐ Female | (760) 767-4696 | |

7. Employee's home mailing address (include city, state, and ZIP code)

330 Palm Canyon Dr. Unit 2   P.O Box 1210

Borrego Springs CA 92004

8. Dependents
☒ Wife, Husband
☐ Children under 18 years
☐ Other

9. Place where injury occurred (e.g. 2nd floor, Main Post Office Bldg., 12th & Pine)

Basilone Rd across from 43 area LANDFILL, Camp Pendleton

| 10. Date injury occurred Mo. Day Yr. | Time | 11. Date of this notice Mo. Day Yr. | 12. Employee's occupation |
|---|---|---|---|
| 04 07 00 | 12:10 ☐ a.m. ☒ p.m. | 04 28 00 | PIPEFITTER |

13. Cause of injury (Describe what happened and why)

While operating a pumper truck, the truck fishtailed and went out of
control. The truck rolled over off the shoulder.

14. Nature of injury (Identify both the injury and the part of body, e.g., fracture of left leg)

SpinAl cord injury. Discectomy with fusion of
vertebee 6 and 7. Broken spongesinspine. fixed with surgery.

**Employee Signature**

15. I certify, under penalty of law, that the injury described above was was sustained in performance of duty as an employee of the
United States Government and that it was not caused by my willful misconduct, intent to injure myself or another person, nor by
my intoxication. I hereby claim medical treatment, if needed, and the following, as checked below, while disabled for work:

☒ a. Continuation of regular pay (COP) not to exceed 45 days and compensation for wage loss if disability for work continues
beyond 45 days.  If my claim is denied, I understand that the continuation of my regular pay shall be charged to sick
or annual leave, or be deemed an overpayment within the meaning of 5 USC 5584.

☐ b. Sick and/or Annual Leave

I hereby authorize any physician or hospital (or any other person, institution, corporation, or government agency) to furnish any
desired information to the U.S. Department of Labor, Office of Workers' Compensation Programs (or to its official representative).
This authorization also permits any official representative of the Office to examine and to copy any records concerning me.

Signature of employee or person acting on his/her behalf _____  Date 4/28/00

Any person who knowingly makes any false statement, misrepresentation, concealment of fact or any other act of fraud to obtain compensation
as provided by the FECA or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative
remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment or both.

Have your supervisor complete the receipt attached to this form and return it to you for your records.

**Witness Statement**

16. Statement of witness (Describe what you saw, heard, or know about this injury)

63

jchefner                    (760) 767-4697      04/28/2000 05:02:22 PM   P.3
04/28/00  15:25 FAX         U.S. LABOR DEPT.                             ☑002

**Official Supervisor's Report: Please complete information requested below.**

**Supervisor's Report**                                                OWCP Agency Code

17. Agency name and address of reporting office (include city, state, and ZIP code)    *Document 8*

                                                                       OSHA Site Code

                                                                       ZIP Code

18. Employee's duty station (Street address and ZIP code)

19. Employee's retirement coverage    ☐ CSRS  ☐ FERS  ☐ Other, ( identify)

| 20. Regular work hours | From: | ☐ a.m. ☐ p.m. | To: | ☐ a.m. ☐ p.m. | 21. Regular work schedule | ☐ Sun. ☐ Mon. ☐ Tues. ☐ Wed. ☐ Thurs. ☐ Fri. ☐ Sa |
|---|---|---|---|---|---|---|

| 22. Date of injury | Mo. Day Yr. | 23. Date notice received | Mo. Day Yr. | 24. Date stopped work | Mo. Day Yr. | Time: ☐ a.m. ☐ p.m. |
|---|---|---|---|---|---|---|

| 25. Date pay stopped | Mo. Day Yr. | 26. Date 45 day period began | Mo. Day Yr. | 27. Date returned to work | Mo. Day Yr. | Time: ☐ a.m. ☐ p.m. |
|---|---|---|---|---|---|---|

28. Was employee injured in performance of duty?  ☐ Yes  ☐ No  (If "No," explain)

29. Was injury caused by employee's willful misconduct, intoxication, or intent to injure self or another?  ☐ Yes (If "Yes," explain)  ☐ No

30. Was injury caused by third party?  ☐ Yes  ☐ No (If "No," go to item 31.)    31. Name and address of third party (Include city, state, and ZIP code)

32. Name and address of physician first providing medical care (Include city, state, ZIP code)    33. First date medical care received  Mo. Day Yr.

34. Do medical reports show employee is disabled for work?  ☐ Yes  ☐ No

35. Does your knowledge of the facts about this injury agree with statements of the employee and/or witness?  ☐ Yes  ☐ No (If "No," expla

36. If the employing agency controverts continuation of pay, state the reason in detail.    37. Pay rate when employee stopped work  $        Per

**Signature of Supervisor and Filing Instructions**

38. A supervisor who knowingly certifies to any false statement, misrepresentation, concealment of fact, etc., in respect of this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on the reverse of this form is true to the best of my knowledge with the following exception:

Name of supervisor (Type or print)

Signature of supervisor                                   Date

Supervisor's Title                                        Office phone

## Instructions for Completing Form CA-1

Complete all items on your section of the form. If additional space is req.  J to explain or clarify any point, attach a supplemental statement to the form. Some of the items on the form which may require further clarification are explained below.

### Employee (Or person acting on the employee's behalf)

**13) Cause of Injury**

Describe in detail how and why the injury occurred. Give appropriate details (e.g.: if you fell, how far did you fall and in what position did you land?)

**14) Nature of Injury**

Give a complete description of the condition(s) resulting from your injury. Specify the right or left side if applicable (e.g., fractured left leg; cut on right index finger).

**15) Election of COP/Leave**

If you are disabled for work as a result of this injury and file CA-1 within thirty days of the injury, you are entitled to receive continuation of pay (COP) from your employing agency. COP is paid for up to 45 calendar days of disability, and is not charged against sick or annual leave. You may elect sick or annual leave if you wish, but compensation from OWCP may not be claimed during the 45 days of COP entitlement. (You may not claim compensation to repurchase leave used during this period.) Also, if you change your election within one year, the agency is obliged to convert past periods of leave to COP, which qualify.

Your agency may controvert (dispute) your entitlement to COP, but must continue pay unless the controversion is based on one of the nine reasons listed in the instructions for item 35.

If you receive COP, but OWCP later determines that you are not entitled to COP, you may either change COP to sick or annual leave or pay the employing agency back for the COP received.

### Supervisor

At the time the form is received, complete the receipt of notice of injury and give it to the employee. In addition to completing items 17 through 36, the supervisor is responsible for obtaining the witness statement in item 16 and for filling in the proper codes in shaded boxes a, b, and c on the front of the form. If medical expense or lost time is incurred or expected, the completed form should be sent to OWCP within 10 working days after it is received.

The supervisor should also submit any other information or evidence pertinent to the merits of this claim.

If the employing agency controverts COP, the employee should be notified and the reason for controversion explained to him or her.

**17) Agency name and address of reporting office.**

The name and address of the office to which correspondence from OWCP should be sent (if applicable, the address of the personnel or compensation office).

**18) Duty station street address and zip code**

The address and zip code of the establishment where the employee actually works.

**19) Employers Retirement Coverage.**

Indicate which retirement system the employee is covered under.

**30) Was injury caused by third party?**

A third party is an individual or organization (other than the injured employee or the Federal government) who is liable for the injury. For instance, the driver of a vehicle causing an accident in which an employee is injured, the owner of a building where unsafe conditions cause an employee to fall, and a manufacturer whose defective product causes an employee's injury, could all be considered third parties to the injury.

**32) Name and address of physician first providing medical care**

The name and address of the physician who first provided medical care for this injury. If initial care was given by a nurse or other health professional (not a physician) in the employing agency's health unit or clinic, indicate this on a separate sheet of paper.

**33) First date medical care received**

The date of the first visit to the physician listed in item 31.

**35) Does the employing agency controvert continuation of pay?**

COP may be controverted (disputed) for any reason; however, the employing agency may refuse to pay COP only if the controversion is based upon one of the nine reasons given below:

a) The disability results from an occupational disease or illness;

b) The employee is a volunteer working without pay or for nominal pay, or a member of the office staff of a former President;

c) The employee is neither a citizen or a resident of the United States or Canada;

d) The injury occurred off the employing agency's premises and the employee was not involved in official "off premise" duties;

e) The injury was proximately caused by the employee's willful misconduct, intent to bring about injury or death to self or another person, or intoxication;

f) The injury was not reported on Form CA-1 within 30 days following the injury;

g) Work stoppage first occurred 90 days or more following the injury;

h) The employee initially reported the injury after his or her employment was terminated; or

i) The employee is enrolled in the Civil Air Patrol, Peace Corps, Youth Conservation Corps, Work Study Programs, or other similar groups.

Employing agency - Required Codes

jchefner                    (760) 767-4697        04/28/2000 05:02:22 PM  P.5
04/28/00  15:26 FAX         U.S. LABOR DEPT.

*Document ID 004*

## Disability Benefits for Employees under the Federal Employees' Compensation Act (FECA)

The FECA, which is administered by the Office of Workers' Compensation Programs (OWCP), provides the following benefits for job-related traumatic injuries:

(1) Continuation of pay for disability resulting from traumatic, job-related injury, not to exceed 45 calendar days. (To be eligible for continuation of pay, the employee, or someone acting on his/her behalf, must file Form CA-1 within 30 days following the injury; however, to avoid possible interruption of pay, the form should be filed within 2 working days. If the form is not filed within 30 days, compensation may be substituted for continuation of pay.)

(2) Payment of compensation for wage loss after the 45 days, if disability extends beyond such period.

(3) Payment of compensation for permanent impairment of certain organs, members, or functions of the body (such as loss or loss of use of an arm or kidney, loss of vision, etc.), or for serious disfigurement of the head, face, or neck.

(4) Vocational rehabilitation and related services where necessary.

(5) Full medical care from either Federal medical officers and hospitals, or private hospitals or physicians, of the employee's choice. Generally, 25 miles from the place of injury, place of employment, or employee's home is a reasonable distance to travel for medical care; however, other pertinent facts must also be considered in making selection of physicians or medical facilities.

At the time an employee stops work following a traumatic, job-related injury, he or she may request continuation of pay or use sick or annual leave credited to his or her record. Where the employing agency continues the employee's pay, the pay must not be interrupted until:

(1) The employing agency receives medical information from the attending physician to the effect that disability has terminated;

(2) The OWCP advises that pay should be terminated; or

(3) The expiration of 45 calendar days following initial work stoppage.

If disability exceeds, or it is anticipated that it will exceed, 45 days, and the employee wishes to claim compensation, Form CA-7, with supporting medical evidence, must be filed with OWCP. To avoid interruption of income, the form should be filed on the 40th day of the COP period. Form CA-3 shall be submitted to OWCP when the employee returns to work, disability ceases, or the 45 days period expires.

An employee may use sick or annual leave rather than LWOP while disabled. The employee may repurchase leave used for approved periods. Form CA-7b, available from the personnel office, should be studied BEFORE a decision is made to use leave.

For additional information, review the regulations governing the administration of the FECA (Code of Federal Regulations, Title 20, Chapter 1) or Chapter 810 of the Office of Personnel Management's Federal Personnel Manual.

## Privacy Act

In accordance with the Privacy Act of 1974, as amended (5 U.S.C. 552a), you are hereby notified that: (1) The Federal Employees' Compensation Act, as amended and extended (5 U.S.C. 8101, et seq.) (FECA) is administered by the Office of Workers' Compensation Programs of the U.S. Department of Labor, which receives and maintains personal information on claimants and their immediate families. (2) Information which the Office has will be used to determine eligibility for and the amount of benefits payable under the FECA, and may be verified through computer matches or other appropriate means. (3) Information may be given to the Federal agency which employed the claimant at the time of injury in order to verify statements made, answer questions concerning the status of the claim, verify billing, and to consider issues relating to retention, rehire, or other relevant matters. (4) Information may also be given to other Federal agencies, other government entities, and to private-sector agencies and/or employers as part of rehabilitative and other return-to-work programs and services. (5) Information may be disclosed to physicians and other health care providers for use in providing treatment or medical/vocational rehabilitation, making evaluations for the Office, and for other purpose related to the medical management of the claim. (6) Information may be given to Federal, state and local agencies for law enforcement purposes, to obtain information relevant to a decision under the FECA, to determine whether benefits are being paid properly, including whether prohibited dual payments are being made, and, where appropriate, to pursue salary/administrative offset and debt collection actions required or permitted by the FECA and/or the Debt Collection Act. (7) Disclosure of the claimant's social security number (SSN) or tax identifying number (TIN) on this form is mandatory. The SSN and/or TIN, and other information maintained by the Office, may be used for identification, to support debt collection efforts carried on by the Federal government, and for other purposes required or authorized by law. (8) Failure to disclose all requested information may delay the processing of the claim or the payment of benefits, or may result in an unfavorable decision or reduced level of benefits.

Note: This notice applies to all forms requesting information that you might receive from the Office in connection with the processing and adjudication of the claim you filed under the FECA.

## Receipt of Notice of Injury
This acknowledges receipt of Notice of Injury sustained by
(Name of injured employee)

Which occurred on  (Mo., Day, Yr.)

*Document 13*

UNITED STATES MARINE CORPS
Civilian Human Resources Office-Southwest
Box 555026    Bldg 2265
Camp Pendleton, California    92055-5026

12810
HRPSW/023
May 4, 2000

Jeffrey Gross, M.D.
26732 Crown Valley Parkway
Suite 561
Mission Viejo, California    92691

Re:  Richard Hefner
File #92004-13-1215222

Dear Doctor Gross:

You are currently treating Mr. Richard Hefner following an injury he
sustained on April 7, 2000, when he was involved in a motor vehicle
accident.  Your treatment began April 7, 2000 and continues through
present.

In your report of May 4, 2000, you provide a diagnosis of spinal cord
injury, cervical disc herniation.  You indicate Mr. Hefner is unable
to return to regular work, but report limitations of sitting up to two
hours; walking up to 30 minutes; simple grasping up to one hour; and
fine manipulation up to one hour. Additional medical information
provided by you indicates Mr. Hefner's condition was stable and you
would follow his condition and recovery and release to work when safe.

In order to provide Mr. Hefner with the appropriate benefits and
ensure prompt adjudication of his claim, the following information is
required.

Please submit a narrative report which includes: history of injury,
examination findings, test results, diagnosis (with ICD-9 diagnosis
code), treatment provided, prognosis, period and extent of disability
and an opinion on the relationship of the diagnosed condition(s) to
Mr. Hefner's Federal employment activity.

Your immediate attention in this matter is greatly appreciated.
Please provide the requested information no later than May 15, 2000.
If you have any questions, please contact Ms. Jalynn Peterson or
myself at (760) 725-3728 or (760) 725-3796 concurrently.

TIMOTHY A. NICHOLS
Employee Relations Officer

Copy to:
DOL
Mr. Hefner

U.S. DEPARTMENT OF LABOR

EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
PO BOX 193769
SAN FRANCISCO CA 94119
Phone: (415) 975-4090

May 9, 2000

File Number:    92004-13-1215222
Date of Injury: 04/07/2000
Employee:       Richard Hefner

Richard R. Hefner
330 Palm Canyon Drive Unit 2
Borrego Springs, CA 92004

Dear Mr. Hefner:

The Office of Workers Compensation Programs (OWCP) has assigned a registered nurse to assist you in your
recovery from your work related injury. The registered nurse will not be involved in your clinical treatment, but
assist in coordinating the medical aspects of your care and facilitating the flow of information between you, your
doctors, your employer, and the OWCP.

Registered nurse, D. G. Kilcher will be contacting you to arrange a mutually convenient time to meet. The registered
nurse will be contacting your treating physicians and learning more about your medical difficulties to determine how
the OWCP can assist you.

Our objective is to assure that you receive appropriate and timely medical attention throughout your recovery period
and that your return to work (if appropriate) or progression from a light duty to a permanent position is
accomplished smoothly in coordination with your attending physician. We sincerely regret that you suffered an
injury and hope that the registered nurse is able to help you during your period of disability and rehabilitation.

If you have any questions or concerns, please contact me at (415) 975-4144.

Sincerely,

*Linda Rodriguez R.N.*

Linda Rodriguez
Staff Nurse Consultant

FROM : Kilcher Rehabilitation Associa    PHONE NO. : 706 5996602    Jun. 01 2000 01:20PM P2

U.S. DEPARTMENT OF LABOR

EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
PO BOX 193769
SAN FRANCISCO CA 94119
Phone: (415) 975-4090

May 9, 2000

File Number:    92004-13-1215222
Date of Injury: 04/07/2000
Employee:    Richard Hefner

D. G. Kilcher, R.N.
1115 Ballata Ct.
Vista, CA 92083

Dear Sir/Madam:

Claimant Information:

Richard Hefner

330 Palm Canyon Dr, Unit 2

Borrego Springs, CA 92004

(760) 767-4696

I am referring the above injured employee to you for medical management services as part of the Nurse Intervention Program. Below is a brief description of the employee's injury and current circumstances. I have attached copies of pertinent medical documents from our file. This information must be kept in a secure location and returned to this office upon case closure. Case information is the property of OWCP and you cannot discuss it with parties other than the injured worker, CE, nurse consultant, medical providers and employing agency.

You are authorized to provide professional services for contact with the employee, employer, and attending physician(s) or other health care providers as needed, and development of a medical management plan appropriate to the case. However, each case is not to exceed $4000. Please provide me with a narrative report each month that discusses accomplishments, future planned actions, and any problems you are encountering.

Thank you for accepting this referral, and if you have any questions or concerns, please do not hesitate to contact me at ▓▓▓▓▓▓▓▓

Summary Information

Claims Examiner: Oscar M. Ramirez ▓▓▓▓(the phone number is for your information only--please do not give out to anyone)

Sincerely,

*Linda Rodriguez R.N.*

Linda Rodriguez
Staff Nurse Consultant

Encl: Letter of receipt

Hefner 67

# DEPARTMENT OF DEFENSE
# CIVILIAN LEAVE AND EARNING STATEMENT
### Visit the DFAS Web Site at www.dfas.mil

| | | |
|---|---|---|
| 1. PAY PERIOD END | | 05/06/00 |
| 2. PAY DATE | | 05/12/00 |

| 2. NAME | 4. PAY PLAN/GRADE/STEP | 5. HOURLY/DAILY RATE | 6. BASIC OT RATE | 7. BASIC PAY | LOCALITY ADJ | ADJUSTED BASIC PAY |
|---|---|---|---|---|---|---|
| HEFNER RICHARD R | WG 10 01 | 16.12 | 24.18 | | | |

| 8. SOC SEC NO | 9. LOCALITY % | 10. FLSA CATEGORY | 11. SCD LEAVE | 12. MAX LEAVE CARRY OVER | 13. LEAVE YEAR END |
|---|---|---|---|---|---|
| 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 | | N | 06/13/91 | 240 | 01/13/01 |

| 14. FINANCIAL INSTITUTE - NET PAY | 15. FINANCIAL INSTITUTION - ALLOTMENT #1 | 16. FINANCIAL INSTITUTION - ALLOTMENT #2 |
|---|---|---|
| CALIFORNIA COAST CREDIT UNI | | |

| 17. TAX | MARITAL STATUS | EXEMPTIONS | ADD'L | 18. TAX | MARITAL STATUS | EXEMPTIONS | ADD'L | TAXING AUTHORITY | 19. CUMULATIVE RETIREMENT | 20. MILITARY DEPOSIT |
|---|---|---|---|---|---|---|---|---|---|---|
| FED | M | 3 | | | | | | | FERS: | |
| CA | M | 11 | | | | | | | 77.76 | |

| 21. | CURRENT | YEAR TO DATE | 22. |
|---|---|---|---|
| GROSS PAY | 2168.14 | 7017.26 | |
| TAXABLE WAGES | 2168.14 | 7017.26 | |
| NONTAXABLE WAGES | | | |
| TAX DEFERRED WAGES | | | |
| DEDUCTIONS | 486.54 | 1496.28 | |
| AEIC | | | |
| NET PAY | 1681.60 | 5521.98 | |

## CURRENT EARNINGS

| TYPE | HOURS/DAYS | AMOUNT | TYPE | HOURS/DAYS | AMOUNT | TYPE | HOURS/DAYS | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| REGULAR PAY | 80.00 | 1289.60 | | | | | | |

## RETROACTIVE EARNINGS

| TYPE | HOURS/DAYS | AMOUNT | TYPE | HOURS/DAYS | AMOUNT | TYPE | HOURS/DAYS | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| REGULAR PAY | 54.50 | 878.54 | | | | | | |

## DEDUCTIONS

| TYPE | CODE | CURRENT | YEAR TO DATE | TYPE | CODE | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|---|---|
| FEGLI | Z6 | 5.68 | 27.90 | FEGLI OPTNL | ABC | 6.75 | 27.00 |
| FEHB | 105 | 66.78 | 200.34 | MEDICARE | | 31.44 | 101.75 |
| OASDI | | 134.42 | 435.07 | RETIRE, FERS | K | 26.03 | 77.76 |
| TAX, FEDERAL | | 216.54 | 624.23 | TAX, STATE | CA | | 1.23 |

## LEAVE

| TYPE | PRIOR YR BALANCE | ACCRUED PAY PD | ACCRUED YTD | USED PAY PD | USED YTD | DONATED/ RETURNED | CURRENT BALANCE | USE-LOSE/ TERM DATE |
|---|---|---|---|---|---|---|---|---|
| ANNUAL | | 6.00 | 30.00 | | 2.60 | | 27.60 | |
| SICK | | 4.00 | 20.00 | | 12.00 | | 8.00 | |
| INJURY (COP) | | | | 14.00 | 20.00 | | | 04/07 |

## REMARKS

ENROLL IN TSP - DEADLINE 31 JUL
BUY US SAVINGS BONDS
NATIONAL ASIAN-PACIFIC AMERICAN HERITAGE OBSERVANCE IS MAY 1 - 31, 2000
CONTACT YOUR CUSTOMER SERVICE REPRESENTATIVE FOR INFORMATION ON THE NEW SERIES I BONDS
PLEASE CUSTOMIZE YOUR TEMPORARY E/MSS PIN. IF YOU DID NOT RECEIVE A PIN CALL 800-390-2348.
RETROACTIVE TIME AND ATTENDANCE ADJUSTMENTS PROCESSED

-70

Document 12

**UNITED STATES MARINE CORPS**
Civilian Human Resources Office-Southwest
Box 555026    Bldg 2265
Camp Pendleton, California    92055-5026

12810
HRPSW
May 15, 2000

Richard Hefner
330 Palm Canyon Drive Unit 2
Borrego Springs, California    92004

Dear Mr. Hefner:

The expiration of your forty-five days of Continuation of Pay (COP) is effective May 22, 2000. Upon expiration of COP, you must submit an Application for Leave, SF-71, enclosure (1), to your supervisor, indicating your election to charge future absences to either annual and/or sick leave or leave without pay (LWOP).

If you choose to use your annual and/or sick leave, and at a later date wish to reclaim that leave for future use, you may do so under a program called "Leave Buyback". This program allows employees who use their own leave for a work-related injury (accepted by the Department of Labor) to "buyback" the leave. Normally an employee would pay 5% to 10% of the basic hourly rate of the leave that they wish to buyback. If you had 10 hours of leave at $10.00 per hour (total $100.00), you would pay back approximately $5.00 to $10.00.

If you elect LWOP, you must complete a Claim for Compensation of Pay on Account of Traumatic Injury or Occupational Disease, Form CA-7, and have your attending physician complete the attached Attending Physician's Report, Form CA-20, enclosure (2). Both documents should be returned to this office no later than April 10, 2000. Thereafter, additional CA-7 forms, along with the Attending Physician's Report covering the period for which compensation is claimed, must be submitted on a bi-weekly basis until further advised by this office or Department of Labor.

Remember, the CA-7's serve as your timecard. In order to ensure your compensation payments are received on time you must carefully complete these forms and submit them when due. Failure to do so mayd elay your compensation benefits.

Employees are reminded fraudulent claims are punishable by a fine of not more than $10,000 or imprisonment for not more than five years, or both. Cashing compensation benefit checks after having returned towork may be determined to be a fraudulent action and result in criminal prosecution. Compensation checks received after you have returned to work must be returned to the Department of Labor.

Please contact the Workers' Compensation Section, Civilian Human Resources Office, Building 2265, or telephone 725-3728 for information and/or forms for filing compensation benefits.

Sincerely,

*JALYNN PETERSON*
JALYNN PETERSON
Injury Compensation Program Administrator

Copy to:
DOL (92004-13-1215222)
Supervisor (S. Stanford)
File

72

Col. Leif Larson
Headquarters, U. S. Marine Corps
2 Navy Annex Room 3315
Washington, DC 20380-1775
(703) 614- 1202/1077/2423
larsenlr@hqmc.usmc.mil


Dear Col. Larsen,

I contacted Ms. Eleanor Kaufer at the Occupational Safety and Health
Branch on Friday September 1, 2000 in regards to my husband Richard's
motor vehicle accident on Marine Corps. Base Camp Pendleton,
California.  I was told I would be hearing back from someone in your
office on the following Tuesday.  I placed a call to Ms. Kaufer this
afternoon and was told that this matter had yet to be attended to and
Mr. Lillibridge, who had the report, did not want to speak with me.
Col. Larsen I have some serious concerns regarding my husband's
accident and the matter in which this case is being handled.  My
conversation with Ms. Kaufer was very brief so I cannot imagine what is
contained in the report handed over to Mr. Lillibridge.  As I said I
was expecting a call back the following Tuesday to further discuss my
concerns and as of our conversation today I have yet to be able to do
this.  I am writing to you in the hopes that you will be able to help
me in resolving this matter.
As of February 28, 2000, my husband Richard Hefner (SSN 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) is
a Civilian Federal Employee on Marine Corps Base Camp Pendleton.  On
the afternoon of April 6, 2000, he received a work order from his
supervisor informing him of his duties for the following day.  His sole
duty for the day of April 7, 2000 was to take the Government issued
Ford Dominator pumper truck from one location to another several times
in order to complete a sewage pump job.  On one of his trips, Richard
came around a corner traveling UNDER THE SPEED LIMIT in the 43 area on
Basilone Rd.  He heard a clanking sound and the truck immediately began
feeling unstable.  Richard glanced in the side mirror finding the rear
of the truck moving towards the left into the oncoming traffic lane.
He immediately corrected by turning the wheel into the slide then
turned the wheel back to the right in hopes to regain control of the
vehicle.  With the sloshing of the sludge inside the tank, the vehicle,
despite Richard's attempts, went out of control slamming into a tree
and rolling over one time on the right shoulder of the road.  SEVERAL
VEHICLES who were being delayed behind Richard's lower speed of travel
witnessed the accident and stopped to assist him.  Richard managed to
climb out of the truck, after falling to his knees he looked to his
left and observed that the cylinder eye at the bottom of the hydraulic
ram arm was broken in half.  One of the witnesses informed Richard of
his former EMT position, told him not to worry and helped him to his
vehicle.  There were several people now huddled around my husband
awaiting the arrival of the ambulance.  A women stepped forward and
thanked Richard, telling him something to the affect that if he would
not have moved the back of the truck she would have run under it.  As
Richard was being loaded into the ambulance, still fully conscious, he
heard the EMT call out to the witnesses "was he speeding" the people
replied "NO".  After Richard was in the ambulance the police showed up
asking the witnesses if he was speeding they once again replied "NO".
The police asked Richard how fast he was going and he replied 35 MPH.

I will address the relevance of the speeding later in this letter.  The
ambulance proceeded to take Richard to the nearest trauma center
qualified to handle him in Mission Viejo, CA.  During this ride to the
hospital Richard began to lose the feeling in his legs.  Upon arrival
to the hospital he was paralyzed from the upper legs down.  After
several days and the paralysis moving now into Richard's hands and
arms, Neurosurgeon Dr. Jeffery Gross decided Richard's spine must be
repaired to prevent permanent paralysis from the neck down.  The night
of April 10, Dr. Gross successfully operated on Richard, pulling the
exposed pinched nerve back into his spinal cord and inserting donor
bone graft and titanium plate thus fusing a section of his spine
together.
The first contact made to Richard in the hospital was on April 10, this
call was from Richard's supervisor, Scott Stanford, inquiring on his
condition.  The second and final contact made to Richard in the
hospital was on April 12 from a HRO representative at Camp Pendleton.
Richard was released from the hospital on April 14 to begin at home
what we and our three very young children thought would be a time of
healing and rehabilitation, instead my husband and our family were only
in the beginning of being subjected to an enormous amount of stress
that no one in our families situation should have ever had to endure.
At 10 am on April 20 we received a call from Jalynn Peterson, a HRO rep
at Camp Pendleton.  She informed us of Workman's Comp. papers that
needed to be signed, she said that she needed our physical address, and
she would be calling us later to set up a date and time to come to our
home.  At 1 pm that same day Jalynn Peterson was at the front door of
our home accompanied by Safety Division officers, Gysgt Flanders and
Chris Chapman.  It was at this point that our troubles began with
Jalynn Peterson.  I will not go into the details of this meeting except
to say that if you do need further information, we have it documented.
Although at this meeting Richard chose not to sign the safety division
officer's papers he did answer all of their questions.  It was at this
meeting that Richard informed the officers of the broken part and the
officers told Richard that they would return to the base to investigate
it.
At this point I would like to briefly describe our troubles with Ms.
Peterson then continue on with our issues with the Safety Division.
Please bear in mind that despite the "Continuation of Pay" set up for
Federal employees in Richard's situation, his pay was delayed for one over a
month due to Ms. Peterson's deliberate refusal to perform her duties.
Ms. Peterson refused to return Richard's phone calls and at the times
when she finally answered his calls she was verbally abusive despite my
husbands patient efforts to get to the bottom of his pay dilemmas.
Because of our current financial situation and our depleted savings due
to his accident and our families recent move, Richard thought that the
best way to get his pay issues resolved was to be extremely courteous
to this woman who was responsible for the income that puts food on our
table.  Ms. Peterson abused not only our family, but also her position
as a Workman's Comp. representative.  After some time of these troubles
and my suspicions of Ms. Peterson's ability to perform her job, I
contacted the Office of Workman's Compensation in San Francisco myself.
I spoke with Randy York a supervisor of the OWCP only to find out that
the OWCP had nothing in their system of my husband's case.  I told Ms.
York of our troubles with Ms. Peterson, at this point Ms. York informed
me of the pertinent paperwork Ms. Peterson should have filed within a
few days of the accident.  Ms. York immediately faxed to my home the
necessary paperwork (CA-1) and requested that I fax it back immediately

to avoid months of further pay delays, I did.  Ms. Peterson's actions not only effected our family they effected Dr. Gross as well, her harassment of him and his office staff outraged him so that at Richard's appointment on May 3 he informed us of the letter he would be writing to her supervisor.  At this appointment Dr. Gross once again told Richard that in order to heal properly he desperately needed to avoid stress.  Taking this advice very seriously I realized that I needed to do whatever it took to resolve our dilemmas with Ms. Peterson.  I drove directly from this appointment in Mission Viejo to the HRO office at Camp Pendleton.  I told the secretary that I was there to file a formal complaint against Ms. Peterson.  The secretary showed me to an area where I was able to meet with another Workman's Comp. Rep. she listened and referred me to Ms. Peterson's supervisor, Tim Nichols.  I was trying to handle this situation myself but was told that my husband needed to be present or nothing would be discussed, I reluctantly agreed.  This meeting with Mr. Nichols was filled with words of defense, denial and excuses, once again nothing was resolved. Mr. Nichols informed me that my formal complaint was not necessary.  In time I contacted the Office of Workman's Comp. and spoke to our assigned worker Oscar Ramirez, he assigned a Registered Nurse to Richard's case.  This RN contacted Richard and told him that any further Workman's Comp related issues would be handled by her and that we no longer had to worry about dealing with Ms. Peterson.  Ms. Peterson's failure to perform her duties, her deliberate misconduct, and abuse of my family is unacceptable.  Although most experiences and details of our encounters with Ms. Peterson have been left out, Please consider this a formal complaint of negligence against her.
Now I would like to address the issues with GySgt Flanders at Occupational Health and Safety on Camp Pendleton. From the day GySgt Flanders met with Richard at our home in April he has been extremely courteous and concerned with the proper investigation of this accident. My main purpose in writing to you is to ask for your help with my concerns for Richard's safety.  Shortly Richard will be returning to work and because of the lack of investigation of the broken cylinder eye I am concerned about another accident occurring.  The accident scene was searched by a group of Marines who could not find the other half of the broken part.  Certainly this broken part may not be the cause of Richard's accident but I feel it would behoove any driver of one of these pumper trucks if the money were authorized to investigate this thoroughly.  Although it is not in his job description, Richard may be requested to drive a pumper truck when he returns to work, I feel extremely uncomfortable about this.  We have been in contact with GySgt Flanders throughout this investigation.  We understand that after exhausted efforts to obtain the $3000.00 necessary to fund an investigation by a licensed metallurgist he has yet to receive the funds.  We have had many incidences and encounters with the Safety office over the past five months.  On Richards last physical encounter with GySgt Flanders there were speculations made of Richard possibly deliberately causing this accident.  I feel this is absurd and would like to know what exactly is going on with this investigation?  About six weeks ago GySgt Flanders informed Richard of a witness that has "mysteriously" come out of nowhere stating that she was traveling at 45 MPH and Richard was pulling away from her.  As discussed earlier and as reported on the final police report one fact that is known is Richard was not speeding, again I ask, What is going on with this investigation?  My concerns with Richard's safety and the safety of other drivers of these pumper trucks need to be addressed.  For a part

so pertinent to this investigation why, five months later, has the
funding not been approved to have this part properly examined by a
metallurgist?  Months ago Richard had requested detailed photos of this
broken part so he may forward them on to a metallurgist in Cincinnati,
these photos have been taken, yet GySgt Flanders still awaits the
approval he needs to release them to us.
These past five months have been extremely difficult for our family,
although Richards healing progress has been extremely rapid and he is
eager to return to this job he greatly enjoys, there are still many
unanswered questions.  We were told that the investigation of this part
would be completed long before Richard's return to work; with that day
rapidly approaching I am extremely concerned about his safety.  I would
greatly appreciate prompt action taken in regards to this letter.

Thank You,

Jennifer Hefner

330 Palm Canyon Dr.
P.O. Box 1210
Borrego Springs, CA 92004

(760) 767-4697


Cc;
William Clinton
Maj. Gen. Hanlon
Col. Leif Larsen
Congressman Duncan Hunter
Congressman Ron Packard
Mr. Russell Stephens
Lt. D. Kennedy

76

Sept. 25, 2000


Dear Larry,

       This is the letter you asked me to write after our discussion on 9/25/00 at about 6:00 P.M.   My wife sent an email to Colonel Larsen of the Marine Corps Safety Division at the Pentagon and copies of that letter to many others.  I believe the actions that have taken place over the past few days are a direct result of her letter.  Today at approximately 9:00 am, I received a call from GySgt Flanders from the Safety Center on Camp Pendleton.  He requested to have a meeting with me in a "neutral" location.  He stated to me that the drive to Borrego Springs was a little long and asked if I could meet him somewhere.  I agreed and suggested Lake Henshaw.  When that location was established and the time of 1:15 P.M. was determined, we hung up the phone.  I showed up at the Lake Henshaw restaurant at 1:15 P.M. GySgt Flanders and Chris Chapman were already there.  Flanders said I was moving kind of slow, I told him I had just finished Physical Therapy and my shoulder is in a lot of pain.  As I sat down, I was told to keep in mind that nothing the Safety Center has can be used against me and everything I said was confidential.  I was also asked to look at the big over all safety picture and forget about this one accident.  They suggested several ideas on how to avoid this accident in the future such as training, supervisor training, and whether or not I was hired as a truck driver or a pipe fitter.  The next series of question pertained to where I got my CDL and my experience.  I explained that I got my CDL in VA while working for a construction company.  I explained that I have driven a truck with a tank on it to water down the dirt streets in a construction site.  Chris Chapman interrupted and said that I must have only driven at low speed and without hills.  This gave me impression that he did not think I could drive on the road.  I told him that we had to drive on highway roads to the fire station and other locations to get the water.  They then said that my DMV record is confusing and were wondering why I had my CA license suspended.  I explained that I got in two accidents without insurance and according to CA law I must now show insurance with a SR-1 or SR-22.  I made it clear that the minute I stepped foot into CA, I could have gone at any time to the DMV, showed them an SR-1 and had my drivers license reinstated.       The next series of questions were confusing to me.  They asked about my supervisor and his role in this accident.  When I got to work on February 28, 2000, Scott Stanford was excited that I had a Virginia CDL.  He copied it and sent me to work.  GySgt Flanders had my time sheets and work orders with him; they show that for three weeks out of the six weeks prior to this accident I was used as a truck driver.  They asked about a base driver's license and a hazardous material sticker, which I had no idea about.  They also implied that the shop I work for did a bad job "getting the job done" by not having a "truck driver."  GySgt Flanders then asked if I was scared to get into another truck.  I told him that I was not scared, but I stressed to him that I would be nervous.  I was concerned that if I said that I was scared I may have problem with my shop when I go back to work.  They asked about training for the truck and whether I was suppose to be in that truck.  I was then told the more disturbing news, they re-stated the fact that they have a witness who states she was traveling 45-50 MPH and I was pulling away.  They also stated that they had a driver do the same job in another truck and the time it took

him was very close to the times I stated it had taken me.  They kept repeating how "very close" the times were.

I was then told that the work order was missing.  Scott Stanford and my other co-workers agree that that was my work assignment for April 7, 2000.  I explained to GySgt Flanders and Chapman that the day of the 7th was Scott Stanford's RDO (regular day off).  I got my work order from Scott Stanford on Thursday afternoon.  I cleared it with Scott Stanford and he told me to go talk to Waste Water Management, so I did.  I talked to Tom Hoots who said yes even though this job has been done within the last few days it needed to be done again because the digester was not empty, go ahead and do it again with the new work order.  I went back into the office and put it in my box.  Friday April 7, 2000, I went into work and started to do the work order.  Now that work order is missing and all evidence of it is missing.

GySgt Flanders also stated something that rings familiar to what he has said many times in the past "either way having the pin tested is a double edged sword" he proceeded to explain again that if it broke before the accident the Government will get all their money back from Huber for my medical bills, but they will look bad for not maintaining their vehicle.  If it broke during the accident it will make me look bad in regards to my driving ability or speeding or something to that effect.

GySgt Flanders and Chapman then showed me the emails that they had sent out requesting the money for the "pin" to be tested.  I was also told that although Keith Huber (the manufacturer of the dominator) had already supplied the general specifications, he was advised by his attorney not to give up the detailed specifications on the broken part.  The metallurgists who now officially have the part at North Island will only be able to perform 9 out of the 10 tests on the broken part.  GySgt said the results on the pin would be in either this Friday or mid next week and he would call me as soon as he found out.  I showed GySgt Flanders the email that Jennifer sent to Colonel Larsen he said he had a copy and stated that I needed to handle my own affairs when it comes to my work and the people from HRO, (Whatever that means).

I left Lake Henshaw at 2:15 pm and drove home.


Thanks,

Richard Hefner

MISSION HOSPITAL
REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital
at Mission
(949) 347-8400

• 27700 Medical Center Road • Mission Viejo, California 92691

## REPORT OF OPERATION

| | |
|---|---|
| DATE: | 04/10/00 |
| PREOPERATIVE DIAGNOSIS: | ACUTE CERVICAL DISK HERNIATION WITH CORD DEFLECTION AND LONG TRACT SIGNS. |
| POSTOPERATIVE DIAGNOSIS: | ACUTE CERVICAL DISK HERNIATION WITH CORD DEFLECTION AND LONG TRACT SIGNS. |

PROCEDURE:
1. ANTERIOR C6 TO C7 DISKECTOMY.
2. ANTERIOR C6 TO C7 ARTHRODESIS.
3. FASHIONING OF ALLOGRAFT ILIAC CREST BONE GRAFT.
4. USE OF OPERATING MICROSCOPE.
5. ANTERIOR INSTRUMENTATION C6 TO C7.

| | |
|---|---|
| SURGEON: | JEFFREY GROSS, M.D. |
| ASSISTANT SURGEON: | JACQUES PALMER, M.D. |
| ANESTHESIA: | GENERAL ENDOTRACHEAL PLUS LOCAL. |
| COMPLICATIONS: | None. |
| COUNTS: | Reported as correct times two. |
| ESTIMATED BLOOD LOSS: | 100 cc. |

OPERATIVE INDICATIONS: Mr. Hefner sustained a roll-over truck accident. He was brought to Mission Hospital Regional Medical Center as a trauma patient. He underwent a workup for lower extremity weakness and numbness with multiple imaging studies which revealed a right sided herniated disk at C6-7. He had been improving neurologically then plateaued with residual foot and hand symptoms and therefore decompressive surgery was chosen. Informed consent was obtained from the patient and his wife and mother. They wished to proceed with surgery.

| | |
|---|---|
| NAME: | HEFNER, RICHARD T69055 |
| HOSPITAL NO.: | 532984 |
| ROOM NO.: | 356-1 |
| DICTATED BY: | Jeffrey Gross, M.D. |

04/11/00 04/13/00 Kerry/h

114832                    REPORT OF OPERATION PAGE 1

ORIGINAL

MISSION HOSPITAL
REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital
at Mission
(949) 347-8400

27700 Medical Center Road  •  Mission Viejo, California 92691

DESCRIPTION OF THE
PROCEDURE:                    The patient was brought to the operating
theater and given general endotracheal anesthesia.  He was placed
in the supine position with appropriate padding and grounding.  The
neck was prepared with Betadine gel and sterile towels and drapes
were placed including an Iodophor-impregnated drape.

A #10 blade was used to make an incision beginning 1 cm right of
midline two fingerbreadths above the clavicle extending for 3.5 cm
laterally.  Hemostasis was achieved using monopolar electrocautery.
Sharp dissection was used to divide the platysma longitudinally
including its superficial and deep investing fascial layers.  The
platysma was then undermined rostrally and caudally.

Dissection was then made medial to the carotid sheath and its
contents yet lateral to the esophagus and trachea until the spine
was localized.  Release of soft tissues was made rostrally and
caudally and the spine was exposed.  Fluoroscopic localization was
made to the C5-6 disk as the shoulder obscured the C6-7 disk space.
The C6-7 disk space was then identified by being one disk space
caudal to the C5-6 disk space.

The longus colli muscle was taken down between the middle of C5 and
C6 bilaterally using the monopolar electrocautery.  The disk was
excised using a #11 blade and partially removed using rongeurs and
curets.

Casper pins were placed at C6 and C7 and mild distraction was
placed after a self retaining retraction system was placed in the
longus colli muscles.  The remainder of the diskectomy was
performed using small curets as well as rongeurs and pituitary
forceps.

Of note was blood and disruption of the disk and the very loose
C6-7 interspace prior to this portion of the procedure.

The microscope was then brought into the operative field and
drilling of the end plates at C6 and C7 was performed.  Removal of
the disk herniation at the right side at C6-7 was performed and the

NAME:           HEFNER, RICHARD T69055
HOSPITAL NO.:  532984
ROOM NO.:
DICTATED BY:  Jeffrey Gross, M.D.

04/11/00 04/13/00 Kerry/h

114832           REPORT OF OPERATION PAGE 2

ORIGINAL

**MISSION HOSPITAL**
**REGIONAL MEDICAL CENTER**
(949) 582-2300 • (949) 364-1400

Children's Hospital
at Mission
(949) 347-8400

27700 Medical Center Road    •    Mission Viejo, California 92691

ligament was disrupted and blood noted. The ligament was then opened after being identified with a hook and the remainder was removed using a small Kerrison rongeur.

The roots decompressed laterally on both sides until the pedicles were localized. Hemostasis was achieved using Gelfoam and thrombin. Copious irrigation was applied and complete decompression was confirmed.

An iliac crest bone graft was fashioned to a lordotic piece 15 mm deep, 18 to 20 mm across and roughly 7 to 9 mm in height anteriorly although shorter posteriorly. This was tamped into position with distraction and the distraction set removed including Casper pins. Removal of very small anterior osteophytes was performed and the graft was counter sunk. A hook was used to confirm that there was adequate space between the graft and the spinal cord.

Anterior instrumentation was then performed using the Blackstone cervical plating system from C5 to C6 utilizing a 26 mm plate and 14 mm screws aimed 15 degrees up at C6 and 15 degrees down at C7. Locking caps were placed at C6 and C7 and copious irrigation was applied. Retractors were removed at the esophagus and carotid artery was found to be injury free. Bleeding was coagulated using bipolar electrocautery.

Ancef powder was placed deeply within the wound and the closure was made by reapproximating the platysma using interrupted 3-0 Vicryl stitches. A superficial layer of subcutaneous interrupted inverted 3-0 Vicryl stitches were placed and skin closure was made using continuous 4-0 subcuticular Monocryl. Benzoin, Steri-Strips and a sterile dressing was applied. The patient was awakened, extubated

NAME:          HEFNER, RICHARD T69055
HOSPITAL NO.:  532984
ROOM NO.:
DICTATED BY:   Jeffrey Gross, M.D.

04/11/00 04/13/00 Kerry/h

114832                 REPORT OF OPERATION PAGE 3

ORIGINAL





**UNITED STATES MARINE CORPS**
MARINE CORPS BASE
BOX 555010
CAMP PENDLETON, CALIFORNIA 92055-5010

IN REPLY REFER TO:
5726/5
BINSP
6 Oct 2000

Ms. Jennifer Hefner
330 Palm Canyon Drive
P.O. Box 1210
Borrego Springs, California 92004

Dear Ms. Hefner:

Colonel Larsen, Director of Safety Division, Headquarters, U.S. Marine Corps, forwarded your
e-mail to me, in which you expressed your concerns regarding the on-going investigation into
your husband's truck accident on April 7, 2000. First, let me say how sorry I am about your
husband's accident and the major disruption, stress, and terrible inconvenience it has caused you
and your family.

After receiving your e-mail, I began looking into the issues you wrote about, with particular
emphasis centering on the safety of our personnel driving what are known as the "dominator"
trucks.

I have thoroughly reviewed the case, had in depth discussions with the Safety Investigator, and
looked into the issues of supervisory oversight and control in regard to the function your husband
was engaged in when the accident occurred.

In your e-mail, you state that one of your chief concerns was that a metallurgist had not tested the
yoke portion of the Hydraulic Ram Assembly. You opined that the broken yoke portion of the
Ram Assembly was a contributing factor in your husband's accident, and could pose a future
safety hazard if not identified and corrected. On September 13, 2000 Gunnery Sergeant Flanders
of Base Safety personally delivered that Assembly to the Materials Engineering Laboratory at
Naval Aviation Depot, North Island, California to perform a fracture analysis and metallurgical
test. Obviously, until we receive the results of that test we cannot make any inferences or draw
any investigative conclusions regarding the Ram Assembly's contribution, if any, to the accident.
We are awaiting the results of that test.

As the Commanding General, Marine Corps Base, Camp Pendleton, Major General Hanlon's
highest priority is the safety and well being of our military and civilian workforce aboard this
base. I have personally briefed him on the status of this investigation and will continue to keep
him informed. Upon conclusion of this investigation, your husband, Richard, will be informed of
the investigator's facts, opinions, and recommendations. Please rest assured that upon your
husband's return to work, he will not be asked to drive the dominator truck, nor will anyone else
who is not properly trained and licensed to do so.

In regard to the Continuation of Pay issue you raised, I spoke with Ms. JoAnne Burson, Deputy
Director, Marine Corps Civilian Human Resources Office-Southwest and received verification

that once all the required paperwork and documentation was supplied by your husband and his physician, that Continuation of Pay was authorized and paid. I regret any misunderstanding or miscommunications that may have occurred as part of that process during April and May 2000.

If you have further questions, please contact me at (760) 725-5112. I will be more than happy to discuss with you those issues and details of the investigation that can be appropriately released at this time.

Sincerely,

JAN M. DURHAM
Colonel, U.S. Marine Corps
Base Inspector
By direction of the
Commanding General

Copy to:
Col L. R. Larsen, CMC (SD)

2

83

DOCUMENT 14

License & Trainin
Bldg 22135
725-4728

P/U application for
3 ton class
Fill Out & Return
3-5 days before
3 ton class

On Class Day bring
valid driver's licens

# NEUROLOGICAL SURGERY

**JACQUES J. PALMER, M.D.**
A PROFESSIONAL CORPORATION
**SYLVAIN PALMER, M.D., F.A.C.S.**
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
**JEFFREY D. GROSS, M.D.**

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 561
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1060
FAX (949) 364-5761

October 3, 2000

Mr. Oscar Ramirez
Claims Adjuster
EMPLOYMENTS STANDARD ADM
WORKERS COMP PROGRAM
P.O. Box 3769
San Francisco, CA 94119-3769

RE:                    RICHARD HEFNER
Date of injury:        04-07-00
Claim No.:             13215222

## WORKERS' COMPENSATION FOLLOW-UP REPORT

Dear Mr. Ramirez:

I am writing after having seen Mr. Hefner in follow-up.

He is status post a cervical spinal cord injury requiring anterior cervical discectomy and instrumented arthrodesis at C6-7. He has been out of his collar and doing well with that. He is extremely motivated and has no upper extremity symptoms except for some left shoulder limitations from his previous visit which have improved. He had been doing his therapy religiously.

He still has some postconcussive syndromes, namely vertigo and some eye problems. He also has rare leg tingling, likely associated with his spinal cord injury.

**Physical Examination**: His wound is well healed. He moves his neck well and is full of energy. His upper extremities are strong and symmetric. He demonstrates an excellent range of motion with the left shoulder.

His gait is normal.

**Diagnostic Images**: Flexion/extension x-rays show an excellent fusion at C5-6 with good positioning and good alignment. There is no movement between the flexion and extension x-ray at the fused level.

Page 2
October 3, 2000
Re:  Richard Hefner

Impression:  Status post spinal cord injury and anterior cervical
discectomy and fusion at C6-7.

He is doing very well and is very motivated to return to work.

Plan:  I will give him a mild muscle relaxant for prn use only.
This will be Flexeril.

I agree he return to work tomorrow.  It appears that he has no
limitations.  I did caution him with regard to his vertigo and if
he develops this while driving or walking, he should pull over and
stop or lie down if he is standing.  He appears to understand
this.

He need only return to see me per renada, as he is doing quite
well.

Please feel free to contact me at any time regarding this case.

DECLARATION PURSUANT TO AB 3660 & LABOR CODE 46281:

I declare under penalty of perjury that the information contained
in this report and its attachments, if any, is true and correct
to the best of my knowledge and belief, except as to information
that I have indicated I received from others.  As to that
information, I declare under penalty of perjury that the infor-
mation accurately describes the information provided to me and,
except as noted herein, that I believe it to be true.  This
document was executed in Orange County, California, on the date
indicated below.

MANDATORY LANGUAGE REQUIRED IN LABOR CODE SECTION 5703:

"I have not violated Labor Code Section 139.3 and the contents of
the report and bill are true and correct to the best of my
knowledge.  This statement is made under penalty of perjury."

Dated this 13th day of _Octob_____, 2000 at Orange County,
California.

Sincerely,

JEFFREY D. GROSS, M.D.

FROM (Title of Supervisor, Shop or Office, and Location)

MAINTENANCE SUPV 97.3 6889

86

NAME OF EMPLOYEE (Last, First, Middle)
RICHARD GIEER

PAYROLL NO. 1    200    SOCIAL SEC. NO.
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

JOB TITLE
DIRECTOR

TIME LEFT JOB    TIME RETURNED

REASON FOR REFERRAL
[ ] INJURY  [ ] ILLNESS  [ ] EMPLOYEE REQUEST  [X] OTHER (Specify) SUPERVISOR

DATE OF INJURY    DATE REFERRED TO CLINIC    OCCUPATIONAL
11-3-00                11-3-00                [ ] YES  [ ] NO  [X] QUESTIONABLE

REMARKS
FELL OF A PUMPER TRUCK

NAME OF SUPERVISOR (Print)    SUPERVISOR (Signature) JOHN R. Howard    PHONE 725-0599    DATE 11-3-00

## THIS SECTION TO BE COMPLETED BY MEDICAL OFFICER

TIME ADMITTED    TIME RELEASED    OCCUPATIONAL
                                  [X] YES  [ ] NO  [ ] QUESTIONABLE

DIAGNOSIS
[ ] FIRST AID  [ ] DISPENSARY  [ ] HOSPITAL  [ ] PERSONAL PHYSICIAN  [ ] SENT HOME  [ ] OTHER (Explain in Remarks)

### DISPOSITION OF EMPLOYEE

[ ] RETURN FOR FURTHER TREATMENT    TIME    DATE
[ ] RETURN TO WORK
[ ] DISCHARGED TREATMENT COMPLETED
[ ] RETURN TO LIMITED DUTY AS INDICATED BELOW

REMARKS

### RECOMMENDED LIMITED DUTY STATUS

| | |
|---|---|
| [ ] NO LIFTING, PULLING OR CARRYING IN EXCESS OF ___ LBS. | [ ] DESK JOB ONLY |
| [ ] NO EXCESSIVE WALKING, STANDING OR BENDING | [ ] NO DRIVING GOVERNMENT VEHICLE |
| [ ] NO EXPOSURE TO SOLVENTS, GREASE, OILS, DETERGENTS, ETC. | [ ] NO WORKING AROUND MOVING MACHINERY |
| [ ] NO WALKING ON UNEVEN OR SLIPPERY SURFACES | [ ] NO WORKING ON LADDERS, SCAFFOLDING, ETC. |
| [ ] NO EXPOSURE TO EXTREME TEMPERATURE OR HUMIDITY | [ ] ONE HAND JOB ONLY |
| [ ] OTHER (Explain) | |

DATE LIMITED DUTY RECOMMENDED    SIGNATURE MEDICAL OFFICER

### THIS SECTION TO BE COMPLETED BY SUPERVISOR

WAS EMPLOYEE ASSIGNED LIMITED DUTY?  [ ] YES  [ ] NO (If yes, describe duties assigned)

PRIVACY ACT STATEMENT
Authority: SECNAVINST 5100.10B and OPNAVINST 5100.14
Principal Purpose: Is to control and monitor treatment and disposition of civilians at Naval Dispensaries in cases of occupational injury or illness.
Routine Use: To ensure prompt investigation of occupational injury and to initiate any necessary immediate corrective action.
Disclosure: Voluntary. Treatment will be provided without regard to employee's willingness to divulge all or part of the requested information.

NOTE: Return completed form to Employee Relations and Services Branch, Civilian Personnel Office, Building 2265, Attention: Compensation Clerk, within TWENTY-FOUR HOURS following ON THE JOB INJURY.

Jan. 16, 2000

From: Richard R. Hefner, Pipefitter, WG-4204-10
To: Facilities Resource Director
Via: Preventative Maintenance Supervisor
Via: General Foreman
Via: Utilities Director
Via: FMO

Subject: Response to my request for advanced sick leave
         Request for 30 hours annual leave
         Request to extend my term until the reduction in force

1. Thank you for authorizing the 24 hours of advanced sick leave. I have already notified my doctors and requested the dates and times that I was in their respective offices. My doctors, which are Dr. Robert Maywood (Orthopedic surgery), Dr. Jeffrey Gross (Neurosurgery), Dr. H. Randall Hicks (Psychiatry), and Dr. Bakst (Neurology), will draft the appropriate letters and fax them to me. I will in turn present them to my supervisor. I just wanted to take this opportunity to thank you for your time and assistance in this matter.

2. I am requesting 30 hours of advanced annual leave on the same grounds that I requested the sick leave. The grounds were due to my medical condition and the use of my leave to go to doctor's appointment and for my further doctor's appointments. As I have stated in the past, I am requesting the leave buy back from the Department of Labor. This process is time consuming. Due to the amount of time this process takes, it does not help in my current financial hardship that the doctor's appointment and the accident have caused my family.

3. I am sincerely requesting that the term I was hired on be extended until the end of the reduction in force. I am requesting this due primarily to the accident of April 7, 2000, and its resulting financial hardship. When I was hired on February 28, 2000, my family and I had a financial plan in mind. The financial plan was being executed until 12:10 P.M., April 7, 2000. On that date and time, my life dramatically changed. I was transported to Mission Viejo Hospital via an ambulance. At that time and for the next three and a half days, I was paralyzed from the hips down. On the night of April 10, 2000, Dr. Jeffrey Gross did an emergency surgery considering my condition was getting worse to include my hands and arms. I was given the choice to have surgery that evening and maybe not walk again or to wait a few days and certainly not have movement from the neck down. He successfully reversed the paralysis with little side effects. Since some of my paper work was not done in a timely fashion, I was not paid Continuation of Pay (COP) for 35 days. This full month's pay had tragic effects on my financial status considering I am the sole means of income for my wife and three small children (all under age seven). Once I started receiving workman's compensation pay, it was approximately $550 less than my normal month's pay. I stayed on workman's compensation for about six months and in that time I had another surgery to repair bone structure inside my left shoulder. The approximate time for a person to recover from a discetomy (the surgery I had on my neck including the plate screwed into my vertebrae) is one full year. I returned to work in five months

and twenty six days.  The average time for recovery for a shoulder surgery is eight weeks.  I recovered in five weeks and was back to full duty on the sixth week.  This time is included in the five months and twenty-six days. In this quick recovery time I had to make some sacrifices, both physically and mentally.  When I returned to work on October 3, 2000, I had to wait a period before my first full pay check.  This period was extremely hard on my family and me.  This period assisted in throwing us further into debt.  I am requesting this extension because for the sacrifices that I have made to return to work. I feel a six or seven-month extension is not a lot to ask.  I lost approximately four thousand dollars in time I was on workman's compensation that does not include the possibility of overtime.  I have also lost 15 to 20% less range of motion in my neck, not to mention strength.  I have also lost 30% less range of motion in my left shoulder and 40% less strength, which may never be recovered.  In the time that I am requesting, I can and will correct the financial debt this accident and pay problems have caused.  Unfortunately the accident took place and while the investigators are looking for a cause of the accident, it has been determined by the base investigator that it was NOT due to driver error.  With this fact in mind, I sincerely request for a six to seven-month extension of my term.

Sincerely,

Richard R. Hefner

Document 21 85



# Local Complaint Form

(For use by a bargaining unit member in asking Local for representation concerning a complaint.)

*Please print.*

To NFFE Local __919__                                    Date __1/18/01__        ~~19~~

A.  Your full name __Richard Hefner__
    Job title __PIPEFITTER__                    Grade __WG-10__
    Work unit & organization __FMD Shop 6889__
    Duty hours _____    Duty phone no. __725-4008__
    Home address __330 Palm Canyon DR. #1310 Borrego Springs CA 920__
    Home phone no. __(760) 767-4697__

I request representation regarding the following complaint:

B.  Complaint.
    Briefly state the facts and circumstances regarding your complaint. Your statement should include the followin
    1) a description of the act or incident; 2) why it happened: personal bias, union activity, alleged poor performan
    or conduct, discrimination; 3) name, job title, grade, work unit, organization and duty phone of each witness wi
    knows the facts about the complaint; 4) why you consider it a valid complaint: give section of contract, regulatio
    law, etc., violated. Be brief, but include all the facts, use additional sheets as necessary.
    __On Feb. 28, 2000, I reported to Camp Pendleton. I had a Va. class "A"__
    __driver's License, Scott Stanford copied it. I was never sent to__
    __Base Safty or Base Licensing for my Base endorsements. I was not__
    __eneven given safty training on any the vehicles. I was told to drive the__
    __Ford Deminator truck. On April 7, 2000 I Rolled the pumper truck,__
    __I am complaining for my lack of training and__ (Additional space on back of form

C.  Remedy Sought. (State in one sentence the action you think management should take to resolve your complaint
    __I Recommend personnel only be assigned to do jobs which__
    __are on your job description__

D.  Have you talked with your supervisor about it? (X) Yes. ( ) No.
    Name of your supervisor __Scott Stanford__  Phone no. __4008__
    If yes, state briefly what he/she told you:
    __Supervisor had no Real answer.__

E.  Have you consulted with any other management official(s) about it? ( ) Yes. (X) No.
    If yes, name the official(s) and state briefly what you were told.
    _____
    _____

F.  Have you submitted your complaint to management in writing? ( ) Yes. (X) No.
    If yes, attach a copy of your submission and any reply you have received.

-----------------------------------------------------------------

## SIGNATURE

G.  I hereby designate NFFE Local __919__ to represent me in the above-described complaint.
    I understand the Local is not obligated to take my complaint to arbitration.    / /

Document 20    90



# Local Complaint Form

(For use by a bargaining unit member in asking Local for representation concerning a complaint.)

*Please print.*

To NFFE Local __919__                                    Date _1/18/01_   ~~19~~

A. Your full name _Richard Randall Hefner_
   Job title _PIPEFITTER_ _____ Grade _WG-10_
   Work unit & organization _FMD Shop 688 G_
   Duty hours _____ Duty phone no. _4008_
   Home address _330 Palm Canyon DR #1210 Borrego Springs CA 92004_
   Home phone no. _(760) 767-4697_

   I request representation regarding the following complaint:

B. **Complaint.**
   Briefly state the facts and circumstances regarding your complaint. Your statement should include the following:
   1) a description of the act or incident; 2) why it happened: personal bias, union activity, alleged poor performance
   or conduct, discrimination; 3) name, job title, grade, work unit, organization and duty phone of each witness who
   knows the facts about the complaint; 4) why you consider it a valid complaint: give section of contract, regulation,
   law, etc., violated. Be brief, but include all the facts, use additional sheets as necessary.
   _When I was injured on APRIL 7, 2000, TALYNN PETERSON DID NOT_
   _FILE A CA-1 FORM to the Department of LABOR IN A TIMELY_
   _FASHION. I WAS FORCED to FILE my own CA-1 FORM ON the 28th_
   _DAY OF the 30 day time limit for my injuries to be considered_
   _FOR WORKMAN's compensation; Due to her lack of doing her_
   _job, MY FAMILY WAS FORCED to go without_ (Additional space on back of form.)

C. **Remedy Sought.** (State in one sentence the action you think management should take to resolve your complaint.)
   _I suggest the workman's compensation specialist File a_
   _CA-1 Form within 72 Hours of the injury._

D. **Have you talked with your supervisor about it?** (X) Yes. ( ) No.
   Name of your supervisor _Scott Stanford_ Phone no. _4008_
   If yes, state briefly what he/she told you:
   _He told me that He has known TALynn Peterson for some time AND_
   _she is good at her job._

E. **Have you consulted with any other management official(s) about it?** (X) Yes. ( ) No.
   If yes, name the official(s) and state briefly what you were told.
   _Lt. Colonel LARSON AT Department of NAVAL safety IN Washington,_
   _Commanding officer HANLON of Camp Pendleton._

F. **Have you submitted your complaint to management in writing?** (X) Yes. ( ) No.
   If yes, attach a copy of your submission and any reply you have received.

------------------------------------------------------------

### SIGNATURE

G. I hereby designate NFFE Local __919__ to represent me in the above-described complaint.
   I understand the Local is not obligated to take my complaint to arbitration.
   _[signature]_                          _1/18/01_

DOCUMENT 91



# Local Complaint Form

(For use by a bargaining unit member in asking Local for representation concerning a complaint.)

*Please print.*

To NFFE Local **919**                                          Date **1/18/01**   19___

A. Your full name **Richard Randall Hefner**
   Job title **PIPEFITTER**                  Grade **WG-10**
   Work unit & organization **FMD Shop 6889**
   Duty hours _____  Duty phone no. **4008**
   Home address **330 Palm Canyon DR. #1210 Borrego Springs CA 92004**
   Home phone no. **(760) 767-4697**

   I request representation regarding the following complaint:

B. Complaint.
   Briefly state the facts and circumstances regarding your complaint. Your statement should include the following 1) a description of the act or incident; 2) why it happened: personal bias, union activity, alleged poor performance or conduct, discrimination; 3) name, job title, grade, work unit, organization and duty phone of each witness who knows the facts about the complaint; 4) why you consider it a valid complaint: give section of contract, regulation, law, etc., violated. Be brief, but include all the facts. use additional sheets as necessary.

   **Disbursing I requested 80 hours advanced sick leave and it was denied for Requesting too much time. I turned the letter into Disbursing. Scott Stanford was on leave at the time, when he returned He commenced to lecture me in public about how I or could not do that, I can do that to start with. He stated that He want the letter I submitted. I went to disbursing** *(Additional space on back of form.)*

C. Remedy Sought. (State in one sentence the action you think management should take to resolve your complaint.
   **Supervisor's should care for their employer's and not Humilate employee's for pay concerns.**

D. Have you talked with your supervisor about it? (X) Yes. ( ) No.
   Name of your supervisor **Scott Stanford**    Phone no. **4008**
   If yes, state briefly what he/she told you:
   **NO response**

E. Have you consulted with any other management official(s) about it? ( ) Yes. (X) No.
   If yes, name the official(s) and state briefly what you were told.

F. Have you submitted your complaint to management in writing? ( ) Yes. (X) No.
   If yes, attach a copy of your submission and any reply you have received.

----------------------------------------

## SIGNATURE

G. I hereby designate NFFE Local **919** to represent me in the above-described complaint.
   I understand the Local is not obligated to take my complaint to arbitration.
   
   1/18/01

*Document 14*

*92*



# Local Complaint Form

(For use by a bargaining unit member in asking Local for representation concerning a complaint.)

*Please print.*

To NFFE Local __419__                                      Date __1/18/01__    19____

A. Your full name __Richard Randall Heture__

   Job title __PIPEFITTER__                    Grade __WG-10__

   Work unit & organization __FMD shop 6855__

   Duty hours _____    Duty phone no. __4008__

   Home address __330 Palm Canyon DR #1210 Borrego Springs CA 92004__

   Home phone no. __(760) 767-4657__

I request representation regarding the following complaint:

B. **Complaint.**
   Briefly state the facts and circumstances regarding your complaint. Your statement should include the following:
   1) a description of the act or incident; 2) why it happened: personal bias, union activity, alleged poor performance
   or conduct, discrimination; 3) name, job title, grade, work unit, organization and duty phone of each witness who
   knows the facts about the complaint; 4) why you consider it a valid complaint; give section of contract, regulation,
   law, etc., violated. Be brief, but include all the facts, use additional sheets as necessary.

   __I am complaining about the comments from Jalynn Peterson__
   __I received on the telephone, my wife and I shared the phone__
   __while Jalynn stated on several times to "Enjoy my vacation"__
   __She also stated that I need to recover quickly so I may return__
   __to work. Other comments also were directed to me recieving__
   __"Free" money for my time off.__                    (Additional space on back of form.)

C. **Remedy Sought.** (State in one sentence the action you think management should take to resolve your complaint.
   __I think people one workman's compensation should__
   __be treated with respect & considering their injuries.__

D. Have you talked with your supervisor about it? (X) Yes. ( ) No.
   Name of your supervisor __Scott Stanford__      Phone no. __4008__
   If yes, state briefly what he/she told you.
   __He stated that Jalynn and He were friends and she does__
   __her job appropriately__

E. Have you consulted with any other management official(s) about it? ( ) Yes. (X) No.
   If yes, name the official(s) and state briefly what you were told.

   _____

F. Have you submitted your complaint to management in writing? ( ) Yes. (X) No.
   If yes, attach a copy of your submission and any reply you have received.

                              **SIGNATURE**
G. I hereby designate NFFE Local __419__ to represent me in the above-described complaint.
   I understand the Local is not obligated to take my complaint to arbitration. /



Document 23
93

## Local Complaint Form

(For use by a bargaining unit member in asking Local for representation concerning a complaint.)

*Please print.*

To NFFE Local __919__                                    Date __1/18/01__    19__

A. Your full name __Richard Randall Hefner__

Job title __PIPEFITTER__          Grade __WG-10__

Work unit & organization __EMD SHOP 688S__

Duty hours _____          Duty phone no. __4008__

Home address __350 Palm Canyon DR #1210 Borrego Springs CA 92004__

Home phone no. __(760) 767-4697__

I request representation regarding the following complaint:

B. Complaint.
Briefly state the facts and circumstances regarding your complaint. Your statement should include the following 1) a description of the act or incident; 2) why it happened: personal bias, union activity, alleged poor performance or conduct, discrimination; 3) name, job title, grade, work unit, organization and duty phone of each witness who knows the facts about the complaint; 4) why you consider it a valid complaint; give section of contract, regulation, law, etc., violated. Be brief, but include all the facts, use additional sheets as necessary.

__Since Oct. 3, 2000, when I returned to work I have been receiving comments such as "your ass is hanging in the wind, your mooning people, your not covering your ass at all." "Your not doing things right," "Your causing problems again," "What do what now?" "I can help you with your problems," "I am out of your loop so I can deal with your problem."" I don't recall talking to__ (Additional space on back of form)

C. Remedy Sought. (State in one sentence the action you think management should take to resolve your complaint.
__I believe people should be punished in po private, and praise in public.__

D. Have you talked with your supervisor about it? (X) Yes. ( ) No.
Name of your supervisor __Scott Stanford__     Phone no. __4008__
If yes, state briefly what he/she told you:
__no response__

E. Have you consulted with any other management official(s) about it? ( ) Yes. (X) No.
If yes, name the official(s) and state briefly what you were told.

_____
_____

F. Have you submitted your complaint to management in writing? ( ) Yes. (X) No.
If yes, attach a copy of your submission and any reply you have received.

............................................................................

### SIGNATURE

G. I hereby designate NFFE Local __919__ to represent me in the above-described complaint.
I understand the Local is not obligated to take my complaint to arbitration.
_____                              __1/18/01__

DOCUMENT 22

94



# Local Complaint Form

(For use by a bargaining unit member in asking Local for representation concerning a complaint.)

*Please print.*

To NFFE Local _919_                                                Date _1/18/01_    19___

A. Your full name _Richard Randall Hefner_

   Job title _Pi DEEater_        Grade _WG-10_

   Work unit & organization _FMD Stop 6885_

   Duty hours _____        Duty phone no. _4008_

   Home address _330 Palm Canyon Dr #1210 Borrego Springs CA 92004_

   Home phone no. _(760) 767 4697_

I request representation regarding the following complaint:

B. Complaint.

   Briefly state the facts and circumstances regarding your complaint. Your statement should include the following
   1) a description of the act or incident; 2) why it happened: personal bias, union activity, alleged poor performan
   or conduct, discrimination; 3) name, job title, grade, work unit, organization and duty phone of each witness wl
   knows the facts about the complaint; 4) why you consider it a valid complaint; give section of contract, regulatio
   law, etc., violated. Be brief, but include all the facts, use additional sheets as necessary.

   Fact: On Oct 3, 2000, I requested my tools back from my shop. My superv,
   told me he had no free recall of my tools, I talked to Lawrence Payne
   who my tools # were in his truck. He states he cleared himself
   putting my tools in the tool room from Scott Stanford. I have written
   statements from Mr. Payne and myself. According to Mr. Stanfor.
   He has no free recall of me ever having person _Additional space on back of form_

C. Remedy Sought. (State in one sentence the action you think management should take to resolve your complaint
   A supervisor should be responsible for his actions an
   his employee's actions.

D. Have you talked with your supervisor about it? (X) Yes. ( ) No.
   Name of your supervisor _Scott Stanford_  Phone no. _4008_
   If yes, state briefly what he/she told you:
   _He claims no recall, responsibility or accountability for_
   _this issue._

E. Have you consulted with any other management official(s) about it? ( ) Yes. (X) No.
   If yes, name the official(s) and state briefly what you were told.

F. Have you submitted your complaint to management in writing? ( ) Yes. (X) No.
   If yes, attach a copy of your submission and any reply you have received.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**SIGNATURE**

G. I hereby designate NFFE Local _919_ to represent me in the above-described complaint.
   I understand the Local is not obligated to take my complaint to arbitration.

_[signature]_                                        _1/18/01_

**UNITED STATES MARINE CORPS**
Civilian Human Resources Office - Southwest
Box 555026 Building 2265
Camp Pendleton, California 92055-5026

12810
HRSWP
February 23, 2001

Richard Hefner
330 Palm Canyon Drive #1210
Borrego Springs, CA 92004

Dear Mr. Hefner:

You recently submitted a CA-1, Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation for an injury you sustained on January 31, 2001.  Your case has been accepted for *Limited Medical Only*.

Limited Medical Only cases are processed and closed without an initial review by a claims examiner, assuming the agency has not controverted this claim.  Controversion occurs either because the agency objects to the claim being work related and/or to the claimant's right to continuation of pay. Limited Medical Only cases cover absences from work and medical expenses up to $1,500.

If the medical bills claimed exceed $1,500, or any other event occurs that may require a claim examiner's review, i.e., request for surgery, a wage-loss claim will be submitted to OWCP.  At that time the case will be reopened, and formally adjudicated.  The adjudication process is a thorough examination and will result in a formal acceptance or denial of the claim.

If you have any questions concerning your workers' compensation claim, please contact Ms. Jalynn Peterson at (760) 725-3728.

Sincerely,

FELISA BAKER
Injury Compensation Specialist

76

**Diedrich GS06 Brenda L**

| | |
|---|---|
| **From:** | Padron GS09 Laura A |
| **Sent:** | Monday, March 19, 2001 9:59 AM |
| **To:** | Brenda Diedrich |
| **Subject:** | R. HEFNER |

Brenda,

I have spoke to Mr. Hird in regards to Mr. Hefner.  We are going to extend his appointment for another six months, nte 8-25-01.
Thanks

Laura

*Hefner 97*

**UNITED STATES MARINE CORPS**
Facilities Maintenance Department
Marine Corps Base
Camp Pendleton, CA  92055-5009

5100
FACFMO/800
28 Mar 01

FMD POLICY MEMORANDUM NO. 2-99  (AMENDMENT #1)

From:  Facilities Maintenance Officer
To:      Facilities Maintenance Department Employees

Subj:  ███████████████

Ref:     (a) BO 12750.1L
            (b) Negotiated Agreement of 20 Feb 98
            (c) 29 CFR 1910
            (d) 29 CFR 1926

1.  Per references (a) and (b), employees and supervisors are reminded of their responsibility to perform their duties in a safe manner and help eliminate accidents and health hazards.

2.  Weekly safety meetings, departmental safety stand-downs, safety training classes, in-house and OSHA inspections and countless dollars spent on safety equipment has not effectively improved the awareness of our personnel concerning safety practices.

3.  Effective this date, all safety requirements, with particular attention to references (c) and (d), will be **strictly enforced** and appropriate corrective action will be taken by all levels of supervision to ensure safe working habits and conditions.

4.  Since following safety rules and regulations is also a critical element of all employees' performance appraisals, any violations of safety practices could result in the withholding of performance related awards during that rating period.

5.  It is the joint obligation of journeymen pipefitters and supervisors to notify the Fire Department in writing of any fire hydrant taken off line for any reason.

S. D. NELSON

**ISAAC BAKST, M.D.**
A PROFESSIONAL CORPORATION
NEUROLOGY

Diplomate of American Board of
Psychiatry and Neurology

La Jolla Medical and Surgical Center
8929 University Center Lane, Suite 207, San Diego, CA 92122
Tel. (858) 552-8828    Fax (858) 552-8858

PATIENT:       Richard Hefner
DATE:             April 5, 2001
W.C. INSURANCE COMPANY: U.S. Department of Labor
EMPLOYER:    Camp Pendleton
DATE OF INJURY: April 7, 2000
CLAIM NO.:       92004-131215222
REFERRING PHYSICIAN: Robert Maywood, M.D.

## NEUROLOGICAL PERMANENT AND STATIONARY REPORT

Mr. Hefner is seen today for review. His symptoms have been stable, and are as follows:

1.    Headache occurring twice a week, lasting an hour, throbbing, severe to the point of discontinuing the particular activity that he is engaged in. Headache is reduced with an electrostimulating machine.
2.    He experiences vertigo two or three times a week, lasting seconds, until he changes position or sits.
3.    He experiences loss of balance, occasionally, two or three times a week, generally associated with stress, and worse when his neck feels tighter than usual.
4.    He experiences nightmares three times a week.
5.    He has constant abnormal sensations in the lower extremities in a sense that he cannot feel his calves properly.

## CLINICAL EXAMINATION

Speech, language, comprehension normal. Eye movements normal. No facial weakness. Tongue and palate central. Hearing normal to conversational tones.

Motor System: Normal power throughout. Tone normal. Deep tendon reflexes symmetric as follows: triceps 0; biceps 1+; brachioradialis 1+; knee jerks 2-3; ankle jerks 2-3. Romberg positive. Tandem abnormal, but able to do so independently.

Vibration sense reduced at ankles and toes.

## DIAGNOSES:

1.    Post-traumatic head syndrome, slight.
2.    Status post spinal cord injury, cervical spine with paraplegia, improved, by history.

**ASSESSMENT:** The assessment is obviously limited in the absence of medical records that relate to the original injury. These have previously been requested from Dr. Gross, and these have not yet been received. Thus, this evaluation is based on the available information.

99

Richard Hefner                                                    Page Two

Mr. Hefner was injured on April 7, 2000, in a motor vehicle accident when he was the driver of a tanker trunk that struck a tree. He suffered head and neck injuries and paraplegia, the latter of which has resolved with residual symptoms characterized by numbness and tingling from the thigh down, as well as an insensitivity in the calves. In this regard, the neurologic examination is abnormal because of mild ataxia and hyperreflexia.

He has had residual headaches, as well as vertigo, and has suffered from nightmares.

Based on the available information, he might be considered to be permanent and stationary at this point.

## SUBJECTIVE FACTORS:

1.    Headache: occasionally severe.
2.    Vertigo and ataxia: occasional, slight.
3.    Lower extremity symptoms: constantly minimal; may become slight to moderate occasionally.
4.    Nightmares: occasional.

## OBJECTIVE FACTORS:

1.    Brisk deep tendon reflexes, lower extremities.
2.    Mild ataxia with a mild positive Romberg sign and abnormal tandem gait and reduced vibration sense, ankles and toes.

## ADDITIONAL OBJECTIVE FACTORS:

1.    Presumed abnormal imaging studies of the cervical spine not reviewed by me.

## FUTURE MEDICAL CARE:

1.    Mr. Hefner is likely to continue suffering from headache for the foreseeable future and ought to have available to him access to medical treatment for these headaches in the nature of supervision, as well as access to medications.
2.    It is expected that the vertigo will improve without intervention, but in the event of exacerbation, either of vertigo or ataxia, he ought to have access to medical attention.
3.    Lower extremity symptoms: It is presumed that these symptoms are going to improve without intervention. The presumption is that these symptoms are due to spinal cord injury at the level of the cervical spine. Thoracic spine and lower lumbar spine injury have not been excluded, and if his symptoms worsen, then he ought to have access to medical attention to image the entire spine, and treat accordingly, and re-image the cervical spine should that become necessary.
4.    Nightmares: These are subsiding. However, he should have the option of having this addressed psychiatrically if necessary.

*100*

Richard Hefner                                                                          Page Three

**NOTE:** I have not reviewed what may turn out to be relevant medical information regarding Mr. Hefner's injury and initial neurosurgical investigation and treatment. This information is by report en route. There is a possibility that this may alter conclusions reached in this case.

**DISCLOSURE STATEMENT:** I declare under penalty of perjury that the information contained in this report and its attachments, if any, are true and correct to the best of my knowledge and belief, except as to the information that I have indicated that I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me. This declaration is made and signed in the County of San Diego, California.

Isaac Bakst, M.D.

IB/lr
cc:     Robert Maywood, M.D.
        Richard Hefner

*101*

# Robert M. Maywood, M.D., P.C.

*Orthopaedic and Arthroscopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board of Orthopaedic Surgeons*
*Qualified Medical Examiner, State of California*

April 5, 2001

U. S. Department of Labor
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

**Attention:**       **Oscar Ramirez**

| | |
|---|---|
| **RE:** | **HEFNER, RICHARD** |
| **DOI:** | **April 7, 2000** |
| **CLAIM NO:** | **92004-131215222** |
| **SS#:** | **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** |
| **EMPLOYER:** | **Camp Pendleton (Facility Maintenance Dept.)** |
| **DOE:** | **April 5, 2000** |

## ORTHOPEDIC PERMANENT AND STATIONARY EVALUATION
## BY PRIMARY TREATING PHYSICIAN

Dear Mr. Ramirez:

This report is being prepared under the guidelines of the Division of Workers Compensation/Industrial Medical Council as a permanent and stationary report by the primary treating physician. The patient, Richard Hefner, was seen in my San Diego office on April 5, 2001, for re-evaluation of orthopedic complaints sustained in an industrial injury on April 7, 2000. In excess of 1 1/2 hours was spent in face-to-face patient contact, record review and report preparation.

## CURRENT COMPLAINTS:

The patient reports continued pain in his left shoulder with activities at shoulder level or above. He also has trouble with lifting heavy weights. He also continues with neck pain, especially with the use of both arms above his head.

## INTERIM HISTORY:

I first saw this patient on July 18, 2000, for an injury sustained on April 7, 2000. He was involved in an accident while driving a tanker truck, where he lost control of the truck and it rolled over. He had been seen at Mission Bay Hospital Emergency Room.

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123

10.2

**RE: HEFNER, RICHARD**
**Claim: 92004-131215222**
**April 5, 2001**
**Page 2**

MRI's and CT scans were performed. In addition, the patient had a C6-7 disc protrusion, for which he underwent surgery by Dr. Jeffrey Gross on April 10, 2000, including an anterior C6-7 diskectomy with arthrodesis, iliac crest bone graft and anterior instrumentation. He continued to have shoulder pain following his neck surgery.

The patient underwent arthroscopy left shoulder surgery on August 23, 2000, for impingement and intra-articular synovitis. Postoperatively, he was noted to have significant headaches and was referred for neurological consultation. He received physical therapy and other conservative treatment for his left shoulder postoperatively. Secondary to his multiple injuries, he was no longer capable of performing his usual and customary work.

<u>PHYSICAL EXAMINATION:</u>  *(Positive findings in italics.)*

The patient is a well-developed, well-nourished male appearing about his stated age, right-hand dominant.

Visual examination of the lower extremities demonstrates them to be grossly symmetrical. There is no evidence of motor paralysis and/or wasting.

<u>EXAMINATION OF THE CERVICAL SPINE:</u>

| | |
|---|---|
| TENDERNESS: | *There is notable tenderness to palpation in the left cervical paraspinal muscles.* The trapezius muscle group is nontender to palpation. |
| SPASM: | *There is spasm palpated in the left trapezius.* |
| FORAMINAL COMPRESSION: | Causes neither axial nor radicular symptoms. |
| HOFFMANS: | Negative on the right and the left. |
| SENSATION: | Sensation to pinprick is normal and equal bilaterally. |

RE: HEFNER, RICHARD
Claim: 92004-131215222
April 5, 2001
Page 3

ACTIVE RANGE OF MOTION:
EXTENSION:                  100%
FLEXION:                    *Limited to 2 fingerbreadths from the chest.*
LEFT ROTATION:              100%
RIGHT ROTATION:             100%
LEFT BENDING:               100%
RIGHT BENDING:              100%

LEFT UPPER EXTREMITY EXAMINATION:

*Visual examination of the left shoulder reveals well-healed arthroscopic portals scars.* There is no evidence of atrophy of the rotator cuff muscles. The acromioclavicular joint is nontender to palpation with a negative crossover. Apprehension test for instability is negative. There is no tenderness to palpation along the long head of the biceps tendon. There is no pain at the proximal biceps tendon with SLAP testing. Neer's impingement sign is negative. Distally, the extensor pollicis longus, abductor pollicis brevis, and dorsal interossei are 5/5 with 2+ radial pulse and normal sensation. *Range of motion of the shoulder is full with pain at the extremes and mild crepitus.*

DEEP TENDON REFLEXES:       2+ and symmetrical throughout the upper extremities.

MANUAL MUSCLE TESTING:      5/5 except the left supraspinatus, which is 5-/5.

| RANGE OF MOTION | INJURED LEFT/RIGHT | UNINJURED NORMAL | |
|---|---|---|---|
| EXTENSION: | 30° | 30° | 30° |
| FLEXION: | 180° | 180° | 180° |
| INTERNAL ROTATION: | T10 | T10 | T10 |
| EXTERNAL ROTATION: | 80° | 80° | 80° |
| ABDUCTION: | 180° | 180° | 180° |
| ADDUCTION: | 20° | 20° | 20° |

JAMAR DYNAMOMETER TESTING AT POSITION 2:
                                        POUNDS
RIGHT DOMINANT UNINJURED:   110/110/100
LEFT INJURED:               78/110/94
I believe the patient put forth maximal effort upon dynamometer testing.

**RE: HEFNER, RICHARD**
**Claim: 92004-131215222**
**April 5, 2001**
**Page 4**

## REVIEW OF MEDICAL RECORDS:

Neurological permanent and stationary report from Isaac Bakst, M.D., is noted, dated April 5, 2001, with a diagnosis of posttraumatic head syndrome, slight, status post spinal cord injury, cervical spine, with paraplegia, improved, by history. Dr. Bakst does not suggest any work restrictions due to his headaches but does suggest that the patient will be likely to continue to have headaches and should be afforded future medical care as necessary.

## DIAGNOSIS:

1.  Left shoulder impingement and labral tearing.
2.  Status post left shoulder arthroscopy with subacromial decompression and debridement, labral fraying and synovitis, August 23, 2000.
3.  Chronic cervical strain with headaches and vertigo.
4.  Status post C6-7 surgery, previously addressed by Dr. Gross.

## DISABILITY STATUS:

It is this examiner's opinion that this patient has reached a permanent and stationary level for the above stated injury, having obtained maximal benefit of medical care.

## SUBJECTIVE FACTORS OF DISABILITY:

The patient's subjective complaints would be characterized as constant slight to moderate neck pain, increasing to moderate to severe levels with repetitive neck motions and movements of the upper extremities above the shoulder level. He reports constant mild shoulder pain, increasing to slight to moderate pain with activities at shoulder level or above.

## OBJECTIVE FACTORS OF DISABILITY:

1.  Well-healed arthroscopy portals.
2.  Residual rotator cuff weakness, 1/2 grade.
3.  Glenohumeral crepitation with range of motion.

## WORK RESTRICTIONS:

The patient is restricted from work requiring repetitive neck movements as well as work at shoulder level or above with the bilateral upper extremities.

*105*

**RE: HEFNER, RICHARD**
**Claim: 92004-131215222**
**April 5, 2001**
**Page 5**

## CAUSATION:

The medical evidence available for review, the patient's current complaints and the physiological findings during my examination indicate left shoulder impingement and labral tearing, status post left shoulder arthroscopy with subacromial decompression and debridement, labral fraying and synovitis, August 23, 2000, and chronic cervical strain with headaches and vertigo.

These injuries are a direct result of the accident which occurred on April 7, 2000, and the patient's description of the mechanism of the accident as well as the findings on physical examination are consistent with the injury.

## VOCATIONAL REHABILITATION:

Vocational rehabilitation is medically indicated in this case as the patient will not be able to return to his work as a pipefitter secondary to his cervical condition as well as his left shoulder condition.

## FUTURE MEDICAL CARE:

The patient will require future medical care to cure and/or relieve the effects of the industrial injury and for pain control with exacerbations over and above the current permanent and stationary levels. This care will consist of nonsteroidal anti-inflammatories and pain medications. The patient may also need the future medical care of doctor office visits, physical therapy, diagnostic studies and/or injections.

At the present time, I do not feel that any further surgical procedures are necessary in regard to the patient's left shoulder. In the future, however, there may be a medical necessity for surgery in the form of repeat left shoulder arthroscopy if he has a recurrence of symptoms and scar tissue in the subacromial space or deterioration of the glenohumeral joint.

For future treatment of the patient's headaches, I would defer to Dr. Bakst's report.

In regard to his shoulder, the patient also has subjective and objective ratable factors of disability. Based on the "American Medical Association Guides to the Evaluation of Permanent Impairment, 4th Edition", page 59, table 19, the patient has a 10% joint impairment due to mild crepitation during range of motion, plus an additional 10% upper extremity impairment due to strength loss index based on table 34, page 65,

*10 6*

**RE: HEFNER, RICHARD**
**Claim: 92004-131215222**
**April 5, 2001**
**Page 6**

for a total of a 20% permanent partial impairment to the left upper extremity. The patient should be afforded future medical care as noted above.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

**AFFIDAVIT OF COMPLIANCE:**

"I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, expect as noted herein, that I believe it to be true."

"I further declare under penalty of perjury that I personally performed the evaluation of the patient on April 5, 2001, at my San Diego office and that, except as otherwise stated herein, the evaluation was performed and the time spent performing the evaluation was in compliance with the guidelines, if any, established by the Industrial Medical Council or the administrative director pursuant to paragraph (5) of subdivision (j) of §139.2 or §5307.6 of the California Labor Code."

"Per Labor Code §4628K, 90% of my practice is devoted to direct treatment and 10% is devoted to medicolegal evaluation of injured workers."

"I verify under penalty of perjury that the total time I spent on the following activities is true and correct:

| | | | |
|---|---|---|---|
| a. | Reviewing the Records | _40_ | Hours |
| b. | Face-to-face time with the patient | _45_ | Hours |
| c. | Preparation of the report | _1_ | Hours |
| d. | Any other relevant activities detailed in the report | _____ | Hours" |

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

*107*

RE: HEFNER, RICHARD
Claim: 92004-131215222
April 5, 2001
Page 7


"I declare under penalty of perjury that I have not violated the provisions of California Labor Code §139.3 and that the contents of this report are true and correct to the best of my knowledge."

Signed this ____2⁴ᵗ____ day of ____April____, 2001, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California

RMM/e

*108*

UNITED STATES MARINE CORPS
Marine Corps Civilian Human Resources Office – Southwest
Box 555026
Camp Pendleton, California  92055-5026

12810
HRSWP/023
June 27, 2001

Richard Hefner
3455 Swinging V Road
Borrego Springs, California  92004

Dear Mr. Hefner:

We have recently conducted a job search in an effort to find you meaningful employment.  A careful review of your qualifications, as well as the most recent medical information in our files, enclosure (1), indicates you are fully capable of successfully performing the duties of Pipefitter, as described in the attached job description, enclosure (2).  Accordingly, we are making a firm job offer.  The assignment will be effective 1 July 2001.

This is a temporary position, for a minimum of 90 days, full-time, with no specific or unusual physical requirements.  Your specific medical restrictions as indicated in the attached medical report will be accommodated.  The position is currently available and located at the Marine Corps Base, Camp Pendleton.

Your pay will be set at WG-10, Step 02, $17.44 per hour.  The difference in pay between your salary and what you currently receive, if any, will be paid by the Department of Labor.

If you have any questions regarding this letter, please contact Ms. Jalynn Peterson or Mr. Timothy Nichols at (760) 725-3728 or 3796 respectively.

Sincerely,

CAROL M. CHOSTNER
Human Resources Director

Encl:
(1)  Medical Report
(2)  Job description

Copy to:
DOL (92004-13-1215222)
Employment
FRM (B. Hird)
RTW File
File

I ACKNOWLEDGE RECEIPT OF THIS LETTER:

Signature                                    Date

Received:   6/ 5/ 1 11:38AM;                     415 975 4287 -> HRO CAMP PENDLETON CA DSN 365;   Page 18
    06/05/01  TUE 11:42 FAX 415 ᵃ75 4287      U.S. DEPT. OF LABOR      +++ JALYNN PNDLTN      @018
                                                                                              P. 85

109

**RE: HEFNER, RICHARD**
**Claim: 92084-131215222**
**April 5, 2001**
**Page 4**

## REVIEW OF MEDICAL RECORDS:

Neurological permanent and stationary report from Isaac Bakst, M.D., is noted, dated April 5, 2001, with a diagnosis of posttraumatic head syndrome, slight, status post spinal cord injury, cervical spine, with paraplegia, improved, by history. Dr. Bakst does not suggest any work restrictions due to his headaches but does suggest that the patient will be likely to continue to have headaches and should be afforded future medical care as necessary.

## DIAGNOSIS:

1.  Left shoulder impingement and labral tearing.
2.  Status post left shoulder arthroscopy with subacromial decompression and debridement, labral fraying and synovitis, August 23, 2000.
3.  Chronic cervical strain with headaches and vertigo.
4.  Status post C6-7 surgery, previously addressed by Dr. Gross.

## DISABILITY STATUS:

It is this examiner's opinion that this patient has reached a permanent and stationary level for the above stated injury, having obtained maximal benefit of medical care.

## SUBJECTIVE FACTORS OF DISABILITY:

The patient's subjective complaints would be characterized as constant slight to moderate neck pain, increasing to moderate to severe levels with repetitive neck motions and movements of the upper extremities above the shoulder level. He reports constant mild shoulder pain, increasing to slight to moderate pain with activities at shoulder level or above.

## OBJECTIVE FACTORS OF DISABILITY:

1.  Well-healed arthroscopy portals.
2.  Residual rotator cuff weakness, 1/2 grade.
3.  Glenohumeral crepitation with range of motion.

## WORK RESTRICTIONS:

The patient is restricted from work requiring repetitive neck movements as well as work at shoulder level or above with the bilateral upper extremities.

110

**POSITION DESCRIPTION** *(Please Read Instructions on the Back)*

| | | 1. Agency Position No. |
|---|---|---|
| | | 6830-3596 |

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|
| Redescription ☐  Establishment ☐  New ☒  Other ☒ | Hdqtrs ☐  Field ☒ | Fac Maintenance Dept | Camp Pendleton, CA | |

Explanation (Show any position replaced)

**OVER T/O**

| 7. Fair Labor Standards Act | 8. Financial Statements Required | 9. Subject to IA Action |
|---|---|---|
| Exempt ☐  Nonexempt ☒ | Executive Personnel Financial Disclosure ☐  Employment and Financial Interests ☐ | Yes ☒  No ☐ |

| 10. Position Status | 11. Position Is | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| Competitive ☒  Excepted (Specify in Remarks) ☐ ☐ (Con.) ☐ ☐ (CS) | Supervisory ☐  Managerial ☐  Neither ☒ | 1-Non Sensitive ☐  2-Noncritical Sensitive ☒  3-Critical Sensitive ☐  4-Special Sensitive ☐ | OF00 |
| | | | 14. Agency Use |
| | 8 | | 0850 |

| 15. Classified/Coded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | Pipefitter | WG | 4204 | 10 | JMS | 06/26/01 |
| e. Recommended by Supervisor or Initiating Office | PIPEFITTER | WG | 4204 | 10 | | |

16. Organizational Title of Position (if different from official title)   17. Name of Employee (if vacant, specify)

| 18. Department, Agency, or Establishment | c. Third Subdivision |
|---|---|
| Marine Corps Base, Camp Pendleton, CA | Maintenance Service Branch |
| a. First Subdivision | d. Fourth Subdivision |
| AC/S Facilities | |
| b. Second Subdivision | e. Fifth Subdivision |
| Facilities Maintenance Department | |

19. Employee Review—This is an accurate description of the major duties and responsibilities of my position.   Signature of Employee (optional)

20. Supervisory Certification. *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.*

| a. Typed Name and Title of Immediate Supervisor | b. Typed Name and Title of Higher-Level Supervisor or Manager (optional) |
|---|---|
| ROBERT L. HIRD, DIR FACILITIES RESOURCE MGMT DEPT | ROBERT L. HIRD, DIR FACILITIES RESOURCE MGMT DEPT |
| Signature          Date  6-25-01 | Signature          Date  6-25-01 |

RECEIVED HRO   01 JUN 25 2:37

21. Classification/Job Grading Certification. *I certify that this position has been classified/graded as required by Title 5 U.S. Code in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

Typed Name and Title of Official Taking Action
Richard D. Crawford
Employment/Classification Officer
Signature          Date  6/26/01

22. Position Classification Standards Used in Classifying/Grading Position
(a) OPM JGS for Pipefitting Series, WG-4204, dated Mar 69 (b) OPM JGS for Plumbing Series, WG-420 dated Mar 69 (c) OPM JGS for Welding Series, WG-3703, dated May 74 (d) OPM JGS for Motor *

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee (optional) | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks  *Vehicle Operating Series, WG-5703, dated Apr 91.

Requires a California Drivers License

*Hefner III*

# PIPEFITTER, WG-4204-10

## A.    INTRODUCTION

This position is located in the Utilities Branch, Maintenance & Repair/Utilities Division, Facilities Maintenance Department.  The purpose of the position is the installation, replacement, and report of building plumbing, water mans, service lines, gas mains and laterals, sewage mains and laterals, various heating and steam processing equipment, gas (natural and propane) hot air furnaces, space heaters, wall heaters, overhead heating units, boilers, hot water tanks with emphasis on component equipment such as gas burners, pilots, igniters, thermostat controls, automatic controls and gas driers and gas vaporizing units.

## B.    TYPICAL WORK PERFORMED

1. The work involves the maintenance, repair and replacement of existing piping.

Building piping consists of all the plumbing normally installed within a building, such as all types of plumbing fixtures, galley equipment, medical and dental equipment. Approximately 25% of the time is devoted to this type of work.

Utilities pipefitting consists of all outside utilities such as water main distribution lines, pumping plants, automatic valves, water treatment plants, training tanks, sewage mains and laterals, sewage disposal plants, sewage effluent purification, water storage reservoirs, and gas lines.  Approximately 25% is devoted to this type of work.

2. The journeyman pipefitter plans, lays out and requisitions materials for completion of the proposed job.

He/She lays out drainage pipe and fittings at job site (i.e. soil pipe - DWV, polyvinyl chloride (PVC)), determines depth and grade of soil and waste lines and route openings, cuts soil drainage vent pipe to proper lengths and connects to pipe fittings using no-hub couplings, installs piping in trench to proper grade, backfills trench to ground level, extends vent pipes 5 feet above floor level, installs test plugs in piping, fills system with water and inspects system for leaks.

He/She installs plumbing fixtures when building is in the finished stage (i.e. water closet, urinals, lavatories, service sink, water coolers, shower fixtures, floor drains, laundry tray, floor sink, hot water heaters, dental equipment, X-ray developers and film processing units), connects water supply to fixture, and tests fixtures for proper operation.

He/She modifies, repairs or replaces piping in all types of buildings using different piping materials (i.e. black iron, galvanized, copper, cast iron, polyvinyl chloride).

He/She performs preventive maintenance on the piping and fixtures mentioned in the preceding paragraphs by repairing or replacing items worn out in service (i.e. faucet week

with seats, supply tubing, angle stops, flushometer valves, ballcocks, tankballs, lift wires, shower valves, pressure regulators, and other related valves).

He/She clears stoppages in the drainage piping systems by using a power sewer snake and a rubber force cup.

He/She uses power sewer rodder to clear stoppages and roots from sewer mains, laterals and storm drains. These power rodders are gasoline powered and function through a hydraulic system to operate and control the 1000 feet of continuos rod. The operation required skill to operate properly without causing damage to either the sewer lines or the rod. He/She is also responsible for the maintenance and repair to the rodder and its accessories.

He/She lays out water mains and services as job site (i.e. cast iron, asbestos cement, polyvinyl chloride, chlorinated polether, polypropylene, polyvinyl dichloride, polyethylene, copper, steel, wrought iron, concrete cylinders, and brass pipe). Determines depth and grade of lines and route openings; locations of valves, blow-offs, pressure reliefs, pressure regulators. After mechanical excavation, digs trench to fine grade. Tests with hydrostatic pressure, checks for leakage, superchlorinate, flushes out lines, and places into service. Makes field drawings for records. Lays out gas mains and laterals at job site (i.e. black steel pipe, polyvinyl chloride); determines depth and grade of pipe lines, and route and location of vaporizers, pressure controlling, sectionalizing, and service valves, and regulators. Cuts pipes to lengths and connects to pipe and fittings and equipment using threads and couplings, colvent weld cement, arc welding or acetylen welding; installs piping in trench to proper grade; install all fittings equipment and pressure test pneumatically for leaks. After all leaks are eliminated, backfills trench to ground level, extends valve cans to grade, fills systems with gas and connects to buildings, laterals and main lines. Then rechecks the new gas system for leaks with a Barton Gastron.

He/She lays out sewer mains and laterals at job sites (i.e. vitrified clay pipe, terra cotta clay pipe, asbestos cement, cast iron, polyvinyl chloride). Determines depth and grade of lines, location of manholes and laterals. Cuts pipe to lengths and connects pipe to fittings using no-hub and flexible couplings, tyton, mechanical, caulk type, fluid tite, and ring tite joints. and solvent weld; installs piping in trench to proper grade; backfills trench to ground level; installs test plugs in piping and fills system with water and inspects system for leaks.

He/She makes emergency repairs to water, gas and sewer mains, laterals and services; must respond quickly to such emergency jobs to prevent damage to structures, roads, and pipelines; must be able to determine the location of the broken pipes by using Geophone, Detectron, Barton Gastron, probes, blueprints, and field drawings; must be familiar with the other underground utilities, such as telephone and electric, to avoid damage to them during excavation of broken pipe; must determine the necessary assistance required for other trades to make complete repairs, and make arrangements for them; must make such repairs without interruption of the utilities services to buildings in the area, if possible; if this is not possible, he/she must notify the tenants of the building, Base Fire Department, Base Utilities Officer, and his/her supervisor, prior to making the outage; direct the operator of the excavation equipment as to where to dig

*113*

and of the existing underground utilities in the immediate area; closely supervises the excavation to avoid damage to the broken pipe; then complete the excavation with a pick and shovel; makes the repairs using redwood plugs, stainless steel and cast steel clamps, flexible cast steel couplings, and epoxy, or, when necessary, by replacing the defective fitting or short length of pipe. Many times he/she required the assistance of excavation equipment operator, welders, laborers, and masonry tradesmen in the completion of the permanent repairs of these systems. The journeyman pipefitter directs the work of these tradesmen. He/She must be extremely cautious at all times of not contaminating the water system, and of not causing an explosion with gas fumes. Must work quickly, with little or no supervision, in order to complete the job in the least possible time.

In the installation of piping and fixtures, employees in this rating determine layout of pipe systems using blueprints, sketches, and following written and oral instructions. This involves establishing locations for systems or sections in relation to walls, passageways, obstructions, tunnels, etc; drilling necessary holes and setting locations of pipe support hangers. Employees cut, bend, thread, and flare pipe according to established layout and specifications using hand tools and power operated pipe cutting and threading machines. Depending upon the type of installation involves, employees work with materials such as half-inch copper tubing used for water, oil and propane lines, up to 8" iron pipe which supports maximum pressures of approximately 340 psi at temperatures up to 412 degrees F. They install pipe hangers, securing them to various surfaces with appropriate drilling tools and hardware. Pipe roll stands and pipe sections are clamped to walls or tunnels with expansion joints to compensate for temperature expansion and contraction. Employees position and align pipe sections and fittings for welding operations as required. System fittings such as strainers, high pressure gauges, by pass and relief valves, steam traps, return lines, condensate tanks, etc, are installed, maintained and repaired. This includes packing and adjustment of various types of valves.

Employees position, secure and connect fixtures such as radiators, hot water heaters, small heating boilers, tanks, steam tables, coffee urns, dishwashing machines to main lines and return systems or to individual boiler installations as appropriate. They install and maintain various hand controlled and automatic devices such as thermostats, temperature and pressure gauges, water level indicators, etc. Employees test installations for leaks and other defects, using hydrostatic water pressure or compressed air.

Employees in this rating also cover steam, hot water heating, oil and gas lines with prefabricated insulation materials, or mix and apply insulating materials to surfaces of hot water tanks, joints, fittings, valves, and other irregular shapes.

Incumbent of this rating will analyze operation of gas equipment (natural or propane), disassemble, make repairs, replace parts, put equipment in operation. employees clean units, replace refractory in fire boxes, check and adjust thermostats. Work involves disassembly, cleaning, parts replacement and reassembly of all gas equipment, automatic safety devices, and regulating controls, also, removing and installing electric motors and burner units. Employee in this rating must be familiar with different types of vaporizers and their repair and replacement.

*114*

The work performed on gas fired hot water boilers, low pressure steam boilers, hot air units, hot water tanks, involves installation, repair and maintenance to units and all component parts associated with such units, including ducts, stacks, pumps, gauges, meters, relief valves, etc.

Employees in this category may be required to perform various other tasks such as boiler cleaning, pumping and cleaning oil tanks, cleaning overhead heaters units and tasks assigned to heating repair shop, but will be utilized in this week less than 5% of the time.

C.    **SKILLS AND KNOWLEDGE**

Employee working under this classification must be a quality journeyman pipefitter. They also must have knowledge of the following codes:

> National Plumbing Code
> San Diego County Plumbing Code, including that portion pertaining to natural, liquified and petroleum gas.
> National Fire Protection Association, as pertaining to automatic fire protection sprinkler system and controls.
> American Water Works Association Standards for Water Systems, Piping and Fittings.
> General order No. 112-B, California Public Utilities Commission Standard Code for Gas Pressure Piping and Gas Transmission and Distribution Systems.

A journeyman must have knowledge of shop mathematics, blueprint reading and training in mechanical drawing in order to show location and scope of work he/she has installed or modified and future replacements. Journeyman must have the ability to read and write and understand simple English language and to interpret blueprints, sketches and work from same. He/She must understand and carry out oral instructions, must be able to interpret technical guides for the installation of new or complex equipment.

He/She must have an intense knowledge of the trade, must know and apply necessary codes when installations are made. He/She must have the ability and dexterity to install, maintain and repair piping systems connected to complicated mechanical equipment incidental to the trade such as: dishwashing machines, steam kettles, bakery equipment, medical and dental equipment, large stationary pumping equipment (water and sewage), large pressure reducing stations, backflow preventor, pump pressure control stations, reservoir water level control valves, fire hydrants and fire sprinkler systems.

Employee in this position must have the necessary skill to install and repair large size water mains up to 18" diameter and work with pressure up to 300#psi with all necessary valving, air and vacuum breakers at proper elevations. All above installations are in all types of terrain, such as: river crossings, canyons and etc. Pipefitter must be able to install all types and sizes of sewer lines such as: building waste lines, building laterals, traps, vents, floor drains, large sewer mains up to 18" diameter. He/She must be able to install and repair high pressure gas mains up to 100#psi and must be able to install, repair and adjust large gas regulate

The journeyman must possess a wide variety of knowledge and skill due to the complexity and diversification of work that is dispersed over a wide expanse equal to ten cities. Each camp is self-contained (water, sewage, gas, plumbing, etc).

He/She must be able to use all tools of the trade: hand tools, power tools, power equipment, pipe machines, portable pumps, sewer rodding machines, emergency chlorination machine.

He/She must be mentally alert at all times, have the ability to use good judgment in planning and laying out work in case of emergencies or injuries, accidents, etc.

Incumbent must possess a valid California state operator's permit.

Employee uses basic arithmetic to measure pipe and tubing. Employee must have trade knowledge of steam space heating, steam processing and hot water heating pipe systems with ability to identify, select and install all fittings, valves, controls, etc. They must be able to use all hand and power trade tools including pipe cutters, benders, threaders, flanges, vises, pipe, strap, crescent, and open end machinists' wrenches, pneumatic star drills, and measuring tools such as steel tapes, folding rules, levels, plumbbobs, and calipers.

Employee in this rating are required to have a wide background of trade experience in repair and installation of gas fired equipment outlined in the introduction above. They must possess a thorough knowledge of many type phases of gas burners, (natural and propane), pipe lines, installation and repair storage tanks maintenance. Must know proper gas equipment to be installed in boilers, heating units, galley equipment, etc.

Employee must be able to use hand and power operated tools of the trade, must have been trained in the installation and repair of low pressure gas and natural gas lines, must be able to repair gas leaks in main line.

## D.    RESPONSIBILITY

The employee is supervised by the Maintenance Supervisor. He/She receives instructions in the form of written, oral, sketches, prints, etc. He/She is responsible for the quantity and quality of work performed. He/She is responsible for the accuracy of work and for adhering to the previously mentioned codes. Often, he/she is on a variety of jobs where no supervision is immediately available due to the wide expanse of the installation. He/She is responsible for the selection of the proper tools and materials to complete the job. When no supervision is available, he/she will make decisions as to layouts, installations, etc. The work is checked while in progress and after completion by his/her supervisor. He/She is responsible for performing the work in a safe manner and adhering to all Safety Regulations. He/She is responsible for all shop tools and equipment assigned to him/her. He/She is required to furnish his/her own tools-of-the-trade as listed by the organization.

## E.    PHYSICAL EFFORT

Incumbent may lift and carry weight of 45 pounds or more for short distances.  Work requires a limited amount of crawling, pulling, pushing, walking, standing, kneeling, repeated bending, climbing and the ability for rapid mental and muscular coordination simultaneously.  Employee may perform work from ladder and scaffolding at various heights.  Such work required the use of arms and legs in climbing.  Incumbent must have normal vision and hearing with or without corrective devices, depth perception and the ability to distinguish basic color to differentiate color coded valves, etc.

## F.    WORKING CONDITIONS

Employee works inside and outside with occasional exposure to excessive intermittent noise.  Exposure to dust, asbestos, fumes, gases, cuts, bruises, oils, grease, solvents, slippery or uneven walking surfaces and working around machinery with moving parts/objects or vehicles.  Occasionally works below ground.  Protective equipment such as safety glasses, goggles, gloves, hard hats and tow guards are furnished as required.  Employee works on assigned shifts but is subject to call 24 hours a day, seven days a week.

117

## UNITED STATES MARINE CORPS
### Marine Corps Civilian Human Resources Office – Southwest
### Box 555026
### Camp Pendleton, California  92055-5026

12810
HRSWP/023
June 28, 2001

Richard Hefner
3455 Swinging V Road
Borrego Springs, California  92004

Dear Mr. Hefner:

On June 27, 2001, a meeting was held at which you were provided a written job offer of Pipefitter. During the meeting you had an opportunity to briefly review the job description and raised concerns about the ability to perform the duties within the current work limitations imposed by your attending physician.

Following the meeting with you, a discussion was held with Mr. David Pierson and Mr. Thomas Shrope regarding the job description that was offered to you.

Based upon the information we obtained during our meeting and an additional review of the medical information in your file, we do not believe this job offer is appropriate.  The job offer of Pipefitter is officially rescinded.

If you have any questions regarding this letter, please contact Ms. Jalynn Peterson or myself at (760) 725-3728 or 3796 respectively.

Sincerely,

TIMOTHY A. NICHOLS
Compensation Program Manager

Copy to:
Employment
RTW File
File

I ACKNOWLEDGE RECEIPT OF THIS LETTER.

_____     6/28/01
Signature                                  Date



**RADIOLOGY MEDICAL GROUP, INC.**

**FIRST & LAUREL IMAGING CENTER**
**2466 FIRST AVENUE**
**SAN DIEGO, CA 92101**
**PHONE: (619) 849-XRAY (849-9729)**

**DIAGNOSTIC RADIOLOGY**
Hans A. Siegel, M.D., F.A.C.R.
Mark S. Schechter, M.D.
Murray A. Reicher, M.D.
John M. Domeny, M.D.
Brian J. Moffit, M.D.
David W. Buckley, M.D.
John O. Johnson, M.D.
Lori L. Baker, M.D.
James A. Cooper, M.D.
Eric K. Literbrum, M.D.

**CENTRALIZED NUMBERS**
PHN: (619) 849-XRAY (849-9729)
FAX: (619) 849-4RMG (849-4764)

**DIAGNOSTIC RADIOLOGY OFFICES**

**FIRST & LAUREL IMAGING CENTER**
2466 First Avenue
San Diego, CA 92101-1492
FAX: (619) 696-7859

**SCRIPPS MERCY HEALTHCARE**
Department of Radiology
4077 Fifth Avenue
San Diego, CA 92103-2180
FAX: (619) 543-1076

**MERCY MAGNETIC IMAGING CENTER**
4077 Fifth Avenue
San Diego, CA 92103-2180
FAX: (619) 543-1076

**ENCINITAS IMAGING CENTER**
477 N. El Camino Real,
Suite A102
Encinitas, CA 92024-1329
FAX: (760) 632-5389

**ADMINISTRATIVE OFFICE**
3366 Fifth Avenue
P. O. Box 34307
San Diego, CA 92163-4307
FAX: (619) 294-8399

**Check out our website**
radiologybyrmg.com

| | | |
|---|---|---|
| PATIENT NAME | ACCOUNT NO | MEDICAL RECORD NUMBER |
| **HEFNER, RICHARD** | **2414560** | **2250805** |

| | | | |
|---|---|---|---|
| AT THE REQUEST OF | DATE OF BIRTH | AGE/SEX | DATE OF SERVICE |
| **ISAAC BAKST M.D.** | **07-01-70** | **31/M** | **08-08-01** |
| **8929 UNIVERSITY LN.** | | | |
| **SUITE 207** | | | |
| **SAN DIEGO, CA 92122** | | | |

**PROCEDURE:**     MAGNETIC RESONANCE IMAGING OF THORACIC SPINE

**COMPARISON:**     None.

**TECHNIQUE:**     A comprehensive examination was performed utilizing a variety of imaging planes and imaging parameters to optimize visualization of suspected pathology.

**FINDINGS:**     The vertebral bodies are normal in height, alignment and marrow signal intensity.  Mild multilevel degenerative disk disease.  Minimal left-sided disk bulge at T10-T11.  No associated nerve root impingement.  Patent neural foramina.  No evidence of facet disease.  The spinal cord is normal in morphology and signal intensity.  Normal caliber of the spinal canal.  No soft tissue abnormalities.

**CONCLUSION:**

**Mild multilevel degenerative disk disease.  Minimal left-sided disk bulge at T10-T11.  No associated nerve root impingement.**

Thank you for referring this patient.

Lori L. Baker, M.D.
km
Dictated: 8/9/01;  Typed:  8/9/01



**RADIOLOGY MEDICAL GROUP, INC.**

**FIRST & LAUREL IMAGING CENTER**
**2466 FIRST AVENUE**
**SAN DIEGO, CA 92101**
**PHONE: (619) 849-XRAY (849-9729)**

**DIAGNOSTIC RADIOLOGY**
Hano A. Siegel, M.D., F.A.C.R.
Mark S. Schechter, M.D.
Murray A. Reicher, M.D.
John M. Doernety, M.D.
Brian J. Moffit, M.D.
David W. Buckley, M.D.
John O. Johnson, M.D.
Lori L. Baker, M.D.
James A. Cooper, M.D.
Eric K. Lizerbram, M.D.

**CENTRALIZED NUMBERS**
PEN: (619) 849-XRAY (849-9729)
FAX: (619) 849-4RMG (849-4764)

**DIAGNOSTIC RADIOLOGY OFFICES**

**FIRST & LAUREL IMAGING CENTER**
2466 First Avenue
San Diego, CA  92101-1492
FAX: (619) 696-7859

**SCRIPPS MERCY HEALTHCARE**
Department of Radiology
4077 Fifth Avenue
San Diego, CA  92103-2180
FAX: (619) 543-1076

**MERCY MAGNETIC IMAGING CENTER**
4077 Fifth Avenue
San Diego, CA  92103-2180
FAX: (619) 543-1076

**ENCINITAS IMAGING CENTER**
477 N. El Camino Real,
Suite A102
Encinitas, CA  92024-1329
FAX: (760) 632-5389

**ADMINISTRATIVE OFFICE**
3366 Fifth Avenue
P. O. Box 34307
San Diego, CA  92163-4307
FAX: (619) 294-8399

**Check out our website**
radiologybyrmg.com

| PATIENT NAME | ACCOUNT NO | MEDICAL RECORD NUMBER |
|---|---|---|
| HEFNER, RICHARD | 2414560 | 2250805 |

| AT THE REQUEST OF | DATE OF BIRTH | AGE/SEX | DATE OF SERVICE |
|---|---|---|---|
| ISAAC BAKST M.D. | 07-01-70 | 31/M | 08-08-01 |

ISAAC BAKST M.D.
8929 UNIVERSITY LN.
SUITE 207
SAN DIEGO, CA 92122

**PROCEDURE:**    MAGNETIC RESONANCE IMAGING OF THE LUMBAR SPINE

**COMPARISON:**    None.

**TECHNIQUE:**    A comprehensive examination was performed utilizing a variety of imaging planes and imaging parameters to optimize visualization of suspected pathology.

**FINDINGS:**    The conus medullaris, intradural structures, lumbar vertebrae and paraspinous soft tissues are normal.

L1-2: The disk, central canal, foramina and facets are normal.

L2-3: The disk, central canal, foramina and facets are normal.

L3-4: The disk, central canal, foramina and facets are normal.

L4-5: The disk, central canal, foramina and facets are normal.

L5-S1: The disk, central canal, foramina and facets are normal.

**CONCLUSION:**

**Normal examination.**

Thank you for referring this patient.

Lori L. Baker, M.D.
km
Dictated: 8/9/01;  Typed:  8/9/01



**RADIOLOGY MEDICAL GROUP, INC.**

**FIRST & LAUREL IMAGING CENTER**
**2466 FIRST AVENUE**
**SAN DIEGO, CA 92101**
**PHONE: (619) 849-XRAY (849-9729)**

**DIAGNOSTIC RADIOLOGY**
Hario A. Siegel, M.D., F.A.C.R.
Mark S. Schechter, M.D.
Murray A. Reicher, M.D.
John M. Doemeny, M.D.
Brian J. Moffit, M.D.
David W. Buckley, M.D.
John O. Johnson, M.D.
Lori L. Baker, M.D.
James A. Cooper, M.D.
Eric K. Lizerbram, M.D.

**CENTRALIZED NUMBERS**
PBN: (619) 849-XRAY (849-9729)
FAX: (619) 849-4RMG (849-4764)

**DIAGNOSTIC RADIOLOGY OFFICES**

**FIRST & LAUREL IMAGING CENTER**
2466 First Avenue
San Diego, CA  92101-1492
FAX: (619) 696-7859

**SCRIPPS MERCY HEALTHCARE**
Department of Radiology
4077 Fifth Avenue
San Diego, CA  92103-2180
FAX: (619) 543-1076

**MERCY MAGNETIC IMAGING CENTER**
4077 Fifth Avenue
San Diego, CA  92103-2180
FAX: (619) 543-1076

**ENCINITAS IMAGING CENTER**
477 N. El Camino Real,
Suite A102
Encinitas, CA  92024-1329
FAX: (760) 632-5389

**ADMINISTRATIVE OFFICE**
3366 Fifth Avenue
P. O. Box 34307
San Diego, CA  92163-4307
FAX: (619) 294-8399

Check out our website
radiologybyrmg.com

| PATIENT NAME | ACCOUNT NO | MEDICAL RECORD NUMBER |
|---|---|---|
| **HEFNER, RICHARD** | **2414560** | **2250805** |

| AT THE REQUEST OF | DATE OF BIRTH | AGE/SEX | DATE OF SERVICE |
|---|---|---|---|
| **ISAAC BAKST M.D.** | **07-01-70** | **31/M** | **08-08-01** |

**8929 UNIVERSITY LN.**
**SUITE 207**
**SAN DIEGO, CA 92122**

**PROCEDURE:**     MAGNETIC RESONANCE IMAGING OF THE CERVICAL SPINE

**COMPARISON:**     None.

**TECHNIQUE:**     A comprehensive examination was performed utilizing a variety of imaging planes and imaging parameters to optimize visualization of suspected pathology.

**FINDINGS:**     Status post anterior diskectomy and fusion procedure at C6-C7. Satisfactory alignment. The vertebral bodies are normal in height and marrow signal intensity. Multilevel intervertebral disk degeneration. The spinal cord is normal in morphology and signal intensity. The craniovertebral junction is unremarkable.

C2-3, C3-4: No disk bulge or protrusion. Patent neural foramina. No evidence of facet disease. No spinal stenosis.

C4-5: Small central disk protrusion which abuts but does not deform the spinal cord. Patent neural foramina. No evidence of facet disease. No spinal stenosis.

C5-6: Minimal disk bulge. No associated nerve root impingement. Patent neural foramina. No evidence of facet disease. No spinal stenosis.

C6-7: Status post anterior diskectomy and fusion procedure. Patent neural foramina. No evidence of facet disease. No spinal stenosis.

C7-T1: Status post protrusion. Patent neural foramina. No evidence of facet disease. No spinal stenosis.

CONTINUED.............



**RADIOLOGY MEDICAL GROUP, INC.**

**FIRST & LAUREL IMAGING CENTER**
2466 FIRST AVENUE
SAN DIEGO, CA 92101
PHONE: (619) 849-XRAY (849-9729)

**DIAGNOSTIC RADIOLOGY**
Hano A. Siegel, M.D., F.A.C.R.
Mark S. Schechter, M.D.
Murray A. Reicher, M.D.
John M. Doemeny, M.D.
Brian J. Moffit, M.D.
David W. Buckley, M.D.
John O. Johnson, M.D.
Lori L. Baker, M.D.
James A. Cooper, M.D.
Eric K. Lizerbram, M.D.

**CENTRALIZED NUMBERS**
PHN: (619) 849-XRAY (849-9729)
FAX: (619) 849-4RMG (849-4764)

**DIAGNOSTIC RADIOLOGY OFFICES**

**FIRST & LAUREL IMAGING CENTER**
2466 First Avenue
San Diego, CA  92101-1492
FAX: (619) 696-7859

**SCRIPPS MERCY HEALTHCARE**
Department of Radiology
4077 Fifth Avenue
San Diego, CA  92103-2180
FAX: (619) 543-1076

**MERCY MAGNETIC IMAGING CENTER**
4077 Fifth Avenue
San Diego, CA  92103-2180
FAX: (619) 543-1076

**ENCINITAS IMAGING CENTER**
477 N. El Camino Real,
Suite A102
Encinitas, CA  92024-1329
FAX: (760) 632-5389

**ADMINISTRATIVE OFFICE**
3366 Fifth Avenue
P. O. Box 34307
San Diego, CA  92163-4307
FAX: (619) 294-8399

**Check out our website**
radiologybyrmg.com

| | | |
|---|---|---|
| **PATIENT NAME** | **ACCOUNT NO** | **MEDICAL RECORD NUMBER** |
| **HEFNER, RICHARD** | **2414560** | **2250805** |

| | | | |
|---|---|---|---|
| **AT THE REQUEST OF** | **DATE OF BIRTH** | **AGE/SEX** | **DATE OF SERVICE** |
| **ISAAC BAKST M.D.** | **07-01-70** | **31/M** | **08-08-01** |
| **8929 UNIVERSITY LN.** | | | |
| **SUITE 207** | | | |
| **SAN DIEGO, CA 92122** | | | |

PAGE TWO:          MAGNETIC RESONANCE IMAGING OF THE CERVICAL SPINE

**CONCLUSION:**

1. **Status post anterior diskectomy and fusion procedure at C6-C7.    Satisfactory alignment.**
2. **Small central disk protrusion at C4-C5 which abuts but does not deform the spinal cord.**
3. **Mild disk bulge at C5-C6.  No associated nerve root impingement.**

Thank you for referring this patient.

Lori L. Baker, M.D.
km
Dictated: 8/9/01;  Typed:  8/9/01



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# *FECA MANAGEMENT BRIEF*

## CIVILIAN HUMAN RESOURCES OFFICE
### Marine Corps Base, Camp Pendleton
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JULY 2001

### TIMELY SUBMISSION OF CLAIMS

As a supervisor, are you aware of the time requirements to submit traumatic injury notices? The Base Order requires a supervisor who receives written notice of a traumatic injury (Form CA-1) to forward the form to the Human Resources Office within two administrative work days of receipt. Failure to meet this requirement will prompt notification to your Assistant Chief of Staff.

The Department of Labor requires an agency to submit all forms CA-1's and CA-2's to their office within 10 working days after receipt from the employee. This means both the supervisor and the Human Resources Office have 10 working days to forward the form. Once received, the supervisor should complete their portion and forward the form, with any supporting documents, to the Human Resources Office immediately.

The Department of Labor begins the 10 day period from the date recorded in block 23 of the CA-1 form, "Date Notice Received". The supervisor should write in the date the employee gives them the form. This is NOT the date of the accident or the date they told you about the accident. It is very important to enter the correct date in block 23, never backdating the form.

It is not appropriate to hold the CA-1 or CA-2 waiting for additional information. It is recommended that you forward the form, with any supporting documents that you have, and advise that additional information will be forwarded. This will allow our office to monitor and manage the case immediately, as well as provide advice and guidance to you as a supervisor. Immediate intervention in cases has shown a quicker return to work.

If you have any questions about this or other workers' compensation matters, please contact our staff at 725-3728 or 3747. Your assistance in this process is greatly appreciated.

JOANNE BURSON
Deputy Director

File Number:
CONFERL-O-CONF

## MEMORANDUM OF CONFERENCE
### Name of Claimant: RICHARD HEFNER
### File Number: 13-1215222

Date of Preconference:

6/11/01. During the preconference call the Agency was informed of the purpose of the conference and evidence they would need to have available for the conference.

Date of Conference:

6/14/01, 4:00 pm

Participants:

TIM NICHOLS AND JALYNN PETERSON, SUPERVISOR AND
INJURY COMPENSATION SPECIALIST, USN, AT CAMP PENDLETON, CA

LINDA KO, SENIOR CLAIMS EXAMINER (SrCE)

OSCAR M. RAMIREZ, CLAIMS EXAMINER (CE)

Background:

The claimant was hired on a temporary basis and injured himself while working in that status. He has now been declared P&S and will have residuals significant enough to warrant two schedule awards. The claimant's future after his term of employment has expired needed to be decided. Since the claimant's participation was not necessary since these are established administrative matters, the claimant was not included in the conference.

Issue(s):

What the Agency's responsibilities towards the claimant after his term has expired and he has permanent residuals from the industrial injury?

Discussion:

In preparation for the teleconference the CE and SrCE contacted the other SrCE in Section (Rob Payne) and the Supervisor CE to get yet other perspectives on procedure to recommend to the Agency. Both Sr's and the CE agreed that the claimant's status as a temporary employee at the time of injury precludes him form an *automatic* referral to vocational rehabilitation after his term employment has been exceeded as it would have occurred if he had been a permanent employee.

The EA was informed that they would, however, have to offer the claimant a formal modified duty job offer to last at least 90 days. After this period, the EA may then remove the claimant from employment without penalty or obligation to refer the claimant to vocational rehabilitation. However, the job offer made to the claimant will have to be medically suitable.

In the instant case, the job offer would be essentially a formal offer to continue doing the work that the claimant has been doing *de facto* as an informal accommodation for some time now, which is virtually DOI work with a few modifications. After the 90-day period has expired, the claimant will be rated in

*124*

File Number:
CONFERL-O-CONF

that position so he can qualify for further benefits under the FECA such as additional schedule awards, recurrences of disability, etc..

It was pointed out to the EA that the claimant does not have to necessarily work the job offer for 90 days. If he has worked it for at least 60 days, he can be rated even if he leaves out of his own volition, but the job has to be kept open for the remaining time within the 90-day original offer.

In case the claimant suffers a recurrence of disability in the future and if he had worked successfully for at least 60 days the formal job offer and had been rated, he could be referred to vocational rehabilitation if the EA at that time could not accommodate again with a temporary position. However, if the EA can again accommodate the claimant on a temporary basis, then referral to vocational rehabilitation would not be effected then either.

At the end of the teleconference the EA agreed that they would draft a formal temporary modified duty job offer for the claimant within the next week and forward it to the CE for suitability. This will be done as soon as received and then formally presented to the claimant.

Subsequent to this teleconference with the EA and during a different teleconference on a different issue this time with the claimant, Sr.CE Rob Payne discussed (among other issues) on 6/20/01 the main points of the above teleconference that had been held with the EA. The claimant then requested a copy of the conference memo and it was agreed that one would be sent to him.

Therefore, the claimant was advised that the discussion would be summarized in a Memorandum to the File and that the memorandum would be used as evidence in making decisions on the claim. The claimant was further advised that a copy of the memorandum would be provided to him and that he would be allowed 15 days to review and comment upon the accuracy of the information contained therein.

File Number:
CONFERL-O-CONF

claimant's term employment will end around September 2001, it is unlikely that the claimant will qualify for a lump sum. He was advised that if he applied for disability retirement through the Office of Personnel Management and was accepted and if the money from OPM could cover all of his financial responsibilities, he would then be able to receive a lump sum for the remainder of his awards. He was advised to contact OPM for further instructions as to how to apply for their retirement program.

Thirdly the claimant wished to know why he would not be able to be referred to vocational rehabilitation as originally planned. It was explained to him that had he been a regular permanent employee, he would have qualified for rehab but that now that this Office is clear on the concept that he has been all along a term employee, this does not qualify him for referral to rehab. Although disappointed, the claimant expressed understanding at this explanation.

Fourthly, the claimant wished to know what he needed to do if he disagreed with the amount of the first award. He was advised to refer back to his appeal rights and that if he chose a Reconsideration, he would need to provide actual  new evidence to warrant the development of a Reconsideration. He was specifically advised that simply writing to this Office and stating that he was in more pain now or that he simply disagreed with the award amount would be insufficient. He was advised that he might wish to consider making an appointment with his attending physician to see if his condition has worsened since he was first made permanent and stationary and to see  if the final figures upon which the first award was based have changed any. The claimant agreed that he would follow up on this with his doctor.

The claimant was advised that this discussion would be summarized in a Memorandum to the File and that the memorandum would be used as evidence in making decisions on the claim. The claimant was further advised that a copy of the memorandum would be provided to him and that he would be allowed 15 days to review and comment upon the accuracy of the information contained therein.

126

File Number:
CONFERL-O-CONF

## MEMORANDUM OF CONFERENCE

Name of Claimant: RICHARD HEFNER

File Number: 13-1215222

Date of Preconference: 6/26/01 (in the AM).  During the preconference call the claimant was informed of the purpose of the conference.

Claimant was contacted for preconference call and opted to go ahead with conference.

Date of Conference: 6/26/01, 4:00 pm

Participants:

TIM NICHOLS, SUPERVISORY INJURY COMPENSATION SPECIALIST
JALYNN PETERSON, INJURY COMPENSATION SPECIALIST
RICHARD HEFNER, CLAIMANT
ROB PAINE, SR. CLAIMS EXAMINER
OSCAR M. RAMIREZ, CLAIMS EXAMINER

Background:

The claimant, a permanently disabled term employee, will be given a term appointment for not less than 90 days as his term of employment is coming to an end and the claimant has permanent residuals.  The claimant wishes to discuss what his options are at this point, as he is also receiving a schedule award.

Issue(s):

What will the claimant's option be after his term employment ends and he has permanent residuals?

Discussion:

The discussion began with the claimant's request that his second schedule award be paid to him concurrently with his first as he has one for his neck and shoulder and another for his lower extremities. He was advised that upon return of his case from being copied per claimant request, we will process his second schedule award.  Originally, the second award would have been keyed upon completion of the first one.  The claimant was advised that the keying of the second award would only extend the length of time over which he would be getting paid schedule award compensation but that it would not increase the amount of money he is currently getting on the periodic roll just because another award is being paid. The claimant understood this.  He also requested that a copy of the calculations used by our District Medical advisor to determine the first schedule award be sent to him.  He was advised that it was now too late to send that item expressly since the entire case file had gone already to be copied, but that he would receive a copy of that in the package containing a full copy of his entire case file.

The second topic was the claimant's request to be paid his awards as a lump sum.  It was explained to him again that this is not an automatic action that this Office has to take on every case.  He was advised that unless he can provide financial evidence that after his term employment ends he will be able to meet his financial responsibilities independent from the award money, he would not be able to qualify for a lump sum.  He was advised that the financial evidence could come from either money that would be entering his household from his own sources or from his wife's.  As the wife is currently about to deliver and the



**DEPARTMENT OF THE NAVY**
HEADQUARTERS UNITED STATES MARINE CORPS
CIVILIAN HUMAN RESOURCES OFFICE-SOUTHWEST
BOX 555026
CAMP PENDLETON, CALIFORNIA 92055-5026

IN REPLY REFER TO:
12810
HRSWP
01 Aug 01

From: Employee/Labor Relations Officer

To:   Mr. Richard Hefner

Subj: EXPIRATION OF TERM APPOINTMENT

Ref:  Standard Form 50 (SF-50) dated 3-25-01

1.  The Agency has provided notification to the Department of Labor (DOL) that limited duty will not be provided beyond the expiration date of your current term appointment which is identified by the reference as 25 August 2001.

2.  The Agency has provided a copy of the reference to the DOL to assist them in placing you on the Periodic Rolls as soon after the expiration of your employment as possible.  This will also permit them to initiate the action to place you in the Vocational Rehabilitation Program as quickly as possible following the expiration of your current appointment with the Marine Corps Base, Camp Pendleton.

3.  If you have any questions regarding this decision please contact me at your convenience at (760) 725-3796.

TIMOTHY A. NICHOLS

Copy to :
        FMD
        DOL

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name   (Last, First, Middle) | | 2. Social Security Number | 3. Date Of Birth | 4. Effective Date |
|---|---|---|---|---|
| HEFNER, RICHARD R. | | 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 | 07-01-70 | 03-25-01 |

| 5-A. Code | 5-B. Nature Of Action | | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|---|
| 765 | 08-25-01  EXT OF TERM APPT NTE | | | |
| 5-C. Code | 5-D. Legal Authority | | 6-C. Code | 6-D. Legal Authority |
| BWA | OPM DELEGATION AGR | | | |
| 5-E. Code | 5-F. Legal Authority | | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| PIPEFITTER          PK08900005 | PIPEFITTER          PK08900005 |

| 8.Pay Plan | 9.Occ. Code | 10.Grade/Level | 11.Step/Rate | 12.Total Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ. Code | 18.Grade/Level | 19.Step/Rate | 20.Total Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WG | 4204 | 10 | 02 | $17.44 | PH | WG | 4204 | 10 | 02 | $17.44 | PH |
| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay | | |
| $17.44 | $ 0 | $17.44 | $ 0 | | | $17.44 | $ 0 | $17.44 | $ 0 | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| AC OF S FACILITIES | AC OF S FACILITIES |
| FACILITIES MAINTENANCE DIVISION | FACILITIES MAINTENANCE DIVISION |
| UTILITIES BRANCH | UTILITIES BRANCH |
| WATER & ELEC DIST SEC/PREV MAINT UNIT | WATER & ELEC DIST SEC/PREV MAINT UNIT |
| MCB CAMP PENDLETON CA 92055 | MCB CAMP PENDLETON CA 92055 |

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|
| 2  1 - None  2 - 5-Point  3 - 10-Point/Disability  4 - 10-Point/Compensable  5 - 10-Point/Other  6 - 10-Point/Compensable/30% | | 3  0 - None  1 - Permanent  2 - Conditional  3 - Indefinite | | X YES  NO |
| 27.FEGLI  Z5  BASIC + OPTION B (5X) + OPTION A - OPTION C (5X) | | 28. Annuitant Indicator  9  NOT APPLICABLE | | 29. Pay Rate Determinant |
| 30. Retirement Plan  K  FERS AND FICA | 31. Service Comp. Date (Leave)  06-13-91 | 32. Work Schedule  F  FULL TIME | | 33. Part-Time Hours Per Biweekly Pay Period |

| 34. Position Occupied  1  1 - Competitive Service  2 - Excepted Service  3 - SES General  4 - SES Career Reserved | 35. FLSA Category  N  E - Exempt  N - Nonexempt | 36. Appropriation Code | | 37.Bargaining Unit Status  0850 |
|---|---|---|---|---|
| 38. Duty Station Code  06-0543-073 | 39. Duty Station  SAN DIEGO  (City-County-State or Overseas Location)  CA | | CAMP PENDLETON | |
| 40. Agency Data | 41. UIC: 00681 | 42. ORG CODE: 6889 | 43. COST CNTR: 68896E    LOC ID: 26478M | 44. PAYROLL OFF ID: DE |

45. Remarks

THIS ACTION MAY BE TERMINATED AT ANY TIME PRIOR TO THE NOT-TO-EXCEED
DATE SHOWN.

| 46. Employing Department or Agency  DEPT OF THE NAVY | 50. Signature/Authentication and Title of Approving Official  Electronically Signed  DAVIS MARIAN (#2)  LEAD PERSONNEL STAFF/CLASS SPEC |
|---|---|
| 47. Agency Code  NV27 | 48. Personnel Office ID  2416 | 49. Approval Date  03-28-01  VPG | |

TURN OVER FOR IMPORTANT INFORMATION          Editions Prior to 7/91 Are Not Usable After 6/          NSN 7540-01-333-
5-Part     50-316                    1 - Employee Copy - Keep For Future Reference

File Number: 92004-13-1215222
FF-O-
129

U.S. DEPARTMENT OF LABOR

EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
PO BOX 193769
SAN FRANCISCO CA 94119
Phone: (415) 975-4090

August 10, 2001

Date of Injury: 04/07/2000
Employee:     Richard Hefner

Richard R. Hefner
Po Box 1210
Borrego Springs, CA 92004

Dear Mr. Hefner:

Per our phone conversation this morning, I am writing to advise you of your compensation payments for the current period.

Effective with election signed on 7/26/01, you elected to receive the balance of your schedule award in a lump sum payment. The schedule award was set to expire on 10/30/01. Therefore, rather than receive a check each 28 days until the expiration date of 10/30/01, you were issued a check dated 8/3/01 in the amount of $5499.88 covering the period 8/12/01 to 10/30/01. The final check covering the prior period 7/15/01 to 8/11/01 in the amount of $1940.92 is scheduled to be released today, 8/10/01. Therefore, you have now received the full schedule award due for the period ending 10/30/01 in a lump sum rather than via payment each 28 days. No additional compensation is payable for the period covered by the schedule award.

Sincerely,

C. Leary
Supervisory Claims Examiner

130

# The Scout

## Out of control



LCpl. Brian J. Griffin

A sewage truck traveling on Basilone Road overturned across from the 52 Area Landfill April 7. "Apparently the truck's load shifted, causing the driver to lose control of the vehicle," said Chief Frank Blair, incident commander, Camp Pendleton Fire Department. "From that point, the driver was not able to regain control, and the truck struck a tree and rolled." The driver was treated for minor back and shoulder injuries and transported to Mission Trauma Center.

Letter Pendleton Paper

your
fire
les

Staff

efore this
700 arson
the United

for setting
high last
as become
teen and
erica.
Protection
hat 55 per-
ted for ar-
of 18, and
dren every
more.
ne-third of
ire set the
untreated,
le fire-set-
to repeat
ns.
rough 7 is
wareness
child that
t a toy. Ed-
ntion pro-
n prevent-
tting. The
s fire and
rams year-



BOARD CERTIFIED RADIOLOGY

WILLIAM F. VELICK, M.D.
SHELDON L. ZIDE, M.D.
ELLIOTT J. WAGNER, M.D.
ROBERT M. TURNER, M.D.
ANTHONY E. STAUFFER, M.D.
JOHN S. BELVILLE, M.D.
MICHAEL J. PORINO, M.D.
GLENN R. SLOCUM, M.D.

## MISSION REGIONAL IMAGING CENTER

27800 Medical Center Road
Suite 108
Mission Viejo, California 92691
(949)364-6900

26732 Crown Valley Parkway
Suite 171
Mission Viejo, California 92691
(949)364-0511

PATIENT:  HEFNER, RICHARD
X-RAY#:   251068.0
   DOB:   07/01/70
   SEX:   M
   DOE:   07/10/00

JEFFREY D GROSS, M.D.
26732 CROWN VALLEY PRKWY
#561
MISSION VIEJO, CA 92691-0000

723.9  NECK DISORDER/SYMPT NOS

XR SPINE CERV LTD
XR SPINE CER C W F&E

CLINICAL HISTORY:  Postop.

COMPARISON:  There are no previous studies available for comparison at this time.

FINDINGS:

The patient is status post anterior plate and interbody fusion at the C6-7 level.  The bone graft is what appears well-healed.  No osseous or hardware fracture is seen.

No instability is noted on flexion and extension views.

IMPRESSION:

STATUS POST ANTERIOR PLATE AND INTERBODY FUSION AT C6-7.

*Michael Forino, MD*
MICHAEL T FORINO, M.D.
sc/07/11/0/WRITTEN REPORT SENT TO PHYSICIAN

Accredited by
Accreditation Association for Ambulatory Health Care, Inc.



BOARD CERTIFIED RADIOLOGY

WILLIAM F. VELICK, M.D.
SHELDON L. ZIDE, M.D.
ELLIOTT J. WAGNER, M.D.
ROBERT M. TURNER, M.D.
ANTHONY E. STAUFFER, M.D.
JOHN S. BELVILLE, M.D.
MICHAEL J. FORINO, M.D.
GLENN R. SLOCUM, M.D.

## MISSION REGIONAL IMAGING CENTER

27800 Medical Center Road
Suite 108
Mission Viejo, California 92691
(949)364-6900

26732 Crown Valley Parkway
Suite 171
Mission Viejo, California 92691
(949)364-0511

```
PATIENT:  HEFNER, RICHARD          JEFFREY D GROSS, M.D.
 X-RAY#:  251068.0                 26732 CROWN VALLEY PRKWY
    DOB:  07/01/70                 #561
    SEX:  M                        MISSION VIEJO, CA 92691-0000
    DOE:  05/03/00
```

723.9  NECK DISORDER/SYMPT NOS

XR SPINE CERV LTD

CLINICAL HISTORY:    Status post C6-7 fusion.

COMPARISON:    No prior studies are available.

FINDINGS:

The patient is status anterior plate and interbody fusion at C6-7.  No osseous or hardware fracture is seen. The bone graft appears well seated.  No instability seen on flexion or extension views.

IMPRESSION:

STATUS ANTERIOR PLATE AND INTERBODY FUSION AT C6-7.


*Michael Forino, M.D.*

MICHAEL T FORINO, M.D.
glm/05/04/00/WRITTEN REPORT SENT TO PHYSICIAN

Accredited by
Accreditation Association for Ambulatory Health Care, Inc.



BOARD CERTIFIED RADIOLOGY

WILLIAM F. VELICK, M.D.
SHELDON L. ZIDE, M.D.
ELLIOTT J. WAGNER, M.D.
ROBERT M. TURNER, M.D.
ANTHONY E. STAUFFER, M.D.
JOHN S. BELVILLE, M.D.
MICHAEL J. FORINO, M.D.
GLENN R. SLOCUM, M.D.

# MISSION REGIONAL IMAGING CENTER

27800 Medical Center Road
Suite 108
Mission Viejo, California 92691
(949)364-6900

26732 Crown Valley Parkway
Suite 171
Mission Viejo, California 92691
(949)364-0511

```
PATIENT:   HEFNER, RICHARD
X-RAY#:    251068.0
   DOB:    07/01/70
   SEX:    M
   DOE:    10/02/00
```

JEFFREY D GROSS, M.D.
26732 CROWN VALLEY PRKWY
#561
MISSION VIEJO, CA 92691-0000

723.1  CERVALGIA

XR SPINE CERV LTD

CLINICAL HISTORY:  Follow up fusion.

COMPARISON:  7-10-00

FINDINGS:

Lateral, neutral, flexion and extension views demonstrate a stable appearance
to the anterior plate and interbody fusion at the C6-7 level.  The bone graft
appears well healed and seated.  No osseous or hardware fracture is seen.
Alignment is intact.  No subluxation is noted.

IMPRESSION:

STABLE APPEARANCE TO THE C6-7 FUSION.

MICHAEL T FORINO, M.D.
sc/10/04/0/WRITTEN REPORT SENT TO PHYSICIAN

Accredited by
Accreditation Association for Ambulatory Health Care, Inc.

# NEUROLOGICAL SURGERY

**JACQUES J. PALMER, M.D.**
A PROFESSIONAL CORPORATION
**SYLVAIN PALMER, M.D., F.A.C.S.**
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
**JEFFREY D. GROSS, M.D.**

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 561
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1080
FAX (949) 364-5761

April 6, 2001

Mr. Oscar Ramirez
Claims Adjuster
EMPLOYMENTS STANDARD ADM
WORKERS COMP PROGRAM
P.O. Box 3769
San Francisco, CA 94119-3769

RE:                    RICHARD HEFNER
Date of injury:        04-07-00
Claim No.:             13215222

## WORKERS' COMPENSATION FOLLOW-UP REPORT

### October 2, 2000

Dear Mr. Ramirez:

I am writing after having seen Mr. Hefner in follow-up.

He is status post a cervical spinal cord injury requiring anterior cervical discectomy and instrumented arthrodesis at C6-7. He has been out of his collar and doing well with that. He is extremely motivated and has no upper extremity symptoms except for some left shoulder limitations from his previous visit which have improved. He had been doing his therapy religiously.

He still has some postconcussive syndromes, namely vertigo, and he is still having ocular problems. He also has leg tingling, likely associated with his spinal cord injury.

Physical Examination: His wound is well healed. He moves his neck well and is full of energy. His upper extremities are strong and symmetric. He demonstrates an excellent range of motion with the left shoulder, which was impaired after his injury.

His gait is normal.

*135*

Page 2
April 6, 2001
Re:  Richard Hefner

Diagnostic Imaging:   We reviewed his x-rays together.   His
flexion/extension x-rays show an excellent fusion at C5-6 with
good positioning and good alignment.  There is no movement between
the flexion and extension x-ray at the fused level.   Fusion
appears to be occurring well.

Impression:

1)   Status  post  spinal  cord  injury  requiring  surgical
     decompression and fusion at C6-7.

2)   The above is related to his work-related injury.

3)   Postconcussive syndrome with vertigo.   This may also
     represent an inner ear disturbance after his injury.

Plan:  Flexeril prn for muscle spasm.

He will return to work on 10-3-00.  Limitations are related to his
vertigo.  I did caution him with regard to his vertigo that if he
develops this while driving or walking, he should pull over and
stop or lie down if he is standing.  He appears to understand
this.

He need only return to see me on a prn basis.

Please feel free to contact me at any time regarding this case.

DECLARATION PURSUANT TO AB 3660 & LABOR CODE 46281:

I declare under penalty of perjury that the information contained
in this report and its attachments, if any, is true and correct
to the best of my knowledge and belief, except as to information
that I have indicated I received from others.  As to that
information, I declare under penalty of perjury that the infor-
mation accurately describes the information provided to me and,
except as noted herein, that I believe it to be true.   This
document was executed in Orange County, California, on the date
indicated below.

Page 3
April 6, 2001
Re:  Richard Hefner

MANDATORY LANGUAGE REQUIRED IN LABOR CODE SECTION 5703:

"I have not violated Labor Code Section 139.3 and the contents of
the report and bill are true and correct to the best of my
knowledge.  This statement is made under penalty of perjury."

Dated this 25ʷ day of _____, 2001 at Orange County,
California.

Sincerely,

JEFFREY D. GROSS, M.D.

/sk

## NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
JEFFREY D. GROSS, M.D.

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 591
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1080
FAX (949) 364-5761

December 10, 2000

Mr. Oscar Ramirez
Claims Adjuster
EMPLOYMENTS STANDARD ADM
WORKERS COMP PROGRAM
P.O. Box 3769
San Francisco, CA 94119-3769

RE:                    RICHARD HEFNER
Date of injury:        04-07-00
Claim No.:             13215222

### PERMANENT AND STATIONARY
### WORKERS' COMPENSATION REPORT

Dear Mr. Ramirez:

I am responding to your request for a permanent and stationary
report with comments toward needs for future medical care
regarding Mr. Hefner's injuries.

I have not seen him in follow-up since my last note of December 7,
2000.

He has continued to have postconcussive syndromes and is likely in
the small percentage group that might even have permanent symptoms
after such an injury.

Furthermore, there is no way to fully predict the duration of his
symptoms nor need for care.

There is no particular treatment for these symptoms except for
appropriate rehabilitation including physical, occupational and
speech therapy.

Perhaps an objective QME examination might be best for your
purposes vis-à-vis your questions regarding Mr. Hefner.

Please feel free to contact me at any time regarding his case.

Page 2
January 7, 2000
Re:  Richard Hefner

## DECLARATION PURSUANT TO AB 3660 & LABOR CODE 46281:

I declare under penalty of perjury that the information contained
in this report and its attachments, if any, is true and correct
to the best of my knowledge and belief, except as to information
that I have indicated I received from others.  As to that
information, I declare under penalty of perjury that the infor-
mation accurately describes the information provided to me and,
except as noted herein, that I believe it to be true.  This
document was executed in Orange County, California, on the date
indicated below.

## MANDATORY LANGUAGE REQUIRED IN LABOR CODE SECTION 5703:

"I have not violated Labor Code Section 139.3 and the contents of
the report and bill are true and correct to the best of my
knowledge.  This statement is made under penalty of perjury."

Dated this 11th day of January, 2001 at Orange County,
California.

Sincerely,

JEFFREY D. GROSS, M.D.

/sk

## NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
JEFFREY D. GROSS, M.D.

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 561
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1050
FAX (949) 364-5761

July 11, 2000

Mr. Oscar Ramirez, Claims Adj.
EMPLOYMENTS STANDARD ADM
WORKMANS COMP PROGRAM
P.O. Box 3769
San Francisco, CA 94119-3769

RE:                    RICHARD HEFNER
Date of injury:        04-07-00
Claim No.:             13215222

### WORKERS' COMPENSATION FOLLOW-UP REPORT

Dear Mr Ramirez:

I am writing to you after having seen Mr. Hefner in neurosurgical follow-up.

As you know, he had been treated for a cervical fracture and spinal cord injury in April of this year.

He is doing quite well with still leg tingling, which is likely related to his spinal cord injury. He has some what appeared to be tension headaches and worse when he is trying to concentrate. These are also consistent with his postconcussive syndrome. He has no symptoms related to his anisocoria that his wife complains of. His right pupil is bigger than his left. He does have some neck spasm. However, he is doing well and his upper extremities are strong and have no numbness. He seems to be improving overall.

He presents today with his wife, children and nurse Kilcher, his case manager.

Physical Examination: Mild anisocoria with the right pupil being slightly larger than the left is noted but this is subtle.

Strength in the upper extremities is strong and symmetric. The neck incision is well-healed. Range of motion is somewhat

Page 2
July 11, 2000
Re:  Richard Hefner

diminished and there is tenderness over the left shoulder to palpation.    There is some paraspinal spasm in the neck, deep palpation and tenderness there but not over the spine.

<u>Diagnostic Images</u>:  X-rays show excellent fusion and placement of the hardware.

<u>Impression</u>:    Mr. Hefner is doing well status post cervical decompression and fusion.    The fusion is quite mature, although the symptoms of the spinal cord injury and the postconcussive symptoms still persist including headache, difficulty focusing and maintaining attention, as well as postoperative neck spasm.

It appears that he has only had a few of his physical therapy visits and they have not performed the treatment I would like.

<u>Plan</u>:

1)    Rewrite his physical therapy prescription so that he might improve his neck spasm and get his neck range of motion improved.

2)    An orthopedic evaluation for the left shoulder should be arranged and I suggested that he should find someone in his region to do this, as he travels a long way to come see me.

3)    I would like to see him back in one month's time to check him for work status.

He and his wife and case manager appear to understand and agree with the plan.    We will also renew his diazepam as a muscle relaxant in the meantime.

Please feel free to contact me if additional information is necessary.

Sincerely,

JEFFREY D. GROSS, M.D.

/pb

## NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
JEFFREY D. GROSS, M.D.

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 561
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1060
FAX (949) 364-5761

May 3, 2000

Ms. Jalynn Peterson, Adjuster
UNITED STATES MARINE CORP
GYSGT Slanders
Occupational Safety Office

FAX 760-725-0058

RE:  RICHARD HEFNER

### FOLLOW-UP REPORT

Dear Ms. Peterson:

I am writing to you in follow-up after having seen Richard Hefner in his first postoperative visit in my office since his injury.

As you know, he had spinal cord compression and neurological sequelae. He has reported significant improvement in his lower extremities although he still gets tired when he is walking. The numbness has seemingly resolved and his hands are also normal.

He has some mild dysphagia after surgery which is expected. He still has some mild posterior neck pain likely due to some ligamentous instability which should improve. This is only when lying down flat. He also notices some mild limited range of motion.

On examination today his neck incision is well healed. He has a supple neck and only mild spasm without tenderness. Range of motion is slightly limited. Upper and lower extremities are strong and there is no numbness detected. His rash is gone.

X-Rays: X-rays show no movement on flexion/extension at C6-7. The interbody graft is in good position and the screws and hardware are in good position there.

Page 2
May 3, 2000
Re:  Richard Hefner

Impression: Mr. Hefner is doing well after C6-7 anterior cervical discectomy, fusion and plating for traumatic herniated disc due to a work-related injury.    His spinal cord injury seems to be resolving as well with only mild lower extremity symptoms.

Recommendations:  I will begin mild physical therapy for his neck range of motion.  He should continue his home exercises as he is doing well including swimming.    He is still off work.    Re-evaluation will be with x-rays in two months.

Please contact me if you have any questions regarding this case.

Sincerely,

JEFFREY D. GROSS, M.D.

/sk

## NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
JEFFREY D. GROSS, M.D.

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 561
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1060
FAX (949) 364-5761

April 26, 2000

UNITED STATES MARINE CORP
GYSGT Slanders
Occupational Safety Office

Fax #760-725-2169

RE: RICHARD HEFNER

To Whom It May Concern:

I have been asked to write to you regarding my patient Mr. Richard Hefner. I am his treating neurological surgeon. Mr. Hefner sustained a traumatic acute cervical disc herniation and manifest by spinal cord injury. This disc herniation was located between cervical 6 and 7.

He underwent an anterior cervical discectomy, decompression of the spinal cord, and C6 to 7 allograft arthrodesis with instrumentation using an operative microscope on 4-10-00 without problems.

Subsequently he has had improvement of his lower extremity neurological signs and numbness.

Because of this acute injury related to a truck accident and recent surgery, he is and will be unable to work for a minimum of twelve weeks. I will be evaluating him on a routine basis and will be able to better ascertain his recovery and neck status as I see him.

Please feel free to contact me at any time regarding additional information you might require on his case.

Sincerely,

JEFFREY D. GROSS, M.D.
/sk

43 AREA LANDFILL
VEHICLE ACCIDENT ON 7 APRIL 2000

DRIVER:  RICHARD HEFNER(6889)
ADDRESS: 3455 SWINGING "V" ROAD
         BORREGO SPRINGS, CA.
         (760) 767-4696
WIFE: JENIFFER

DATE ON BOARD FMD: 2/28/00

LICENSE: OUT OF STATE CLASS "B" FROM VIRGINIA. EXPIRATION: 2005.

DOES NOT HAVE A HAZARDOUS MATERIAL LICENSE FOR THE BASE.

ACCIDENT INFORMATION:  RECEIVED A PHONE CALL FROM RAY BRENGARTH AT
1210 THAT ONE OF OUR EMPLOYEES ROLLED OVER A 3,000 GALLON DOMINATOR
TRUCK IN FRONT OF THE 43 AREA LANDFILL'S FRONT GATE. LANDFILL
PERSONNEL CALLED THE FIRE DEPARTMENT FOR MEDICAL ATTENTION OF
EMPLOYEE. PRELIMARY INFORMATION WAS THAT THE DRIVER WAS OKAY.

AT 1240 RAY BRENGARTH PHONED BACK WITH INFORMATION ABOUT THE
EMPLOYEE'S NAME AND THAT THE TANK WAS SEPARATED FROM THE TRUCK.
ALSO, THAT THE TRUCK IS BEYOND REPAIR. HE ALSO STATED THAT MR.
HEFNER WAS COMPLAINING ABOUT HIS BACK AND WAS PUT ON A BOARD BY
THE PARAMEDICS FOR TRANSPORT TO THE HOSPITAL.

FIRE DEPARTMENT PARAMEDICS TOOK MR. HEFNER TO THE MISSION HOSPITAL
IN SAN CLEMENTE (949) 489-4516. (LOOKED IN PHONE BOOK – 949 AREA CODE IS
LISTED AS NEWPORT BEACH).

BRENDA CALLED HOSPITAL AT 1310 AND SPOKE TO NANCY. INFORMATION
RECEIVED WAS THAT HE HAD NOT YET ARRIVED. JESSICA (ON BREAK AT TIME
OF CALL) WILL RETURN BRENDA'S CALL WHEN MR. HEFNER ARRIVES AT THE
HOSPITAL.

BRENDA WILL THEN UPDATE US AND PHONE HIS WIFE WITH THE INFORMATION.

BRENDA PROVIDED THE HOSPITAL WITH HRO'S PHONE NUMBER FOR THEIR
AUTHORIZATION OF TREATMENT FOR OCCUPATIONAL INJURY.

IF NO PHONE CALL BY 1400, SHE WILL CALL HOSPITAL AGAIN.

DAVID SMITH IS SUPERVISOR IN CHARGE AT UTILITIES TODAY. HE HAS BEEN
INFORMED OF THE EVENTS OF THE ACCIDENT. MR. SMITH WAS GOING OUT TO
THE BORDER PATROL AREA – WE AREA DOING WORK OUT THERE AND THERE

WAS A PROBLEM. HE WAS TO BE IN RADIO CONTACT WITH BRENDA DURING THE TIME HE WAS THERE.

AT 1350 DON TAYLOR CALLED FROM THE 43 AREA LANDFILL. HE SAID THAT THE TRUCK WAS BEING TAKEN TO BASE MOTORS TO THE DEADLINE AREA. HAZMAT WAS ON SCENE FOR CLEAN UP. NO MORE THAN 15-20 GALLONS SPILLED – ALL SURFACE WATER. DID NOT REACH GROUNDWATER.

AT 1400 BRENDA WAS INFORMED THAT MR. HEFNER WAS ACTUALLY TAKEN TO MISSION VIEJO HOSPITAL, NOT SAN CLEMENTE. PHONE NUMBER IS (949) 365-2202. BRENDA SPOKE TO ANN IN EMERGENCY ROOM AND TERRY IN ICU. MR. HEFNER WAS TALKING, WALKING, AND UNDERGOING A CAT SCAN FOR PRECAUTIONARY MEASURES.

MOTHER AND WIFE WERE NOTIFIED BY HOSPITAL.

TERRY WAS ASKED TO HAVE MR. HEFNER PHONE THE UNITY ROOM TO PROVIDE VEHICLE INFORMATION SO IT COULD BE SECURED FOR THE WEEKEND.

PER RONALD SCOTT, SKID MARKS OF OVER 200 FEET LONG – VEHICLE DID A FEW TURNS, AND WENT OVER BERM INTO EMBANKMENT. CALIFORNIA DRIVER'S HANDBOOK FOUND ON GROUND AT THE SCENE OF ACCIDENT. BOOK WILL BE GIVEN TO MR. STANFORD ON MONDAY.

*145*

## Diedrich GS06 Brenda L

| | |
|---|---|
| **From:** | McAlexander GS13 James F |
| **Sent:** | Monday, April 10, 2000 7:23 AM |
| **To:** | Diedrich GS06 Brenda L |
| **Subject:** | FW: Status on  Mr. Hefner |

——Original Message——
**From:**      Stanford WS10 Scott P
**Sent:**      Saturday, April 08, 2000 8:15 AM
**To:**      Stefani WS15 Louis D; McAlexander GS13 James F
**Subject:**      Status on  Mr. Hefner

Good Morning Gentleman's:
I called the hospital in San Clement to get a update on Mr. Hefner. He is still in ICU on Saturday morning and his progress is stable. The male nurse said, they are removing Mr. Hefner from ICU to his own room this afternoon until the Doctor could see him on Monday to release him. At this time I do not know what assignment Mr. Hefner was task to do during the time of his accident. Mr. Hefner may have got a service ticket out of his assignment box. I will provide you with more information when I can talk to Mr., Hefner.

*146*

**Diedrich GS06 Brenda L**

| | |
|---|---|
| **From:** | Liinangi WG10 Linda A |
| **Sent:** | Wednesday, April 12, 2000 12:47 PM |
| **To:** | Diedrich, Brenda |
| **Cc:** | Stanford, Scott |
| **Subject:** | HEFNER |

Brenda:

Per your request, this is all the first hand knowledge I have about last Friday's accident involving Mr. Hefner:

Since Friday, 7 April 2000, was Mr. Stanford's RDO, he asked me to turn in the time cards to you on Friday morning. I did this. Everyone in the shop that day had received their assignments from Mr. Stanford on Thursday.

I was out in 43 area when I heard about Mr. Hefner's accident. By the time I returned to the shop, you were already notified of the situation, and you were trying to locate Mr. Hefner. There was a message on the shop's answering machine from the ER where Mr. Hefner was being treated. I wrote down that number and gave it to Mr. Scott to take to you. The last I had heard Friday, before leaving work, was that Mr. Hefner was conscious and talking.

This is second hand knowledge that I learned, after the fact, in trying to gather information about the accident:

That Mr. Hefner did not have a California State driver's license, nor a Base license to drive the vehicle he was driving. Being new to the state, he still had an out-of-state license. No one in the shop knew why he was driving the Dominator down Basilone Road.

LA Liinangi
Shop 89 Safety Rep

*147*

UNITED STATES MARINE CORPS
Facilities Maintenance Department
Marine Corps Base
Camp Pendleton, California  92055-5009

12810
FACFMO/880
13 April 2000

From:  Administrative Assistant, Facilities Maintenance Department, Utilities Branch
To:     Human Resource Office, Compensation Section

Subj:   RICHARD HEFNER, PIPEFITTER

1.  I have filled out the CA-1 and Mishap Report as accurate as I could without having any
information from Mr. Richard Hefner himself.  I previously faxed your office a copy of the CA-1
form on Mon, 10 Apr 2000 until I could obtain information in which to fill out the Mishap
Report and to submit them to your office all at once.

2.  Yesterday, 12 April at approximately 1530, I received a copy of the Preliminary Traffic
Accident Report that Mr. Scott Stanford was able to obtain from PMO's office.  There is more to
follow from PMO.   From what information that was on the Traffic Accident Report I was able
to provide you a name of a witness (Block 16 on CA-1 form).  I do not know this person but
there is a phone number to obtain further information regarding this case.

3.  On Monday, 10 April Mr. Hefner called Scott Stanford's office (Ronald Scott took the call).
Mr. Scott came to me and told me that Mr. Hefner called and needed Scott to call him back as
soon as possible.  That he was going in for surgery that same evening.

4.  At 4:10 PM, 10 April, Mr. Stanford returned Mr. Hefner's phone call.  I was on the same line
to over hear and ask questions to Mr. Hefner.  Mr. Hefner stated that Friday evening the doctor
told him that he had (2) herniated disks in his neck and he wanted to wait and see if the swelling
would go down. Apparently Mr. Hefner could not feel anything from his knee down to his foot
on one side (we weren't notified of Mr. Hefner's condition of the herniated disk or numbness he
was experiencing until this phone call).   His doctor then informed Mr. Hefner that he had
scheduled him for surgery this same evening between 6:30-7:00 PM.  They would repair the disk
through the front of his throat and that if the surgery was a success he would then regain feeling
in his leg.

5.  I asked Mr. Hefner if he had any indication from his doctor how long he would be
incapacitated. He told me at least 2 weeks. I asked Mr. Hefner the name of his doctor and he
told me Mr. Jeffrey Gross.  He then told me he was worried about whether or not he had a job to
come back to.  My reply to Mr. Hefner was that his number one concern at this time is to get
through the surgery, do whatever the doctor told him to do to help him fully recover first and not

worry or be concerned about his job, he needed his strength to recover. He agreed. I told him that we would be calling the hospital tomorrow (11 Apr) and check on his condition.

6. 11 April - Mr. Stanford called the hospital to check up on Mr. Hefner. I asked Mr. Stanford how Mr. Hefner was doing and he told me he came through the surgery just fine and that he would be starting physical therapy and that Jalynn, Lou Stefani and Jim McAlexander have all been informed of his condition.

7. 12 April - Jalynn called my office and left word on my answering machine that she needed to know: 1) Who gave Mr. Hefner his work assignment on Friday, what was his assignment. 2) Jalynn asked for a statement from Ms. Linda Liinangi because she had been given Ms. Liinangi's name and wanted to know what she knew of the situation. 3) Jalynn's final question was have we obtained a copy of the PMO report.

   1) In response to Mr. Hefner's work assignment and who assigned him: I question Mr. Stanford on Mr. Hefner's work assignment and he told me that the employees have work assignments (tickets and such) in a box inside his office. Each box has the individual employee's name and when the employee needs work to do or a supervisor is not available they can get work from that box which is what he suspects Mr. Hefner did Friday morning. Either that or it was in his "incoming" box that Mr. Stanford had not gone through yet. He might of taken the ticket from there. Mr. Stanford did not issue any work assignments out Thursday to anyone before he left for the day. Friday was his RDO. Ms. Liinangi was asked by Mr. Stanford Thursday afternoon if she would drop off the time cards to me Friday morning since they had to be at Payroll by 9 AM and that if the phone rang to answer it. Through a phone conversation Mr. Stanford informed me that Mr. Hefner had told him that he had gone to 62 Area sewer plant to pump out wastewater and he went to 33 Area to dump the waste and it was his second trip according to Mr. Hefner.

   2) Ms. Liinangi has provided a statement. Encl (3)

   3) PMO report was obtained yesterday afternoon and a copy is provided. Encl (4).

8. As we receive further information we will ensure that your office receives it as soon as possible. If any more information is needed, please feel free to contact me at 725-3384.

BRENDA DIEDRICH

00 APR 13 PH 2: 33

**Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation**

**J.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs

**Employee:** Please complete all boxes 1 - 15 below. Do not complete shaded areas.
**Witness:** Complete bottom section 16.
**Employing Agency** (Supervisor or Compensation Specialist): Complete shaded boxes a, b, and c.

SD

**Employee Data**

1. Name of employee (Last, First, Middle)
Hefner, Richard D.

2. Social Security Number
557-45-714

3. Date of Birth
Mo. 07 Day 01 Yr. 70

4. Sex
☒ Male ☐ Female

5. Home telephone
(760) 761-4696

6. Grade as of date of injury
WG-18
Level 18 Step 6

7. Employee's home mailing address (include city, state, and ZIP code)
3455 Swinging "V" Road   1/3/2/5222
Borrego Springs, CA   92004

8. Dependents
☒ Wife, Husband
☐ Children under 18
☐ Other

**Description of Injury**

8. Place where injury occurred (e.g. 2nd floor, Main Post Office Bldg., 12th & Pine)
43 Area Landfill - Deadman's Curve        (6889)

10. Date injury occurred
Mo. 4 Day 7 Yr. 00

Time
12:00 ☐ a.m. ☒ p.m.

11. Date of this notice
Mo. 4 Day 10 Yr. 00

12. Employee's occupation
Pipefitter

13. Cause of injury (Describe what happened and why)
Overturned pumper truck - cause of accident under investigation

a. Occupation Code
WG-120

b. Type Code
800

c. Source
012

OWCP Use: NOT CODE

14. Nature of injury (Identify both the injury and the part of body, e.g., fracture of left leg)
Pain to Neck, Shoulders & Back

**Employee Signature**

15. I certify, under penalty of law, that the injury described above was sustained in performance of duty as an employee of the United States Government and that it was not caused by my willful misconduct, intent to injure myself or another person, nor by my intoxication. I hereby claim medical treatment, if needed, and the following, as checked below, while disabled for work:

☒ a. Continuation of regular pay (COP) not to exceed 45 days and compensation for wage loss if disability for work continues beyond 45 days. If my claim is denied, I understand that the continuation of my regular pay shall be charged to sick or annual leave, or be deemed an overpayment within the meaning of 5 USC 5584.

☐ b. Sick and/or Annual Leave

I hereby authorize any physician or hospital (or any other person, institution, corporation, or government agency) to furnish any desired information to the U.S. Department of Labor, Office of Workers' Compensation Programs (or to its official representative). This authorization also permits any official representative of the Office to examine and to copy any records concerning me.

Signature of employee or person acting on his/her behalf
Sandi L. Diedrich for
Richard D. Hefner

Date 4/10/00

Any person who knowingly makes any false statement, misrepresentation, concealment of fact or any other act of fraud to obtain compensation as provided by the FECA or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment or both.

Have your supervisor complete the receipt attached to this form and return it to you for your records.

**Witness Statement**

16. Statement of witness (Describe what you saw, heard, or know about this injury) According to Police Report there w
a witness on the scene:
Sisk, Rhiannon M.
263 Palma Ct #9
Oceanside CA 92054
(949) 882-1160

| Name of witness | Signature of witness | Date signed |
|---|---|---|

| Address | City | State | ZIP Code |
|---|---|---|---|

Official Supervisor's Report: Please complete information requested below:

**Supervisor's Report**

**17.** Agency name and address of reporting office (include city, state, and ZIP code)

*McHen-West Box 555026*

*MCB Camp Pendleton, CA 92055*

OWCP Agency Code *65131*

OSHA Site Code *0068*

**18.** Employee's duty station (Street address and ZIP code)

*AMD Fttil Br Bldg 2096 Box 555007, MCB Cam Plu, CA 92055* ZIP Code

**19.** Employee's retirement coverage

☐ CSRS  ☒ FERS  ☐ Other, (Identify)

**20.** Regular work hours  From *07:00*  ☒ a.m. ☐ p.m.  To: *16:30*  ☐ a.m. ☒ p.m.

**21.** Regular work schedule  *"A" Shift — off 1st Fri of PP*  ☐ Sun. ☒ Mon. ☒ Tues. ☒ Wed. ☒ Thurs. ☒ Fri. ☐ S

**22.** Date of injury  Mo. *4* Day *7* Yr. *00*

**23.** Date notice received  Mo. *4* Day *10* Yr. *00*

**24.** Date stopped work  Mo. *4* Day *8* Yr. *00*  Time *07:00* ☒ a.m. ☐ p.m.

**25.** Date pay stopped  Mo. Day Yr.

**26.** Date 45 day period began  Mo. *4* Day *8* Yr. *00*

**27.** Date returned to work  Mo. Day Yr.  Time: : ☐ a.m. ☐ p.m.

**28.** Was employee injured in performance of duty? ☒ Yes ☐ No (If "No," explain)  *Not returned*

**29.** Was injury caused by employee's willful misconduct, intoxication, or intent to injure self or another? ☐ Yes (If "Yes," explain) ☒ No

**30.** Was injury caused by third party? ☐ Yes ☒ No (If "No," go to item 31.)

**31.** Name and address of third party (Include city, state, and ZIP code)  *N/A*

**32.** Name and address of physician first providing medical care (include city, state, ZIP code)  *Mission Viejo Trauma Center*

**33.** First date medical care received  Mo. *4* Day *7* Yr. *00*

**34.** Do medical reports show employee is disabled for work? ☒ Yes ☐ No

**35.** Does your knowledge of the facts about this injury agree with statements of the employee and/or witness? ☒ Yes ☐ No (If "No," explain)

**36.** If the employing agency controverts continuation of pay, state the reason in detail.  *N/A*

**37.** Pay rate when employee stopped work  $ *17.23* Per *HR*  *16.12*

**Signature of Supervisor and Filing Instructions**

**38.** A supervisor who knowingly certifies to any false statement, misrepresentation, concealment of fact, etc., in respect of this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on the reverse of this form is true to the best of my knowledge with the following exception:

Name of supervisor (type or print)  *Scott Stanford*

Signature of supervisor  *Philip H Steward*

Date *4/10/00*

Supervisor's Title  *Maintenance Supervisor — WS-10*

Office phone *225-4008*

**39.** Filing instructions
☐ No lost time and no medical expense: Place this form in employee's medical folder (SF-66-D)
☐ No lost time, medical expense incurred or expected: forward this form to OWCP
☒ Lost time covered by leave, LWOP, or COP: forward this form to OWCP
☐ First Aid Injury

150

Newspaper article from local paper.

## Out of control



LCpl. Brian J. Griffin

A sewage truck traveling on Basilone Road overturned across from the 52 Area Landfill April 7. "Apparently the truck's load shifted, causing the driver to lose control of the vehicle," said Chief Frank Blair, incident commander, Camp Pendleton Fire Department. "From that point, the driver was not able to regain control, and the truck struck a tree and rolled." The driver was treated for minor back and shoulder injuries and transported to Mission Trauma Center.

151

On April 7, 2000 Approx 11:30 A.M.
Mr. Aguillar handed Mr. A. Rodriguez
the phone he said he could not
under stand what was being
said, he gave mr. a Rodriguez
the phone that it was 911, I
Responded that we needed an
Emergency Vehicle in front
of the 43 area landfill cause
of an accident had just
occurred.

Alexander Rodriguez
4/12/2000

**Claim for Compensation
On Account of Traumatic Injury
or Occupational Dise**

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs

*152*

| | |
|---|---|
| | OMB No. 1215-0103 Expires: 10-31-99 |

| 1. Name of Employee | Last *Hefner* | First *Richard* | Middle *R* | 2. OWCP File Number *92004-13121252* |
|---|---|---|---|---|

| 3. Social Security Number *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* | 4. Period of wage loss for which compensation is claimed From *mo. 4 day 3 yr. 00* Thru *Present* | Hours | 5. Is this a claim for a schedule award? ☐ Yes ☒ No |
|---|---|---|---|

| 6. Has any pay been received for period shown in item 4? ☒ Yes ☐ No | 7. If yes, amount *1821.33 295.57* | From *mo. 4 day 28 yr.* Thru *mo. day yr. 35.5 hours leave paid on 4/28* |
|---|---|---|

8. Complete this item if you worked during the period shown in item 4. Attach a separate sheet if needed.

a. Salaried Employment

| Dates & Hours Worked | Pay Rate (Per hour, day or week) | Total Amount Earned | Type Work Performed | Name & Address of Employer |
|---|---|---|---|---|

*SEE #6  NO WORK Between 4/7/00 - Present*

b. Commission and Self-Employment. Show all activities, whether or not income resulted from your efforts.

| Dates & Hours Worked | Name and Address of Business | Self-Employed ☐ Commission ☐ | Type of Activity Performed | Income Derived (Attach Explanation if Needed) |
|---|---|---|---|---|

| 9. Was claim made against | 10. Name of 3rd party or insurance carrier |
|---|---|

*DOI - 4/7/00
COP ends - 5/21/00
(continued)*

| | | State | ZIP |
|---|---|---|---|
| 12. | Claim number *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* | b. Address of VA office where claim is filed *San Diego* | c. Nature of disability monthly payment *Knees + Jc 120.00* |

*LWOP - 5/22/00 →
TTD-DR: 5/22 - 6/17/00
PR -: 6/18/00 →*

| 13. | Claim number | b. Date annuity began mo. day yr. | c. Amount of monthly payment $ |
|---|---|---|---|

*Ed. = $16.12 P/h. (m-1)*

| 14. Name | | | Relationship | Living with you? (yes/no) | Mailing Address, if different from your own |
|---|---|---|---|---|---|
| | *68* | Spouse | Y | |
| | *95* | Child | Y | |
| Elliott Hefner | *12/13/95* | Child | Y | |
| Emmett Hefner | *4/2/98* | Child | Y | |

| 15. Support information for above dependents. Are you making support payments for a dependent shown above? ☐ Yes ☒ No | 16. Were support payments ordered by a court? If so, attach copy of court order. ☐ Yes ☒ No |
|---|---|

| 17. If yes, support payments are made to: Last | First | Middle | 18. Amount | Per |
|---|---|---|---|---|

| Street | City | State | ZIP |
|---|---|---|---|

19. I hereby make claim for compensation because of the injury sustained by me while in the performance of my duty for the United States, said injury not being due to willful misconduct on my part or to my intention to bring about the injury or death of myself or another, or to my intoxication. I have been disabled because of this injury and have not refused or failed to perform any work I was able to do during the period for which compensation is claimed, and every statement above is true to the best of my knowledge and belief.

Any person who knowingly makes any false statement, misrepresentation, concealment of fact, or any other act of fraud, to obtain compensation as provided by the FECA, or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment, or both.

| Employee's signature | Date (Mo., day, year) *5/9/00* |
|---|---|

153

# Claim for Compensation
## On Account of Traumatic Injury or Occupational Dise

U.S. Department of Labor
Employment Standards Administration
Office of Workers' Compensation Pr ms

OMB No. 1215-0103
Expires: 10-91-99

| 1. Name of Employee | Last | First | Middle | 2. OWCP File Number |
|---|---|---|---|---|
| | Hefner | Richard | R | G2604-131215.22 |

| 3. Social Security Number | 4. Period of wage loss for which compensation is claimed | | Hours | 5. Is this a claim for a schedule award? |
|---|---|---|---|---|
| 557 45 7148 | From mo. day yr. 4 7 00 | Thru Present | | ☐ Yes  ☒ No |

| 6. Has any pay been received for period shown in item 4? | ☒ Yes  ☐ No | 7. If yes, amount 1897.33  29.57 | From mo. day yr. 3 29 00 | Thru mo. day yr. reg p 35.5 hours leave paid on 4/28 |
|---|---|---|---|---|

**8.** Complete this item if you worked during the period shown in item 6. Attach a separate sheet if needed.

**a. Salaried Employment.**

| Dates & Hours Worked | Pay Rate (Per hour, day or week) | Total Amount Earned | Type Work Performed | Name & Address of Employer |
|---|---|---|---|---|
| SEE #6   NO WORK Between 4/7/00 - Present | | | | |

**b. Commission and Self-Employment.** Show all activities, whether or not income resulted from your efforts.

| Dates & Hours Worked | Name and Address of Business | Self-Employed ☐  Commission ☐ | Type of Activity Performed | Income Derived (Attach Explanation if Needed) |
|---|---|---|---|---|

| 9. Was claim made against 3rd party? | ☐ Yes  ☒ No | 10. Name of 3rd party or insurance carrier |
|---|---|---|

| 11. Has the claim been settled. Give amount recovered. | Address |
|---|---|
| | City | State | ZIP |

| 12. Have you ever applied for or received benefits from the Veterans Administration based on disability incurred while serving in the Armed Forces of the United States? ☒ Yes ☐ No  If Yes, furnish ▶ | a. Claim number 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 | b. Address of VA office where claim is filed  San Diego | c. Nature of disability monthly payment Knees + Tc 120.00 |
|---|---|---|---|

| 13. Have you applied for or received an annuity under the U.S. Civil Service Retirement Act or any other Federal Retirement or Disability Law? ☐ Yes ☒ No  If Yes, furnish ▶ | a. Claim number | b. Date annuity began mo. day yr. | c. Amount of monthly payment $ |
|---|---|---|---|

**14.** List your dependents

| Name | Date of Birth mo. day yr. | Relationship | Living with you? (yes/no) | Mailing Address, if different from your own |
|---|---|---|---|---|
| Jennifer Hefner | 4 30 69 | Spouse | Y | |
| Shellina Hefner | 5 21 93 | Child | Y | |
| Elliott Hefner | 12 13 95 | Child | Y | |
| Emmett Hefner | 4 2 98 | Child | Y | |

**15.** Support information for above dependents
Are you making support payments for a dependent shown above?  ☐ Yes  ☒ No

**16.** Were support payments ordered by a court? If so, attach copy of court order.  ☐ Yes  ☒

| 17. If yes, support payments are made to: Last | First | Middle | 18. Amount | Per |
|---|---|---|---|---|
| Street | City | State | ZIP | |

**19.** I hereby make claim for compensation because of the injury sustained by me while in the performance of my duty for the United States, said injury not being due to willful misconduct on my part or to my intention to bring about the injury or death of myself or another, or to my intoxication. I have been disabled because of this injury and have not refused or failed to perform any work I was able to do during the period for which compensation is claimed, and every statement above is true to the best of my knowledge and belief.

Any person who knowingly makes any false statement, misrepresentation, concealment of fact, or any other act of fraud, to obtain compensation as provided by the FECA, or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment, or both.

Employee's signature _[signature]_　　　Date (Mo., day, year) 5/9/00

# Claim for Compensation
## On Account of Traumatic Injury
### or Occupational Disease

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs

154

OMB No. 1215-0103
Expires: 10-31-99

| 1. Name of Employee | Last | First | Middle | 2. OWCP File Number |
|---|---|---|---|---|
| | Hefner | Richard | R | 92004-131315222 |

| 3. Social Security Number | 4. Period of wage loss for which compensation is claimed | | Hours | 5. Is this a claim for a schedule award? |
|---|---|---|---|---|
| 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 | From mo 4 day 7 yr 00 Thru mo day yr Present | | | ☐ Yes  ☒ No |

| 6. Has any pay been received for period shown in item 4? | ☒ Yes ☐ No | 7. If yes, amount $1259.55 / 25.57 | From mo day yr Thru mo day yr | req. pay rec'd 4/14 |
|---|---|---|---|---|

25.5 hours leave paid on 4/28

8. Complete this item if you worked during the period shown in item 6. Attach a separate sheet if needed.

a. Salaried Employment.

| Dates & Hours Worked | Pay Rate (Per hour, day or week) | Total Amount Earned | Type Work Performed | Name & Address of Employer |
|---|---|---|---|---|
| SEE #6 | NO WORK Between 4/7/00 - Present | | | |

b. Commission and Self-Employment. Show all activities, whether or not income resulted from your efforts.

| Dates & Hours Worked | Name and Address of Business | Self-Employed ☐ Commission ☐ | Type of Activity Performed | Income Derived (Attach Explanation if Needed) |
|---|---|---|---|---|

| 9. Was claim made against 3rd party? ☐ Yes ☒ No | 10. Name of 3rd party or insurance carrier |
|---|---|
| 11. Has the claim been settled? Give amount recovered. | Address |
| | City    State    ZIP |

| 12. Have you ever applied for or received benefits from the Veterans Administration based on disability incurred while serving in the Armed Forces of the United States? ☒ Yes ☐ No  If Yes, furnish ▶ | a. Claim number 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 | b. Address of VA office where claim is filed San Diego | c. Nature of disability and monthly payment Knees + Toes 120.00 |
|---|---|---|---|

| 13. Have you applied for or received an annuity under the U.S. Civil Service Retirement Act or any other Federal Retirement or Disability Law? ☐ Yes ☒ No  If Yes, furnish ▶ | a. Claim number | b. Date annuity began mo. day yr. | c. Amount of monthly payment $ |
|---|---|---|---|

14. List your dependents

| Name | Date of Birth mo day yr | Relationship | Living with you? (yes/no) | Mailing Address If different from yours/own |
|---|---|---|---|---|
| Jennifer Hefner | 4 30 68 | Spouse | Y | |
| Shellina Hefner | 5 21 95 | Child | Y | |
| Elliott Hefner | 12 13 95 | Child | Y | |
| Emmett Hefner | 4 2 98 | Child | Y | |

RECEIVED HRO PM 4:18

| 15. Support information for above dependents. Are you making support payments for a dependent shown above? ☐ Yes ☒ No | 16. Were support payments ordered by a court? If so, attach copy of court order. ☐ Yes ☒ No |
|---|---|

| 17. If yes, support payments are made to: Last | First | Middle | 18. Amount |
|---|---|---|---|
| Street | City | State | ZIP |  /Per |

19. I hereby make claim for compensation because of the injury sustained by me while in the performance of my duty for the United States, said injury not being due to willful misconduct on my part or to my intention to bring about the injury or death of myself or another, or to my intoxication. I have been disabled because of this injury and have not refused or failed to perform any work I was able to do during the period for which compensation is claimed, and every statement above is true to the best of my knowledge and belief.

Any person who knowingly makes any false statement, misrepresentation, concealment of fact, or any other act of fraud, to obtain compensation as provided by the FECA, or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment, or both.

| Employee's signature | Date (Mo., day, year) 5/9/00 |
|---|---|

20. Employee's home mailing address (include Zip Code)

Street PO Box 1210   City Borrego Springs   State CA   ZIP 92004

Form CA-7
Rev. Jan 1997

155

## Statement of Official Superior

| 21. Pay Rate As Of: | a. Base Pay | b. Subsiste | c. Quarters | d. Other (Specify) |
|---|---|---|---|---|
| Date of Injury | $ 16.12 per hr | $ per | $ per | $ per |
| Date Employee Stopped Work | $ per | $ per | $ per | $ per |

**22.** If employee received additional pay, identify type and show amount

| ☐ Premium Pay | N/A | per | ☐ Night Pay | | per |
|---|---|---|---|---|---|
| ☐ Sunday Pay | | per | ☐ Other (Identify) | | per |

**23.** Show work schedule for week pay stopped
☐ Sun ☒ Mon ☒ Tue ☒ Wed ☒ Thu ☒ Fri ☐ Sat

**24.** Did employee work in position for 11 months prior to injury? ☐ Yes ☒ No

**25.** If not, would position have afforded employment for 11 months but for the injury? ☐ Yes ☐ No

**26.** Total length of federal civilian service Yrs. Mos.

**27.** Was the employee enrolled in a Health Benefits Program at first opportunity, or for 5 years prior to the date pay stopped? ☒ Yes ☐ No

If yes, give code

**28.** Was the employee enrolled in an Optional Life Insurance Program on the date pay stopped? ☒ Yes ☐ No

If yes, was employee enrolled in Option ☒ A ☒ B ☒ C 5X

Ending date of the pay period in which HBS / OLI Deductions were last made? mo. day yr. 11 to 15

If Option B, show number of multiples 5

**29.** Type and inclusive dates employee received leave for any part of period since stopping work. Specify type of leave, SICK, ANNUAL, or OTHER

| Type of Leave | From mo. day yr. | Thru mo. day yr. | Type of Leave | From mo. day yr. | Thru mo. day yr. |
|---|---|---|---|---|---|
| Type of Leave | From | Thru | Type of Leave | From | Thru |

**30.** If employee received continuation of pay (COP), give dates.

04/08/00 through 05/22/00

**31.** Date all pay stopped Hour
mo. day yr. 05 23 00 ☐AM ☐PM

**32.** Period for which compensation is claimed
From mo. day yr. 05 23 00 Thru mo. day yr. 06 03 00

**33.** Date returned to work Hour
mo. day yr. Not returned. ☐AM ☐PM

**34.** Work schedule when returned to work
☐ Sun ☐ Mon ☐ Tue ☐ Wed ☐ Thu ☐ Fri ☐ Sat

**35.** Did the work assignment change because of disability resulting from the injury? Describe. ☐ Yes ☐ No

**36.** Pay rate on return to work
$ Per

**37.** A supervisor who knowingly certifies to any false statement, misrepresentation, or concealment of fact, with respect to this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on the reverse of this form is true to the best of my knowledge with the following exception:

_Scott P. Stanford_   5-18-00

MAINTENANCE SUPERVISOR

FMD   95-3580

**38.** If OWCP needs specific pay information the person who should be contacted is ☐ Supervisor ☒ Other: Name Jalynn Peterson, ICPA   Phone 760-725-3728

# Claim for Compensation
## On Account of Traumatic Injury or Occupational Disease

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs

### Employee Statement

OMB No. 1215-0103
Expires: 10-31-99

| | | |
|---|---|---|
| 1. Name of Employee   Last   *Hefner*   First   *Richard*   Middle   *R* | | 2. OWCP File Number  *92004-131715222* |

3. Social Security Number  *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*

4. Period of wage loss for which compensation is claimed
From mo. *4* day *7* yr. *00*  Thru mo. *Present* day  yr.
Hours

5. Is this a claim for a schedule award?  ☐ Yes  ☒ No

6. Has any pay been received for period shown in item 4?  ☒ Yes  ☐ No

7. If yes, amount  *1277.33*   *295.57*   From mo. *3* day *27* yr. *00*   Thru mo. *4* day  yr.  *reg. pay rec'd 4/11*
*35.5 hours leave paid on 4/28*

8. Complete this item if you worked during the period shown in item 6. Attach a separate sheet if needed.

a. Salaried Employment,
| Dates & Hours Worked | Pay Rate (Per hour, day or week) | Total Amount Earned | Type Work Performed | Name & Address of Employer |
|---|---|---|---|---|
| *SEE #6   NO WORK Between 4/7/00 - present* | | | | |

b. Commission and Self-Employment. Show all activities, whether or not income resulted from your efforts.
| Dates & Hours Worked | Name and Address of Business | Self-Employed ☐ Commission ☐ | Type of Activity Performed | Income Derived (Attach Explanation if Needed) |
|---|---|---|---|---|

9. Was claim made against 3rd party?  ☐ Yes  ☒ No

10. Name of 3rd party or insurance carrier

11. Has the claim been settled? Give amount recovered.
Address
City  State  ZIP

12. Have you ever applied for or received benefits from the Veterans Administration based on disability incurred while serving in the Armed Forces of the United States?  ☒ Yes  ☐ No   If Yes, furnish ▶
a. Claim number  *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*
b. Address of VA office where claim is filed  *San Diego*
c. Nature of disability and monthly payment  *Knees + Toes 120.00*

13. Have you applied for or received an annuity under the U.S. Civil Service Retirement Act or any other Federal Retirement or Disability Law?  ☐ Yes  ☒ No   If Yes, furnish ▶
a. Claim number
b. Date annuity began  mo. day yr.
c. Amount of monthly payment  $

### Dependents

14. List your dependents

| Name | Date of Birth mo. day yr. | Relationship | Living with you? (yes/no) | Mailing Address if different from your own |
|---|---|---|---|---|
| *Jennifer Hefner* | *4 30 68* | *Spouse* | *Y* | |
| *Shellina Hefner* | *5 21 93* | *Child* | *Y* | |
| *Elliott Hefner* | *12 13 95* | *Child* | *Y* | |
| *Emmett Hefner* | *4 2 98* | *Child* | *Y* | |

15. Support Information for above dependents
Are you making support payments for a dependent shown above?  ☐ Yes  ☒ No

16. Were support payments ordered by a court? If so, attach copy of court order.  ☐ Yes  ☒ No

17. If yes, support payments are made to:  Last   First   Middle
Street   City   State   ZIP

18. Amount  Per

### Signature of Employee

19. I hereby make claim for compensation because of the injury sustained by me while in the performance of my duty for the United States, said injury not being due to willful misconduct on my part or to my intention to bring about the injury or death of myself or another, or to my intoxication. I have been disabled because of this injury and have not refused or failed to perform any work I was able to do during the period for which compensation is claimed, and every statement above is true to the best of my knowledge and belief.

Any person who knowingly makes any false statement, misrepresentation, concealment of fact, or any other act of fraud, to obtain compensation as provided by the FECA, or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment, or both.

Employee's signature  *[signature]*   Date (Mo., day, year)  *5/9/00*

20. Employee's home mailing address (Include Zip Code)
Street  *PO Box 1210*   City  *Borrego Springs*   State  *CA*   ZIP  *92004*

Form CA-7
Rev. Jan. 1997

UNITED STATES MARINE CORPS
CIVILIAN HUMAN RESOURCES OFFICE-SOUTHWEST
BOX 555025
CAMP PENDLETON, CALIFORNIA  92055 5026

12810
HRPSW
20 Apr 00

From: Injury Compensation Program Administrator, Civilian Human
      Resources Office-Southwest, Box 555026, Camp Pendleton,
      California 92055-5026
To:   US Department of Labor, Office of Workers' Compensation Programs,
      Attn: San Diego Claims Unit, San Francisco, California 94119

Subj: NOTICE OF TRAUMATIC INJURY ICO RICHARD HEFNER; SSN 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

Encl: (1) Notice of Traumatic Injury Claim for Richard Hefner w/
      supporting documents

1. The enclosure is forwarded to your office for immediate processing.
   Mr. Hefner was involved in a rollover accident on 7 April 2000,
   which resulted in pain to his neck, back and shoulder.  The
   following additional information is provided.

2. He was transported to Mission Viejo Trauma Center.  He was evaluated
   and treated, and remained in the hospital for surveillance.  On 10
   April 2000, Mr. Hefner was admitted for surgery for herniated discs.
   He remained in the hospital until his release on 14 April 2000.

3. The medical information provided includes the results of a MRI.  The
   medical information does not include a relationship between the
   injuries sustained as a result of this accident, and the requirement
   for surgery.

4. The agency is conducting an investigation as to the cause of the
   accident.  Mr. Hefner will also provide a written statement as to
   the events of 7 April 2000.

5. If you have any questions or require additional information, please
   contact me at (760) 725-3728.

JALYNN PETERSON

Copy to:
File

Sent by: HRO SVC CENTER CA DSN 365    760 725 0058:    05/04/00  1:19PM;JetFax #628;Page 1/1

**NEUROLOGICAL SURGERY**

JACQUES J. L. PALMER, M.D.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
CAL. LIC. NO. C-9777

SYLVAIN PALUSEK, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
CAL. LIC. NO. C-4884

JEFFREY D. GROSS, M.D.
GROSS MD, SO INC
CAL. LIC. NO. G01694

26752 CHURN VALLEY PKWY • SUITE 561 • MISSION VIEJO, CA 92691   (949) 364-1030

Name _____  Date _____ 

Address _____  CA

R

Diagnosis - Spinal Cord
Injury - traumatic Cervical
disc herniation

☐ Label
MAY CAUSE DROWSINESS ☐   REF _____ TIMES
                              M.D.   GENERIC ☐

---

OPTIONAL FORM 99 (7-90)

**FAX TRANSMITTAL**   # of pages ▶ 1

To _Richard_   From _____
Dept./Agency _____  Phone # _____
Fax # _7 6 7 4 6 9 6_   Fax # _____
NSN 7540-01-317-7368   5099-101   GENERAL SERVICES ADMINISTRATION

jchefner  Case 3:08-cv-01586-L-BLM  (760) 767-4697  Document 153  Filed 08/29/2008  05/09/2000 01:09:36 PM  Page 51 of 101  P.11

159

**X-RAY ORDER →**

X-RAYS TAKEN
10:30 R.M. PRIOR TO
11:15 AM APPT.
WITH DR. GROSS
ON 5/3
THIS WAS FIRST APPT.
W/ DR. GROSS AFTER
DISCHARGE FROM HOS.

---

**NEUROLOGICAL SURGERY**
JACQUES J.     IER, M.D.          SYLVAN PALMER, M.D., F.A.C.S.          JEFFREY U. GROSS, M.D.
A PROFESSIO     IFORMATION        A PROFESSIONAL CORPORATION            BNDD NO. BG4549741
BNDD NO. AH9188376                 DIPLOMATE AMERICAN BOARD              CAL. LIC. NO. G079294
CAL. LIC. NO. C-31771              OF NEUROLOGICAL SURGERY
                                   BNDD NO. AP6726617
                                   CAL. LIC. NO. C 39418

26732 CROWN VALLEY PKWY. • SUITE 561 • MISSION VIEJO, CA 92691 • (949) 364-1080

Name ___Hefner, R._____ Date _5/3/00_

Address _____ ____CA

℞

AP + LAT  Cspine xrays

☐ Label
MAY CAUSE DROWSINESS ☐              REF. _____ TIMES
                                   ____ M.D.  GENERIC ☐

---

**NEUROLOGICAL SURGERY**
JACQUES J     IER, M.D.           SYLVAN PALMER, M.D., F.A.C.S.          JEFFREY U. GROSS, M.D.
A PROFESSION    IFORMATION         A PROFESSIONAL CORPORATION            BNDD NO. BG4M9741
BNDD NO. AH9188376                 DIPLOMATE AMERICAN BOARD              CAL. LIC. NO. G079294
CAL. LIC. NO. C-31771             OF NEUROLOGICAL SURGERY
                                   BNDD NO. AP6726617
                                   CAL. LIC. NO. C-39418

26732 CROWN VALLEY PKWY. • SUITE 561 • MISSION VIEJO, CA 92691 • (949) 364-1080

Name ___Hefner, Richard___ Date _5/2/00_

Address _____ ____CA

℞

Date of Injury = 4/7/00
Condition = stable
Will follow Condition and reeval
& release to work when safe.

☐ Label
MAY CAUSE DROWSINESS ☐              REF. _____ TIMES
                                   ____ M.D.  GENERIC ☐

File # 168
920043-1215222

**NEUROLOGICAL SURGERY**

JACQUES J.        IER, M.D.
A PROFESSION     PORATION
BNDD NO. A*6158376
CAL. LIC. NO. C-31771

SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
BNDD NO. AP9720017
CAL. LIC. NO. C-36816

JEFFREY D. GROSS, M.D.
BNDD NO. BG4576041
CAL. LIC. NO. G079394

26732 CROWN VALLEY PKWY. • SUITE 561 • MISSION VIEJO, CA 92691 • (949) 364-1060

Name _Hefner, R._  Date _5/2/00_

Address _____  CA

**R**

AP + LAT  Cspine  Xrays

☐ Label
MAY CAUSE DROWSINESS ☐        REF. _____ TIMES
                               M.D.  GENERIC ☐

---

**NEUROLOGICAL SURGERY**

JACQUES J.        IER, M.D.
A PROFESSION     RPORATION
BNDD NO. AP6158376
CAL. LIC. NO. C-31771

SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
BNDD NO. AP9720017
CAL. LIC. NO. C-36816

JEFFREY D. GROSS, M.D.
BNDD NO. BG4576041
CAL. LIC. NO. G079394

26732 CROWN VALLEY PKWY. • SUITE 561 • MISSION VIEJO, CA 92691 • (949) 364-1060

Name _Hefner, Richard_  Date _5/2/00_

Address _____  CA

**R**

Date of Injury = 4/7/00
Condition = Stable
Will follow Condition and Recovery
& release to Work when safe.

☐ Label
MAY CAUSE DROWSINESS ☐        REF. _____ TIMES
                               M.D.  GENERIC ☐

9200413121522J
161

## NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
BNDD NO. AP6158376
CAL. LIC. NO. C-31771

SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
BNDD NO. AP9720017
CAL. LIC. NO. C-38616

JEFFREY D. GROSS, M.D.
BNDD NO. BG4576041
CAL. LIC. NO. G079394

26732 CROWN VALLEY PKWY. • SUITE 561 • MISSION VIEJO, CA 92691 • (949) 364-1060

Name _____ Date _____

Address _____ CA

R

☐ Label
MAY CAUSE DROWSINESS ☐ _____ M.D.    REF. _____ TIMES    GENERIC ☐

162

**NEUROLOGICAL SURGERY**

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
BIND NO. A191998RE
CAL. LIC. NO. C-41771

SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
BIND NO. AN07601T
CAL. LIC. NO. C-31614

JEFFREY G. GROSS, M.D.
BIND NO. BD489N041
CAL. LIC. NO. DG73994

28732 CROWN VALLEY PKWY. • SUITE 661 • MISSION VIEJO, CA 92691 • (949) 364-1000

Name _____   Date 5/3/00

Address _____ CA

R

Cspe Flex /EXT , AP

☐ Late
MAY CAUSE DROWSINESS ☐ _____   REF _____ TIMES

M.D. _____   GENERIC ☐

---

**NEUROLOGICAL SURGERY**

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
BIND NO. A191998RE
CAL. LIC. NO. C-41771

SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
BIND NO. AN07601T
CAL. LIC. NO. C-31614

JEFFREY G. GROSS, M.D.
BIND NO. BD489N041
CAL. LIC. NO. DG73994

28732 CROWN VALLEY PKWY. • SUITE 661 • MISSION VIEJO, CA 92691 • (949) 364-1000

Name _____   Date 5/3/00

Address _____ CA

R

PT - MWD cerw Rom
+ MWD strping
May use massage    3/wk x 8
No traction              wks

☐ Label
MAY CAUSE DROWSINESS ☐ _____   REF _____ TIMES

M.D. _____   GENERIC ☐

Physical
Therapy
orders.

FROM : Kirtner Rehabilitation Associa    PHONE NO. : 706 5996602    May. 15 2000 03:14PM P3
Sent by: HRO SVC CENTER CA DSN 365          780 725 0058;

5- 2-06 :12:33PM;Neuro Surgery Med                    05/15/00  9:23AM;JetFax #731;Page 3/5

                                                                    ;949 364 576 •

163

## NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
ENDO NO. AF616876
CAL. LIC. NO. O-31771

SYLVAN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
ENDO NO. AF172017
CAL. LIC. NO. C-42814

JEFFREY D. GROSS, M.D.
ENDO NO. BG4504841
CAL. LIC. NO. G37C004

25732 CROWN VALLEY PKWY. • SUITE 201 • MISSION VIEJO, CA 92691 • (949) 364-1080

Name  Hefner, R.                          Date  5/1/00

Address _____ CA

R

AP + LAT Cspine xrays

☐ Label
MAY CAUSE DROWSINESS ☐                    REF._____ TIMES
                                          _____ M.D.    GENERIC ☐

---

## NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
ENDO NO. AF618576
CAL. LIC. NO. O-31771

SYLVAN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
ENDO NO. AF172017
CAL. LIC. NO. O-32816

JEFFREY D. GROSS, M.D.
ENDO NO. BG4504841
CAL. LIC. NO. G37C004

25732 CROWN VALLEY PKWY. • SUITE 201 • MISSION VIEJO, CA 92691 • (949) 364-1080

Name  Hefner, Richard            Date  5/1/00

Address _____ CA

R

Date of Injury = 4/7/00
Condition = stable
Will follow Condition and recovery
& release to Work when safe.

☐ Label
MAY CAUSE DROWSINESS ☐                    REF._____ TIMES
                                          _____ M.D.    GENERIC ☐

(949) 364·5761     Fax

*164*

# Confirmation of Hospital stay

```
RUN DATE: 04/26/00        MISSION HOSPITAL REGIONAL MEDICAL CENTER        PAGE 1
RUN TIME: 0945                      PATIENT'S DATA

PATIENT: 532984

NAME: HEFNER,RICHARD          BIRTHDATE: 07/01/70  AGE: 29     SEX: M

PO BOX 1210,WARNGO SPRINGS,CA 92004-1210

MAIDEN/OTHER NAMES:  TQ,T69055

OTHER NUMBERS:          532984

MOTHER'S NAME:                        MORE DATA ON FICHE:
RECORD LOCATOR:                       PORTION SIGNED OUT:
DISCHARGE DISP:      HOM               PORTION INCOMPLETE:
FOLDER CREATED:      04/07/00

COMMENT:

  DATE    TYPE  ACCOUNT #   CON LOCATION   DOCTOR    DISCH DT  DISCH DISP
                              REASON FOR VISIT

04/07/00   IN   10792893    3E          BORMA      04/14/00  HOM
                              SPINAL CORD INJURY
04/07/00   ER   10792893    ER          BORMA      04/07/00  P
                              UNKNOWN INJURIES
```

165

UNITED STATES MARINE CORPS
Civilian Human Resources Office-Southwest
Box 555026    Bldg 2265
Camp Pendleton, California 92055-5026

12810
HRPSW/023
May 4, 2000

Jeffrey Gross, M.D.
26732 Crown Valley Parkway
Suite 561
Mission Viejo, California 92691

Re:  Richard Hefner
File #92004-13-1215222

Dear Doctor Gross:

You are currently treating Mr. Richard Hefner following an injury he
sustained on April 7, 2000, when he was involved in a motor vehicle
accident.  Your treatment began April 7, 2000 and continues through
present.

In your report of May 4, 2000, you provide a diagnosis of spinal cord
injury, cervical disc herniation.  You indicate Mr. Hefner is unable
to return to regular work, but report limitations of sitting up to two
hours; walking up to 30 minutes; simple grasping up to one hour; and
fine manipulation up to one hour. Additional medical information
provided by you indicates Mr. Hefner's condition was stable and you
would follow his condition and recovery and release to work when safe.

In order to provide Mr. Hefner with the appropriate benefits and
ensure prompt adjudication of his claim, the following information is
required.

Please submit a narrative report which includes: history of injury,
examination findings, test results, diagnosis (with ICD-9 diagnosis
code), treatment provided, prognosis, period and extent of disability
and an opinion on the relationship of the diagnosed condition(s) to
Mr. Hefner's Federal employment activity.

Your immediate attention in this matter is greatly appreciated.
Please provide the requested information no later than May 15, 2000.
If you have any questions, please contact Ms. Jalynn Peterson or
myself at (760) 725-3723 or (750)725-3736 concurrently.

TIMOTHY A. NICHOLS
Employee Relations Officer

Copy to:
DOL
Mr. Hefner
File

# DEPARTMENT OF DEFENSE
# CIVILIAN LEAVE AND EARNING STATEMENT    *166*

### Visit the DFAS Web site at www.dfas.mil

| 3. NAME | 4. PAY PLAN/GRADE/STEP | 5. HOURLY/DAILY RATE | 6. BASIC OT RATE | 7. BASIC PAY | LOCALITY ADJ | ADJUSTED BASIC PAY |
|---|---|---|---|---|---|---|
| HEFNER RICHARD R | WG 10 01 | 18.12 | 24.18 | | | |

| 8. SOC SEC NO | 9. LOCALITY % | 10. FLSA CATEGORY | 11. SCD LEAVE | 12. MAX LEAVE CARRY OVER | 13. LEAVE YEAR END |
|---|---|---|---|---|---|
| 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 | | N | 06/13/91 | 240 | 01/13/01 |

| 14. FINANCIAL INSTITUTE - NET PAY | 15. FINANCIAL INSTITUTION - ALLOTMENT #1 | 16. FINANCIAL INSTITUTION - ALLOTMENT #2 |
|---|---|---|
| CALIFORNIA COAST CREDIT UNI | | |

**1. PAY PERIOD END** 04/22/00
**2. PAY DATE** 04/28/00

| 17. TAX | MARITAL STATUS | EXEMPTIONS | ADD'L | 18. TAX | MARITAL STATUS | EXEMPTIONS | ADD'L | TAXING AUTHORITY | 19. CUMULATIVE RETIREMENT | 20. MILITARY DEPOSIT |
|---|---|---|---|---|---|---|---|---|---|---|
| FED | M | 3 | | | | | | | FERS: | |
| CA | M | 11 | | | | | | | 61.73 | |

| 21. | CURRENT | YEAR TO DATE | 22. |
|---|---|---|---|
| GROSS PAY | 411.06 | 4849.12 | |
| TAXABLE WAGES | 411.06 | 4849.12 | |
| NONTAXABLE WAGES | | | |
| TAX DEFERRED WAGES | | | |
| DEDUCTIONS | 115.49 | 1008.74 | |
| AEIC | | | |
| NET PAY | 295.57 | 3840.38 | |

## CURRENT EARNINGS

| TYPE | HOURS/DAYS | AMOUNT | TYPE | HOURS/DAYS | AMOUNT | TYPE | HOURS/DAYS | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| REGULAR PAY | 26.50 | 411.06 | | | | | | |

## DEDUCTIONS

| TYPE | CODE | CURRENT | YEAR TO DATE | TYPE | CODE | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|---|---|
| FEGLI | Z6 | 5.68 | 22.32 | FEGLI OPTNL | ABC | 6.75 | 20.25 |
| FEHB | 105 | 66.78 | 133.56 | MEDICARE | | 5.96 | 70.31 |
| OASDI | | 25.49 | 300.85 | RETIRE, FERS | K | 4.93 | 61.73 |
| TAX, FEDERAL | | | 408.89 | TAX, STATE | CA | | 1.23 |

## LEAVE

| TYPE | PRIOR YR BALANCE | ACCRUED PAY PD | ACCRUED YTD | USED PAY PD | USED YTD | DONATED/ RETURNED | CURRENT BALANCE | USE-LOSE/ TERM DATE |
|---|---|---|---|---|---|---|---|---|
| ANNUAL | | 6.00 | 24.00 | 21.60 | 24.00 | | | |
| SICK | | 4.00 | 16.00 | 4.00 | 16.00 | | | |
| INJURY (COP) | | | | | 1.00 | | | 04/07 |
| LWOP | | | | 54.50 | 54.50 | | | |

## REMARKS

BUY US SAVINGS BONDS
NATIONAL ASIAN-PACIFIC AMERICAN HERITAGE OBSERVANCE IS MAY 1 - 31, 2000
CONTACT YOUR CUSTOMER SERVICE REPRESENTATIVE FOR INFORMATION ON THE NEW SERIES I BONDS
PLEASE CUSTOMIZE YOUR TEMPORARY E/MSS PIN. IF YOU DID NOT RECEIVE A PIN CALL 800-390-2348.

*162*

5/9/00

QCM? YES

## REFERRAL FOR NURSE INTERVENTION
### CASE FILE NUMBER: 131215222

Claimant:          RICHARD HEFNER

Address:           330 PALM CANYON DR UNIT 2

City, State and Zip: BORREGO SPRINGS CA 92004

Phone:             760-767-4696


Attending Physician: TO BE ADVISED (SEE BELOW)


Employer Contact:   JAYLINN PETERSON

Title:              ICS

Phone:             760- *725- 3728*

### Statement of Accepted Facts

The claimant, date of birth 7/1/70, is employed as a PIPEFITTER by CAMP PENDELTON MARINE CORPS, US DEPT OF THE NAVY in CAMP PENDELTON CA. On 4/7/00, the claimant sustained an injury as the result of HAVING HIS TRUCK ROLL OFF THE ROAD . The following conditions have been accepted as work related: ADMINISTRATIVELY CLOSED FOR NOW (SEE BELOW). The claimant stopped work on 4/7/00.

Special Concerns/Instructions:  THIS CASE CAME IS AS A DIRECT FAX FROM THE CL'S WIFE TO RANDY YORK.  ACTUAL CA-1 HAS NOT COME IN YET FROM EA.  RANDY HAD A CASE CREATED FOR IT AND ACCEPTED IT AS AN ADMIN CLOSED CASE WITH CAP OF $1500.00.  CASE NOW NEEDS TO BE FORMALLY ADJUDICATED AND ACCEPTED.  CL HAD TO HAVE SURGERY FOR HIS SPINAL CORD AND HAD  DISKECTOMY WITH FUSION @ C6-7.  CE HAS REQUESTED CL TO RESPOND TO FACTUAL Q'S FOR FACTUAL EVIDENCE AND  TO  HAVE MD FAX ALL MED'S TO DATE FOR MEDICAL EVID.  CURRENTLY CASE HAS NO EVIDENCE FOR MED'S.  CL NEEDS RN TO HELP ARRANGE FOR TRANSPORTATION TO/FROM MED APPTS AND FOR RTLD IN ABOUT TWO MONTHS.  RN MAY ALSO NEED TO COORDINATE SEVERAL OTHER SPECIAL NEEDS FOR THIS CL AS CASE WAS TAGGED BY RANDY "SERIOUS INJURY".  ALL THAT IS IN THE CASE FILE CURRENTLY HAS BEEN COPIED FOR RN INTERVENTION.


OSCAR M. RAMIREZ
Claims Examiner

TO:     Oscar Ramirez (claim)

        101081114159754287

FROM:   Richard Hefner

        (760) 767-4697

DATE:   11/13/2000

Number of Pages: 2

Message:

        Mr. Ramirez,
        Here is the doctor's portion of the CA-7 for
        my neck injury.  Would you please advise me
        of any other paperwork which is necessary to
        complete this claim.  Thank you
        Richard Hefner

*168*

*13-12/5 222*

**Attending Physician's Report**

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs

| 1. Patient's name  Last    First    Middle | 2. Date of Injury | 3. OWCP File Number | OMB No. 1215-0103 |
|---|---|---|---|
| Hefner, Richard R | mo. day yr. 04 07 00 | 92004-1312 15222 | Expires: 10-31-99 |

**4. What history of injury (including disease) did patient give you?**
Patient was brought in as a trauma following an accident in which he was driving a tanker truck which slid and eventually rolled over after h

**5. Is there any history or evidence of concurrent or pre-existing injury or disease or physical impairment?** (If yes, please describe)
☐ Yes  ☒ No

ICD-9 Code tried + corre
⌊_⌋ 8 5 0 . 1

**6. What are your findings?** (Include results of X-Rays, laboratory reports, etc.)
Concussion ; Weakness of lower extremities with numbness

**7. What is your diagnosis?**
Cerebral concussion

ICD-9 Code
⌊_⌋ 7 2 0

**8. Do you believe the condition found was caused or aggravated by an employment activity?** (Please explain answer)
☒ Yes  ☐ No

| 9. Did injury require hospitalization? If no, go to item #13 | 10. Date of admission | 11. Date of discharge | 12. Additional Hospitalization required If Yes, describe in "Remarks" (Item 25) |
|---|---|---|---|
| ☒ Yes  ☐ No | mo. day yr. 4 7 00 | mo. day yr. 4 14 00 | ☐ Yes  ☒ No |

**13. What treatment did you provide?**
ANTERIOR C6-C7 DISKECTOMY

| 14. Date of first examination | 15. Date(s) of treatment | | | 16. Date of discharge from treatmen |
|---|---|---|---|---|
| mo. day yr. 04 07 00 | mo. day yr. 05 03 00 | mo. day yr. 07 10 00 | mo. day yr. 10 02 00 | mo. day yr. 10 02 00 |

| 17. Period of total disability | 18. Period of Partial Disability N/A | 19. Date employee able to resume light work mo. day yr. |
|---|---|---|
| From mo. day yr. 04 07 00 Thru mo. day yr. 10 02 00 | From mo. day yr. Thru mo. day yr. | N/A |

| 20. Date employee is able to resume regular work mo. day yr. 10 03 00 | 21. Has employee been advised that he/she can return to work? ☒ Yes  ☐ No | 22. If yes, on what date was he/she advised? mo. day yr. 10 02 00 |
|---|---|---|

| 23. If employee is able to resume only light work, indicate the extent of physical limitations and the type of work that could reasonably be performed with these limitations. (Continue in item #25 if necessary.)  N/A | 24. Are any permanent effects expected as a result of this injury? If yes, describe in item #25. ☒ Yes  ☐ No |
|---|---|

**25. Remarks** ✓
Numbness / tingling — Diagnosis C6 Cord
LIMITED CERVICAL RANGE OF MOTION / POST-CONCUSSIVE HEADAGE

**26. If you have referred the employee to another physician provide the following:**
Name
Address
City    State    ZIP

Specialty
**27. What was the reason for this referral?**
☐ Consultation  ☐ Treatment

**28.** I certify that the statements in response to the questions asked above are true, complete and correct to the best of my knowledge. Further, I understand that any false or misleading statement or any misrepresentation or concealment of material fact which is knowingly made may subject me to felony criminal prosecution.
Signature of Physician _____    Date 10 17 00

| 29. Name of Physician | 30. Tax ID Number |
|---|---|
| Jeffrey D. Gross, M.D. | 33-0360524 |
| Address  26732 Crown Valley Pkwy #561 | 31. Do you specialize? ☒ Yes  ☐ No |

HEFNER, RICHARD R
???
MRN: 00-75-05-07  BN: 2973029
Room: ED-26
Physician: SINCAVAGE, DAVID L
Admit Date: 10/24/2000

Notes

**SHARP**

Note Type:     **ED Physician Discharge**
Note Time:     **N/A**
Last Stored:   **1248 24 Oct 2000**
Stored by:     **David L. Sincavage, MD**

## Discharge Instructions

### Sharp Memorial Hospital
7901 Frost St.
San Diego, CA 92123
(858) 541-3411

You have been seen in the Emergency Department today.  Please read these instructions carefully.

**#1 Discharge Diagnosis: *L OCCIPITAL CONTUSION***

It is your responsibility to contact the doctor named below for a follow-up appointment.  Please TELL THE OFFICE THAT THIS IS A FOLLOW-UP VISIT FROM SHARP MEMORIAL'S EMERGENCY DEPARTMENT.

**#1 Name:**      *SEE YOUR PSYCHIATRIST ASAP*

Call as soon as possible for an appointment to be seen by the doctor *CALL FOR APPOINTMENT*

**#2 Name:**      *SINCAVAGE JR.,DAVID L.*        *858-541-3411   EMERGENCY MEDICINE*

Call as soon as possible for an appointment to be seen by the doctor *CALL IN TWO HOURS FOR RESULTS OF BLOOD TEST*

If your condition worsens and you are unable to contact the above physician, call or return to the Emergency Department.

**For additional physician options call our Physician Referral Service at 1-800-82-SHARP.**

Allergies: *NKA*

Discharge Instructions to be given to the Patient:

**#1  *Head Injury***
**#2  *Contusion***
**#3  *Concussion***
**#4  *None***

**#1 Special Instructions:**    *TYLENOL FOR PAIN EVERY FOUR HOURS*
**#2 Special Instructions:**    *RETURN IF WORSE*
**#3 Special Instructions:**    *OFF WORK IF NEEDED*
**#4 Special Instructions:**    *CONTINUE CURRENT MEDS*
**#5 Special Instructions:**    *CALL ME IN TWO HOURS*
**#6 Special Instructions:**
**#7 Special Instructions:**
**#8 Special Instructions:**
**#9 Special Instructions:**
**#1 Special Instructions:**
0

You have received:

X  Procedure/Treatment _____

**California Law REQUIRES** children under the age of 4 years old, and weighing less than 40 pounds, to use a Car Seat or Booster Seat. Children less than 12 years old should NOT be in a front seat if it has an air bag .

Patient instructions and instruction document given to *Patient*           who verbalizes understanding.

**"I hereby acknowledge receipt of the instructions above; I will arrange for follow-up care as instructed."**

Signature: _____        Witness:_____

00 OCT 27  AH 7: 07

RECEIVED
HRO

File Number:
CONFERL-O-CONF

/ 7 /

## MEMORANDUM OF CONFERENCE
### Name of Claimant: RICHARD HEFNER
### File Number: 13-1215222

Date of Preconference:

6/11/01. During the preconference call the Agency was informed of the purpose of the conference and evidence they would need to have available for the conference.

Date of Conference:

6/14/01, 4:00 pm

Participants:

TIM NICHOLS AND JALYNN PETERSON, SUPERVISOR AND
INJURY COMPENSATION SPECIALIST, USN, AT CAMP PENDLETON, CA

LINDA KO, SENIOR CLAIMS EXAMINER (SrCE)

OSCAR M. RAMIREZ, CLAIMS EXAMINER (CE)

Background:

The claimant was hired on a temporary basis and injured himself while working in that status. He has now been declared P&S and will have residuals significant enough to warrant two schedule awards. The claimant's future after his term of employment has expired needed to be decided. Since the claimant's participation was not necessary since these are established administrative matters, the claimant was not included in the conference.

Issue(s):

What the Agency's responsibilities towards the claimant after his term has expired and he has permanent residuals from the industrial injury?

Discussion:

In preparation for the teleconference the CE and SrCE contacted the other SrCE in Section (Rob Payne) and the Supervisor CE to get yet other perspectives on procedure to recommend to the Agency. Both Sr's and the CE agreed that the claimant's status as a temporary employee at the time of injury precludes him form an *automatic* referral to vocational rehabilitation after his term employment has been exceeded as it would have occurred if he had been a permanent employee.

The EA was informed that they would, however, have to offer the claimant a formal modified duty job offer to last at least 90 days. After this period, the EA may then remove the claimant from employment without penalty or obligation to refer the claimant to vocational rehabilitation. However, the job offer made to the claimant will have to be medically suitable.

In the instant case, the job offer would be essentially a formal offer to continue doing the work that the claimant has been doing *de facto* as an informal accommodation for some time now, which is virtually DOI work with a few modifications. After the 90-day period has expired, the claimant will be rated in

that position so he can qualify for further benefits under the FECA such as additional schedule awards, recurrences of disability, etc..

It was pointed out to the EA that the claimant does not have to necessarily work the job offer for 90 days. If he has worked it for at least 60 days, he can be rated even if he leaves out of his own volition, but the job has to be kept open for the remaining time within the 90-day original offer.

In case the claimant suffers a recurrence of disability in the future and if he had worked successfully for at least 60 days the formal job offer and had been rated, he could be referred to vocational rehabilitation if the EA at that time could not accommodate again with a temporary position.  However, if the EA can again accommodate the claimant on a temporary basis, then referral to vocational rehabilitation would not be effected then either.

At the end of the teleconference the EA agreed that they would draft a formal temporary modified duty job offer for the claimant within the next week and forward it to the CE for suitability.  This will be done as soon as received and then formally presented to the claimant.

Subsequent to this teleconference with the EA and during a different teleconference on a different issue this time with the claimant, Sr.CE Rob Payne discussed (among other issues) on 6/20/01 the main points of the above teleconference that had been held with the EA.  The claimant then requested a copy of the conference memo and it was agreed that one would be sent to him.

Therefore, the claimant was advised that the discussion would be summarized in a Memorandum to the File and that the memorandum would be used as evidence in making decisions on the claim.  The claimant was further advised that a copy of the memorandum would be provided to him and that he would be allowed 15 days to review and comment upon the accuracy of the information contained therein.

File Number:
CONFERL-O-CONF

## <u>MEMORANDUM OF CONFERENCE</u>

Name of Claimant: RICHARD HEFNER

File Number: 13-1215222

Date of Preconference: 6/26/01 (in the AM). During the preconference call the claimant was informed of the purpose of the conference.

Claimant was contacted for preconference call and opted to go ahead with conference.

Date of Conference: 6/26/01, 4:00 pm

Participants:

TIM NICHOLS, SUPERVISORY INJURY COMPENSATION SPECIALIST
JALYNN PETERSON, INJURY COMPENSATION SPECIALIST
RICHARD HEFNER, CLAIMANT
ROB PAINE, SR. CLAIMS EXAMINER
OSCAR M. RAMIREZ, CLAIMS EXAMINER

Background:

The claimant, a permanently disabled term employee, will be given a term appointment for not less than 90 days as his term of employment is coming to an end and the claimant has permanent residuals. The claimant wishes to discuss what his options are at this point, as he is also receiving a schedule award.

Issue(s):

What will the claimant's option be after his term employment ends and he has permanent residuals?

Discussion:

The discussion began with the claimant's request that his second schedule award be paid to him concurrently with his first as he has one for his neck and shoulder and another for his lower extremities. He was advised that upon return of his case from being copied per claimant request, we will process his second schedule award. Originally, the second award would have been keyed upon completion of the first one. The claimant was advised that the keying of the second award would only extend the length of time over which he would be getting paid schedule award compensation but that it would not increase the amount of money he is currently getting on the periodic roll just because another award is being paid. The claimant understood this. He also requested that a copy of the calculations used by our District Medical advisor to determine the first schedule award be sent to him. He was advised that it was now too late to send that item expressly since the entire case file had gone already to be copied, but that he would receive a copy of that in the package containing a full copy of his entire case file.

The second topic was the claimant's request to be paid his awards as a lump sum. It was explained to him again that this is not an automatic action that this Office has to take on every case. He was advised that unless he can provide financial evidence that after his term employment ends he will be able to meet his financial responsibilities independent from the award money, he would not be able to qualify for a lump sum. He was advised that the financial evidence could come from either money that would be entering his household from his own sources or from his wife's. As the wife is currently about to deliver and the

claimant's term employment will end around September 2001, it is unlikely that the claimant will qualify for a lump sum. He was advised that if he applied for disability retirement through the Office of Personnel Management and was accepted and if the money from OPM could cover all of his financial responsibilities, he would then be able to receive a lump sum for the remainder of his awards. He was advised to contact OPM for further instructions as to how to apply for their retirement program.

Thirdly the claimant wished to know why he would not be able to be referred to vocational rehabilitation as originally planned. It was explained to him that had he been a regular permanent employee, he would have qualified for rehab but that now that this Office is clear on the concept that he has been all along a term employee, this does not qualify him for referral to rehab. Although disappointed, the claimant expressed understanding at this explanation.

Fourthly, the claimant wished to know what he needed to do if he disagreed with the amount of the first award. He was advised to refer back to his appeal rights and that if he chose a Reconsideration, he would need to provide actual new evidence to warrant the development of a Reconsideration. He was specifically advised that simply writing to this Office and stating that he was in more pain now or that he simply disagreed with the award amount would be insufficient. He was advised that he might wish to consider making an appointment with his attending physician to see if his condition has worsened since he was first made permanent and stationary and to see if the final figures upon which the first award was based have changed any. The claimant agreed that he would follow up on this with his doctor.

The claimant was advised that this discussion would be summarized in a Memorandum to the File and that the memorandum would be used as evidence in making decisions on the claim. The claimant was further advised that a copy of the memorandum would be provided to him and that he would be allowed 15 days to review and comment upon the accuracy of the information contained therein.

| 1. Name   (Last, First, Middle) | | 2. Social Security Number | 3. Date Of Birth | 4. Effective Date |
|---|---|---|---|---|
| HEFNER RICHARD R | | 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 | 07-01-70 | 02-28-00 |

**FIRST ACTION**

| 5-A. Code | 5-B. Nature Of Action |
|---|---|
| 108 | TERM APPT NTE 03-24-01 |

| 5-C. Code | 5-D. Legal Authority |
|---|---|
| BWA | OPM DELEGATION AGR DD-NV-135-HRSC-SW |

| 5-E. Code | 5-F. Legal Authority |
|---|---|
| | DEA-222-99, MCB-02, CERT 3 |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |

| 6-C. Code | 6-D. Legal Authority |
|---|---|
| | |

| 6-E. Code | 6-F. Legal Authority |
|---|---|
| | |

7. FROM: Position Title and Number

15. TO: Position Title and Number
PIPEFITTER
PK08900005

| 8.Pay Plan | 9.Occ. Code | 10.Grade/Level | 11.Step/Rate | 12.Total Salary | 13.Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 16.Pay Plan | 17.Occ Code | 18.Grade/Level | 19.Step/Rate | 20.Total Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|
| WG | 4204 | 10 | 01 | $16.12 | PH |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| | | | |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $16.12 | $ 0 | $16.12 | $ 0 |

14. Name and Location of Position's Organization

22. Name and Location of Position's Organization
AC OF S FACILITIES
FACILITIES MAINTENANCE DIVISION
UTILITIES BRANCH
WATER & ELEC DIST SEC/PREV MAINT UNIT
MCB CAMP PENDLETON CA 92055

**EMPLOYEE DATA**

| 23. Veterans Preference | | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|---|
| 1 - None    2 - 5-Point | 3 - 10-Point/Disability    4 - 10-Point/Compensable | 5 - 10-Point/Other    6 - 10-Point/Compensable/30% | 3 | 0 - None    1 - Permanent    2 - Conditional    3 - Indefinite | | X YES    NO |
| 2 | | | | | | |

| 27. FEGLI | | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|---|
| C0 | BASIC ONLY | 9    NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K    FERS AND FICA | 06-13-91 | F    FULL TIME | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service    2 - Excepted Service    3 - SES General    4 - SES Career Reserved | N    E - Exempt    N - Nonexempt | | 0850 |
| 1 | | | |

| 38. Duty Station Code | 39. Duty Station | (City-County-State or Overseas Location) | |
|---|---|---|---|
| 06-0543-073 | SAN DIEGO    CA | CAMP PENDLETON | |

| 40. Agency Data | 41. UIC: 00681 | 42. ORG CODE: 6889 | 43. COST CNTR: 68896E | 44. PAYROLL OFF ID: DE LOC ID: |
|---|---|---|---|---|

45. Remarks

EMPLOYEE IS AUTOMATICALLY COVERED UNDER FERS.

CONDITIONS OF EMPLOYMENT STATEMENT DATED 01-18-00

OPF MAINTAINED BY: HRSC-SW, 525 B STREET, SUITE 600, CODE 517,

SAN DIEGO, CA 92101-4418.

THIS ACTION MAY BE TERMINATED AT ANY TIME PRIOR TO THE NOT-TO-EXCEED

DATE SHOWN.

SERVICING HRO: MCCHROW, BOX 555026, CAMP PENDLETON,

CAMP PENDLETON, CA 92055-5026.

APPOINTMENT IS SUBJECT TO COMPLETION OF ONE YEAR TRIAL PERIOD BEGINNING

02-28-00.

SELECTED FROM DEA-222-99, MCB-02, CERT 3 DATED 12-16-99.

APPOINTMENT AFFIDAVIT EXECUTED 02-28-00.

REMARKS CONTINUED ON NEXT PAGE

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPT OF THE NAVY | Electronically Signed Valdez, Norma |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| NV27 | 2414 | 02-24-00  JMM | Supvy Personnel Management Specialist |

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

TURN OVER FOR IMPORTANT INFORMATION
5-Part   SO-316

3 - OPF Copy - For Future Reference

| 1. Name    (Last, First, Middle) | | 2. Social Security Number | 3. Date Of Birth | 4. Effective Date |
|---|---|---|---|---|
| HEFNER  RICHARD R | | 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 | 07-01-70 | 02-28-00 |

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 108 | TERM APPT NTE    03-24-01 |

| 5-C. Code | 5-D. Legal Authority |
|---|---|
| BWA | OPM DELEGATION AGR    DD-NV-135-HRSC-SW |

| 5-E. Code | 5-F. Legal Authority |
|---|---|
| | DEA-222-99, MCB-02, CERT 3 |

**SECOND ACTION**    176

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |

| 6-C. Code | 6-D. Legal Authority |
|---|---|
| | |

| 6-E. Code | 6-F. Legal Authority |
|---|---|
| | |

**7. FROM: Position Title and Number**

**15. TO: Position Title and Number**

PIPEFITTER

PK08900005

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| | | | |

| 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| WG | 4204 | 10 | 01 | $16.12 | PH |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $16.12 | $ 0 | $16.12 | $ 0 |

**14. Name and Location of Position's Organization**

**22. Name and Location of Position's Organization**

AC OF S FACILITIES

FACILITIES MAINTENANCE DIVISION

UTILITIES BRANCH

WATER & ELEC DIST SEC/PREV MAINT UNIT

MCB CAMP PENDLETON CA 92055

**EMPLOYEE DATA**

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 - None    3 - 10-Point/Disability    5 - 10-Point/Other | 0 - None    2 - Conditional | | X YES    NO |
| 2    2 - 5-Point    4 - 10-Point/Compensable    6 - 10-Point/Compensable/30% | 3    1 - Permanent    3 - Indefinite | | |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0    BASIC ONLY | 9    NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date(Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K    FERS AND FICA | 06-13-91 | F    FULL TIME | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service    3 - SES General | N    E - Exempt    N - Nonexempt | | 0850 |
| 1    2 - Excepted Service    4 - SES Career Reserved | | | |

| 38. Duty Station Code | 39. Duty Station | (City-County-State or Overseas Location) | |
|---|---|---|---|
| 06-0543-073 | SAN DIEGO    CA | CAMP PENDLETON | |

| 40. Agency Data | 41.  UIC: | 42.  ORG CODE: | 43.  COST CNTR: | 44.    PAYROLL OFF ID: DE |
|---|---|---|---|---|
| | 00681 | 6889 | 68896E | LOC ID: |

**45. Remarks**

REMARKS - CONTINUED:

FROZEN SERVICE:  NONE

HEALTH BENEFITS PENDING

PAYROLL OFFICE: DFAS-DE 6760 E IRVINGTON PL, DENVER CO 80279

EMPLOYEE IS ELIGIBLE FOR THRIFT SAVINGS PLAN (TSP), EFFECTIVE 12-03-00. TSP-

SCD IS 02-28-00, STATUS CODE IS I, STATUS DATE IS 02-28-00

CREDITABLE MILITARY SERVICE:  08 YRS 08 MOS

PREVIOUS RETIREMENT COVERAGE:  NEVER COVERED

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPT OF THE NAVY | Electronically Signed |
| | Valdez, Norma |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| NV27 | 2414 | 02-24-00  JMM | Supvy Personnel Management Specialist |

Editions Prior to 7/91 Are Not Usable After 6/30/93

NSN 7540-01-333-6238

TURN OVER FOR IMPORTANT INFORMATION

5-Part    50-316

**WOMEN'S HEALTH CARE**
**FROST STREET**
A Medical Corporation
8010 Frost Street Suite 301
San Diego, CA. 92123
Office: 858-292-7200 // Fax: 858-504-0304

*177*

Re: Richard Hefner (husband of Jennifer Hefner)

Date: July 17, 2001

## To Whom It May Concern:

☐ The above patient was seen in our office today.

☐ Please excuse her from ( ) work  ( ) school: _____ through _____ for medical reasons.

☐ The above patient has had a positive pregnancy test. Her estimated date for deliver is:

   8-5-01 .

☐ The above patient was seen in our office.  She is pregnant and cannot work as of

   _____ through six weeks after her delivery.

☐ The above patient is under our medical care.  She has the following restrictions to her work:

   Jennifer is on strict bedrest, her husband is needed at home
   to help out

☐ These restrictions are ( ) permanent ( ) other _____

☐ The above patient is restricted from work until reevaluation.  Her next scheduled appointment with

   us is: _____ .

☐ The above patient may return to work on: _____

☐ The above patient has our permission to participate in:

   ○ Pregnancy related exercise classes.

   ○ Preterm birth classes.

   ○ Other : _____

Thank you,

Peter Dietze Jr., M.D.
Helen S. Lee, M.D.
Colleen McNally, M.D.
Melissa Rankin, M.D.
Rovena Reagan, M.D.

*128*

# ─Fax Cover Sheet ──────────

Date: 07/26/2001

Total Pages: 5

▼

## To: C. LEARY

Company: _____

Phone: _____

Fax: 101081114159754287

## From: Jennifer Hefner

Company: _____

_____

_____

Phone: (760) 767-4697

Fax: (760) 767-4697

## Message...        CONFIDENTIAL

Ms. Leary,

Contrary to the information you have received, I am not taking the extended 12
weeks Leave Without Pay for the FMLA. As the following leave paper shows I
took 17 days Leave Without Pay to assist with the birth of my son. I am
returning to work on the 27th of July.
Please inform me when this schedule award is processed for full payment.

Thank You,

Richard Hefner

THIS FAX WAS CREATED AND FAXED BY SUPERFAX/SUPERVOICE/SUPERVOICE PRO FOR WINDOWS

Sent by: HRO CAMP PENDLETON CA DSN 365    760 725 8418;    08/01/01  8:56AM;Jetfax #966;Page 1/2

*179*

[Click here and type address]

# facsimile transmittal

| **To:** | Ms. Charlene Leary | **Fax:** | (415) 975-4287 |
|---|---|---|---|
| **From:** | Timothy A. Nichols | **Date:** | 08/01/01 |
| **Re:** | Mr. Richard Hefner | **Pages:** | |
| **CC:** | | | |

| x Urgent | ☐ For Review | ☐ Please Comment | ☐ Please Reply | ☐ Please Recycle |
|---|---|---|---|---|

Good Morning Ms. Leary

1.  The Employer has reviewed the current medical restrictions of the claimant and determined they will not be able to provide limited duty beyond the date of his current term of employment. As indicated on the attached Standard Form 50 (SF50), his current appointment expires on 25 August 2001.

2.  The Employer will notify the claimant of its intention not to extend his current appointment beyond the expiration date of 25 August 2001.

3.  The Employer requests the Department initiate the necessary action to enroll the claimant in the Vocational Rehabilitation Program as soon as possible following the expiration of his current term appointment.

4.  If you have any additional questions, please contact me at your convenience at (760) 725-3796.

*Timothy A. Nichols*

Timothy A. Nichols
Supervisory Labor Relations Specialist
NicholsT@mail.cpp.usmc.mil

ent by: HRO CAMP PENDLETON CA DSN 365    760 725 8418;    08/01/01  8:56AM; Jetfax #966;Page 2/2

07/31/2001   11:38    56608    68608 -> HRO CAMP PENDLETON CA DSN 365;  Page 2

FACRES

PAGE  80

Standard Form 50-B
Rev. 290
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

180

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name    (Last, First, Middle) | | 2. Social Security Number | 3. Date Of Birth | 4. Effective Date |
|---|---|---|---|---|
| HEFNER  RICHARD R. | | 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 | 07-01-70 | 03-25-01 |

| FIRST ACTION | | | SECOND ACTION | | |
|---|---|---|---|---|---|
| 5-A. Code | 5-B. Nature Of Action | | 6-A. Code | 6-B. Nature of Action | |
| 765 | EXT OF TERM APPT NTE   04-25-01 | | | | |
| 5-C. Code | 5-D. Legal Authority | | 6-C. Code | 6-D. Legal Authority | |
| BWA | OPM DELEGATION AGR | | | | |
| 5-E. Code | 5-F. Legal Authority | | 6-E. Code | 6-F. Legal Authority | |

| 7. FROM: Position Title and Number | | | 15. TO: Position Title and Number | | |
|---|---|---|---|---|---|
| PIPEFITTER          PK08900005 | | | PIPEFITTER          PK08900005 | | |

| 8.Pay Plan | 9.Occ Code | 10.Grade/Level | 11.Step/Rate | 12.Total Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ.Code | 18.Grade/Level | 19.Step/Rate | 20.Total Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WG | 4204 | 10 | 02 | $17.44 | PH | WG | 4204 | 10 | 02 | $17.44 | PH |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $17.44 | $   0 | $17.44 | $   0 | $17.44 | $   0 | $17.44 | $   0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| AC OF S FACILITIES | AC OF S FACILITIES |
| FACILITIES MAINTENANCE DIVISION | FACILITIES MAINTENANCE DIVISION |
| UTILITIES BRANCH | UTILITIES BRANCH |
| WATER & ELEC DIST SEC/PREV MAINT UNIT | WATER & ELEC DIST SEC/PREV MAINT UNIT |
| MCB CAMP PENDLETON CA 92055 | MCB CAMP PENDLETON CA 92055 |

| EMPLOYEE DATA | | | | | |
|---|---|---|---|---|---|
| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
| 1 - None          3 - 10-Point/Disability     5 - 10-Point/Other<br>2 - 5-Point     4 - 10-Point/Compensable     6 - 10-Point/Compensable/30% | | 0 - None    2 - Conditional<br>1 - Permanent   3 - Indefinite | | | X  YES      NO |
| 27. FEGLI     BASIC - OPTION B (5X) + OPTION A | | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
| 25  - OPTION C (5X) | | | NOT APPLICABLE | | 0 |
| 30. Retirement Plan | 31. Service Comp. Date (Leave) | | 32. Work Schedule | | 33. Part-Time Hours Per<br>Biweekly<br>Pay Period |
| K      FERS AND FICA | 06-13-91 | | F      FULL TIME | | |

| POSITION DATA | | | | | |
|---|---|---|---|---|---|
| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | | 37. Bargaining Unit Status |
| 1 - Competitive Service     3 - SES General<br>2 - Excepted Service   4 - SES Career Reserved | | N      E - Exempt<br>N - Nonexempt | | | 0850 |
| 38. Duty Station Code | 39. Duty Station    (City-County-State or Overseas Location) | | | CAMP PENDLETON | |
| 06-0543-073 | SAN DIEGO          CA | | | | |
| 40. Agency Data | 41.    UIC:<br>00681 | 42.   ORG CODE:<br>6689 | 43.  COST CNTR:<br>68896E | 44.     PAYROLL OFF ID: DB<br>LOC ID: 2647DM | |

| 45. Remarks |
|---|
| THIS ACTION MAY BE TERMINATED AT ANY TIME PRIOR TO THE NOT-TO-EXCEED<br>DATE SHOWN. |

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPT OF THE NAVY | Electronically Signed |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | DAVIS MARIAN (#2) |
| NV27 | 2414 | 03-28-01  VPG | LEAD PERSONNEL STAFF/CLASS SPEC |

TURN OVER FOR IMPORTANT INFORMATION

5-Part     50-316

1 - Employee Copy - Keep For Future Reference

Editions Prior to 7-91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE
KILCHER REHABILITATION ASSOCIATES, INC.
1115 PALLATA COURT
V  A, CA 92083
Phone (760) 599-6602   Cellular (760) 809-3854
Fax (760) 599-6654

*181*

*CSD*

## INITIAL EVALUATION REPORT
Oscar Ramirez, CE

**IDENTIFICATION:**

| | |
|---|---|
| File #: | 92004-13-1215222 |
| Name of Claimant: | Richard Hefner |
| Name of FN: | DG Kilcher, RN |
| Reporting Period: | 05/09-06/20/00 |
| Accepted Condition: | Spinal Cord Injury, Disectomy w/fusion of vertebrae 6 & 7, Broken Sponges in spine – 04/10/00 |
| Date of Injury: | 04/07/00 |
| Employing Agency: | US Department of Navy – Camp Pendleton |
| Claimant's Job Title: | Pipe Fitter |
| Primary Physician: | Dr. Jerry Gross, M.D., Spinal Orthopedic Surgeon |

## DESCRIPTION OF DUTIES

Mr. Hefner is employed as a Pipe Fitter with the U.S. Department of the Navy at Camp Pendleton. The job is listed in the D.O.T., Dictionary of Occupational Titles, as Pipe Fitter, D.O.T. Code 862.281-022, Reasoning is High School, and Language and Math are 7-8 grade level. Specific Vocational Preparation (SVP) is 2-4 years and the job is Skilled; and, the Physical Demands Strength Level is Heavy.

The D.O.T. job description entails:

Lays out, assembles, installs, and maintains pipe systems, pipe supports, and related hydraulic and pneumatic equipment for steam, hot water, heating, cooling, lubricating, sprinkling, and industrial production and processing systems, applying knowledge of system operation, and following blueprints. Selects type and size of pipe, and related materials and equipment, such as supports, hangers, and hydraulic cylinders, according to specifications. Inspects work site to determine presence of obstructions and to ascertain that holes cut for pipe will not cause structural weakness. Plans installation or repair to avoid obstructions and to avoid interfering with activities of other workers. Cuts pipe, using saws, pipe cutter, hammer and chisel, cutting torch, and pipe cutting machine. Threads pipe, using pipe threading machine. Bends pipe, using pipe bending tools and pipe bending machine. Assembles and installs variety of metal and nonmetal pipes, tubes, and fittings, including iron, steel, copper, and plastic. Connects pipes, using threaded, caulked, soldered, brazed, fused, or cemented joints, and handtools. Secures pipes to structure with brackets, clamps, and hangers, using handtools and power tools. Installs and maintains hydraulic and pneumatic components of machines and equipment, such as pumps and cylinders, using handtools. Installs and maintains refrigeration and air-conditioning systems, including compressors, pumps, meters, pneumatic and hydraulic controls, and piping, using handtools and power tools, and following specifications and blueprints. Increases pressure in pipe system and observes connected pressure gauge to test system for leaks. May weld pipe supports to structural steel members.

Page 1 of 5

RICHARD HEFNER                    #92004-13-1215222                    MAY-JUNE 2000

*182*

## DESCRIPTION OF DUTIES (Con't)

May observe production machines in assigned area of manufacturing facility to detect machinery malfunctions. May operate machinery to verify repair. May modify programs of automated machinery, such as robots and conveyors, to change motion and speed of machine, using teach pendant, control panel, or keyboard and display screen of robot controller and programmable controller . May be designated Steam Fitter (construction) when installing piping systems that must withstand high pressure. May be designated according to type of system installed as Pipe Fitter, Ammonia (construction); Pipe Fitter, Fire-Sprinkler Systems (construction); Pipe Fitter, Gas Pipe (construction); or type of piping used as Pipe Fitter, Plastic Pipe (construction); Pipe Fitter, Soft Copper (construction). May be designated: Airdox Fitter (mine & quarry); Freight-Air-Brake Fitter (railroad equip.); Instrument Fitter (construction); Maintainer, Sewer-And-Waterworks (construction); Pipe Fitter, Maintenance (any industry); Pipe Fitter, Welding (construction); Pneumatic-Tube Fitter (construction); Sprinkler-And-Irrigation-System Installer (construction); Tuyere Fitter (steel & rel.).

## DESCRIPTION OF INJURY

Mr. Hefner states that on 4/7/00 he was operating a pumper truck, the truck fishtailed and went out of control. The truck rolled over off the shoulder.

## MEDICAL HISTORY/CONDITION

Mr. Hefner is a 29-year old male who was involved in the above very serious accident. The claimant had to have surgery in the form of an anterior cervical diskectomy, decompression of the spinal cord, and C6 to7 allograft arthrodesis with instrumentation using an operative microscope.

The Report of Operation dated 4/10/00 indicated preoperative diagnosis was: acute cervical disc herniation with cord deflections and long tract signs. Post operative diagnosis was: Acute cervical disk herniation with cord deflexion and long track signs.

Procedure included:

1)     Anterior C6 to C7 discectomy.
2)     Anterior C 62 C7 Arthrodesis.
3)     Fashioning of allograft iliac crest bone graft.

RICHARD HEFNER                #92004-13-1215222                MAY-JUNE 2000

183

## MEDICAL HISTORY/CONDITION (Cc..t)

Jeffrey D. Gross, M.D., the attending physician, in the report dated May 3, 2000, indicated the patient reported significant improvement in his lower extremities although he still gets tired when he is walking. The numbness has seemingly resolved and his hands are also normal.

Dr. Gross noted, he has some mild dysphagia after surgery which is expected. He still has some mild posterior neck pain likely due to some ligamentous instability which should improve.

Dr. Gross' impression is Mr. Hefner is doing well after C6-7 anterior cervical diskectomy, fusion and plating for traumatic herniated disc due to a work-related injury. His spinal cord injury seems to be resolving as well with only mild lower extremity symptoms.

Dr.. Gross indicated he will begin mild physical therapy for his neck range of motion. He should continue his home exercises as he is doing well including swimming. He is still off work. Re-evaluation will be with X-rays in 2 months.

## SUMMARY OF PROGRESS TO DATE:

On 5/15 I received and reviewed the file record. The ICS phoned me for update, I just received referral without medical. Jalynn has 17 and prescription and letter to claimant, which she'll fax to me. Reminded me that lite-duty available.

I received and reviewed information from ICS. I phoned the SRN concerning letter from HRO to AP requesting narrative and medicals, she requested I fax information to her attention.

I then wrote update, typed fax covers and faxed to SRN & CE (4 pages).

PC to AP office and spoke to Jennifer, claimant had cervical fusion with plating on 4/10 and was f/u on 5/3 and is doing well. Radiculopathy was resolving. PT is to start and swimming and home exercises. It is not necessary to return for f/u until 2 months.

I also received a call from the claimant, and we discussed DOL, OWCP, and Nurse Intervention. He was in ICU, because he began losing feeling legs then chest and arms. Emergency fusion, anterior plating. He has not received any compensation yet, and ICS hasn't submitted forms. Claimant was discharged home, and he is having difficulty swallowing, very apprehensive about future. His supervisors are calling requesting medical and no one from HRO has explained the process. I will be contact person from now on. Also spoke to his wife, and all medical and information was faxed directly to OWCP. She has requested hospital medical records be copied and sent to her. She will forward them to me to expedite to DOL and they can in turn share with claimant. She faxed their portion of OWCP forms directly to OWCP. The claimant's next f/u appointment with AP is in 6 weeks, which she will inform me of so I may attend. I will contact CE to see what he needs for compensation. I then phoned the CE and left a message to see what I can do. The CE returned my call and said he can't do compensation until E/A sends CA7 and needs medical.

## SUMMARY OF PROGRESS TO DATE (cont.):

On 5/16 the claimant phoned and CA7 form completed and mailed overnight and registered to HRO. The claimant has tingling in his legs, but probably due to stress and anxiety. If not improved, claimant should call AP tomorrow.

I then phoned ICS and explained that CE needs CA7 information faxed to him ASAP for compensation and wife sent it overnight for her today. ICS is still requesting medical.

On 5/17 the claimant phoned and just found out about travel reimbursement and needs money expedited ASAP. I explained that I do not have forms, so I'll contact HRO to mail them ASAP.

I phoned the ICS and she'll put forms in mail in AM, and she also just received CA7 to process and fax to CE.

On 5/23 the claimant's wife phoned and I clarified with her to get refills and prescription. The AP ordered PT extensions and she requested travel reimbursement guidelines.

On 6/1 the claimant's wife phoned and claimant had unequal pupil episodes yesterday. I advised her to take him to AP office to get check and call me. She just received notice that medical records are ready and needs medical release and my address. She provided me with her fax number.

I wrote authorization letter and update to claimant and providers and faxed to claimant.

On 6/5 the claimant's wife phoned and had called AP and he said not to worry about pupil inequality.

On 6/20 I phoned the claimant and he just received a check. He already submitted another CA7. He is having severe spasms, which PT was unable to resolve in back and shoulder causing numbness in arms and legs.

He is to call AP for appointment first week of July, and he'll let me know date and I'll meet him there for II. He just sent medical records yesterday, and I should get them by tomorrow.

## RTW ISSUES

The claimant underwent surgery on 4/10/00 in the form of an anterior cervical diskectomy, decompression of the spinal cord, and C6 to7 allograft arthrodesis. Physical therapy should assist the claimant to regain strength and endurance so that he can return to work to Lite Duty initially, then resume Full Duty when AP determines appropriate. Employing agency has Lite Duty positions available.

RICHARD HEFNER                **#92004-13-1215222**                          **MAY-JUNE 2000**

*185*

## PERSONAL INFORMATION

The claimant was born on 07/01/70 and is 30 years of age.  He is married and resides in Borrego Springs.

   Note: This section will be completed in conjunction with the next report after the initial interview at Dr. Gross' office on 7/10/00.


## PLANNED SERVICES

I will attend the Claimant's next appointment with AP on 7/10 and obtain a release to RTW to Lite Duty when appropriate.  I will stay in phone contact with the claimant and continue to update all pertinent parties on the status of the case.


## ATTACHMENTS

LifeStep DOT Browser
Fax Covers

FROM : Kilcher Rehabilitation Associa   PHONE NO. : 706 5996602        Jul. 11 2000 12:19PM P1

---

**DG KILCHER, BS, RN, CDMS, C M, DOL OWCP CONTRACT NURSE**
**KILCHER REHABILITATION ASSOCIATES, INC.**
**1115 BALLATA COURT**
**VISTA, CA 92083**
Phone (760) 599-6602   Pager (760) 809-3854
Fax (760) 599-6654

*186*

# FAX COVER

| | | | |
|---|---|---|---|
| **DATE:** | 07/11/00 | **TIME:** | 12:00 PM |

**TO:**      Oscar Ramirez Claims Examiner

**FAX:**      (415) 975-4287

**FROM:**   DG Kilcher RN

**REF:**     RICHARD HEFNER      OWCP# 92004-13-1215222

**PAGES:**   3

--------------------------------------------------------------------------------

**COMMENTS:**      AP dictated the information to me for the CA 5 & CA20A after the examination. Fusion site is healing well and x-rays are looking good.  He still has considerable severe muscle spasms in the neck which will take continued home exercising and resistance exercises with the therapist plus time and tissue healing to be resolved.  He continues to suffer with Post-concussive syndrome symptoms, vertigo, difficulty concentration and severe headaches, which will also take time to resolve.  He is not permitted to drive until the vertigo resolves and it is safe for him (and others). The problems with his shoulder has now begun to inhibit his PT and needs to evaluated by an Orthopedic Surgeon in the San Diego area, which I am requesting authorization form the DOL to schedule.  This condition is surely causally related to the accident from the roll over, but was not apparent until the cervical condition calmed down.  Claimant to return in 4 weeks for a follow-up and Dr. Gross will probable release the claimant to the Orthopedic Surgeon to treat his shoulder condition after diagnostic studies diagnose the exact problem.


Also faxed all of this to the ICS.


## CONFIDENTIAL PRIVILEGED FACSIMILE COMMUNICATION

The information contained in this facsimile message is intended for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received the communication in error, please immediately notify me by telephone and return the original message to me at the above address via the U.S. Postal Service.  Thank you.

DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE
KILCHER REHABIL'   ~ON ASSOCIATES, INC.
1115 BA__ _/A COURT
VISTA, CA 92083
Phone (760) 599-6602  Cellular (760) 809-3854
Fax (760) 599-6654

*187*

# FAX COVER

**DATE:**    07/13/00                    **TIME:**        9:05  PM

**TO:**      Jalynn Peterson, Injury Compensation Specialist

**FAX:**     (760) 725-8418

**FROM:**    DG Kilcher RN

**REF:**     Richard Hefner  92004-13-121522

**PAGES:**   2

---

**COMMENTS:**    Orthopedic Evaluation Scheduled as authorized by CE

## CONFIDENTIAL PRIVILEGED FACSIMILE COMMUNICATION

The information contained in this facsimile message is intended for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received the communication in error, please immediately notify me by telephone and return the original message to me at the above address via the U.S. Postal Service.  Thank you.

**DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE**
KILCHER REHABIL ___ )N ASSOCIATES, INC.
**1115 BALLATA COURT**
**VISTA, CA 92083**
**Phone (760) 599-6602  Cellular (760) 809-3854**
**Fax (760) 599-6654**

*188*

Dr. Robert Maywood
3444 Kearney Villa Road Suite 202
San Diego, CA 91914

Date:      7/13/2000
Referring:   Richard  Hefner   92004-13-1215222  Appointment 08/18 @ 10:30 AM

Dear Dr. Maywood:

As you are aware, I am the nurse case manager who has been requested by the OWCP to work with Mr.  Richard  Hefner and develop a rehabilitation program which will eventually assist Mr.  Hefner's return to work to a position within the physical capacities of the claimant at that time and safely remain on the job.

This is your letter of authorization to evaluate this claimant and complete any diagnostic testing that you deem necessary to clarify this claimant's injuries that are causally related to his industrial injury and identify what conditions should be allowed in this claim.  Your report needs to explain in detail how this condition was not identified at the time of the original accident but now has become apparent.  This report will need to be reviewed by the DOL prior to any treatment being authorized. Please fax me a copy of your report and forward your reports with the claimant's name and Worker's Compensation number 92004-13-1215222 on each page to the CE, who is Oscar Ramirez @ 415/ 975-4090, fax 415/ 975-4287 and your billing to the Fiscal Billing Department at the following address:

US Department of Labor
Office of Workers' Compensation Programs
PO Box 194610
San Francisco, CA 94119-4610

Sincerely,

*DGKilcher*

DG Kilcher, RN
Rehabilitation Nurse

XC:   Oscar Ramirez CE
      Dept of the Navy - Camp Pendleton
      Richard  Hefner
      Rehabilitation File

# LifeStep DOT Browser

189

## 862.281-022  PIPE FITTER

Lays out, assembles, installs, and maintains pipe systems, pipe supports, and related hydraulic and pneumatic equipment for steam, hot water, heating, cooling, lubricating, sprinkling, and industrial production and processing systems, applying knowledge of system operation, and following blueprints: Selects type and size of pipe, and related materials and equipment, such as supports, hangers, and hydraulic cylinders, according to specifications. Inspects work site to determine presence of obstructions and to ascertain that holes cut for pipe will not cause structural weakness. Plans installation or repair to avoid obstructions and to avoid interfering with activities of other workers. Cuts pipe, using saws, pipe cutter, hammer and chisel, cutting torch, and pipe cutting machine. Threads pipe, using pipe threading machine. Bends pipe, using pipe bending tools and pipe bending machine. Assembles and installs variety of metal and nonmetal pipes, tubes, and fittings, including iron, steel, copper, and plastic. Connects pipes, using threaded, caulked, soldered, brazed, fused, or cemented joints, and handtools. Secures pipes to structure with brackets, clamps, and hangers, using handtools and power tools. Installs and maintains hydraulic and pneumatic components of machines and equipment, such as pumps and cylinders, using handtools. Installs and maintains refrigeration and air-conditioning systems, including compressors, pumps, meters, pneumatic and hydraulic controls, and piping, using handtools and power tools, and following specifications and blueprints. Increases pressure in pipe system and observes connected pressure gauge to test system for leaks. May weld pipe supports to structural steel members. May observe production machines in assigned area of manufacturing facility to detect machinery malfunctions. May operate machinery to verify repair. May modify programs of automated machinery, such as robots and conveyors, to change motion and speed of machine, using teach pendant, control panel, or keyboard and display screen of robot controller and programmable controller. May be designated Steam Fitter (construction) when installing piping systems that must withstand high pressure. May be designated according to type of system installed as Pipe Fitter, Ammonia (construction); Pipe Fitter, Fire-Sprinkler Systems (construction); Pipe Fitter, Gas Pipe (construction); or type of piping used as Pipe Fitter, Plastic Pipe (construction); Pipe Fitter, Soft Copper (construction). May be designated: Airdox Fitter (mine & quarry); Freight-Air-Brake Fitter (railroad equip.); Instrument Fitter (construction); Maintainer, Sewer-And-Waterworks (construction); Pipe Fitter, Maintenance (any industry); Pipe Fitter, Welding (construction); Pneumatic-Tube Fitter (construction); Sprinkler-And-Irrigation-System Installer (construction); Tuyere Fitter (steel & rel.).

| Aptitudes | Lvl | Temperaments | Lvl | Physical Demands | Lvl | Environmental | Lvl |
|---|---|---|---|---|---|---|---|
| General learning ability | 3 | Directing people or events | | Climbing | O | Exposure to weather | N |
| Verbal skill | 3 | Repetitive tasks | | Balancing | O | Extreme Cold | N |
| Numerical skill | 3 | Influencing people | | Stooping | O | Extreme Heat | N |
| Spatial perception | 3 | Variety of tasks | | Kneeling | O | Wet and/or humid | N |
| Form perception | 3 | Express personal feelings | | Crouching | O | Noise Intensity Level | 3 |
| Clerical perception | 4 | Alone or apart from others | | Crawling | N | Vibration | N |
| Motor coordination | 3 | Stress, dangerous tasks | | Reaching | F | Atmospheric conditions | N |
| Finger dexterity | 3 | Tolerances, precise limits | X | Handling | F | Moving mechanical parts | O |
| Manual dexterity | 3 | Under specific instructions | | Fingering | O | Exposure to electrical shock | N |
| Eye-Hand-Foot coordination | 4 | Dealing with people | | Feeling | N | High, exposed places | N |
| Color discrimination | 5 | Making judgments | X | Talking | N | Exposure to radiation | N |
| GED | Lvl | Work Fields | Lvl | Hearing | O | Working with explosives | N |
| Reasoning | 4 | Structural-Fabricating-Installing-Re | 102 | Tasting/Smelling | N | Toxic or caustic chemicals | N |
| Math | 3 | Mechanical Fabricating-Installing-R | 121 | Near Acuity | F | Other | O |
| Language | 3 | | | Far Acuity | N | | |
| Trailer | Lvl | MPSMS | Lvl | Depth Perception | F | | |
| Strength | H | Water, Gas, and Sewer Mains; Pipel | 364 | Accomodation | F | | |
| SVP | 7 | Fabricated Metal Products, except O | 559 | Color Vision | N | | |
| GOE | 05 05.03 | | | Field of Vision | N | | |

© LegalTech, Inc 1996

FROM : Kilcher Rehabilitation Associa    PHONE NO. : 706 5996602    Aug. 03 2000 08:06AM P1

*190*

**DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE**
**KILCHER REHABILITATION ASSOCIATES, INC.**
1115 BALLATA COURT
VISTA, CA 92083
Phone (760) 599-6602   Pager (760) 809-3854
Fax (760) 599-6654

# FAX COVER

**DATE:**   08/02/00

**TIME:**   4:00 PM

**TO:**   Oscar Ramirez Claims Examiner

**FAX:**   (415) 975-4287

**FROM:**   DG Kilcher RN

**REF:**   RICHARD HEFNER    OWCP# 92004-13-1215222

**PAGES:**   10

**COMMENTS:**   **AP narrative from initial evaluation enclosed.**   MRI negative for torn rotator cuff but objective symptoms still present for impingement.   AP did an injection of Celestone for additional diagnostic testing, claimant to continue PT and return in 2 weeks for follow-up.   Probable release to Lite Duty and request for authorization for diagnostic shoulder arthroscopy with probable repair of impingement if cortisone injection verifies diagnosis.   ✓

Please call me with your recommendations

Also faxed all of this to the ICS FYI.

**CONFIDENTIAL PRIVILEGED FACSIMILE COMMUNICATION**

The information contained in this facsimile message is intended for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received the communication in error, please immediately notify me by telephone and return the original message to me at the above address via the U.S. Postal Service.  Thank you.

DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE
KILCHER REHABILITATION ASSOCIATES, INC.
1115 BALLATA COURT
VIS⎯ CA 92083
Phone (760) 599-⎯⎯  Pager (760) 809-3854
Fax (760) 599-6654

*191*

# FAX COVER

**DATE:**   09/07/00              **TIME:**      7:45 PM

**TO:**   Oscar Ramirez Claims Examiner

**FAX:**   (415) 975-4287

**FROM:**   DG Kilcher RN

**REF:**   RICHARD HEFNER      OWCP# 92004-13-1215222

**PAGES:**   2

--------------------------------------------------

**COMMENTS:**     Surgery performed 08/23 and follow-up on 08/29.  AP requested authorization to resume shoulder PT 3 times a week and follow-up appointment 09/19 and will obtain a release to Lite Duty if AP amenable.  Claimant will also obtain a release from Dr. Gross considering his cervical injury.

Therapy authorized?

Please call me with your recommendations


Also faxed all of this to the ICS FYI.


### CONFIDENTIAL PRIVILEGED FACSIMILE COMMUNICATION

The information contained in this facsimile message is intended for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received the communication in error, please immediately notify me by telephone and return the original message to me at the above address via the U.S. Postal Service.  Thank you.

DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE
KILCHER REHABILITATION ASSOCIATES, INC.            *192*
1115 BALLATA COURT
VISTA 92083
Phone (760) 599-6602    Cellular (760) 809-3854      *SD*
Fax (760) 599-6654

## INITIAL EVALUATION REPORT
Oscar Ramirez, CE

### IDENTIFICATION:

| | |
|---|---|
| File #: | 92004-13-1215222 |
| Name of Claimant: | Richard Hefner |
| Name of FN: | DG Kilcher, RN |
| Reporting Period: | 08/10-09/02/00 |
| Accepted Condition: | Spinal Cord Injury, discectomy w/fusion of vertebrae 6 & 7, Broken Sponges in spine. |
| Date of Injury: | 04/07/00 |
| Employing Agency: | US Department of Navy – Camp Pendleton |
| Claimant's Job Title: | Pipefitter |
| Primary Physician: | Dr. Jerry Gross, M.D. Neurosurgeon |
| | Dr. Robert Maywood, M.D. Orthopedic Surgeon |

### SUMMARY OF PROGRESS TO DATE

On 08/10 the ICS phoned and E/A is really interested in RTW to lite-duty. I received and reviewed the AP's narrative Interim Report. I then wrote, typed and faxed update to ICS.

On 08/15 I met with the claimant at the AP's office and he says the injection helped and would prefer to avoid surgery. We then met with the AP and injection verified arthroscopic repair of impingement for possible tear. It will take at least one month to schedule surgery considering AP's schedule. Claimant to discuss surgery with his wife and call Dr. Gross to get release to RTW. I wrote, typed and faxed update to CE and ICS along with request to let me know if surgery is OK'd.

On 08/16 I phoned the ICS and she received fax and is eager to hear when surgery will be authorized and scheduled. I phoned the CE and LMR inquiring if there is any problem with authorizing surgery. I then phoned the claimant and LMR inquiring if he will have surgery?

The claimant returned my call on 08/17 and he's ready to have surgery. He received a letter from CE that shoulder injury added to claim, and I requested that he fax it to me. I then received and reviewed the DOL correspondence, which looks like surgery is authorized.

The CE phoned me on 08/18 clarifying claimant restrictions and inability to RTW yet. On 8/19 I wrote and faxed update to AP.

On 08/22 the claimant phoned me and Dr. Maywood has a cancellation and claimant surgery was rescheduled from 09/13 to 08/23. He needs a CA-7 that I will mail to him. I then phoned Lena at Dr. Maywood's office and requested last OV dictation to be faxed to me ASAP, so I can get it to DOL.

RICHARD HEFNER                    92004-13-1215222                    AUG 2000

*193*

## SUMMARY OF PROGRESS TO DATE (cont.)

On 08/22, later while I was at AP's office with another claimant I spoke with Lena and found out the OV notes were not typed yet. I then explained to her the importance of getting records to DOL ASAP.

I phoned the CE and LDMR that surgery was moved up and did letter approve this treatment? The CE phoned and he reviewed medical and negative MRI. I explained cortisone injections confirmed diagnosis that surgery indicated. I will fax documentation and request for surgery because Rob Paine will be in late and can review them. I then called Lena at Dr. Maywood's office and will fax in AM.

On 08/28 I returned the claimant's call and his surgery went OK. They cleaned it out and his shoulder is very painful. He has f/u appointment tomorrow at 1:30. He is still using polar packs to control the pain and Vicoden.

On 08/30 I stopped by AP's office and OP report was not typed yet. I phoned the claimant on 08/31 as CA 7 was returned in mail, need update on surgery and next OV appointment.

On 09/01 the claimant phoned and Dr. Maywood informed him at appointment that he had cleaned out bone spur that was tearing muscle and cartilage, but tendon is OK. He is to resume PT 3x week for 4 weeks. He has a F/U appointment in 3 weeks.

On 09/02 I wrote and typed Progress Report.


## RETURN TO WORK ISSUES

The claimant underwent additional surgery on his shoulder and is recuperating and is starting his reconditioning program to strengthen his shoulder to permit him to return to Lite Duty in a timely fashion when the AP provides a release to return to the restrictions that he outlines. The employing agency has Lite Duty available and is amenable to accommodating his restrictions.


## PLANNED SERVICES FOR THE NEXT 30 DAYS

I will attend his follow-up AP appointment on 09/21 and obtain a release to return to limited duty if the AP deems appropriate and monitor his return to work to ensure that he can safely remain on the job. I will stay in telephone contact with the CE and the ICS to keep all parties updated on the claimant's status.

**Attachments**

AP Report
Fax Covers

DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE
KILCHER REHABILITATION ASSOCIATES, INC.
1115 BAJATA COURT
VISTA, CA 92083
Phone (760) 599-6602     Cellular (760) 809-3854
Fax (760) 599-6654

*194*

*SD*

**PROGRESS REPORT**
Oscar Ramirez, CE

## IDENTIFICATION:

| | |
|---|---|
| File #: | 92004-13-1215222 |
| Name of Claimant: | Richard Hefner |
| Name of FN: | DG Kilcher, RN |
| Reporting Period: | 09/03-10/15/00      10/03/00      RTW Lite Duty |
| Accepted Condition: | Spinal Cord Injury, Disectomy w/fusion of vertebrae 6 & 7, Broken Sponges in spine. |
| Date of Injury: | 04/07/00 |
| Employing Agency: | US Department of Navy – Camp Pendleton |
| Claimant's Job Title: | Pipefitter |
| Primary Physician: | Dr. Jerry Gross, M.D. Neurosurgeon |
| | Dr. Robert Mayfield, M.D. Orthopedic Surgeon |

## SUMMARY OF PROGRESS TO DATE

On 9/7 the PT in Borrego Springs phoned and LM that he needs authorization for PT for shoulder 3 x week for 4 weeks. I received and reviewed AP 8/15 narrative. I wrote an update requesting authorization for PT and faxed to CE and ICS.

On 9/11 I spoke with CE and PT will be authorized directly by CE. He will need restrictions at next AP appointment. I then phoned PT with authorization info x 2, and then phoned the claimant leaving a message that I need next appointment info.

On 9/14 the claimant phoned, his next appointment is 9/21 and is hoping for release 10/7 to RTW. He said he can camp at Pendleton Lake to eliminate so much driving. PT is concerned that he is not ready to RTW and will submit a report to AP prior to f/u.

On 9/15 I received and reviewed AP narrative of 8/29. I wrote an update to ICS and faxed AP report.

On 9/20 the claimant phoned and has appointment with Dr. Gross with x-rays on 10/2. The doctor needs to see x-rays before he releases claimant. I will see claimant at appointment tomorrow.

On 9/22 I wrote an update, typed the fax cover and faxed it to the CE and ICS with restrictions and release.

Page 1 of 3

RICHARD HEFNER            92004-13-1215222                    SEPT 2000

/95

## SUMMARY OF PROGRESS TO DATE (cont.)

On 9/25 the claimant phoned and indicated he has an appointment on 10/3 with podiatrist to have two ingrown toenails removed. If he remains off work after the appointment with Dr. Gross then he should use sick leave for this time.

On 9/26 the CE phoned me and indicated he received my fax and PT extension and off work until Dr. Gross appointment okayed. He requests PT and Dr. Gross to call him for authorization on the computer.

On 9/27 the claimant's wife phoned and provided information for the claimant.

On 10/2 I phoned the claimant and PT can be done at GYM as home program, he's postponing foot surgery. He will RTW tomorrow (10/3) AM, and will stay at campground during week and ride his bike to work and gym. He is going to have AP call CE for x-ray authorization. I then phoned the ICS and updated her on release to RTW and claimant will report to his supervisor and I will meet ICS tomorrow (10/3) AM for copy of job offer. The claimant's wife phoned and x-ray billing office spoke with CE who says x-rays were not being approved. I then phoned the x-ray office. I attempted to phone the CE and left a detailed message on the recorder. I phoned Rob Paine transfer made to the CE who indicated he finally received body part (cervical spine) and authorized repeat x-rays. I then left a message with claimant of authorization. I also phoned Allison at X-ray billing and informed her of authorization. I traveled to AP and met with claimant and Dr. Gross, who reviewed the x-rays which revealed the fusion is healing but is not solid as yet.

On 10/3 the claimant's supervisor called and needs both OWCP's, which I faxed to supervisor. I then traveled to work site and met with ICS. There is no real job offer yet, and they will call me when available to be observed. Actual PD provided and claimant will not be driving in the future. I wrote RTW form and faxed to SRN and wrote and faxed update to CE with OWCP 5 and RTW.

On 10/9 the PT phoned me and claimant has increased pain and swelling. Work site and duties at computer are not compatible with restrictions? Or post-op. She'll send me a report and fax to AP.

On 10/11 I received and reviewed PT report verifying her concerns

On 10/12 I wrote and faxed update to ICS and CE with AP status update and PT report.

I wrote the Progress Report on 10/15/00.

## RETURN TO WORK ISSUES

On 9/21 I met with claimant at AP and he is doing very well, his strength is returning. We then met with the AP and claimant was released to lite-duty with LUE restrictions. Claimant has f/u after appointment with Dr. Gross.

RICHARD HEFNER                    92004-13-1215222                            SEPT 2000

*196*

## RETURN TO WORK ISSUES (cont)

On 10/02 Dr. Gross provided the claimant with a release to Return to Work also.

On 10/11 I traveled to work site and met with ICS, claimant and his supervisor. I observed the work site and the claimant is performing only clerical duties, however, his worksite is not ergonomically appropriate. I traveled to AP and talked AP into full release with caution on a trial basis.

## PLANNED SERVICES FOR THE NEXT 30 DAYS

I will follow the claims progress on the job to determine if he is having any problems and continue to update all pertinent parties on the status of the case. If he is able to remain on the full duty job for the follow up period, his file will be closed as a successful Return To Work.

## ATTACHMENTS

RTW form
Fax covers
Work Capacity Evaluation forms
Comprehensive Physical Therapy progress note and report

FROM : Kilcher Rehabilitation Associa    PHONE NO. : 706 5996602    Sep. 21 2000 06:36PM P1

*197*

**DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE**
**KILCHER REHABILITATION ASSOCIATES, INC.**
**1115 BALLATA COURT**
**VISTA, CA 92083**
**Phone (760) 599-6602  Pager (760) 809-3854**
**Fax (760) 599-6654**

# FAX COVER

**DATE:** 09/21/00                **TIME:**        6:45 PM

**TO:** Oscar Ramirez Claims Examiner

**FAX:** (415) 975-4287

**FROM:** DG Kilcher RN

**REF:** RICHARD HEFNER        OWCP# 92004-13-1215222
OWCP 5

**PAGES:** 2

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**COMMENTS:**      Dr. Maywood released claimant to RTW to Lite Duty when considering his left shoulder, but Dr. Gross will not release him considering his cervical fusion until after he examines the claimant and repeats his x-rays.  Have an appointment for this on October 9. Dr. Maywood also requested therapy to be extended till RTW?

Please call me with your recommendations


Also faxed all of this to the ICS FYI.

### CONFIDENTIAL PRIVILEGED FACSIMILE COMMUNICATION

The information contained in this facsimile message is intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received the communication in error, please immediately notify me by telephone and return the original message to me at the above address via the U.S. Postal Service. Thank you.

**Work Capacity Evaluation**
**Musculoskeletal Conditions**

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs



*198*

| Injured Worker's Name *(First, middle, last)* | OWCP No. | OMB No.: 1215-0103 |
|---|---|---|
| RICHARD HEFNER | 92004-13-1215222 | Expires:    10-31-99 |

Please answer the questions below concerning your patient (named above) for whom the Office of Workers' Compensation Programs (OWCP) has accepted the following conditions: FUSION C6-7 Left shoulder INTRA-ARTICULAR DEBRIDEMENT & SUB ACROMIAL DECOMPRESSION

1. In many employing establishments, light duty can be made available.

   a. Is there any reason that this person cannot WORK for 8 hours per workday? If so, please provide medical reasons to support your opinion.

   _____

   _____

   b. If less than 8 hours per workday, how many hours can he/she work? _____

   c. Do you anticipate an increase in the number of hours per day this person will be able to work?   ☐ Yes   ☐ No
   If yes, when will this person achieve an 8 hour workday? _____
   If no, please provide medical reasons to support your opinion.

   _____

2. Please indicate whether this person has any LIMITATION in the activity listed and how many hours this person can perform each activity. If there are limitations in lifting, pulling and/or pushing, please provide the maximum number of pounds that can be handled by this person.

| Activity | Limitation | # of Hours Able to Work | Activity | Limitation | # of Hours Able to Work | Lbs. |
|---|---|---|---|---|---|---|
| Sitting | ___ Yes | ___ | Pushing | ___ Yes | ___ | |
| Walking | ___ Yes | ___ | Pulling | ___ Yes | ___ | |
| Standing | ___ Yes | ___ | Lifting | ✓ Yes | ___ | 25 lbs |
| Reaching | ✓ Yes | O | Squatting | ___ Yes | ___ | |
| Reaching above Shoulder | ✓ Yes | O | Kneeling | ___ Yes | ___ | |
| Twisting | ___ Yes | ___ | Climbing | ___ Yes | ___ | |
| Operating a Motor Vehicle | ___ Yes | ___ | Breaks: | | | |
| Repetitive Movements: | | | Duration | ___ | Frequency | |
| Wrists | ___ Yes | ___ | Duration | ___ | Frequency | |
| Elbow | ___ Yes | ___ | | | | |

3. Are there OTHER medical facts, situational factors, equipment or devices which need to be considered in the identification of a position for this person? If so, please explain.
ABOVE, ONLY CONSIDERING LEFT SHOULDER INJURY

_____

| 4. Physician's Name *(Type or print)* | 5. Telephone |
|---|---|
| DR. ROBERT MAYWOOD, M.D. | 858-874-3444 |
| 6. Signature | 7. Date |
| [signature] | 09/21/00 |

The information requested will assist OWCP in determining eligibility to benefits and is required to obtain or retain a benefit. (5 USC 8101 et. seq.)

**Public Burden Statement**
We estimate that it will take an average of 15 minutes per response to complete this information collection, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Office of Workers' Compensation Programs, U.S. Department of Labor, Room S-3229, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

DO NOT SEND THE COMPLETED FORM TO THE OFFICE SHOWN ABOVE                    Form OWCP-5b

FROM : Kilcher Rehabilitation Associa    PHONE NO. : 706 5996602    Oct. 03 2000 01:09PM P1

*199*

---

**DG KILCHER, BS, RN, CDMS, CC....DOL OWCP CONTRACT NURSE**
**KILCHER REHABILITATION ASSOCIATES, INC.**
**1115 BALLATA COURT**
**VISTA, CA 92083**
**Phone (760) 599-6602  Pager (760) 809-3854**
**Fax (760) 599-6654**

---

# FAX COVER

**DATE:**    10/03/00                    **TIME:**       12:45 PM

**TO:**    Oscar Ramirez Claims Examiner

**FAX:**    (415) 975-4287

**FROM:**    DG Kilcher RN

**REF:**    RICHARD HEFNER        OWCP# 92004-13-1215222
            OWCP 5
            RTW Form

**PAGES:**    3

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**COMMENTS:**    Claimant's x-rays look good fusion appears solid already, highly unusual!

Claimant's wife drove him to the base yesterday, they setup a tent and he is camping on the base and riding his bicycle to worksite and to the Gym to work out. What a guy!

**CONFIDENTIAL PRIVILEGED FACSIMILE COMMUNICATION**

The information contained in this facsimile message is intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received the communication in error, please immediately

FROM : Kilcher Rehabilitation Associa    PHONE NO. : 706 5996602    Oct. 11 2000 08:31AM P1

**DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE**
**KILCHER REHABILITATION ASSOCIATES, INC.**
**1115 BALLATA COURT**
**VISTA, CA 92083**
Phone (760) 599-6602   Pager (760) 809-3854
Fax (760) 599-6654

# FAX COVER

**DATE:**    10/11/00
                                        **TIME:**        8:15 AM

**TO:**    Oscar Ramirez Claims Examiner

**FAX:**    (415) 975-4287

**FROM:**    DG Kilcher RN

**REF:**    RICHARD HEFNER        OWCP# 92004-13-1215222
            AP Status Update & PT Report

**PAGES:**    4

**COMMENTS:**        Dr. Maywood released claimant to RTW to Full Duty as a trial but to call him immediately if anything gets worse.  This took a lot of negotiating from Richard, but the clerical work in a work setting that I observed was not ergonomically appropriate was causing him great inflammation of his neck and shoulder so he talked the AP into this as the lesser of two evils after looking at the job description which ICS provided to me.  Let's keep our fingers crossed.

Dr. Maywood also requested therapy to be extended.

Faxed to ICS also

## CONFIDENTIAL PRIVILEGED FACSIMILE COMMUNICATION

The information contained in this facsimile message is intended for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received the communication in error, please immediately notify me by telephone and return the original message to me at the above address via the U.S. Postal Service.  Thank you.

DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE
KILCHER REHABILITATION ASSOCIATES, INC.
1115 B      ATA COURT
VIST.., CA 92083
Phone (760) 599-6602      Cellular (760) 809-3854
Fax (760) 599-6654

*201*

*SD*

## PROGRESS REPORT
Oscar Ramirez, CE

**IDENTIFICATION:**

File #:                  92004-13-1215222
Name of Claimant:        Richard Hefner
Name of FN:              DG Kilcher, RN
Reporting Period:        10/15-11/15/00           10/03/00 RTW Lite Duty
                                                  10/12/00 Trial Full Duty
Accepted Condition:      Spinal Cord Injury, diskectomy w/fusion of vertebrae 6 & 7, Broken
                         Sponges in spine.
Date of Injury:          04/07/00
Employing Agency:        US Department of Navy – Camp Pendleton
Claimant's Job Title:    Pipefitter
Primary Physician:       Dr. Jerry Gross, M.D. Neurosurgeon
                         Dr. Robert Mayfield, M.D. Orthopedic Surgeon

## SUMMARY OF PROGRESS TO DATE

I phoned the claimant on 10/20 and he is doing OK, and his co-workers are helping him with his job duties that are too heavy.

The claimant phoned me on 11/3, and LM with his pager number and E/A is requiring him to ride a pumper-truck. The claimant can't make himself do this as he gets panicky at the thought of getting into the type of truck that he was driving when the accident happened. Tim Nichols the HRO Director is requiring him to go to psychiatrist to get a restriction from driving the pumper-truck or he'll be reprimanded. I returned the claimant's phone call and I told him I would clarify status and requirements with DOL and get back with him. Claimant was sent to see a Navy M.D., who gave him a temporary limited work slip, and he is not to ride a pumper-truck, but he still needs psychiatric consultation and restriction. I then phoned the DOL CE and LDMR inquiring how does this work?

On 11/6 the CE phoned and Oscar updated me that for a Psychiatric diagnosis, the claimant should consult a psychiatrist to address justifying claimant cannot ride in pumper (a real phobia vs. fear of being re-injured. Burden of proof is on claimant to obtain medical justifications (and pay for it initially). If he must take time off, sick leave or LWOP, he may or may not be able to buy time back or be reimbursed (up to E/A). I'll inform claimant of his responsibilities.

I phoned ICS and discussed all issues in detail. I'll be at base tomorrow morning and will stop to see if a meeting could be set up with all parties to prevent additional psychiatric allowance being applied for if not necessary. I then phoned the claimant and discussed all issues and responsibilities in detail. He will discuss with his wife.

I stopped by ICS on 11/7 and she was not available and will call me with HRO Director recommendations.

RICHARD HEFNER                          92004-13-1215222                          NOV 2000

*202*

## SUMMARY OF PROGRESS TO DATE (cont.)

While I was at the AP's office on 11/8 with another claimant, I picked up a copy of PD that I had left at previous appointment and forgot to make a copy for my files.

On 11/9 I phoned ICS and LDM if she had an update?

I phoned the claimant on 11/10 and updated him on attempts to arrange a meeting with all parties to discuss issues without success. His supervisor commented that claimant's CDL doesn't do him any good and attitude is poor, but he has not been requested to drive or get into tanker again. He hasn't made an appointment with psychiatrist yet.

I received and reviewed the CA20 from Dr. Gross, which he amended on 10/17/00 to include Limited cervical ROM & post-concussive vertigo.

I called the ICS on 11/15 and she informed me that Tim Nichols asked to reschedule a meeting or a possible teleconference after Thanksgiving as he is on vacation. Apparently there was a miscommunication with the claimant's supervisor which is being addressed.

Progress Report was written and typed.

## RETURN TO WORK ISSUES

Claimant has been attempting to work Full Duty on a trial basis since 10/12/00 and has been able to have a helper with him for the very heavy lifting and then he performs the technical aspects of pipefitting. An issue arose when he was requested to drive the pumper-truck again, which was specifically eliminated from his PD before his return to work. Claimant experiencing psychological symptoms when thinking about getting into the pumper and trying to drive. After E/A requested him to drive his nightmares and insomnia increased and he is contemplating a Psych consult to address these problems at the direction of the HRO Director. I am attempting to have a teleconference with E/A concerning these issues.

## PLANNED SERVICES FOR THE NEXT 30 DAYS

I will continue to monitor the claimant's progress on the job and keep all parties updated during this trial Full Duty. File will be closed to nurse intervention if the claimant successfully remains on the job for the 60-day monitor period.

## Attachments

CA 20 Amended

DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE
KILCHER REHABILITATION ASSOCIATES, INC.
1115 BALLATA COURT
VIS      A 92083
Phone (760) 599-6602      Cellular (760) 809-3854
Fax (760) 599-6654

*203*

### CLOSURE REPORT
Oscar Ramirez, CE

**IDENTIFICATION:**

| | |
|---|---|
| File #: | 92004-13-1215222 |
| Name of Claimant: | Richard Hefner |
| Name of FN: | DG Kilcher, RN |
| Reporting Period: | <u>11/15-12/09/00</u> |
| Accepted Condition: | Spinal Cord Injury, Diskectomy w/fusion of vertebrae 6 & 7, Broken Sponges in spine.  Left Shoulder impingement repair |
| Date of Injury: | 04/07/00 |
| Employing Agency: | US Department of Navy – Camp Pendleton |
| Claimant's Job Title: | Pipefitter |
| Primary Physician: | Dr. Jerry Gross, M.D.      Neurosurgeon |
| | Dr. Robert Maywood, M.D.      Orthopedic Surgeon |

### <u>SUMMARY OF PROGRESS TO DATE</u>

On 11/21 I traveled to AP's office from previous appointment and met with the claimant.  His pain in shoulder is exacerbating when heavy lifting is done.  We then met with the AP and the pain is due to overuse and claimant must ease up on heavy lifting.  Motrin is to be started and f/u on 12/8 to see if additional restrictions need to be put into writing if claimant cannot personally limit his job duties.

On 11/29, the claimant phoned and his back is aching and is taking anti-inflammatories.  He received a call from the CE that he hadn't received scheduled award form or any update from Dr. Gross by fax or mail and ICS has her copies, which she faxed and mailed.

On 12/1 Dr. Addario's office phoned and requested authorization for evaluation.  She will call CE also.

The claimant phoned me on 12/5 and LMR that CE still doesn't have P&S from Dr. Gross and wants to get this done.  He also received a call from Dr. Addario that CE will only reimburse claimant if report justifies additional claim.  I phoned ICS and LMR that time frame is ending and has she received P&S report from Dr. Gross?

The ICS returned my call and only medical she has is what I sent her plus claimant was seen at Sharp for left occ. contusion on 10/24.  I'll send her a copy if and when I get P&S Report.  I then phoned Dr. Gross' office and spoke with April in Medical Records and she could not find claimant's records and will look for chart and call me.

RICHARD HEFNER                    92004-13-1215222                        DEC 2000

*204*

### SUMMARY OF PROGRESS TO DATE (cont.)

On 12/6, I phoned claimant and LM on his beeper. The claimant returned my call on 12/7 and we discussed P&S Report was not received from Dr. Gross. The claimant fell on 1024 due to dizziness and cut his head open. The dizziness may need to be evaluated since it has not subsided and he will contact Dr. Gross as he had indicated the vertigo from the head injury should disappear in time. My time frame on this case is ending.

I traveled to AP's office on 12/8 and met with the claimant. We then met with the AP and pain is still present. The AP diagnosed tendonitis at rotator cuff and claimant is to resume rotator cuff rehabilitation protocol with home program. The AP is concerned about PTSD symptoms and neurological problems and will make referral to a neurologist and psychologist for a consult in his report. Claimant is not P&S as yet and still uses a laborer for his heavy work.

On 12/9 I completed Closure Form and faxed to SRN. I then wrote, typed and faxed update to CE and ICS. I also wrote Claimant Closure Letter and copied to all pertinent parties. I wrote and typed Closure Report.

### RETURN TO WORK

10/03/00     **RTW Lite Duty**

10/12/00     **RTW Full Duty Trial**

### RECOMMENDED SERVICES

File is being closed to nurse intervention as a successful RTW since the claimant has returned to work and remained on the job for the 60-day follow-up period. He is however experiencing ongoing symptoms of a subtle traumatic brain injury (postconcussive syndrome) with vertigo and cognitive impairments. AP has requested that these medical issues be evaluated by the appropriate specialists.

### Attachments

Closure Form
Claimant correspondence
Fax Covers
Updated Medical reports and OWCP RTW forms previously faxed

FROM : Kilcher Rehabilitation Associa    PHONE NO. : 706 5996602                Dec. 09 2000 12:07PM P1

*205*

**DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE**
**KILCHER REHABILITATION ASSOCIATES, INC.**
**1115 BALLATA COURT**
**VISTA, CA 92083**
**Phone (760) 599-6602   Pager (760) 809-3854**
**Fax (760) 599-6654**

*close QM auth. neuro*

# ·FAX COVER

**DATE:**     12/09/00                    **TIME:**        10:45 AM

**TO:**       Oscar Ramirez Claims Examiner

**FAX:**      (415) 975-4287

**FROM:**     DG Kilcher RN

**REF:**      RICHARD HEFNER        OWCP# 92004-13-1215222

**PAGES:**    1

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**COMMENTS:**      Dr. Maywood released claimant to RTW to Full Duty but he still needs to use discretion and do no heavy lifting which he is able to have a helper for.  He recommended another round of home therapy for rotator cuff strengthening since the claimant still has positive objective signs for rotator cuff tendinitis due to overuse.  Dr. Maywood concerned about claimant's vertigo, which continues, and he even fell recently and cut his head open.  He also has unequal pupils and Dr. Maywood is requesting a neurology consult.  Also the claimant has symptoms of PTSD and Dr. Maywood is requesting a consult for these symptoms.  The justifications for these consults will be included in his next narrative report.  My time-frame has expired and I am closing his file to the nurse intervention program.

Faxed to ICS also

**CONFIDENTIAL PRIVILEGED FACSIMILE COMMUNICATION**

The information contained in this facsimile message is intended for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received the communication in error, please immediately notify me by telephone and return the original message to me at the above address via the U.S. Postal Service.  Thank you.

206

**DG KILCHER, BS, RN, CDMS, CCM, DOL OWCP CONTRACT NURSE**
**KILCHER REHABILITATION ASSOCIATES, INC.**
**1115 BALLATA COURT**
**VISTA, CA 92083**
**Phone (760) 599-6602  Cellular (760) 809-3854**
**Fax (760) 599-6654**

Richard  Hefner
P. O. Box 1210
Borrego Springs, CA 92004


Date:      12/09/00

Referring:   Richard  Hefner  92004-13-1215222


Dear Richard :


This letter is to inform you that I have been requested by the DOL to close your file to the nurse intervention program in as much as you have returned to work with your Employing agency in your original position and successfully remained on the job for the 60 day follow-up monitoring.  Dr. Maywood has not determined that you are P & S as yet and requested additional consults for you. Any questions or actions concerning your claim are to forwarded to your Injury Compensation Specialist Jalynn Peterson and/or the CE at the DOL who is Oscar Ramirez.

It has been a pleasure working with such a motivated person as yourself.  Congratulations on a job well done and your return to work.  Best wishes to you and your family for the Holidays and in the future!!


Sincerely,

*DG Kilcher*

DG Kilcher, RN
Rehabilitation Nurse


XC:    Oscar Ramirez CE
         Dept of the Navy - Camp Pendleton
         Dr. Jeffrey Gross, M.D.
         Rehabilitation File
         Dr. Maywood

207

| MISSION HOSPITAL REGIONAL MEDICAL CENTER | Children's Hospital at Mission |
|---|---|
| (949) 582-2300 • (949) 364-1400 | (949) 347-8400 |

27700 Medical Center Road  •  Mission Viejo, California 92691

| LAST NAME | FIRST NAME | | MIDDLE NAME | AGE | ACCOUNT NUMBER |
|---|---|---|---|---|---|
| HEFNER,T69055 RICHARD | | | | 29 | 10792893 |

| ORDERING PHYSICIAN | | | PT. STATUS | LOCATION | MEDICAL RECORD NO. |
|---|---|---|---|---|---|
| Gross,Jeffrey D. MD | 09020 | ADM | IN    356 1 | | 532984 |

| ADMITTING PHYSICIAN | | DATE OF EXAM | SEX | D.O.B. | CPT NO. |
|---|---|---|---|---|---|
| Borzatta,Marcello A. MD | 03327 | 04/07/2000 | M | 07/01/1970 | 1 |
| | | | | | 2 |
| | | | | | 3 |

EXAMS: 000281201 MRI/L-SPINE WITHOUT CONTRAST

DATE OF DICTATION: 04/09/00
TIME OF DICTATION: 1533 HOURS

HISTORY
Trauma.

PULSE SEQUENCES
Utilizing a GE 1.5 Tesla MR, T1 sagittal, FSE sagittal, proton density,
FSE axial, inversion recovery sagittal scans were performed.

FINDINGS
The study shows mild generalized decrease in signal intensity throughout the
lumbar vertebral bodies consistent with persistent red marrow formation.
Otherwise, the signal intensity and heights of the lumbar vertebral bodies are
unremarkable.  The conus ends normally.

The sagittal diameter of the spinal canal is widely patent.  The disk spaces
are unremarkable.  No disk protrusion is seen.  No thecal sac compression is
noted.

IMPRESSION
1.  GROSSLY UNREMARKABLE MRI SCAN OF THE LUMBAR SPINE.
2.  THESE FINDINGS WERE DISCUSSED WITH DR. GROSS BY DR. STAUFFER THE
    MORNING OF 04/08/2000.

-------------------------------------
REPORTED BY: ANTHONY E. STAUFFER, M.D.

CC: Gross,Jeffrey D. MD

TECHNOLOGIST: CLINT CLAWITTER, CRT
TRANSCRIBED DATE/TIME: 04/10/2000 (0938)
TRANSCRIPTIONIST: FRAME
PRINTED DATE/TIME: 04/10/2000 (0941)    BATCH NO: 60161

PAGE 1                    MEDICAL RECORD

$208$

| MISSION HOSPITAL REGIONAL MEDICAL CENTER | Children's Hospital at Mission |
|---|---|
| (949) 582-2300 • (949) 364-1400 | (949) 347-8400 |

27700 Medical Center Road • Mission Viejo, California 92691

| LAST NAME | FIRST NAME | MIDDLE NAME | AGE | ACCOUNT NUMBER |
|---|---|---|---|---|
| HEFNER, T69055 RICHARD | | | 29 | 10792893 |

| ORDERING PHYSICIAN | | PT. STATUS | LOCATION | MEDICAL RECORD NO |
|---|---|---|---|---|
| Brennock, Gerald M. MD | 03707 | ADM IN    356 1 | | 532984 |

| ADMITTING PHYSICIAN | | DATE OF EXAM | SEX | D.O.B. | CPT NO |
|---|---|---|---|---|---|
| Borzatta, Marcello A. MD | 03327    04/07/2000 | | M | 07/01/1970 | 72170 |

EXAMS: 000281112 RAD/PELVIS AP ONLY ROUTINE

DATE OF DICTATION:  04/07/2000
TIME OF DICTATION:  1351 HOURS

HISTORY
Trauma.

FINDINGS
No fracture identified.   The study is normal.

IMPRESSION
NORMAL PELVIS.

*Elliott Wagner MD*

--------------------------------
REPORTED BY: ELLIOTT J. WAGNER, M.D.

CC: Brennock, Gerald M. MD

TECHNOLOGIST: WAYNE BELL, CRT
TRANSCRIBED DATE/TIME: 04/08/2000 (1259)
TRANSCRIPTIONIST: RAD-DRACA
PRINTED DATE/TIME: 04/11/2000 (1906)    BATCH NO: 60319

PAGE 1                            MEDICAL RECORD

209

MISSION HOSPITAL REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital at Mission
(949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

| LAST NAME | FIRST NAME | | MIDDLE NAME | AGE | ACCOUNT NUMBER |
|---|---|---|---|---|---|
| HEFNER,T69055 RICHARD | | | | 29 | 10792893 |

| ORDERING PHYSICIAN | | | PT. STATUS | LOCATION | MEDICAL RECORD NO. |
|---|---|---|---|---|---|
| Brennock,Gerald M. MD | 03707 | ADM | IN | 355 1 | 532984 |

| ADMITTING PHYSICIAN | | DATE OF EXAM | SEX | D.O.B. | CPT NO. |
|---|---|---|---|---|---|
| Borzatta,Marcello A. MD | 03327 | 04/07/2000 | M | 07/01/1970 | 72010 |

EXAMS: 000281113 RAD/T+L SPINES AP/LAT (OS)

DATE OF DICTATION: 04/07/2000
TIME OF DICTATION: 1351 HOURS

HISTORY
Trauma.

FINDINGS
No fracture identified in the thoracic spine.  From T1 through T12 is visualized.  The study is normal.

IMPRESSION
NORMAL THORACIC SPINE.


LUMBAR SPINE.

FINDINGS
From L1 through L5 is visualized.  The alignment is anatomic.  The study is normal.

IMPRESSION
NORMAL LUMBAR SPINE.


-------------------------------
REPORTED BY: ELLIOTT J. WAGNER, M.D.


CC: Brennock,Gerald M. MD

TECHNOLOGIST: WAYNE BELL, CRT
TRANSCRIBED DATE/TIME: 04/08/2000 (1202)
TRANSCRIPTIONIST: RAD-DRACA
PRINTED DATE/TIME: 04/11/2000 (2028)   BATCH NO: 60326

PAGE 1

210

MISSION HOSPITAL REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital at Mission
(949) 347-8400

27700 Medical Center Road   •   Mission Viejo, California  92691

| LAST NAME | FIRST NAME | MIDDLE NAME | AGE | ACCOUNT NUMBER |
|---|---|---|---|---|
| HEFNER,T69055 RICHARD | | | 29 | 10792893 |

| ORDERING PHYSICIAN | | PT. STATUS | LOCATION | MEDICAL RECORD NO |
|---|---|---|---|---|
| Borzatta,Marcello A. MD | 03327 | ADM IN | 356 1 | 532984 |

| ADMITTING PHYSICIAN | | DATE OF EXAM | SEX | D.O.B. | CPT NO |
|---|---|---|---|---|---|
| Borzatta,Marcello A. MD | 03327 | 04/07/2000 | M | 07/01/1970 | 72040 |

EXAMS: 000281147 RAD/CERVICAL SPINE FLEX/EXT ONLY

    DATE OF DICTATION:   04/07/2000
    TIME OF DICTATION:   1625 HOURS

    HISTORY
    Trauma.

    FINDINGS
    Flexion and extension views shows no evidence of ligamentous instability.  The
    flexion extension views show good mobility.

    IMPRESSION
    NORMAL CERVICAL SPINE FLEXION AND EXTENSION VIEWS.

*Elliott W agner MD*

    -------------------------------
    REPORTED BY: ELLIOTT J. WAGNER, M.D.

CC:

TECHNOLOGIST: JOANNE Z. SMITH, CRT
TRANSCRIBED DATE/TIME: 04/08/2000 (1506)
TRANSCRIPTIONIST: RAD-DRACA
PRINTED DATE/TIME: 04/11/2000 (1906)    BATCH NO: 60319

PAGE 1                          MEDICAL RECORD

Form 316.491

211

| MISSION HOSPITAL REGIONAL MEDICAL ‍NTER<br>(949) 582-2300 • (949) 364-1400<br>27700 Medical Center Road • Mission Viejo, California 92691 | Children's Hospital at Mission<br>(949) 347-8400 |

| LAST NAME<br>HEFNER, T69055 RICHARD | FIRST NAME | | MIDDLE NAME | AGE<br>29 | | ACCOUNT NUMBER<br>10792893 |
|---|---|---|---|---|---|---|
| ORDERING PHYSICIAN<br>Brennock, Gerald M. MD | 03707 | ADM | PT. STATUS<br>IN | LOCATION<br>355 1 | | MEDICAL RECORD NO.<br>532984 |
| ADMITTING PHYSICIAN<br>Borzatta, Marcello A. MD | 03327 | DATE OF EXAM<br>04/07/2000 | SEX<br>M | D.O.B.<br>07/01/1970 | | CPT NO.<br>1 71010<br>2<br>3 |

EXAMS: 000281126 RAD/CHEST 1 VIEW

    DATE OF DICTATION: 04/07/2000
    TIME OF DICTATION: 1351 HOURS

    HISTORY
    Trauma.

    FINDINGS
    Pulmonary vascularity and heart size are normal. No acute pulmonary or
    pleural disease is seen.

    IMPRESSION
    NORMAL CHEST.

                        -----------------------------------
                        REPORTED BY: ELLIOTT J. WAGNER, M.D.

    CC: Brennock, Gerald M. MD

    TECHNOLOGIST: WAYNE BELL, CRT
    TRANSCRIBED DATE/TIME: 04/00/2000 (1234)
    TRANSCRIPTIONIST: RAD-DRACA
    PRINTED DATE/TIME: 04/11/2000 (2028)    BATCH NO: 60326

PAGE 1
                         RADIOLOGIST BILLING COPY

Form 318, 4/91

212'

**MISSION HOSPITAL REGIONAL MEDICAL CE  ER**
(949) 582-2300 • (949) 364-1400

**Children's Hospital at Mission**
(949) 347-8400

27700 Medical Center Road  •  Mission Viejo, California 92691

| LAST NAME | FIRST NAME | MIDDLE NAME | AGE | ACCOUNT NUMBER |
|---|---|---|---|---|
| HEFNER,T69055 RICHARD | | 29 | | 10792893 |

| ORDERING PHYSICIAN | | | PT. STATUS | LOCATION | MEDICAL RECORD NO. |
|---|---|---|---|---|---|
| Brennock,Gerald M. MD | 03707 | ADM IN | 355 1 | 532984 |

| ADMITTING PHYSICIAN | | DATE OF EXAM | SEX | D.O.B. | CPT NO. |
|---|---|---|---|---|---|
| Borzatta,Marcello A. MD | 03327 | 04/07/2000 | M | 07/01/1970 | 74160 |

EXAMS: 000281127 CT/ABDOMEN AND PELVIS

DATE OF DICTATION: 04/07/2000
TIME OF DICTATION: 1524 HOURS

CLINICAL INDICATION
Trauma with abdominal pain.

FINDINGS
Axial CT scanning through the abdomen and pelvis was performed. The study was performed after oral and intravenous contrast administration. There are no previous studies for comparison.

There is basilar dependent atelectasis within the lungs.

No focal abnormalities are identified within the liver, spleen, pancreas, kidneys, gallbladder, or adrenal glands. The bowel is poorly opacified with contrast, but is free of focal abnormality. There are no signs of free air or fluid within the peritoneal cavity.

Images through the pelvis demonstrate a Foley catheter terminating within the bladder. The urinary bladder and soft tissue structures of the pelvis demonstrate no acute abnormality.

CONCLUSION
NO EVIDENCE OF INTRA-ABDOMINAL ORGAN INJURY.

---------------------------------
JOHN BELVILLE, M.D.

-------------------------------
REPORTED BY: CRAIG SUCHIN, M.D.

CC: Brennock,Gerald M. MD

TECHNOLOGIST: GAYLE CUZICK, CRT
TRANSCRIBED DATE/TIME: 04/08/2000 (1412)
TRANSCRIPTIONIST: RAD-DRACA
PRINTED DATE/TIME: 04/11/2000 (1901)    BATCH NO: 60318

PAGE 1                    MEDICAL RECORD

Form 318 (491)

213

## MISSION HOSPITAL REGIONAL MEDICAL CENTER
### (949) 582-2300 • (949) 364-1400

**Children's Hospital at Mission**
(949) 347-8400

### 27700 Medical Center Road  •  Mission Viejo, California  92691

| LAST NAME | FIRST NAME | MIDDLE NAME | AGE | ACCOUNT NUMBER |
|---|---|---|---|---|
| HEFNER, T69055 RICHARD | | | 29 | 10792893 |

| ORDERING PHYSICIAN | | PT. STATUS | LOCATION | MEDICAL RECORD NO. |
|---|---|---|---|---|
| Borzatta, Marcello A. MD | 03327 | ADM IN  356 | 1 | 532984 |

| ADMITTING PHYSICIAN | | DATE OF EXAM | SEX | D.O.B. | CPT NO. |
|---|---|---|---|---|---|
| Borzatta, Marcello A. MD | 03327 | 04/07/2000 | M | 07/01/1970 | 1 70450  2  3 |

EXAMS: 000281285 CT/BRAIN WITHOUT CONTRAST

DATE OF DICTATION: 04/07/2000
TIME OF DICTATION: 2341 HOURS

HISTORY
Trauma.

FINDINGS
Serial axial sections were performed from the level of the base of the skull through the vertex without administration of IV contrast agent.

The incidentally visualized basilar skull and paranasal sinus anatomy is unremarkable.

The ventricular system and visualized subarachnoid spaces are within normal limits of size and position with no evidence of mass effect or shift of the midline structures.

No areas of abnormally increased or decreased intraparenchymal attenuation are identified.

There is no evidence of extra-axial fluid collection.

CONCLUSION
NORMAL NONCONTRAST CT SCAN OF THE BRAIN.

-------------------------------
REPORTED BY: SHELDON L. ZIDE, M.D.

CC:

TECHNOLOGIST: MARIE BROWN, CRT
TRANSCRIBED DATE/TIME: 04/09/2000 (1007)
TRANSCRIPTIONIST: RAD-DRACA
PRINTED DATE/TIME: 04/11/2000 (2045)    BATCH NO: 60327

PAGE 1

RADIOLOGIST BILLING COPY

214

# Mission Hospital Regional Medical Cen...
### (949) 582-2300 • (949) 364-1400

## Children's Hospital at Mission
### (949) 347-8400

### 27700 Medical Center Road • Mission Viejo, California 92691

| LAST NAME | FIRST NAME | MIDDLE NAME | AGE | ACCOUNT NUMBER |
|---|---|---|---|---|
| HEFNER,T69055 RICHARD | | | 29 | 10792893 |

| ORDERING PHYSICIAN | | PT. STATUS | LOCATION | MEDICAL RECORD NO. |
|---|---|---|---|---|
| Borzatta,Marcello A. MD | 03327 | ADM IN | 356 1 | 532984 |

| ADMITTING PHYSICIAN | | DATE OF EXAM | SEX | D.O.B. | CPT NO. |
|---|---|---|---|---|---|
| Borzatta,Marcello A. MD | 03327 | 04/07/2000 | M | 07/01/1970 | 1 72052 2 3 |

EXAMS: 000281099 RAD/CERVICAL ROUTINE 5 VIEW

    DATE OF DICTATION:  04/07/2000
    TIME OF DICTATION:  1351 HOURS

    HISTORY
    Trauma.

    FINDINGS
    No fracture is identified. The alignment is anatomic. The study is normal.

    IMPRESSION
    NORMAL CERVICAL SPINE.


                                    *Elliott Wagner MD*
                        ------------------------------------
                        REPORTED BY: ELLIOTT J. WAGNER, M.D.


    CC:

    TECHNOLOGIST: WAYNE BELL, CRT
    TRANSCRIBED DATE/TIME: 04/08/2000 (1231)
    TRANSCRIPTIONIST: RAD-DRACA
    PRINTED DATE/TIME: 04/11/2000 (1906)   BATCH NO: 60319

Form 310.4/91

215

| MISSION HOSPITAL REGIONAL MEDICAL CENTER (949) 582-2300 • (949) 364-1400 | Children's Hospital at Mission (949) 347-8400 |

27700 Medical Center Road   •   Mission Viejo, California 92691

REPORT OF CONSULTATION
NEUROSURGICAL-EMERGENCY

DATE OF CONSULTATION:  04/07/00

REASON FOR CONSULTATION:  I was asked to see Mr. Hefner by Dr. Borzatta of the Mission Hospital Regional Medical Center Trauma Program.

HISTORY OF PRESENT ILLNESS:  Mr. Hefner is a 29-year-old male who was driving a tanker truck down a hill at Camp Pendleton which slid; he tried to correct it and had a fish tail nature of a skid and then over corrected and then the truck rolled over.  He does not remember losing consciousness and crawled from the scene feeling woozy and had blurry vision and his legs were tingling and numb.

Subsequently he was brought to Mission Hospital Regional Medical Center as a trauma patient where his feet became numb and then this numbness ascended up the legs circumferentially initially to the knees and now the mid thigh.

Initial survey was otherwise negative.  There were no signs of trauma about the head or back.  He complains of lumbospinal pain which ascends up to the infrascapular region and also mildly in the neck.

He has no upper extremity findings at this time.

He has no genitalia weakness or anal sphincter weakness.

PAST MEDICAL HISTORY:  Significant for previous appendectomy.

SOCIAL HISTORY:  He is married.

ALLERGIES:  None.

---

NAME:          HEFNER, RICHARD (T69055)
HOSPITAL NO.:  532984
ROOM NO.:      ICU-6
ATTENDING:     Marcello Borzatta, M.D.
CONSULTANT:    Jeffrey Gross, M.D.

04/07/00 04/08/00 Suzanne/h

113507    REPORT OF NEUROSURGICAL CONSULTATION PAGE 1

ORIGINAL

MISSION HOSPITAL
REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital
at Mission
(949) 347-8400

27700 Medical Center Road    •    Mission Viejo, California 92691

## NEUROSURGICAL EXAMINATION:

GENERAL:  Mr. Hefner is wide awake.  He had recent emesis.

HEAD, EYES, EARS, NOSE, AND THROAT:  Pupils equal, round, and reactive to light and accommodation.  Extra ocular muscles are intact.  Face is symmetric.  Tongue and uvula are midline.

EXTREMITIES:  Upper extremities are strong and symmetric.  Upper extremity sensory testing is normal.

There are sensory levels bilaterally at the mid thigh.  This is incomplete and there is sensory below that although it is significantly diminished to pin prick and light touch.

Diffuse weakness throughout the lower extremities is noted. Minimum function is 1 out of 5 and there is 2 out of 5 in plantar flexion and dorsiflexion.  Reflexes are 1 at the knees and 1 at the ankles.  The toes are downgoing, more briskly on the right.

Sacral sensation is intact.  Anal sphincter has tone.

There is no Beevor's sign.  Abdominal and chest sensation is normal.

Back is severely tender in the paraspinal region and not over the spine.  This is lumbar and thoracic with some mild cervical tenderness as well.

The head is atraumatic.

## DIAGNOSTIC IMAGING:  X-rays were read as normal.  Head CT scan was not performed.  MRI of the lumbosacral spine was normal.

---

NAME:           HEFNER, RICHARD (T69055)
HOSPITAL NO.:   532984
ROOM NO.:       ICU-6
ATTENDING:      Marcello Borzatta, M.D.
CONSULTANT:     Jeffrey Gross, M.D.

04/07/00 04/08/00 Suzanne/h

113507    REPORT OF NEUROSURGICAL CONSULTATION PAGE 2

ORIGINAL

MISSION HOSPITAL
REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital
at Mission
(949) 347-8400

27700 Medical Center Road    •    Mission Viejo, California 92691

IMPRESSION:

1.    CONCUSSION WITH BILATERAL LOWER EXTREMITY DEFICITS.
2.    PAN-SPINAL SPASM.

RECOMMENDATIONS:

1.    Admit for observation and neuro checks.
2.    Stat CT scan of the head to rule out para-falx or other lesions.
3.    Anti-emetics.
4.    We may obtain MRI at higher levels.
5.    Continue Solu-Medrol protocol with Pepcid prophylaxis.

DISCUSSION:    I have discussed this in detail with the patient.

Jeffrey Gross, M.D.

NAME:              HEFNER, RICHARD (T69055)
HOSPITAL NO.:    532984
ROOM NO.:        ICU-6
ATTENDING:        Marcello Borzatta, M.D.
CONSULTANT:      Jeffrey Gross, M.D.

04/07/00 04/08/00 Suzanne/h

113507      REPORT OF NEUROSURGICAL CONSULTATION PAGE 3

ORIGINAL

218

w/c

| MISSION HOSPITAL REGIONAL MEDICAL CEN.<br>(949) 582-2300 • (949) 364-1400 | Children's Hospital at Mission<br>(949) 347-8400 |
|---|---|

27700 Medical Center Road • Mission Viejo, California 92691

| LAST NAME | FIRST NAME | | MIDDLE NAME | AGE | ACCOUNT NUMBER |
|---|---|---|---|---|---|
| HEFNER,T69055 RICHARD | | | | 29 | 0792893 |

| ORDERING PHYSICIAN | | | PT. STATUS | LOCATION | MEDIC. RECORD NO. |
|---|---|---|---|---|---|
| orzatta,Marcello A. MD | 03327 | ADM IN | 356 1 | 5329t |

| ADMITTING PHYSICIAN | | | DATE OF EXAM | SEX | D.O.B | CPT NO |
|---|---|---|---|---|---|---|
| orzatta,Marcello A. MD | 03327 | 04/08/2000 | M | 07/01/1970 | 1<br>2<br>3 |

EXAMS: 000281283 RAD/PORTABLE 1 VIEW CHEST

DATE OF DICTATION:  04/08/2000
TIME OF DICTATION:  1029 HOURS

HISTORY
Injury.

PORTABLE TIME
0530 hours.

FINDINGS
Comparison is made to the 04/07/2000 examination.

The lungs are free of acute infiltrate, congestion, or effusion.  The
cardiomediastinal contour is within normal limits.  No pneumothorax is seen.

IMPRESSION
NO ACUTE DISEASE OF THE CHEST.

-----------------------------------
REPORTED BY: MICHAEL T. FORINO, M.D.

CC:

TECHNOLOGIST: Suradej Sumonnath, CRT
TRANSCRIBED DATE/TIME: 04/09/2000 (1302)
TRANSCRIPTIONIST: RAD-DRACA
PRINTED DATE/TIME: 04/11/2000 (1949)    BATCH NO: 60322
PAGE 1
RADIOLOGIST BILLING COPY

219

## MISSION HOSPITAL REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

### Children's Hospital at Mission
(949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

| LAST NAME | FIRST NAME | MIDDLE NAME | AGE | ACCOUNT NUMBER |
|---|---|---|---|---|
| HEFNER,T69055 RICHARD | | | 29 | 10792893 |

| ORDERING PHYSICIAN | | PT. STATUS | LOCATION | MEDICAL RECORD NO. |
|---|---|---|---|---|
| Gross,Jeffrey D. MD | 09020 | ADM IN | 355 1 | 532984 |

| ADMITTING PHYSICIAN | | DATE OF EXAM | SEX | D.O.B. | CPT NO. |
|---|---|---|---|---|---|
| Borzatta,Marcello A. MD | 03327 | 04/08/2000 | M | 07/01/1970 | 1 2 3 |

EXAMS: 000281320 MRI/C-SPINE WITHOUT CONTRAST,
       000281321 MRI/T-SPINE WITHOUT CONTRAST

   DATE OF DICTATION: 04/09/00
   TIME OF DICTATION: 1533 HOURS

   CERVICAL SPINE MRI

   HISTORY
   Spinal cord injury.

   PULSE SEQUENCES
   Utilizing a GE 1.5 Tesla MR, T1 sagittal, FSE, sagittal and FSE axial scans of
   the cervical spine were performed.  The study was initially interpreted by Dr.
   Wagner after hours.

   FINDINGS
   No previous films are available for comparison.

   The craniocervical junction is normal.  The cervical spinal cord is of normal
   size, shape, position and signal intensity.

   The prevertebral soft tissues are unremarkable.

   C2-3:  Unremarkable.

   C3-4:  Unremarkable.

   C4-5:  There is a 1 mm central disk protrusion at C4-5 that causes 1 mm of
   indentation of the thecal sac.  This does not abut the spinal cord.  The
   sagittal diameter of the spinal canal opposite the C4-5 disk space is within
   normal limits.  The bony neural foramina are patent.

   C5-6:  The C5-6 disk space shows a 1 mm broad-based disk bulge that causes
   1 mm of concentric indentation of the thecal sac and no nerve root
   compression.  The bony neural foramina are patent.

   C6-7:  There is a right paracentral disk protrusion at C6-7 that measures
   4 mm in AP dimension.  This abuts upon and causes at least mild flattening of
   the anterior aspect of the spinal cord.  The sagittal diameter of the spinal
   canal opposite the C6-7 disk space is 9 mm compatible with changes of mild
   central stenosis.  The bony neural foramina are patent.

   C7-T1:  Unremarkable.

   IMPRESSION
   1.  4 MM RIGHT PARACENTRAL DISK PROTRUSION AT C6-7 THAT CAUSES AT LEAST MILD
       FLATTENING OF THE ANTERIOR ASPECT OF THE SPINAL CORD.  THE SAGITTAL
       DIAMETER OF THE SPINAL CANAL IS WITHIN NORMAL LIMITS.  THE SAGITTAL
   2.  THE PREVERTEBRAL SOFT TISSUES AND ANTERIOR LONGITUDINAL LIGAMENT ARE
       INTACT.  THE SIGNAL INTENSITY OF THE SPINAL CORD IS UNREMARKABLE.

   THORACIC SPINE MRI

220

MISSION HOSPITAL REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital at Mission
(949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

| LAST NAME | FIRST NAME | MIDDLE NAME | AGE | ACCOUNT NUMBER |
|---|---|---|---|---|
| HEFNER,T69055 RICHARD | | | 29 | 10792893 |

| ORDERING PHYSICIAN | | | PT. STATUS | LOCATION | MEDICAL RECORD NO. |
|---|---|---|---|---|---|
| Gross,Jeffrey D. MD | 09020 | ADM | IN | 356 1 | 532984 |

| ADMITTING PHYSICIAN | | DATE OF EXAM | SEX | D.O.B. | CPT NO. |
|---|---|---|---|---|---|
| Corzatta,Marcello A. MD | 03327 | 04/08/2000 | M | 07/01/1970 | 1 2 3 |

EXAMS: 000281320 MRI/C-SPINE WITHOUT CONTRAST,
        000281321 MRI/T-SPINE WITHOUT CONTRAST
        <Continued>

PULSE SEQUENCES
Utilizing a GE 1.5 Tesla MR, T1 sagittal, FSE echo sagittal, T1 axial and FSE axial scans of the thoracic spine were performed.  Finally, inversion recovery sagittal scans were obtained.

FINDINGS
The study shows a mild decrease in signal intensity throughout the lumbar vertebral bodies consistent with persistent red marrow formation.  The heights of the thoracic vertebral bodies are unremarkable.

The sagittal diameter of the spinal canal is within normal limits.  The thoracic spinal cord is of normal size, shape, position and signal intensity.

The axial series of scans shows no evidence of paraspinous mass lesion.  There is minimal disk bulging at T7-8 and T10-11.

IMPRESSION
1.  MINIMAL DISK BULGING IN THE THORACIC SPINE.  THE THORACIC MRI SCAN IS
    OTHERWISE UNREMARKABLE.

REPORTED BY: ANTHONY R. STAUFFER, M.D.

CC: Gross,Jeffrey D. MD
TECHNOLOGIST: CLINT CLAWITTER, CRT
TRANSCRIBED DATE/TIME: 04/10/2000 (0934)
TRANSCRIPTIONIST: FRAME
PRINTED DATE/TIME: 04/10/2000 (0945)    BATCH NO: 60165

PAGE 2                    RADIOLOGIST BILLING COPY

221 *(handwritten)*

MISSION HOSPITAL
REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital
at Mission
(949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

## REPORT OF OPERATION

DATE:                              04/10/00

PREOPERATIVE DIAGNOSIS:            ACUTE CERVICAL DISK HERNIATION WITH
                                   CORD DEFLECTION AND LONG TRACT SIGNS.

POSTOPERATIVE DIAGNOSIS:           ACUTE CERVICAL DISK HERNIATION WITH
                                   CORD DEFLECTION AND LONG TRACT SIGNS.

PROCEDURE:                         1.  ANTERIOR C6 TO C7 DISKECTOMY.
                                   2.  ANTERIOR C6 TO C7 ARTHRODESIS.
                                   3.  FASHIONING OF ALLOGRAFT ILIAC
                                       CREST BONE GRAFT.
                                   4.  USE OF OPERATING MICROSCOPE.
                                   5.  ANTERIOR INSTRUMENTATION C6 TO
                                       C7.

SURGEON:                           JEFFREY GROSS, M.D.
ASSISTANT SURGEON:                 JACQUES PALMER, M.D.
ANESTHESIA:                        GENERAL ENDOTRACHEAL PLUS LOCAL.

COMPLICATIONS:                     None.

COUNTS:                            Reported as correct times two.

ESTIMATED BLOOD LOSS:              100 cc.

OPERATIVE INDICATIONS:    Mr. Hefner sustained a roll-over truck
accident.   He was brought to Mission Hospital Regional Medical
Center as a trauma patient.   He underwent a workup for lower
extremity weakness and numbness with multiple imaging studies which
revealed a right sided herniated disk at C6-7.   He had been
improving neurologically then plateaued with residual foot and hand
symptoms and therefore decompressive surgery was chosen.   Informed
consent was obtained from the patient and his wife and mother.
They wished to proceed with surgery.

NAME:          HEFNER, RICHARD T69055
HOSPITAL NO.:  532984
ROOM NO.:      356-1
DICTATED BY:   Jeffrey Gross, M.D.

04/11/00  04/13/00  Kerry/h

114832              REPORT OF OPERATION PAGE 1

ORIGINAL

MISSION HOSPITAL
REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital
at Mission
(949) 347-8400

27700 Medical Center Road   •   Mission Viejo, California 92691

DESCRIPTION OF THE
PROCEDURE:                          The patient was brought to the operating
theater and given general endotracheal anesthesia.  He was placed
in the supine position with appropriate padding and grounding.  The
neck was prepared with Betadine gel and sterile towels and drapes
were placed including an Iodophor-impregnated drape.

A #10 blade was used to make an incision beginning 1 cm right of
midline two fingerbreadths above the clavicle extending for 3.5 cm
laterally. Hemostasis was achieved using monopolar electrocautery.
Sharp dissection was used to divide the platysma longitudinally
including its superficial and deep investing fascial layers.  The
platysma was then undermined rostrally and caudally.

Dissection was then made medial to the carotid sheath and its
contents yet lateral to the esophagus and trachea until the spine
was localized.  Release of soft tissues was made rostrally and
caudally and the spine was exposed.  Fluoroscopic localization was
made to the C5-6 disk as the shoulder obscured the C6-7 disk space.
The C6-7 disk space was then identified by being one disk space
caudal to the C5-6 disk space.

The longus colli muscle was taken down between the middle of C5 and
C6 bilaterally using the monopolar electrocautery.   The disk was
excised using a #11 blade and partially removed using rongeurs and
curets.

Casper pins were placed at C6 and C7 and mild distraction was
placed after a self retaining retraction system was placed in the
longus colli muscles.   The remainder of the diskectomy was
performed using small curets as well as rongeurs and pituitary
forceps.

Of note was blood and disruption of the disk and the very loose
C6-7 interspace prior to this portion of the procedure.

The microscope was then brought into the operative field and
drilling of the end plates at C6 and C7 was performed.  Removal of
the disk herniation at the right side at C6-7 was performed and the

NAME:              HEFNER, RICHARD T69055
HOSPITAL NO.:   532984
ROOM NO.:
DICTATED BY:   Jeffrey Gross, M.D.

04/11/00 04/12/00 Kerry/h

114832              REPORT OF OPERATION PAGE 2

ORIGINAL

*223*

**MISSION HOSPITAL
REGIONAL MEDICAL CENTER**
(949) 582-2300 • (949) 364-1400

**Children's Hospital
at Mission**
(949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

ligament was disrupted and blood noted. The ligament was then opened after being identified with a hook and the remainder was removed using a small Kerrison rongeur.

The roots decompressed laterally on both sides until the pedicles were localized. Hemostasis was achieved using Gelfoam and thrombin. Copious irrigation was applied and complete decompression was confirmed.

An iliac crest bone graft was fashioned to a lordotic piece 15 mm deep, 18 to 20 mm across and roughly 7 to 9 mm in height anteriorly although shorter posteriorly. This was tamped into position with distraction and the distraction set removed including Casper pins. Removal of very small anterior osteophytes was performed and the graft was counter sunk. A hook was used to confirm that there was adequate space between the graft and the spinal cord.

Anterior instrumentation was then performed using the Blackstone cervical plating system from C5 to C6 utilizing a 26 mm plate and 14 mm screws aimed 15 degrees up at C6 and 15 degrees down at C7. Locking caps were placed at C6 and C7 and copious irrigation was applied. Retractors were removed at the esophagus and carotid artery was found to be injury free. Bleeding was coagulated using bipolar electrocautery.

Ancef powder was placed deeply within the wound and the closure was made by reapproximating the platysma using interrupted 3-0 Vicryl stitches. A superficial layer of subcutaneous interrupted inverted 3-0 Vicryl stitches were placed and skin closure was made using continuous 4-0 subcuticular Monocryl. Benzoin, Steri-Strips and a sterile dressing was applied. The patient was awakened, extubated

NAME:              HEFNER, RICHARD T69055
HOSPITAL NO.:   532984
ROOM NO.:
DICTATED BY:   Jeffrey Gross, M.D.

04/11/00 04/13/00 Kerry/h

114832              REPORT OF OPERATION PAGE 3

ORIGINAL

| MISSION HOSPITAL REGIONAL MEDICAL CENTER (949) 582-2300 • (949) 364-1400 | Children's Hospital at Mission (949) 347-8400 |

27700 Medical Center Road    •    Mission Viejo, California 92691

and sent to the recovery room in good condition.

_____
Jeffrey Gross, M.D.

NAME:            HEFNER, RICHARD T69055
HOSPITAL NO.:  532984
ROOM NO.:
DICTATED BY:   Jeffrey Gross, M.D.

04/11/00 04/13/00 Kerry/h

114832              REPORT OF OPERATION PAGE 4

ORIGINAL

225

MISSION HOSPITAL REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital at Mission
(949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

| LAST NAME | FIRST NAME | MIDDLE NAME | | AGE | | ACCOUNT NUMBER |
|---|---|---|---|---|---|---|
| HEFNER,T69055 RICHARD | | | | 29 | | 10792893 |
| ORDERING PHYSICIAN | | PT. STATUS | | LOCATION | | MEDICAL RECORD NO. |
| Borzatta,Marcello A. MD | 03327 | ADM | IN | 356 1 | | 532984 |
| ADMITTING PHYSICIAN | | DATE OF EXAM | SEX | D.O.B. | | CPT NO. |
| Borzatta,Marcello A. MD | 03327 | 04/11/2000 | M | 07/01/1970 | 76499 | 72040 |

EXAMS: 000282347 RAD/CERV LTD 2/3VIEWS AP/LAT ,
       000282348 RAD/PORTABLE

DATE OF DICTATION: 04/11/00
TIME OF DICTATION: 2138 hours.

CLINICAL HISTORY
Postoperative.

FINDINGS
Comparison is made with the previous study performed on 04/07/00.

Postoperative changes are noted. Alignment is anatomic. The fusion is well
positioned.

IMPRESSION
ANATOMIC ALIGNMENT.

-------------------------------
REPORTED BY: ROBERT M. TURNER, M.D.

CC:

TECHNOLOGIST: Andy Boddy, CRT
TRANSCRIBED DATE/TIME: 04/12/2000 (1223)
TRANSCRIPTIONIST: FRAME
PRINTED DATE/TIME: 04/12/2000 (1541)    BATCH NO: 60409

PAGE 1
RADIOLOGIST BILLING COPY

| Mission Hospital/Children's Hosp. at Mission | Mission Pathology Medical Associates, Inc. |
|---|---|

Mission Hospital/Children's Hosp. at Mission
27700 Medical Center Road
Mission Viejo, CA 92691
Tel: (949) 364-7710
Fax: (949) 364-3539

Mission Pathology Medical Associates, Inc.
Justin H. Ekuan, MD
Kenneth L. Kaye, MD
Michael J. Blumenfeld, MD
Hitomi Momose, MD

**PATHOLOGY REPORT**

Patient: HEFNER,T69055 RICHARD
Account: 10792893
Med Record #: 532984

Age/Sex: 29/M
Location: 3E
Room: 356    Bed: 1

Pathology Number: 00:M2531
Received date: 04/11/00

**PHYSICIAN:**
 Marcello Borzatta, MD/J. Gross, MD

**CLINICAL DATA:**

 PRE-OP DIAGNOSIS : Traumatic cervical disc herniation
 PROCEDURE       : Ant. cervical fusion/discectomy C6-7 with plate and bone bank

**SPECIMENS:**
 Disc C6-7

**GROSS:**
 The specimen is received in saline.  The specimen consists of 7 gms of pink tissue
 fragments.  R1 following decalcification.  MB:tmd

**DIAGNOSIS:**
 DISC, C6-7:
   INTERVERTEBRAL DISC TISSUE AND SCANT ASSOCIATED FRAGMENTS OF SKELETAL MUSCLE AND
     FIBROFATTY TISSUE WITH NO DIAGNOSTIC HISTOPATHOLOGIC CHANGES.
 MJB/fv

Signed _____    Michael J. Blumenfeld, MD 04/12/00

Run: 04/12/00 1044              ** END OF REPORT **              Page  1

MISSION HOSPITAL REGIONAL MEDICAL CENTER                          CHILDREN'S HOSPITAL at Mission
A Sisters of St. Joseph of Orange Corporation
95-1643360    (949)347-8400         27700 Medical Center Road, Mission Viejo, California 92691      (949)347-8400    33-0528802
IN/OUT PATIENT RECORD                  Mission [X]          Children's [ ]        Run Date: 04/15/00    Run Time: 1411

| ACCOUNT #<br>10792893 | ADMIT DATE<br>04/07/00 | ADMIT TIME<br>1721 | SERVICE<br>3E NE | LOCATION<br>3E | BED<br>356-1 | ADMIT TYPE<br>DIS IN | F/C<br>WC | MED REC NO<br>532984 |
|---|---|---|---|---|---|---|---|---|

| ADMITTING PHYSICIAN NAME & PHONE NO.<br>Borzatta,Marcello A. M  03327   949/364-1007 | SEX<br>M | MAR STAT<br>M | DATE OF BIRTH<br>07/01/70 | AGE<br>29 | RACE<br>CAU | RELIGION<br>CAT |
|---|---|---|---|---|---|---|

| DISCHARGE DATE<br>04/14/00 | LAST HOSPITALIZATION   HOSPITAL NAME | SMOKER<br>N | DRIVER'S LICENSE/STATE<br>A9426881    CA | PRIMARY LANGUAGE<br>E | ADMIT SOURCE<br>ER | ADMITTED BY<br>HIGLIS |
|---|---|---|---|---|---|---|

| PATIENT NAME   HEFNER,T69055 RICHARD<br>ADDRESS          PO BOX 1210<br>                 BORREGO SPRINGS   CA 92004-1210<br>PHONE            760/767-4996    SSN  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 | NEXT OF KIN   HEFNER,JENNIFER          REL WIF<br>ADDRESS       PO BOX 1210<br>              BORREGO SPRINGS  CA 92004-1210<br>HOME PHONE    760/767-4996    WORK PHONE |
|---|---|
| PAT.EMPLOYER   US GOVERNMENT<br>ADDRESS<br>               .CA .      760/725-4008<br>OCCUPATION                      LOE | PER TO NOTIFY   HEFNER,JENNIFER          REL WIF<br>ADDRESS        PO BOX 1210<br>               BORREGO SPRINGS  CA 92004-1210<br>HOME PHONE     760/767-4996    WORK PHONE |
| GUARANTOR   US.GOVERNMENT          REL EMP<br>ADDRESS<br>            2. .       .00000<br>PHONE       760/725-4008    SSN 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<br>GUAR EMPLOYER | PATIENT DOES NOT HAVE AN ADVANCED DIRECTIVE<br>                            INFORMATION GIVEN |
| | ACCIDENT OCCURENCE        ACCIDENT, EMPLOYMENT RELATED<br>DATE OF INJURY    04/07/00   TIME OF INJURY |
| .OCCUPATION                     LOE | FAMILY PHYSICIAN<br>REASON FOR VISIT   SPINAL CORD INJURY<br>COMMENTS |
| PRIMARY INSURANCE   MCCHRO - SWER<br>SUBSCRIBER      HEFNER,T69055 RICHARD<br>BILLING ADDRESS P.O. BOX 555026<br>                CAMP PENALTON    CA 92055-5026<br>PHONE           760/725-3747    GRP<br>POLICY NO.      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     DOB<br>AUTHORIZATION              INSURANCE CODE   WCO | SECONDARY INSURANCE<br>SUBSCRIBER<br>BILLING ADDRESS<br><br>PHONE             GRP<br>POLICY NO.        DOB<br>AUTHORIZATION              INSURANCE CODE |

| PRINCIPAL DIAGNOSIS - THAT CONDITION WHICH AFTER STUDY IS DETERMINED TO BE THE REASON FOR ADMISSION | CODES |
|---|---|
| | |
| SECONDARY<br>DIAGNOSIS 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |

SEE DISCHARGE
SUMMARY

| OPERATIONS/<br>PROCEDURES 1. | ASSEMBLED: |
|---|---|
| 2. | ANALYZED: |
| 3. | CODED: |
| 4. | ROUTED: |

| CONSULTANTS | X |
|---|---|
| | ATTENDING PHYSICIAN          DATE |

**MISSION HOSPITAL REGIONAL MEDICAL CENTER**
27700 Medical Center Road, Mission Viejo, CA 92691
(949) 364-1400

## PHYSICIAN'S DISCHARGE CARE INSTRUCTIONS

### ● MEDICATIONS          ☐ None

| | Name | Dose | When to take | Reason for medication |
|---|---|---|---|---|
| 1 | MEDICATIONS AS AT HOME | | | |
| 2 | BENADRYL 25mg 1-2 TABS PO Q6° PRN | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |

### ● NUTRITION-DIET                                    ☞ ☒ Resume regular diet

### ● ACTIVITY
AS TOLERATED

### ● ADDITIONAL INSTRUCTIONS          ☞ IMPORTANT: CALL PHYSICIAN FOR A FEVER OF 101⁵ ° ORALLY.
BRING X-RAYS TO APPOINTMENT
KEEP NECK DSG CLEAN & DRY

### ● MEDICAL FOLLOW-UP

● Physician: DR. GROSS                                ● Physician: _____
Date of appointment: 3 WEEKS                        Date of appointment: _____
Phone #: (949) 364 1060                              Phone #: _____

Physician signature: _____     Date: _____ 350-1

Discharge via: W/C      To: Taxi/Car/Amb/Helicopter    Patient accompanied by: MOTHER
Valuables envelope ☐    Medications retained in Pharmacy returned ☐    Closet/cubicle empty ☐
Glasses ☐    Wheelchair ☒    Cane ☐    Crutches ☐    Walker ☒    Dentures ☐    Hearing aid(s) ☐

**I have received and understand the above instructions:**

★Patient or Parent/Guardian _____ T 4/14/00

Nurse discharging patient _____ MB 4/14/00
                                                     Date

WHITE—Chart, YELLOW—Patient, PINK—Physician

FORM 629 (8/95)

RUN ON: 04/15/00-0742

DISCHARGE SUMMARY REPORT - LABORATORY

PAGE: 1

HEFNER,T69055 RICHARD      MR#:532984  29/M    DIS IN  04/14/00  Dr. Borzatta,Marcello A. M

MISSION HOSPITAL REGIONAL MEDICAL CENTER   A Sisters of St. Joseph of Orange Corporation   Children's Hospital at Mission
Acct:10792893      27700 MEDICAL CENTER ROAD, MISSION VIEJO, CALIFORNIA 92691    FINAL 04/07/00
Justin H. Ekuan M.D. — Pathologists — Kenneth L. Kaye, M.D.    3E 356-1

| TEST | TEST RESULTS | | | | | REFERENCE RANGE | |
|------|------|------|------|------|------|------|------|
| | **************************************** ***** H E M A T O L O G Y ***** **************************************** | | | | | | |
| | <<<   COMPLETE BLOOD COUNT   >>> | | | | | | |
| Date | 04/08/00 | ------04/07/00------ | | | | | |
| Time | 0500 | 1455 | 1250 | | | Reference | Units |
| WBC | 7.5 | | 8.2 | | | 4.8-10.8 | k/cmm |
| RBC | 5.01 | | 5.27 | | | 4.45-5.75 | m/cmm |
| Hemoglobin | 13.7 | 14.4 | 14.3 | | | 13.5-17.5 | g/dL |
| Hematocrit | 42.2 | 44.9 | 44.2 | | | 40.5-50.5 | % |
| MCV | 84.2 | | 83.9 | | | 82-98 | fL |
| MCH | 27.3 | | 27.1 | | | 27-34 | pg |
| MCHC | 32.5 | | 32.3L | | | 32.5-36.0 | g/dL |
| RDW | 13.8 | | 14.1 | | | 11-15 | |
| Platelet Count | 200 | | 187 | | | 150-400 | k/cmm |
| Granulocytes | 72 | | | | | 45-79 | % |
| Lymphocytes | 27 | | | | | 16-48 | % |
| Monocytes | 1L | | | | | 2-10 | % |
| Eosinophils | 0 | | | | | | % |
| Basophils | 0 | | | | | | % |

Acct:10792893 HEFNER,T69055 RICHARD     MR#:532984  DIS IN  04/14/00  Dr. Borzatta,Marcello A

■ = OUT OF REFERENCE RANGE LOW      * = PANIC VALUE      * * = ABNORMAL VALUE      FORM NO. M-2 (2/2X
■ = OUT OF REFERENCE RANGE HIGH      # = EXCEEDS DELTA CHECK      ND = TEST NOT PERFORMED

DISCHARGE SUMMARY

RUN ON: 04/15/00-0742

PAGE: 2

DISCHARGE SUMMARY REPORT - LABORATORY

HEFNER,T69055 RICHARD          MR#:532984  29/M    DIS IN  04/14/00   Dr. Borzatta,Marcello A. M

MISSION HOSPITAL REGIONAL MEDICAL CENTER  A Sisters of St. Joseph
Acct:10792893                27700 MEDICAL CENTER ROAD, MISSION VIEJO, CALIFORNIA 92691
                       Justin H. Ekuan M.D. — Pathologists — Kenneth L. Kaye, M.D.

Children's Hospital at Mission 04/07/00
3E 356-1

| TEST | TEST RESULTS | | | | | REFERENCE RANGE |
|---|---|---|---|---|---|---|
| | ************************************** | | | | | |
| | ***** C H E M I S T R Y ***** | | | | | |
| | ************************************** | | | | | |
| | <<<  ROUTINE CHEMISTRY  >>> | | | | | |
| Date | 04/08/00 | 04/07/00 | | | | |
| Time | 0500 | 1250 | | | | Reference  Units |
| Sodium | 140 | | | | | 137-145  mmol/L |
| Potassium | 4.2 | | | | | 3.6-5.0  mmol/L |
| Chloride | 108 | | | | | 98-112  mmol/L |
| CO2 | 24 | | | | | 22-30  mmol/L |
| Anion Gap | 12 | | | | | 10-20  mEq/L |
| Glucose | 203H | | | | | 75-110  mg/dL |
| BUN | 12 | | | | | 9-20  mg/dL |
| Creatinine | 0.9 | | | | | 0.8-1.5  mg/dL |
| Calcium | 7.7L | | | | | 8.4-10.2  mg/dL |
| Amylase | | 70 | | | | 30-110  U/L |
| | <<<  DRUG LEVELS  >>> | | | | | |
| Date | 04/07/00 | | | | | |
| Time | 1250 | | | | | Reference  Units |
| Ethanol | < 10(a) | | | | | < 10  mg/dL |

NOTES:  (a)  Results less than 10 mg/dL are below the low limit of
             instrument sensitivity, and are presumed negative for ETOH.

Acct:10792893 HEFNER,T69055 RICHARD         MR#:532984  DIS IN  04/14/00  Dr. Borzatta,Marcello A
█=OUT OF REFERENCE RANGE LOW              * =PANIC VALUE              * * =ABNORMAL VALUE      FORM NO. M-2 (2/20C
█=OUT OF REFERENCE RANGE HIGH             # =EXCEEDS DELTA CHECK      ND =TEST NOT PERFORMED

DISCHARGE
SUMMARY

231

# PHYSICIAN'S PROGRESS RECORD

| DATE / TIME | TREATMENT |
| --- | --- |
| | NOTE PROGRESS OF CASE, COMPLICATIONS, CONSULTATIONS, CHANGE IN DIAGNOSIS, CONDITION OF DISCHARGE, INSTRUCTION TO PATIENTS |
| 4-7-00 | Trauma admit note |
| | 29 y.o. WM driving heavy truck, rollover. |
| | [illegible] McGrath. no LOC. |
| | c/o back pain numbness lower extremities. |
| | Score 10/10 pain. |
| | PMH ∅ PSH Appendectomy. |
| | Meds ∅ NKA |
| | A/1) Head : clear. |
| | PERRL ~ 3mm. |
| | No face tenderness. |
| | 2) Neck : spine vertebrae moderately tender |
| | ⊖ SQ air Trachea midline. |
| | 3) Chest : no tenderness ⊖ SQ air |
| | clear BS. |
| | 4) CV : rr ⊖ m/g/r Pulses wnl. ⊖ JVD |
| | 5) Abd : soft not distended. Mild LUQ tenderness. |
| | 6) Pelvis : stable. |
| | 7) Back : ⊕ lower thoracic lumbar tenderness. |
| | ⊖ hematoma / ecchymosis. |
| | 8) Rectal : nl Tone prostate OK. |
| | 9) Ext : wnl. |
| | 10) Neuro : awake alert appropriate oriented x4 |
| | Moving all 4, no weakness. |
| | No objective sensory deficit. |
| | Dx/Ddx : CT head ⊖ Spine series ⊖ CXR ⊖ |
| | [ ] Discharge summary to be dictated by: [illegible] ⊖ Pelvis ⊖ |
| | [ ] Discharge summary dictated on: (cont) |

ALTNER, 169055 RICHARD
04/07/00 MR 532984
DOB 07/01/70 29Y M WC
WCO McGuire

MISSION HOSPITAL REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital at Mission
(949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

PHYSICIAN'S PROGRESS RECORD

Form #174 (11/93)

-232

# PHYSICIAN'S PROGRESS RECORD

| DATE / TIME | TREATMENT<br>NOTE PROGRESS OF CASE, COMPLICATIONS, CONSULTATIONS, CHANGE IN DIAGNOSIS, CONDITION OF DISCHARGE, INSTRUCTION TO PATIENTS |
|---|---|
| 4/7/00 | Continued - |
| | Xrays WNL |
| | MRI c spine - Nl cons / Readu |
| | CT head not done |
| | Imp - S/p Concussion c Bilat UE deficits |
| | & ? paraspinal sp |
| | Plan - Stat CT head - r/o parafalcine |
| | hematoma, other injury |
| | - Continue Neuro checks |
| | - Scheduled [illegible] |
| | - will consult MRI higher. |
| | - will follow c you! |
| | [signature] Gross |

[ ] Discharge summary to be dictated by:

[ ] Discharge summary dictated on:

10792893 BORZATTA, MARCELLO
PERNER, TOROSS RICHARD-CELLO
04/07/00 MR 532984 HFN
DOB 07/01/70 29Y M WC
WCO

MISSION HOSPITAL REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital at Mission
(949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

PHYSICIAN'S PROGRESS RECORD

Form #174 (11/93)

233

## PHYSICIAN'S PROGRESS RECORD

| DATE / TIME | TREATMENT<br>NOTE PROGRESS OF CASE, COMPLICATIONS, CONSULTATIONS, CHANGE IN DIAGNOSIS, CONDITION OF DISCHARGE, INSTRUCTION TO PATIENTS |
|---|---|
| 4-7-00 | Imp 1) Blunt abd trauma, no evidence of intraabdominal injuries |
| | 2) Blunt trauma to the back with paresthesias but no weakness or sensory deficit. |
| | Plan 1) admit 2) steroids protocol 3) neurosurg consult |
| 4/7/00 10:30p | NS Consult<br>Pt seen + examined.<br>Films reviewed -<br>Full consult dictated. |
| | [illegible] |
| | Next → |

| | Discharge summary to be dictated by:
| | Discharge summary dictated on:

10792893 BORZATTA, MARCELLO
[illegible]
04/07/00 MR 532984 IN
DOB 07/01/70 29Y M WC

MISSION HOSPITAL REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital at Mission
(949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

PHYSICIAN'S PROGRESS RECORD

Form #174 (11/93)

234

# TRAUMA PHYSICIAN'S PROGRESS RECORD

## Treatment

DATE 4-8-00

NOTE PROGRESS OF CASE, COMPLICATIONS, CONSULTATIONS, CHANGE OF DIAGNOSIS, CONDITION OF DISCHARGE, INSTRUCTION TO PATIENTS.

DAYS #

| WBC | HGB | HCT | BS | BUN | CR | NA | K | CL | CO2 | AMYLASE | PLATELETS |
|-----|-----|-----|----|----|----|----|----|----|-----|---------|-----------|
| 7.5 | 13.7 | 42 | 203 | 12 | 0.9 | 140 | 4.2 | 108 | 24 | | |

| | PREVIOUS 24° | PREVIOUS 12° | ABG | VENT | VITALS |
|--|--|--|--|--|--|
| CALORIES | | | pH = | FI02= | T MAX = 98.0 |
| NITROGEN | | | PCO2= | TV = 954 | BP = 120's |
| SOURCE | | | PO2= 95 | RATE = 954 | HR = 70's-80's |
| INTAKE | 1507 | | HCO3= | PEEP = RA | |
| OUTPUT | 1050 | | SAT = | | |

MEDICATIONS    Solumedrol

CULTURES

Afebrile

Awake & alert, oriented and appropriate.

No pain.

Hungry.

c/o persistent paresthesias & some weakness

both lower extremities.

B/Chest clear            CVRR

Abd sft some tenderness LLQ

Ext no edema

Neuro 4/5 weakness lower

some sensation deficit legs bilaterally.

... A little better.

results of M feeling.

Has clear lipids—

10792893  BORZATTA, MARCLL...
HEFNER, T69055 RICHARD
04/07/00  MR 532984 IN
DOB 07/01/70  29Y  M WC
WCO

MISSION HOSPITAL
REGIONAL MEDICAL CENTER
(949) 582-2300  •  (949) 364-1400
27700 Medical Center Road  •  Mission Viejo, California  92691

Children's Hospital
at Mission
(949) 347-8400

TRAUMA PROGRESS REPORT
Form #855 (11/92)

C235

# NEURO PHYSICIAN'S PROGRESS RECORD

| DATE | Treatment<br>NOTE PROGRESS OF CASE, COMPLICATIONS, CONSULTATIONS, CHANGE OF DIAGNOSIS, CONDITION OF DISCHARGE, INSTRUCTION TO PATIENTS. | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAYS # | WBC | HGB | HCT | BS | BUN | CR | NA | K | CL | CO2 | OTHER | DILANTIN LEVEL |
| | | | | | | | | | | | | |

| | CT SCAN: | | X-RAYS: | | |
|---|---|---|---|---|---|
| | PREVIOUS 24° | PREVIOUS 12° | ABG | VENT | VITALS |
| CSF DRAIN | | | pH = | FI02= | T MAX = |
| INTAKE | | | PCO2= | TV = | BP = |
| OUTPUT | | | PO2= | RATE = | HR = |
| | | | HCO3= | PEEP = | ICP = |
| | | | SAT = | | |

MEDICATIONS: Scheduled

CULTURES

4/8/00 NS –
Urgency
full body spasm
[illegible] in [illegible] – urging [illegible] to [illegible]?
MRI T/L spine [illegible]
CT head [illegible]

Imp – ? Spasm / Hysteria ?

Forgoing ahead c̄ MRI Results
Awaiting C-spine MRI films
Ext'd schedule

1. add Diazepam
2. [illegible]
3. PT eval / Rx

[signature]

MISSION HOSPITAL REGIONAL MEDICAL CENTER (949) 582-2300 • (949) 364-1400
Children's Hospital at Mission (949) 347-8400
27700 Medical Center Road • Mission Viejo, California 92691
NEURO PROGRESS REPORT
Form #211 (11/92)

C 236

# TRAUMA PHYSICIAN'S PROGRESS RECORD

| | | | | | | | | Treatment | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE 4-9-00 | NOTE PROGRESS OF CASE, COMPLICATIONS, CONSULTATIONS, CHANGE OF DIAGNOSIS, CONDITION OF DISCHARGE, INSTRUCTION TO PATIENTS. | | | | | | | | | | | |
| DAYS # 2 | WBC | HGB | HCT | BS | BUN | CR | NA | K | CL | CO2 | AMYLASE | PLATELETS |
| | | | | | | | | | | | | |

| | PREVIOUS 24° | PREVIOUS 12° | ABG | VENT R/A | VITALS |
|---|---|---|---|---|---|
| CALORIES | | | pH = | FIO2= | T MAX = 99¹ |
| NITROGEN | | | PCO2= | TV = | BP = 110/50 |
| SOURCE | | | PO2= | RATE = | HR = 60 |
| INTAKE | +3510 | +1500 | HCO3= | PEEP = | |
| OUTPUT | -1950 | -1000 | SAT = | | |

**MEDICATIONS** Pepcid, Zofran, Demerol, Valium

**CULTURES**

Still c̄/ō some numbness ē ___ low ext.
O/w stable.

R/ Chest clear
    ō RR
    Abd soft not tender.        Neuro Still ___
    Ext no edema

Imp: About the same

Plan: Continue Tx To settle down to ___

**MISSION HOSPITAL
REGIONAL MEDICAL CENTER**
(949) 582-2300 • (949) 364-1400
27700 Medical Center Road • Mission Viejo, California 92691

**Children's Hospital
at Mission**
(949) 347-8400

**TRAUMA PROGRESS REPORT**
Form #855 (11/92)

10792893 BORZATTA,MARCELLO
HEFNER,T69055 RICHARD
04/07/00 MR 532984 IN
DOB 07/01/70 29Y  M WC
WCO

237

# NEURO PHYSICIAN'S PROGRESS RECORD

| | Treatment |
|---|---|
| DATE 4-9-00 | NOTE PROGRESS OF CASE, COMPLICATIONS, CONSULTATIONS, CHANGE OF DIAGNOSIS, CONDITION OF DISCHARGE, INSTRUCTION TO PATIENTS. |

| DAYS # 2 | WBC | HGB | HCT | BS | BUN | CR | NA | K | CL | CO2 | OTHER | DILANTIN LEVEL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

| CT SCAN: | | | X-RAYS: | | | |
|---|---|---|---|---|---|---|
| | PREVIOUS 24° | PREVIOUS 12° | ABG | VENT RA | VITALS | |
| CSF DRAIN | | | pH = | FIO2= | T MAX = 99' | |
| INTAKE | +3570 | +1500 | PCO2= | TV = | BP = 110/60 | |
| OUTPUT | -1950 | -1000 | PO2= | RATE = | HR = 60 | |
| | | | HCO3= | PEEP = | ICP = | |
| | | | SAT = | | | |

**MEDICATIONS** Pepcid  Zofran  Demerol  Valium

**CULTURES**

4/9/00   NS -
Awake, Alert
Much less pain
Memory & Much better
DF/PF  4/5
toes ↓↓

MM Cspine:  (R) C6-7  H/p & Cervical
Deficits

Since he is getting better & No true
myelopathy  (& hx of psychiatric)
will Not  suggest surgery at this time
If he plateaus  or decons - will reconsider.

PT/O -
future

10792893  BORZATTA, MARCELLO
HEFNER, T69055  RICHARD
04/07/00  MR 532984  IN
DOB 07/01/70  29Y  M WC
WCO

MISSION HOSPITAL
REGIONAL MEDICAL CENTER
(949) 582-2300  •  (949) 364-1400
27700 Medical Center Road  •  Mission Viejo, California 92691

Children's Hospital
at Mission
(949) 347-8400

NEURO PROGRESS REPORT

Form #211 (11/92)

238

# PHYSICIAN'S PROGRESS RECORD

| DATE / TIME | TREATMENT<br>NOTE PROGRESS OF CASE, COMPLICATIONS, CONSULTATIONS, CHANGE IN DIAGNOSIS, CONDITION OF DISCHARGE, INSTRUCTION TO PATIENTS |
|---|---|
| 4/10/00 | [illegible] |
| | [illegible] VSS |
| | Chest [illegible] [illegible] |
| | [illegible] |
| | [illegible] BS [illegible] [illegible] LLQ |
| | [illegible] |
| | [illegible] [illegible] / Neurology [illegible] |
| 4/10/00 | N/S |
| | Now begin to c/o neck pain |
| | [illegible] |
| | apraxic gait |
| | It is becoming clearer that some of these sx represent |
| | long tract sys 2° cervical disc herniation. |
| | He has plateaued clearly. |
| | I recommend ACDF C6-7 to relieve cord pressure. |
| | I explained potential for recovery 5 [illegible]. |
| | I also explained the procedure in detail - |
| | including risks + benefits. He may not agree |
| | as [illegible] Discharge summary to be dictated by: |
| | He wants to talk to his wife. Discharge summary dictated on: |

[illegible signature] GROSS

MISSION HOSPITAL REGIONAL MEDICAL CENTER
(949) 582-2300 • (949) 364-1400

Children's Hospital at Mission
(949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

10792893 BORZATTA, MARCELLO
HEFNER, T/GROSS RICHARD
04/07/00 MR 532984 IN
DOB 07/01/70 29Y M WC
WCO

PHYSICIAN'S PROGRESS RECORD

Form #174 (11/93)

C 239

# PHYSICIAN'S PROGRESS RECORD

| DATE / TIME | TREATMENT |
|---|---|
| | NOTE PROGRESS OF CASE, COMPLICATIONS, CONSULTATIONS, CHANGE IN DIAGNOSIS, CONDITION OF DISCHARGE, INSTRUCTION TO PATIENTS |
| 4/10/00 | |
| 7pm | Therapy |
| | Reviewed Risks + Benefits again, in detail, but not limited to bleeding, infection, failed fusion, hardware failure, recurrent laryngeal nerve injury, esophageal injury, need for add'l surgery, neurological injury in cervical injury SCI, radiculopathy, and even coma or death. |
| | He & his wife appear to understand. Questions were answered & they wish to proceed c̄ surgery. |
| | [signature] |
| 4/11/00 | Operative Note |
| | Proc C6-7 ACDF c̄ Microscope, plate |
| | Surg - [illegible] |
| | Asst - [illegible] |
| | Comp - ∅ |
| | EBL - 100 cc |
| | Counts - correct |
| | Dict 4/10 [illegible] |
| | Drains - [illegible] |
| | [signature] |
| | [ ] Discharge summary to be dictated by: |
| | [ ] Discharge summary dictated on: 353-1 |

MISSION HOSPITAL REGIONAL MEDICAL CENTER (949) 582-2300 • (949) 364-1400

Children's Hospital at Mission (949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

PHYSICIAN'S PROGRESS RECORD

10792893 BORZATTA, MARCELLO
HEFNER, 169055 RICHARD
04/07/00 MR 532934 IN
[illegible] 07/31/70 29Y M [illegible]

Form #174 (11/93)

240

## PHYSICIAN'S PROGRESS RECORD

| DATE / TIME | TREATMENT |
| --- | --- |
| | NOTE PROGRESS OF CASE, COMPLICATIONS, CONSULTATIONS, CHANGE IN DIAGNOSIS, CONDITION OF DISCHARGE, INSTRUCTION TO PATIENTS |
| 4/11/00 1000 | [illegible handwriting] |
| | A: Stable |
| | P: [illegible] |
| 4/11/00 | [illegible handwriting] |
| 4/12/00 | [illegible handwriting] |

[ ] Discharge summary to be dictated by:

[ ] Discharge summary dictated on:

Mission Hospital Regional Medical Center (949) 582-2300 • (949) 364-1400

Children's Hospital at Mission (949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

PHYSICIAN'S PROGRESS RECORD

Form #174 (11/93)

10792893 BORZATTA, MARCELLO
HEFNER, T69033 RICHARD
04/07/00 MR 532984 IN
DOB 07/01/70 29Y M WC
WCO

241

| DATE & TIME | DISCIPLINE | PATIENT CARE NOTES |
|---|---|---|
| 4/13/00 pm | Nsg | P#9 Knowledge Deficit<br>I - pt teaching re record/sheet<br>E - pt was amenable to health teaching gain ___ (signature) RN |
| 4·13·00 1445 15' | PT | P#10: activity intolerance<br>I: pt. transferred supine → sit c̄ SBA via log roll; sit → stand c̄ furn, SBA. Gait train 200' pt. c̄ furn, CGA. BTB R/L.<br>E: good transfer & ambulation mobility; good gait balance c̄ furn. ___ PT |
| 4/13/00 1500 | Nsg | Free entry — Pt. c̄ whitish scaly, bumpy raised rash bil. middle fingers, also has pinkish raised rash on R abd. c̄ (3) 1 fluid filled vessicle, has pinkish rash on bil. top of chest areas also — Dr. J. Palmer on call for Dr. Gross — message left for him in ICU (MD there) about pts. rash will come to see pt. later — Benadryl given for c/o itching from rash ___ ___ RN |

Key: P = problem   I = intervention   E = evaluation

PATIENT IDENTIFICATION

Hefner, 769057 Michael

MISSION HOSPITAL REGIONAL MEDICAL CENTER

MULTIDISCIPLINARY PATIENT CARE NOTES

Form # 911  (Rev. 9/1999)

F242

## PHYSICIAN'S PROGRESS RECORD

| DATE / TIME | TREATMENT |
|---|---|
| | NOTE PROGRESS OF CASE, COMPLICATIONS, CONSULTATIONS, CHANGE IN DIAGNOSIS, CONDITION OF DISCHARGE, INSTRUCTION TO PATIENTS |
| 4/13/00 | [illegible] |
| 4/14/00 | [illegible] |

[ ] Discharge summary to be dictated by:

[ ] Discharge summary dictated on:

Mission Hospital Regional Medical Center (949) 582-2300 • (949) 364-1400

Children's Hospital at Mission (949) 347-8400

27700 Medical Center Road • Mission Viejo, California 92691

PHYSICIAN'S PROGRESS RECORD

Form #174 (11/93)

10792893 DORZAITA, MARCELLO
HEFNER, T69055 RICHARD
04/07/00 MR 532984 IN
DOB 07/01/70 29Y M NC
WCO

*243*

# NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
JEFFREY D. GROSS, M.D.

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26752 CROWN VALLEY PARKWAY, SUITE 561
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1060
FAX (949) 364-5761

April 26, 2000

UNITED STATES MARINE CORP
GYSGT Slanders
Occupational Safety Office

Fax #760-725-2169

RE: RICHARD HEFNER

To Whom It May Concern:

I have been asked to write to you regarding my patient Mr. Richard Hefner. I am his treating neurological surgeon. Mr. Hefner sustained a traumatic acute cervical disc herniation and manifest by spinal cord injury. This disc herniation was located between cervical 6 and 7.

He underwent an anterior cervical discectomy, decompression of the spinal cord, and C6 to 7 allograft arthrodesis with instrumentation using an operative microscope on 4-10-00 without problems.

Subsequently he has had improvement of his lower extremity neurological signs and numbness.

Because of this acute injury related to a truck accident and recent surgery, he is and will be unable to work for a minimum of twelve weeks. I will be evaluating him on a routine basis and will be able to better ascertain his recovery and neck status as I see him.

Please feel free to contact me at any time regarding additional information you might require on his case.

Sincerely,

JEFFREY D. GROSS, M.D.
/sk

244

BOARD CERTIFIED RADIOLOGY

WILLIAM F. VELICK, M.D.
SHELDON L. ZIDE, M.D.
ELLIOTT J. WAGNER, M.D.
ROBERT M. TURNER, M.D.
ANTHONY E. STAUFFER, M.D.
JOHN S. BELVILLE, M.D.
MICHAEL J. FORINO, M.D.
GLENN R. SLOCUM, M.D.



# MISSION REGIONAL IMAGING CENTER

27800 Medical Center Road
Suite 108
Mission Viejo, California 92691
(949)364-6900

26732 Crown Valley Parkway
Suite 171
Mission Viejo, California 92691
(949)364-0511

PATIENT:  HEFNER, RICHARD
  X-RAY#:  251068.0
    DOB:  07/01/70
    SEX:  M
    DOE:  05/03/00

JEFFREY D GROSS, M.D.
26732 CROWN VALLEY PRKWY
#561
MISSION VIEJO, CA 92691-0000

723.9  NECK DISORDER/SYMPT NOS

XR SPINE CERV LTD

CLINICAL HISTORY:   Status post C6-7 fusion.

COMPARISON:   No prior studies are available.

FINDINGS:

The patient is status anterior plate and interbody fusion at C6-7.   No osseous or hardware fracture is seen. The bone graft appears well seated.   No instability seen on flexion or extension views.

IMPRESSION:

STATUS ANTERIOR PLATE AND INTERBODY FUSION AT C6-7.

MICHAEL T FORINO, M.D.
glm/05/04/00/WRITTEN REPORT SENT TO PHYSICIAN

Accredited by
Accreditation Association for Ambulatory Health Care, Inc.

AN AFFILIATION OF MISSION HOSPITAL REGIONAL MEDICAL CENTER AND DIGITAL&RADIOLOGIC IMAGING ASSOCIATES, A MEDICAL GROUP

$\partial 45$

# NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
JEFFREY D. GROSS, M.D.

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 561
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1060
FAX (949) 364-5761

May 3, 2000

Ms. Jalynn Peterson, Adjuster
UNITED STATES MARINE CORP
GYSGT Slanders
Occupational Safety Office

FAX 760-725-0058

RE:  RICHARD HEFNER

### FOLLOW-UP REPORT

Dear Ms. Peterson:

I am writing to you in follow-up after having seen Richard Hefner
in his first postoperative visit in my office since his injury.

As you know, he had spinal cord compression and neurological
sequelae.  He has reported significant improvement in his lower
extremities although he still gets tired when he is walking.  The
numbness has seemingly resolved and his hands are also normal.

He has some mild dysphagia after surgery which is expected.  He
still has some mild posterior neck pain likely due to some
ligamentous instability which should improve.  This is only when
lying down flat.  He also notices some mild limited range of
motion.

On examination today his neck incision is well healed.  He has a
supple neck and only mild spasm without tenderness.  Range of
motion is slightly limited.    Upper and lower extremities are
strong and there is no numbness detected.  His rash is gone.

X-Rays:  X-rays show no movement on flexion/extension at C6-7.
The interbody graft is in good position and the screws and
hardware are in good position there.

246

Page 2
May 3, 2000
Re:  Richard Hefner

<u>Impression</u>:  Mr. Hefner is doing well after C6-7 anterior cervical discectomy, fusion and plating for traumatic herniated disc due to a work-related injury.  His spinal cord injury seems to be resolving as well with only mild lower extremity symptoms.

<u>Recommendations</u>:  I will begin mild physical therapy for his neck range of motion.  He should continue his home exercises as he is doing well including swimming.  He is still off work.  Re-evaluation will be with x-rays in two months.

Please contact me if you have any questions regarding this case.

Sincerely,

JEFFREY D. GROSS, M.D.

/sk

247



**MISSION REGIONAL IMAGING CENTER**

BOARD CERTIFIED RADIOLOGY

WILLIAM F. VELICK, M.D.
SHELDON L. ZIDE, M.D.
ELLIOTT J. WAGNER, M.D.
ROBERT M. TURNER, M.D.
ANTHONY E. STAUFFER, M.D.
JOHN S. BELVILLE, M.D.
MICHAEL J. FORINO, M.D.
GLENN R. SLOCUM, M.D.

27800 Medical Center Road
Suite 108
Mission Viejo, California 92691
(949)364-6900

26732 Crown Valley Parkway
Suite 171
Mission Viejo, California 92691
(949)364-0511

PATIENT:  HEFNER, RICHARD
  X-RAY#:  251068.0
    DOB:  07/01/70
    SEX:  M
    DOE:  07/10/00

JEFFREY D GROSS, M.D.
26732 CROWN VALLEY PRKWY
#561
MISSION VIEJO, CA 92691-0000

723.9  NECK DISORDER/SYMPT NOS

XR SPINE CERV LTD
XR SPINE CER C W F&E

CLINICAL HISTORY:  Postop.

COMPARISON:  There are no previous studies available for comparison at this time.

FINDINGS:

The patient is status post anterior plate and interbody fusion at the C6-7 level.  The bone graft is what appears well-healed.  No osseous or hardware fracture is seen.

No instability is noted on flexion and extension views.

IMPRESSION:

STATUS POST ANTERIOR PLATE AND INTERBODY FUSION AT C6-7.

*Michael Forino, MD*
MICHAEL T FORINO, M.D.
sc/07/11/0/WRITTEN REPORT SENT TO PHYSICIAN

Accredited by
Accreditation Association for Ambulatory Health Care, Inc.

AN AFFILIATION OF MISSION HOSPITAL REGIONAL MEDICAL CENTER AND DIGITAL&RADIOLOGICIMAGING ASSOCIATES, A MEDICAL GROUP

$248$

## NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
JEFFREY D. GROSS, M.D.

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 361
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1060
FAX (949) 364-5761

July 11, 2000

Mr. Oscar Ramirez, Claims Adj.
EMPLOYMENTS STANDARD ADM
WORKMANS. COMP PROGRAM
P.O. Box 3769
San Francisco, CA 94119-3769

RE:                    RICHARD HEFNER
Date of injury:        04-07-00
Claim No.:             13215222

### WORKERS' COMPENSATION FOLLOW-UP REPORT

Dear Mr Ramirez:

I am writing to you after having seen Mr. Hefner in neurosurgical
follow-up.

As you know, he had been treated for a cervical fracture and
spinal cord injury in April of this year.

He is doing quite well with still leg tingling, which is likely
related to his spinal cord injury.  He has some what appeared to
be tension headaches and worse when he is trying to concentrate.
These are also consistent with his postconcussive syndrome.  He
has no symptoms related to his anisocoria that his wife complains
of.  His right pupil is bigger than his left.  He does have some
neck spasm.  However, he is doing well and his upper extremities
are strong and have no numbness.  He seems to be improving
overall.

He presents today with his wife, children and nurse Kilcher, his
case manager.

Physical Examination:  Mild anisocoria with the right pupil being
slightly larger than the left is noted but this is subtle.

Strength in the upper extremities is strong and symmetric.  The
neck incision is well-healed.  Range of motion is somewhat

2&9

Page 2
July 11, 2000
Re:  Richard Hefner

diminished ' and there is tenderness over the left shoulder to palpation.   There is some paraspinal spasm in the neck, deep palpation and tenderness there but not over the spine.

<u>Diagnostic Images</u>:  X-rays show excellent fusion and placement of the hardware.

<u>Impression</u>:   Mr. Hefner is doing well status post cervical decompression and fusion.   The fusion is quite mature, although the symptoms of the spinal cord injury and the postconcussive symptoms still persist including headache, difficulty focusing and maintaining attention, as well as postoperative neck spasm.

It appears that he has only had a few of his physical therapy visits and they have not performed the treatment I would like.

<u>Plan</u>:

1)    Rewrite his physical therapy prescription so that he might improve his neck spasm and get his neck range of motion improved.

2)    An orthopedic evaluation for the left shoulder should be arranged and I suggested that he should find someone in his region to do this, as he travels a long way to come see me.

3)    I would like to see him back in one month's time to check him for work status.

He and his wife and case manager appear to understand and agree with the plan.   We will also renew his diazepam as a muscle relaxant in the meantime.

Please feel free to contact me if additional information is necessary.

Sincerely,

JEFFREY D. GROSS, M.D.

/pb

*250*

**Work Capacity Evaluation**
**Musculoskeletal Conditions**

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs



| Injured Worker's Name *(First, middle, last)*<br>RICHARD HEFNER | OWCP No. 92804-13-<br>1215222 | OMB No.: 1215-0103<br>Expires: 10-31-99 |
|---|---|---|

Please answer the questions below concerning your patient (named above) for whom the Office of Workers' Compensation Programs (OWCP) has accepted the following conditions: LAMINECTOMY, CERVICAL FUSION C6-7 DISCECTOMY

1. In many employing establishments, light duty can be made available.

   a. Is there any reason that this person cannot WORK for 8 hours per workday? If so, please provide medical reasons to support your opinion.
   
   No

   b. If less than 8 hours per workday, how many hours can he/she work? _____

   c. Do you anticipate an increase in the number of hours per day this person will be able to work?  ☐ Yes  ☐ No
      If yes, when will this person achieve an 8 hour workday? _____
      If no, please provide medical reasons to support your opinion.

2. Please indicate whether this person has any LIMITATION in the activity listed and how many hours this person can perform each activity. If there are limitations in lifting, pulling and/or pushing, please provide the maximum number of pounds that can be handled by this person.

| Activity | Limitation | # of Hours Able to Work | Activity | Limitation | # of Hours Able to Work | Lbs. |
|---|---|---|---|---|---|---|
| Sitting | ___ Yes | ___ | Pushing | ___ Yes | ___ | ___ |
| Walking | ___ Yes | ___ | Pulling | ___ Yes | ___ | ___ |
| Standing | ___ Yes | ___ | Lifting | ___ Yes | ___ | ___ |
| Reaching | ___ Yes | ___ | Squatting | ___ Yes | ___ | ___ |
| Reaching above Shoulder | ___ Yes | ___ | Kneeling | ___ Yes | ___ | ___ |
| Twisting | ___ Yes | ___ | Climbing | ___ Yes | ___ | ___ |
| Operating a Motor Vehicle | ___ Yes | ___ | Breaks: | | | |
| Repetitive Movements: | | | Duration ___ | Frequency ___ | | |
| Wrists | ___ Yes | | Duration ___ | Frequency ___ | | |
| Elbow | ___ Yes | | | | | |

3. Are there OTHER medical facts, situational factors, equipment or devices which need to be considered in the identification of a position for this person? If so, please explain.

| 4. Physician's Name *(Type or print)*<br>DR. JEFFREY GROSS, M.D. | 5. Telephone<br>949/364-1060 |
|---|---|
| 6. Signature | 7. Date<br>10/2/00 |

The information requested will assist OWCP in determining eligibility to benefits and is required to obtain or retain a benefit. (5 USC 8101 et. seq.)

**Public Burden Statement**

We estimate that it will take an average of 15 minutes per response to complete this information collection, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Office of Workers' Compensation Programs, U.S. Department of Labor, Room S-3229, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

DO NOT SEND THE COMPLETED FORM TO THE OFFICE SHOWN ABOVE                    Form OWCP-5b



BOARD CERTIFIED RADIOLOGY

WILLIAM F. VELICK, M.D.
SHELDON L. ZIDE, M.D.
ELLIOTT J. WAGNER, M.D.
ROBERT M. TURNER, M.D.
ANTHONY E. STAUFFER, M.D.
JOHN S. BELVILLE, M.D.
MICHAEL J. FORINO, M.D.
GLENN R. SLOCUM, M.D.

# MISSION REGIONAL
# IMAGING CENTER

27800 Medical Center Road
Suite 108
Mission Viejo, California 92691
(949)364-6900

26732 Crown Valley Parkway
Suite 171
Mission Viejo, California 92691
(949)364-0511

PATIENT:  HEFNER, RICHARD
 X-RAY#:  251068.0
    DOB:  07/01/70
    SEX:  M
    DOE:  10/02/00

JEFFREY D GROSS, M.D.
26732 CROWN VALLEY PRKWY
#561
MISSION VIEJO, CA 92691-0000

723.1  CERVALGIA

XR SPINE CERV LTD

CLINICAL HISTORY:  Follow up fusion.

COMPARISON:  7-10-00

FINDINGS:

Lateral, neutral, flexion and extension views demonstrate a stable appearance to the anterior plate and interbody fusion at the C6-7 level.  The bone graft appears well healed and seated.  No osseous or hardware fracture is seen.  Alignment is intact.  No subluxation is noted.

IMPRESSION:

STABLE APPEARANCE TO THE C6-7 FUSION.

MICHAEL T FORINO, M.D.
sc/10/04/0/WRITTEN REPORT SENT TO PHYSICIAN



Accredited by
Accreditation Association for Ambulatory Health Care, Inc.

AN AFFILIATION OF MISSION HOSPITAL REGIONAL MEDICAL CENTER AND DIGITAL&RADIOLOGIC IMAGING ASSOCIATES, A MEDICAL GROUP

# NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
JEFFREY D. GROSS, M.D.



NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 561
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1060
FAX (949) 364-5761

October 3, 2000



Mr. Oscar Ramirez
Claims Adjuster
EMPLOYMENTS STANDARD ADM
WORKERS COMP PROGRAM
P.O. Box 3769
San Francisco, CA 94119-3769

RE:                RICHARD HEFNER
Date of injury:    04-07-00
Claim No.:         13215222

## WORKERS' COMPENSATION FOLLOW-UP REPORT

Dear Mr. Ramirez:

I am writing after having seen Mr. Hefner in follow-up.

He is status post a cervical spinal cord injury requiring anterior
cervical discectomy and instrumented arthrodesis at C6-7.  He has
been out of his collar and doing well with that.  He is extremely
motivated and has no upper extremity symptoms except for some left
shoulder limitations from his previous visit which have improved.
He had been doing his therapy religiously.

He still has some postconcussive syndromes, namely vertigo and
some eye problems.  He also has rare leg tingling, likely
associated with his spinal cord injury.

Physical Examination:  His wound is well healed.  He moves his
neck well and is full of energy.  His upper extremities are strong
and symmetric.  He demonstrates an excellent range of motion with
the left shoulder.

His gait is normal.

Diagnostic Images:  Flexion/extension x-rays show an excellent
fusion at C5-6 with good positioning and good alignment.  There is
no movement between the flexion and extension x-ray at the fused
level.

Page 2
October 3, 2000
Re:  Richard Hefner

*253*

<u>Impression</u>:  Status post spinal cord injury and anterior cervical discectomy and fusion at C6-7.

He is doing very well and is very motivated to return to work.

<u>Plan</u>:  I will give him a mild muscle relaxant for prn use only. This will be Flexeril.

I agree he return to work tomorrow.  It appears that he has no limitations.  I did caution him with regard to his vertigo and if he develops this while driving or walking, he should pull over and stop or lie down if he is standing.  He appears to understand this.

He need only return to see me per renada, as he is doing quite well.

Please feel free to contact me at any time regarding this case.

<u>DECLARATION PURSUANT TO AB 3660 & LABOR CODE 46281</u>:

I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated I received from others.  As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, except as noted herein, that I believe it to be true.  This document was executed in Orange County, California, on the date indicated below.

<u>MANDATORY LANGUAGE REQUIRED IN LABOR CODE SECTION 5703</u>:

"I have not violated Labor Code Section 139.3 and the contents of the report and bill are true and correct to the best of my knowledge.  This statement is made under penalty of perjury."

Dated this 13 day of October, 2000 at Orange County, California.

Sincerely,

JEFFREY D. GROSS, M.D.

/sk

NEUROLOG. . .L SURGERY                    254

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
JEFFREY D. GROSS, M.D.

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 561
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1060
FAX (949) 364-5761

December 10, 2000

Mr. Oscar Ramirez
Claims Adjuster
EMPLOYMENTS STANDARD ADM
WORKERS COMP PROGRAM
P.O. Box 3769
San Francisco, CA 94119-3769

DMP
13-1215 222

RE:              RICHARD HEFNER
Date of injury:  04-07-00
Claim No.:       13215222

WORKERS' COMPENSATION FOLLOW-UP REPORT

December 7, 2000

Dear Mr. Ramirez:

I returned Mr. Hefner's calls from today and yesterday.

He is still complaining of severe vertigo causing him to have to
pull off to the side of the road and stop driving for awhile.  He
also says he has pupillary dilation that bothers his wife causing
him to be sensitive to light.

He has no other complaints of vision, seizures or neurological
deficiencies over the phone.

As he has such a prolonged course with what was thought to be a
postconcussive syndrome, I recommend that further treatment be
referred to a neurologist in his area.  I don't know anyone in
that area and will leave it up to his insurance carrier.

255

Page 2
December 10, 2000
Re: Richard Hefner

**DECLARATION PURSUANT TO AB 3660 & LABOR CODE 46281:**

I declare under penalty of perjury that the information contained
in this report and its attachments, if any, is true and correct
to the best of my knowledge and belief, except as to information
that I have indicated I received from others.  As to that
information, I declare under penalty of perjury that the infor-
mation accurately describes the information provided to me and,
except as noted herein, that I believe it to be true.  This
document was executed in Orange County, California, on the date
indicated below.

**MANDATORY LANGUAGE REQUIRED IN LABOR CODE SECTION 5703:**

"I have not violated Labor Code Section 139.3 and the contents of
the report and bill are true and correct to the best of my
knowledge.  This statement is made under penalty of perjury."

Dated this __ day of _____, 2000 at Orange County,
California.

Sincerely,

JEFFREY D. GROSS, M.D.

/sk

*13215222*

*256 CSB*

NEUROLOGICAL SURGERY

JACQUES J. PALMER, M.D.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
SYLVAIN PALMER, M.D., F.A.C.S.
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
JEFFREY D. GROSS, M.D.

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 561
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1060
FAX (949) 364-5761

December 10, 2000

Mr. Oscar Ramirez
Claims Adjuster
EMPLOYMENTS STANDARD ADM
WORKERS COMP PROGRAM
P.O. Box 3769
San Francisco, CA 94119-3769

RE:                    RICHARD HEFNER
Date of injury:        04-07-00
Claim No.:             13215222

                PERMANENT AND STATIONARY
                WORKERS' COMPENSATION REPORT

Dear Mr. Ramirez:

I am responding to your request for a permanent and stationary report with comments toward needs for future medical care regarding Mr. Hefner's injuries.

I have not seen him in follow-up since my last note of December 7, 2000.

He has continued to have postconcussive syndromes and is likely in the small percentage group that might even have permanent symptoms after such an injury.

Furthermore, there is no way to fully predict the duration of his symptoms nor need for care.

There is no particular treatment for these symptoms except for appropriate rehabilitation including physical, occupational and speech therapy.

Perhaps an objective QME examination might be best for your purposes vis-à-vis your questions regarding Mr. Hefner.

Please feel free to contact me at any time regarding his case.

Page 2
January 7, 2000
Re:  Richard Hefner

257

**DECLARATION PURSUANT TO AB 3660 & LABOR CODE 46281:**

I declare under penalty of perjury that the information contained
in this report and its attachments, if any, is true and correct
to the best of my knowledge and belief, except as to information
that I have indicated I received from others.  As to that
information, I declare under penalty of perjury that the infor-
mation accurately describes the information provided to me and,
except as noted herein, that I believe it to be true.  This
document was executed in Orange County, California, on the date
indicated below.

**MANDATORY LANGUAGE REQUIRED IN LABOR CODE SECTION 5703:**

"I have not violated Labor Code Section 139.3 and the contents of
the report and bill are true and correct to the best of my
knowledge.  This statement is made under penalty of perjury."

Dated this ___ day of _____, 2001 at Orange County,
California.

Sincerely,

JEFFREY D. GROSS, M.D.

/sk

NEUROLOGICAL SURGERY

**JACQUES J. PALMER, M.D.**
A PROFESSIONAL CORPORATION
**SYLVAIN PALMER, M.D., F.A.C.S.**
A PROFESSIONAL CORPORATION
DIPLOMATE AMERICAN BOARD
OF NEUROLOGICAL SURGERY
**JEFFREY D. GROSS, M.D.**

NEUROLOGICAL SURGERY MEDICAL ASSOCIATES
26732 CROWN VALLEY PARKWAY, SUITE 561
MISSION VIEJO, CALIFORNIA 92691
(949) 364-1060
FAX (949) 364-5761

April 6, 2001

Mr. Oscar Ramirez
Claims Adjuster
EMPLOYMENTS STANDARD ADM
WORKERS COMP. PROGRAM
P.O. Box 3769
San Francisco, CA 94119-3769

RE:                  RICHARD HEFNER
Date of injury:      04-07-00
Claim No.:           ~~13215222~~

WORKERS' COMPENSATION FOLLOW-UP REPORT

October 2, 2000

Dear Mr. Ramirez:

I am writing after having seen Mr. Hefner in follow-up.

He is status post a cervical spinal cord injury requiring anterior cervical discectomy and instrumented arthrodesis at C6-7. He has been out of his collar and doing well with that. He is extremely motivated and has no upper extremity symptoms except for some left shoulder limitations from his previous visit which have improved. He had been doing his therapy religiously.

He still has some postconcussive syndromes, namely vertigo, and he is still having ocular problems. He also has leg tingling, likely associated with his spinal cord injury.

Physical Examination: His wound is well healed. He moves his neck well and is full of energy. His upper extremities are strong and symmetric. He demonstrates an excellent range of motion with the left shoulder, which was impaired after his injury.

His gait is normal.



Page 2
April 6, 2001
Re:  Richard Hefner

<u>Diagnostic Imaging</u>:    We reviewed his x-rays together.    His flexion/extension x-rays show an excellent fusion at C5-6 with good positioning and good alignment.    There is no movement between the flexion and extension x-ray at the fused level.    Fusion appears to be occurring well.

<u>Impression</u>:

1)    Status   post   spinal   cord   injury   requiring   surgical decompression and fusion at C6-7.

2)    The above is related to his work-related injury.

3)    Postconcussive  syndrome  with  vertigo.    This  may  also represent an inner ear disturbance after his injury.

<u>Plan</u>:  Flexeril prn for muscle spasm.

He will return to work on 10-3-00.  Limitations are related to his vertigo.   I did caution him with regard to his vertigo that if he develops this while driving or walking, he should pull over and stop or lie down if he is standing.   He appears to understand this.

He need only return to see me on a prn basis.

Please feel free to contact me at any time regarding this case.

<u>DECLARATION PURSUANT TO AB 3660 & LABOR CODE 46281</u>:

I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that  I  have  indicated  I  received  from  others.   As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, except  as  noted  herein,  that  I  believe  it  to  be  true.   This document was executed in Orange County, California, on the date indicated below.

260

Page 3
April 6, 2001
Re: Richard Hefner


MANDATORY LANGUAGE REQUIRED IN LABOR CODE SECTION 5703:

"I have not violated Labor Code Section 139.3 and the contents of
the report and bill are true and correct to the best of my
knowledge. This statement is made under penalty of perjury."

Dated this 25ᵗʰ day of April, 2001 at Orange County,
California.

Sincerely,

JEFFREY D. GROSS, M.D.

/sk

# SHOULDER
## KNEE
### INSTITUTE

AUG 0 1 RECD 261

**Robert Maywood, M.D.**
*Orthopaedic and Arthroscopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board*
*of Orthopaedic Surgeons*
*Qualified Medical Examiner,*
*State of California*

U. S. Department of Labor                                    July 18, 2000
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

**ATTENTION:     Oscar Ramirez**

**RE:            HEFNER, RICHARD**
**DOI:           April 7, 2000**
**CLAIM NO:      92004-131215222**
**SS#:           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**
**EMPLOYER:      Camp Pendleton (Facility Maintenance Dept.)**
**DOE:           July 18, 2000**

## INITIAL ORTHOPEDIC EXAMINATION

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on July 18, 2000, for evaluation of orthopaedic complaints sustained in an injury on April 7, 2000. The following is a complete history and physical examination of the initial evaluation.

| SUMMARY OF REPORT | |
|---|---|
| DATE OF INJURY: | April 7, 2000. |
| DIAGNOSIS: | 1.  Left shoulder impingement. |
| | 2.  Rule out subscapularis tear, left shoulder rotator cuff. |
| | 3.  Status post cervical fusion. |
| WORK STATUS: | Temporary total disability. |
| WORK PRECLUSIONS: | N/A. |
| VOCATIONAL REHABILITATION: | Pending review of job description and medical records. |
| TREATMENT PLAN: | MRI of the left shoulder; Lodine and home exercises; further recommendations to follow. |
| CAUSATION: | Work injury, April 7, 2000 |

International Shoulder Knee Institute, L.C.

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-3444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452

262

RE: HEFNER, RICHARD
July 18, 2000
Page 2


## CHIEF COMPLAINT:

"Pain in the left shoulder."

## CURRENT COMPLAINTS IN PATIENT'S WORDS:

The patient complains of constant pain in the left shoulder, which increases with use of the left arm for activities of lifting or carrying, particularly with the arm at or above the shoulder level. He also indicates that he has popping and clicking in the shoulder joint with range of motion of the arm. He feels his range of motion has decreased since the date of his injury.

## HISTORY OF INJURY:

At the time of his injury, the patient was performing his usual and customary work activities for the United States Navy and, while driving a tanker truck down a hill at Camp Pendleton, he apparently lost control of the truck, which slid and fishtailed. As he attempted to regain control of the truck, it rolled over.

The patient had significant trauma and is unaware of whether or not he lost consciousness. He was able to crawl from the scene of the accident but felt extremely unstable and disoriented. He also had numbness and tingling in his legs. He had blurred vision at that time.

The patient was taken to Mission Bay Hospital Emergency Room and examined by several physicians. The medical records from Mission Bay Hospital were provided for my review and indicate that the patient did, in fact, have a neurosurgical consultation on April 7, 2000, with Jeffrey Gross, M.D. Dr. Gross' report of that date was reviewed and he felt that the patient had a concussion with bilateral lower extremity deficits. He also had a pan-spinal spasm. Dr. Gross recommended that he be admitted for observation and neuro checks. He recommended a stat CT scan of the head to rule out parafalx or other lesions, antiemetics and MRI's at higher levels.

Various study reports were provided for my review as well, indicating a normal chest X-ray. An MRI of the lumbar spine was normal. MRI of the cervical spine demonstrated a 4 mm. right paracentral disc protrusion at C6-7, causing mild flattening of the anterior aspect of the spinal cord. There was minimal disc bulging in the thoracic spine on MRI. There was no acute disease of the chest indicated on X-rays. Cervical spine films revealed anatomical alignment as well as normal flexion and extension views. X-rays of

263

RE: HEFNER, RICHARD
July 18, 2000
Page 3

the thoracic and lumbar spine were also reportedly normal. CT scan of the brain was normal, as were X-rays of the pelvis.

The operative report of Jeffrey Gross, M.D., dated April 10, 2000, was reviewed. He performed an anterior C6-7 diskectomy with arthrodesis, fashioning of iliac crest bone graft with use of operating microscope and anterior instrumentation, C6-7.

Additional medical reports of Dr. Gross were reviewed, specifically a report dated April 26, 2000, discussing the patient's surgery and indicating improvement of his lower extremity neurological signs of numbness and indicating that the patient would be re-evaluated on a routine basis. His medical report of May 3, 2000, was reviewed. Dr. Gross took X-rays of the cervical spine, flexion and extension views, indicating that the interbody graft was in good position and the screws and hardware in good position as well. He felt that the patient was doing well after his C6-7 anterior cervical diskectomy, fusion and plating for traumatic herniated disc and felt that the patient could begin mild physical therapy for his neck in the form of range of motion exercises. The patient was doing home exercises, including swimming and was kept off work.

It should be noted that I have been asked to evaluate the patient's left shoulder, which is felt to represent an injury sustained from the accident of April 7, 2000.

## WORK STATUS:

The patient has been off work since the date of the injury.

## JOB DESCRIPTION:

The patient's job title at the time of the industrial injury was pipefitter for the U. S. Navy. The patient works 8 hours per day, 5 days per week. His job duties during the average work day consist of lifting 45 pounds above his head, fitting pipes together, replacing motors, rebuilding motors, driving tractor trailers and large trucks, etc. The maximum weight that he is required to lift unassisted is 45 pounds, which he does at various times throughout the day. Other activities required include repetitive use of the upper and lower extremities, operating equipment and hand tools, lifting, carrying, bending, stooping, squatting, pushing, pulling, reaching forward, reaching overhead, working in awkward positions, climbing, walking, sitting, standing and exposure to weather. The patient had been working for this employer for 6 months at the time of the industrial injury and has been in this line of work for 11 years.

264

RE: HEFNER, RICHARD
July 18, 2000
Page 4


## PAST MEDICAL HISTORY:

### PREVIOUS INJURIES TO THE BODY PARTS INVOLVED IN THIS CLAIM:

None.

| | |
|---|---|
| **INDUSTRIAL INJURIES:** | None. |
| **NONINDUSTRIAL INJURIES:** | None. |
| **HOSPITALIZATIONS:** | Appendectomy in 1993; cervical diskectomy on 4/7/00. |
| **SURGERIES:** | As above. |
| **ACCIDENTS:** | None. |
| **CURRENT MEDICATIONS:** | Valium PRN. |
| **ALLERGIES TO MEDICATIONS:** | None. |
| **ADULT ILLNESSES:** | Noncontributory. |
| **CHILDHOOD ILLNESSES:** | Heart murmur. |

### FAMILY HISTORY:

The patient's parents and sisters are alive and well.

### SOCIAL HISTORY:

The patient is married with three children, and was born in Yokohama, Japan, on July 1, 1970. He completed high school. The patient does not smoke tobacco products or drink alcoholic beverages. He denies the use of street drugs and has never been in a drug or alcohol rehabilitation program.

### MILITARY HISTORY:

The patient was in the Navy from 1989-1997, and was discharged on December 17, 1997.

265

RE: HEFNER, RICHARD
July 18, 2000
Page 5

## PHYSICAL EXAMINATION: (Positive findings in italics.)

The patient is a well-developed, well-nourished male appearing about his stated age of 30 years, right-hand dominant, alert, cooperative, and appearing in no undue discomfort at the time of this examination when observed walking into the examination room.

## LEFT UPPER EXTREMITY EXAMINATION:

The neck is supple with full range of motion and no pain with compression testing. The left elbow and shoulder demonstrate full range of motion and no tenderness to palpation. There is no evidence on visual examination of the left shoulder of atrophy of the rotator cuff muscles. The sternoclavicular joint is nontender to palpation. *The acromioclavicular joint is tender to palpation.* Apprehension test for instability is negative when the shoulder is placed in full external rotation and abduction. *There is tenderness to palpation along the long head of the biceps tendon.* There is no tenderness to palpation of the greater tuberosity in the area of the supraspinatus tendon. *Neer's impingement sign is positive.* When placed through range of motion, there is no crepitus at the glenohumeral joint. He complains of no pain at the acromioclavicular joint with cross-chest maneuver. Distally, the extensor pollicis longus, abductor pollicis brevis, and dorsal interossei are 5/5 with 2+ radial pulse and normal sensation. There is no pain at the proximal biceps tendon with SLAP testing. *There is pain with subscapularis testing, which is 4+/5.*

| DEEP TENDON REFLEXES: | INJURED LEFT | UNINJURED RIGHT |
|---|---|---|
| BICEPS | 2+ | 2+ |
| TRICEPS | 2+ | 2+ |
| BRACHIORADIALIS | 2+ | 2+ |

| MANUAL MUSCLE TESTING: | LEFT | RIGHT |
|---|---|---|
| DELTOID: | 5/5 | 5/5 |
| EXTERNAL ROTATION: | 5/5 | 5/5 |
| INTERNAL ROTATION: | 5/5 | 5/5 |
| SUPRASPINATUS: | 5/5 | 5/5 |
| BICEPS: | 5/5 | 5/5 |
| TRICEPS: | 5/5 | 5/5 |

| RANGE OF MOTION | LEFT | RIGHT | NORMAL |
|---|---|---|---|

266

RE: HEFNER, RICHARD
July 18, 2000
Page 6

| EXTENSION: | 30° | 30° | 30° |
|---|---|---|---|
| FLEXION: | 180° | 180° | 180° |
| INTERNAL ROTATION: | T10 | T10 | T10 |
| EXTERNAL ROTATION: | 80° | 80° | 80° |
| ABDUCTION: | 180° | 180° | 180° |
| ADDUCTION: | 20° | 20° | 20° |

**X-RAYS:**

X-rays of the left shoulder demonstrate a type II to III acromion.

**DIAGNOSIS:**

1. Left shoulder impingement.
2. Rule out subscapularis tear, left shoulder rotator cuff.
3. Status post cervical fusion.

**PERMANENT AND STATIONARY:**

It is this examiner's opinion that this patient has not reached a permanent and stationary level for the above stated injury.

**WORK RESTRICTIONS:**

The patient is placed on temporary total disability.

**CAUSATION:**

Based upon the medical evidence available for review, the patient's current complaints and the physiological findings during physical examination indicate left shoulder impingement, rule out subscapularis tear, left shoulder rotator cuff and status post cervical fusion..

These injuries are a direct result of the accident and the mechanism of the injury and the patient's description of the accident are consistent with the findings on physical examination.

267

RE: HEFNER, RICHARD
July 18, 2000
Page 7

## VOCATIONAL REHABILITATION:

It is difficult to ascertain whether or not Mr. Hefner will be able to return to his usual and customary work activities at this time. A decision regarding this will be deferred until he has reached maximum medical benefit.

## TREATMENT PLAN:

At this time, I would like to obtain an MRI of the patient's left shoulder to rule out a subscapularis tear or other injury to the remainder of his rotator cuff or labrum. In addition, I have placed him on anti-inflammatory medication, Lodine. I have instructed him in a home exercise program until his MRI is obtained. Following review of the MRI scan, further treatment recommendations can be made.

It is apparent from the patient's history that he did have a significant injury, causing paralysis at the time of his accident. The focus of the patient's care was his cervical spine, which certainly was appropriate. It is not uncommon to see evaluation and treatment of other injuries be delayed following a spine injury of this severity. Fortunately for the patient, he has made an excellent recovery in terms of his cervical spine but now, with his increase in activity, the injury to his left shoulder has become apparent.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

## AFFIDAVIT OF COMPLIANCE:

"I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, except as noted herein, that I believe it to be true."

"I further declare under penalty of perjury that I personally performed the evaluation of the patient on July 18, 2000, at my San Diego office and that, except as otherwise stated herein, the evaluation was performed and the time spent performing the evaluation was in compliance with the guidelines, if any, established by the Industrial Medical Council or the administrative director pursuant to paragraph (5) of subdivision (j) of Section 139.2 or Section 5307.6 of the California Labor Code."

268

RE: HEFNER, RICHARD
July 18, 2000
Page 8

"I verify under penalty of perjury that the total time I spent on the following activities is true and correct:"

| | | |
|---|---|---|
| a. | Reviewing the Records | _____1_____ Hours |
| b. | Face-to-face time with the patient | _____45"_____ Hours |
| c. | Preparation of the report | _____1_____ Hours |
| d. | Any other relevant activities detailed in the report | _____ Hours |

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California Labor code Section 139.3 and that the contents of the report are true and correct to the best of my knowledge."

"I further declare under penalty of perjury that the name and qualifications of each person who performed any services in connection with this report, including diagnostic studies, other than clerical preparation, is Phil Hastings."

Signed this _____31st_____ day of _____July_____, 2000, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California

RMM/pdh/e
cc:   D. G. Kilcher, R.N.
       1115 Ballata Court
       Vista, California 92083

FROM : Kilcher Rehabilitation Associa   PHONE NO. : 706 5996602        Aug. 03 2000 08:07AM P2

Radiology Medical Gr via VSI~FAX

Page 1 of 1 #373090   B

269

# RMG.
## RADIOLOGY MEDICAL GROUP, INC.

AUG 0 1 RECD

**FIRST & LAUREL IMAGING CENTER**
2466 FIRST AVENUE
SAN DIEGO, CA 92101
PHONE: (619) 849-XRAY (849-9729)

**DIAGNOSTIC RADIOLOGY**
Elmo A. Segul, M.D., P.A.C.R.
Mark E. Schecther, M.D.
Murray A. Reicher, M.D.
John M. Doorney, M.D.
Brian J. Moffit, M.D.
David W. Bradley, M.D.
Jens G. Johnson, M.D.
Lud L. Maker, M.D.
James A. Casper, M.D.
Eric K. Lukahman, M.D.

**CENTRALIZED NUMBERS**
PHN: (619) 849-XRAY (849-9729)
FAX: (619) 849-4XMG (849-4766)

**DIAGNOSTIC RADIOLOGY OFFICES**

**FIRST & LAUREL IMAGING CENTER**
2466 First Avenue
San Diego, CA 92101-1622
FAX : (619) 696-7839

**SCRIPPS MERCY HEALTHCARE**
Department of Radiology
4077 Fifth Avenue
San Diego, CA 92103-2180
FAX: (619) 543-1076

**MERCY MAGNETIC IMAGING CENTER**
4077 Fifth Avenue
San Diego, CA 92103-2180
FAX: (619) 543-1076

**ENCINITAS IMAGING CENTER**
477 N. El Camino Real,
Suite A102
Encinitas, CA 92024-1329
FAX: (760) 632-5069

**ADMINISTRATIVE OFFICE**
3345 Fifth Avenue
P. O. Box 34397
San Diego, CA 92163-4397
FAX: (619) 294-4396

Check out our website
radiologybyrmg.com

**PATIENT NAME**
HEFNER, RICHARD

**ACCOUNT NO**
2250805

**MEDICAL RECORD NUMBER**
2250805

**AT THE REQUEST OF**
ROBERT MAYWOOD M.D.
3444 KEARNY VILLA RD
SUITE 202
SAN DIEGO, CA 92123

**DATE OF BIRTH**
07-01-70

**AGE/SEX**
30/M

**DATE OF SERVICE**
07-25-00

**PROCEDURE:**    MAGNETIC RESONANCE IMAGING OF LEFT SHOULDER

**HISTORY:**        History of work comp related injury, April 7, 2000.   Rule out subscapularis tendon tear.

**COMPARISON:**    None.

**TECHNIQUE:**      A comprehensive examination was performed utilizing a variety of imaging planes and imaging parameters to optimize visualization of suspected pathology.

**FINDINGS:**        The glenohumeral joint shows no evidence of any bony deformity, effusion or arthritic disease.   The labral and capsular attachments are intact.   The anterior capsule and subscapularis tendon appear unremarkable.

The left rotator cuff mechanism is unremarkable.   No tear or defect is seen.   The coracoacromial arch shows no evidence of any significant bony narrowing.

Exam shows no evidence of any significant bony narrowing.   The proximal and/or intra-articular segment of the biceps tendon appears unremarkable as well.

**CONCLUSION:**

Examination within normal limits.

Thank you for referring this patient.

Brian J. Moffit, M.D.
sms
Dictated: 7/25/00;  Typed: 7/26/00

THIS REPORT IS BASED SOLELY UPON THE RADIOLOGICAL EXAMINATION.
CORRELATION WITH THE CLINICAL EXAMINATION IS ESSENTIAL.

*270*

# SHOULDER KNEE INSTITUTE

**Robert Maywood, M.D.**
*Orthopaedic and Arthroscopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board*
*of Orthopaedic Surgeons*
*Qualified Medical Examiner,*
*State of California*

U. S. Department of Labor
Office of Workers Compensation                                  August 15, 2000
P. O. Box 194610
San Francisco, California 94119-4610

**ATTENTION:**      Oscar Ramirez

**RE:**              **HEFNER, RICHARD**
**DOI:**             **April 7, 2000**
**CLAIM NO:**        **92004-131215222**
**SS#:**             **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**
**EMPLOYER:**        **Camp Pendleton (Facility Maintenance Dept.)**
**DOE:**             **August 15, 2000**

## INTERIM REPORT

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on August 15, 2000, for re-evaluation of orthopaedic complaints sustained in an injury on April 7, 2000. Follow-up left shoulder. The patient reports he did get relief with the subacromial injection. However, his shoulder is now hurting again. I would consider this a positive injection test.

## PHYSICAL EXAMINATION:
Examination of the left shoulder reveals a continued positive impingement sign and some pain with rotator cuff testing. There is pain with biceps testing.

## IMPRESSION:
Left shoulder rotator cuff impingement and biceps tendinitis, rule out possible SLAP lesion.

International Shoulder Knee Institute, L.C.

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-3444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452

*271*

RE: HEFNER, RICHARD
August 15, 2000
Page 2

**PLAN:**
At this point in time, secondary to the patient's positive injection test and continued symptoms, I would like to proceed with left shoulder arthroscopy and subacromial decompression with evaluation of his biceps tendon. The patient would like to proceed.

The patient was apprised of his condition. The proposed procedure was explained in detail. Risks, complications, potential gains and alternatives were outlined. All questions were satisfactorily answered. The patient understands and consents to the proposed procedure. Instructions were given. Pending authorization, we will see him for preoperative visit.

Secondary to some of his job demands regarding driving, I am keeping him on total disability until the time of the surgery.

**ADDENDUM:**
The patient was seen with his nurse case manager today. Pertinent issues were discussed.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California Labor code Section 139.3 and that the contents of the report are true and correct to the best of my knowledge."

Signed this ____21____ day of ____Aug____, 2000, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California
RMM/e
cc:   D. G. Kilcher, R.N.
       1115 Ballata Court
       Vista, California 92083

272

SD

**COAST SURGERY CENTER**
**3444 KEARNY VILLA ROAD, SUITE #100**
**SAN DIEGO, CALIFORNIA 92123**

<u>OPERATIVE REPORT</u>    13 - 1215222

| | |
|---|---|
| **PATIENT:** | HEFNER, RICHARD |
| **DATE OF OPERATION:** | August 23, 2000 |
| **SURGEON:** | Robert M. Maywood, M.D. |
| **ASSISTANT:** | Lou Katzman, M.D. |
| **PREOPERATIVE DIAGNOSIS:** | Left shoulder impingement. |

**POSTOPERATIVE DIAGNOSES:**
1. Left shoulder impingement.
2. Left shoulder labral fraying and synovitis glenohumeral joint.

**PROCEDURE:**
1. Left shoulder arthroscopy with subacromial decompression.
2. Left shoulder intra-articular extensive debridement.

| | |
|---|---|
| **ANESTHESIA:** | General. |
| **ESTIMATED BLOOD LOSS:** | Less than 30 cc. |
| **COMPLICATIONS:** | None. |

**INDICATIONS:** This is a 30-year-old male, status post significant rollover accident with left shoulder pain refractory to conservative care. The patient is brought to the operating room for arthroscopic evaluation and treatment.

<u>PROCEDURE:</u>
The patient was taken to the operating room. One gram of Ancef was administered. A general anesthetic was administered. An interscalene block was administered. The left arm was examined under anesthesia. It was found to have full range of motion with no instability. The patient was then placed in the lateral decubitus position with the right side down. Care was taken to pad bony prominences. The arm was then placed in the arthroscopic arm holder with approximately 10-12 pounds of traction in the glenohumeral position. The arm was then thoroughly prepped and draped in the usual fashion. Bony landmarks were identified utilizing a marking pen. A spinal needle was placed into the shoulder joint through the standard posterior soft spot. 20 cc of fluid was injected into the

273

RE:   HEFNER, RICHARD
DOS: AUGUST 23, 2000
Page 2 of 2

shoulder joint. A stab wound was made in the area of the spinal needle. Blunt trocar and cannula were utilized to enter the glenohumeral joint. Immediately, the anterior triangle was identified. Utilizing a spinal needle superior and lateral to the coracoid process, the glenohumeral joint was entered. A stab wound was made in the area of the spinal needle. A blue cannula was placed creating an anterior portal. The probe was inserted into the shoulder joint and a systematic examination of the shoulder was begun, including the biceps tendon, glenohumeral joint, subscapularis tendon, inferior and axillary pouch, entire labrum, and the entire rotator cuff. The patient was found to have the following findings:

Fraying of the anterior labrum as well as associated synovitis seen in the anterior aspect of the shoulder joint with some associated synovitis over the supraspinatus portion of the rotator cuff. The remainder of the shoulder was free of significant abnormalities, including an intact rotator cuff.

A 3.5 shaver was placed into the glenohumeral joint. The area of labral fraying and synovitis was debrided. Instruments were removed from the glenohumeral joint. Utilizing the same two incisions, the subacromial space was entered. The 3.5 shaver was inserted through the anterior portal. Some of the notable bursa was debrided until visualization was obtained. The arm was then placed in the subacromial position. Utilizing a spinal needle followed by #11 blade, a standard lateral portal was created. A Vulcan probe was inserted into the subacromial space through the lateral portal. The soft tissue from the undersurface of the acromion in its anterior third extending from the lateral border until the AC joint was taken down, including the coracoacromial ligament. The coracoacromial ligament bleeder was cauterized. A bur was then utilized first through the lateral portal, taking down approximately 6-8 mm of bone, again from the lateral border of the acromion extending to the AC joint in its anterior third. The camera was switched to the lateral portal and acromionizer into the posterior portal to complete the subacromial decompression and ensure a flat acromion. The shaver was then inserted in the shoulder joint to remove any residual bursa and any notable bleeders were cauterized.

The wounds were closed utilizing 3-0 nylon suture. At the end of the case, 20 cc Marcaine with epinephrine was inserted into the subacromial space. Sterile dressing, ice pack, and sling were applied. The patient was awoken in the operating room and taken to the recovery room in stable condition.

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California
RMM:tw
cc:    Lou Katzman, M.D.

274

**SHOULDER**
**KNEE**
**INSTITUTE**

**Robert Maywood, M.D.**
*Orthopaedic and Arthroscopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board*
*of Orthopaedic Surgeons*
*Qualified Medical Examiner,*
*State of California*

August 29, 2000

U. S. Department of Labor
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

**ATTENTION:**      **Oscar Ramirez**

**RE:**              **HEFNER, RICHARD**
**DOI:**             **April 7, 2000**
**CLAIM NO:**        **92004-131215222**
**SS#:**             **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**
**EMPLOYER:**        **Camp Pendleton (Facility Maintenance Dept.)**
**DOE:**             **August 29, 2000**

## INTERIM REPORT

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on August 29, 2000, for re-evaluation of orthopaedic complaints sustained in an injury on April 7, 2000. Follow-up 6 days status post left shoulder surgery with intra-articular debridement and subacromial decompression. The patient has the standard postoperative complaints. He has had no significant fever.

## PHYSICAL EXAMINATION:
Examination of the left shoulder reveals clean and dry arthroscopy portals. He is able to do pendulums. Neuromotor intact.

## IMPRESSION:
Status post left shoulder surgery.

International Shoulder Knee Institute, L.C.

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-3444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452

275

RE: HEFNER, RICHARD
·August 29, 2000
Page 2

**PLAN:**
Sutures were removed today and the wounds were Steri-Stripped. He was given a prescription for Lortab and placed on temporary total disability for three weeks. He was started in physical therapy. I will see him in three weeks.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California Labor code Section 139.3 and that the contents of the report are true and correct to the best of my knowledge."

Signed this *13th* day of *June*, 2000, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California
RMM/e
cc:    D. G. Kilcher, R.N.
       1115 Ballata Court
       Vista, California 92083

276

Sʜᴏᴜʟᴅᴇʀ
Kɴᴇᴇ
 Iɴsᴛɪᴛᴜᴛᴇ

**Robert Maywood, M.D.**
*Orthopaedic and Arthroscopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board*
*of Orthopaedic Surgeons*
*Qualified Medical Examiner,*
*State of California*



U. S. Department of Labor                                         September 21, 2000
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

**ATTENTION:      Oscar Ramirez**

**RE:            HEFNER, RICHARD**
**DOI:           April 7, 2000**
**CLAIM NO:      92004-131215222**
**SS#:           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**
**EMPLOYER:      Camp Pendleton (Facility Maintenance Dept.)**
**DOE:           September 21, 2000**

<u>**INTERIM REPORT**</u>

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on September 21, 2000, for re-evaluation of orthopaedic complaints sustained in an injury on April 7, 2000. Follow-up 4 weeks status post left shoulder arthroscopy and subacromial decompression. He reports notable improvement.

<u>**PHYSICAL EXAMINATION:**</u>
Examination of the left shoulder reveals well-healed arthroscopy portals with some tenderness over the lateral scar. There is full range of motion. He still has rotator cuff weakness, 5-/5.

<u>**IMPRESSION:**</u>
Doing well, status post left shoulder surgery.

International Shoulder Knee Institute, L.C.

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-3444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452



RE: HEFNER, RICHARD
September 21, 2000
Page 2

**PLAN:**
At this point, I have instructed the patient in a continued physical therapy program. We will see him in approximately three weeks, at which point he may be ready to return to regular duty. He is on modified work at this time with no work at shoulder level or above until he finishes strengthening his rotator cuff. He is also going to see his neck surgeon regarding further clearance for work.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California Labor code Section 139.3 and that the contents of the report are true and correct to the best of my knowledge."

Signed this 26th day of Sep. , 2000, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California
RMM/e
cc:    D. G. Kilcher, R.N.
        1115 Ballata Court
        Vista, California 92083

278

**SHOULDER**
**KNEE**
**INSTITUTE**

SD

**Robert Maywood, M.D.**
*Orthopaedic and Arthroscopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board*
*of Orthopaedic Surgeons*
*Qualified Medical Examiner,*
*State of California*

October 10, 2000

U. S. Department of Labor
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

**ATTENTION:**    Oscar Ramirez

**RE:**             HEFNER, RICHARD
**DOI:**            April 7, 2000
**CLAIM NO:**       92004-131215222
**SS#:**            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
**EMPLOYER:**       Camp Pendleton (Facility Maintenance Dept.)
**DOE:**            October 10, 2000

## INTERIM REPORT

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on October 10, 2000, for re-evaluation of orthopaedic complaints sustained in an injury on April 7, 2000. Follow-up left shoulder. The patient reports continued improvement. He is having some intermittent pain with some repetitive desk work.

## PHYSICAL EXAMINATION:
Examination of the left shoulder reveals full range of motion. The rotator cuff is 5-/5. There is slight anterior tenderness.

## IMPRESSION:
Doing well, status post left shoulder surgery.

International Shoulder Knee Institute, L.C.

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-3444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452

279

RE: HEFNER, RICHARD
Claim#:92004-131215222
October 10, 2000
Page 2


**PLAN:**
At this point, we are going to return the patient to regular work. I would like to see him in six weeks.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California Labor code Section 139.3 and that the contents of the report are true and correct to the best of my knowledge."

Signed this ___24th___ day of ___October___, 2000, in San Diego County, California.

Yours very truly,


Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California
RMM/e
cc:    D. G. Kilcher, R.N.
       1115 Ballata Court
       Vista, California 92083

**ADDENDUM:**
The patient was seen with his nurse case manager today. Pertinent issues were discussed.

RMM/e

280

**SHOULDER**
**KNEE**
**INSTITUTE**

**Robert Maywood, M.D.**
*Orthopaedic and Arthroscopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board*
*of Orthopaedic Surgeons*
*Qualified Medical Examiner,*
*State of California*

U. S. Department of Labor                                      November 21, 2000
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

ATTENTION:    Oscar Ramirez

RE:           HEFNER, RICHARD
DOI:          April 7, 2000
CLAIM NO:     92004-131215222
SS#:          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
EMPLOYER:     Camp Pendleton (Facility Maintenance Dept.)
DOE:          November 21, 2000

### INTERIM REPORT

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on November 21, 2000, for re-evaluation of orthopaedic complaints sustained in an injury on April 7, 2000. Follow-up left shoulder. The patient reports that he felt a pop in his shoulder while working. It was back by his scapula. He has also noted increased pain in the shoulder region itself.

**PHYSICAL EXAMINATION:**
Examination of the left shoulder reveals a notable area of tenderness in the medial border of the scapula. He also has a slightly positive impingement sign and pain with rotator cuff testing.

**IMPRESSION:**
Trigger point, left scapula, and overuse syndrome, left rotator cuff, status post surgery.

International Shoulder Knee Institute, L.C.

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-3444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452

20097

*281*

**RE: HEFNER, RICHARD**
**Claim#:92004-131215222**
**November 21, 2000**
**Page 2**


**PLAN:**
I have instructed the patient to decrease his work at shoulder level and above at this time. He can use an icing program and anti-inflammatories for the trigger point. He insures me that he is going to do this and does not feel he needs specific work restrictions in order to accomplish this. Therefore, he remains on full duty.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California Labor code Section 139.3 and that the contents of the report are true and correct to the best of my knowledge."

Signed this _28TH_ day of _November_ 2000, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California
RMM/e
cc:   D. G. Kilcher, R.N.
        1115 Ballata Court
        Vista, California 92083


**ADDENDUM:**
The patient was seen with his nurse case manager today. Pertinent issues were discussed.

RMM/e

JAN-03-01 10:46 AM                                                              P.02

282

SHOULDER
KNEE
INSTITUTE


**Robert Maywood, M.D.**
*Orthopaedic and Arthroscopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board*
*of Orthopaedic Surgeons*
*Qualified Medical Examiner,*
*State of California*


U. S. Department of Labor                                    December 8, 2000
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

ATTENTION:      Oscar Ramirez

RE:             HEFNER, RICHARD
DOI:            April 7, 2000
CLAIM NO:       92004-131215222
SS#:            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
EMPLOYER:       Camp Pendleton (Facility Maintenance Dept.)
DOE:            December 8, 2000

## INTERIM REPORT

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on December 8, 2000, for re-evaluation of orthopaedic complaints sustained in an injury on April 7, 2000. Follow-up left shoulder. The patient still reports some pain in the left shoulder, especially with activities overhead. He reports he is notably improved from preoperatively. Of note is that the patient reports he has had episodes of vertigo since April.

In addition, on October 24, 2000, he had some dizziness and fell and hit his head. He had no loss of consciousness. He went to the Emergency Room at Sharp Memorial and the dizziness has remained the same. He also reports having nightmares since the date of the accident with difficulty sleeping and loss of appetite. He reports he was assigned back to a pumper truck but he experienced significant anxieties as this was the same kind of truck involved in the accident. He was sent to a doctor at the Naval Medical Center, who recommended a psychiatric evaluation for posttraumatic stress disorder.

International Shoulder Knee Institute, L.C.

5444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-5444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452

283

RE: HEFNER, RICHARD
Claim#:92004-131215222
December 8, 2000
Page 2


PHYSICAL EXAMINATION:
Examination of the left shoulder reveals pain with rotator cuff testing, full range of motion, slightly positive impingement sign.

IMPRESSION:
1.    Postoperative rotator cuff tendinitis.
2.    Posttraumatic stress disorder.
3.    Vertigo and dizziness, unexplained.

PLAN:
I feel the aforementioned conditions are related to the patient's accident. I do feel he is in need of psychiatric evaluation as well as a neurologic evaluation. In addition, I have kept him on an anti-inflammatory, Lodine, and have given him a prescription for TheraBand for a rotator cuff strengthening program. I will see him in four weeks.

Discussion was held with his nurse case manager, D. G. Kilcher, regarding appropriate details surrounding the case.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California Labor code Section 139.3 and that the contents of the report are true and correct to the best of my knowledge."

Signed this _12th_ day of _Dec._, 2000, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California
RMM/e
cc:   D. G. Kilcher, R.N.
      1115 Ballata Court
      Vista, California 92083

284

**SHOULDER**
**KNEE**
**INSTITUTE**

**Robert Maywood, M.D.**
*Orthopaedic and Arthroscopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board*
*of Orthopaedic Surgeons*
*Qualified Medical Examiner,*
*State of California*

U. S. Department of Labor                                            January 11, 2001
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

**ATTENTION:**      **Oscar Ramirez**

**RE:**             **HEFNER, RICHARD**
**DOI:**            **April 7, 2000**
**CLAIM NO:**       **92004~~~~~~~~~~~~**
**SS#:**            **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**
**EMPLOYER:**       **Camp Pendleton (Facility Maintenance Dept.)**
**DOE:**            **January 11, 2001**

<u>**INTERIM REPORT**</u>

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on January 11, 2001, for re-evaluation of orthopaedic complaints sustained in an injury on April 7, 2000. Follow-up left shoulder and multiple trauma. The patient reports continued left shoulder pain. He has some pain with overhead activities.

<u>**PHYSICAL EXAMINATION:**</u>
Examination of the left shoulder reveals full range of motion. There is some pain with rotator cuff testing and a slightly positive impingement sign.

<u>**X-RAYS:**</u>
X-rays of the right shoulder demonstrate no recurrent spur.

International Shoulder Knee Institute, L.C.

3444 Kearny Villa Road. Suite 202
San Diego. CA 92123
(858) 874-3444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road. Suite 6
Chula Vista. CA 91910
(619) 421-1990 • FAX (619) 421-7452



285

**RE: HEFNER, RICHARD**
Claim#:92004~~1945222~~
**January 11, 2001**
**Page 2**

**IMPRESSION:**
1.    Continued rotator cuff tendinitis, status post surgery.

**PLAN:**
It appears that the patient's living conditions are such that he is living in a tent during this job. He says this may be aggravating his condition. He is also going to see a neurologist that was recently approved. I will see him in 3-4 weeks to reassess him and review the neurologist's recommendations. He remains on full duty except for pumper truck driving.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California Labor code Section 139.3 and that the contents of the report are true and correct to the best of my knowledge."

Signed this ___16ᵗ___ day of ___Jᴀɴ___, 2001, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California
RMM/e
cc:    D. G. Kilcher, R.N.
        1115 Ballata Court
        Vista, California 92083

286

# SHOULDER
# KNEE
# INSTITUTE

### Robert Maywood, M.D.
*Orthopaedic and Arthroscopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board*
*of Orthopaedic Surgeons*
*Qualified Medical Examiner,*
*State of California*

U. S. Department of Labor                                             January 22, 2001
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

**ATTENTION:**     **Oscar Ramirez**

**RE:**              **HEFNER, RICHARD**
**DOI:**             **April 7, 2000**
**CLAIM NO:**        **92004-131215222**
**SS#:**             **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**
**EMPLOYER:**        **Camp Pendleton (Facility Maintenance Dept.)**
**DOE:**             **January 22, 2001**

### INTERIM REPORT

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on January 22, 2001, for re-evaluation of orthopaedic complaints sustained in an injury on April 7, 2000. Follow-up left shoulder. The patient has seen Dr. Bakst for consultation. He reports continued shoulder pain. He also has pain directly in the medial border of the left scapula.

**PHYSICAL EXAMINATION:**
Examination of the left shoulder reveals tenderness over the medial border of the scapula that is notable. There is a slightly positive impingement sign.

**IMPRESSION:**
1.      Status post left shoulder surgery.
2.      Left shoulder trigger points.

International Shoulder Knee Institute, L.C.

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-3444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452

RE: HEFNER, RICHARD
Claim#:92004-131215222
January 22, 2001
Page 2

287

PLAN:
Today under sterile conditions, a trigger point injection was given in the area of maximal tenderness in the left scapular border. In addition, the patient was given Antivert 25 mg. PO t.i.d. He will also have an MRI of the brain performed. I will see him after that is performed with a follow-up visit to Dr. Bakst as well. He continues to perform his regular duty work.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California Labor code Section 139.3 and that the contents of the report are true and correct to the best of my knowledge."

Signed this 30th day of January 2001, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California
RMM/e
cc:    D. G. Kilcher, R.N.
       1115 Ballata Court
       Vista, California 92083

**SHOULDER**
**KNEE**
**INSTITUTE**



**Robert Maywood, M.D.**
*Orthopaedic and Arthroscopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board*
*of Orthopaedic Surgeons*
*Qualified Medical Examiner,*
*State of California*

U. S. Department of Labor                                    February 6, 2001
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

**ATTENTION:**     Oscar Ramirez


| | |
|---|---|
| **RE:** | **HEFNER, RICHARD** |
| **DOI:** | **April 7, 2000** |
| **CLAIM NO:** | **92004-131215222** |
| **SS#:** | **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** |
| **EMPLOYER:** | **Camp Pendleton (Facility Maintenance Dept.)** |
| **DOE:** | **February 6, 2001** |

### INTERIM REPORT

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on February 6, 2001, for re-evaluation of orthopaedic complaints sustained in an injury on April 7, 2000. Follow-up left shoulder. The patient reports continued pain in the left trapezius and medial border of the scapula as well as some pain in the left shoulder. However, the scapular pain is greater.

**PHYSICAL EXAMINATION:**
Examination of the left shoulder reveals notable tenderness with spasms in the medial border of the left scapula today. The patient continues to have a slightly positive impingement sign.

**IMPRESSION:**
1.     Status post left shoulder surgery with myofascial pain.

International Shoulder Knee Institute, L.C.

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-3444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452

289

RE: HEFNER, RICHARD
Claim#:92004-131215222
February 6, 2001
Page 2


## PLAN:

At this point in time, I have instructed the patient to go back to physical therapy. He was also given Motrin and placed on restricted work. He had his neurology consult and will be seeing the neurologist again. We will evaluate those final reports as they come in.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California Labor code Section 139.3 and that the contents of the report are true and correct to the best of my knowledge."

Signed this _13th_ day of _February_ 2001, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California

RMM/e
cc:   D. G. Kilcher, R.N.
        1115 Ballata Court
        Vista, California 92083

## Robert M. Maywood, M.D., P.C.

*Orthopaedic an̄  ̄ thrascopic Surgery*
*Fellowship Tra⸝⸝_; Sports Medicine*
*Board Certified American Board of Orthopaedic Surgeons*
*Qualified Medical Examiner, State of California*

290

50        February 27, 2001

U. S. Department of Labor
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

ATTENTION:        Oscar Ramirez

RE:               HEFNER, RICHARD
DOI:              April 7, 2000
CLAIM NO:         92004-131215222
SS#:              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
EMPLOYER:         Camp Pendleton (Facility Maintenance Dept.)
DOE:              February 27, 2001

### INTERIM REPORT

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on February 27, 2001, for re-evaluation of orthopaedic complaints sustained in an injury on April 7, 2000. Follow-up left shoulder. The patient reports continued pain in the left shoulder, neck and back area. It has been difficult for him to go to physical therapy secondary to the significant drive. He has reported some help intermittently with a TENS unit.

### PHYSICAL EXAMINATION:
Examination reveals notable pain in the left trapezius area and left paracervical musculature, radiating down to the border of the scapula. He continues to have a slightly positive impingement sign and some pain with rotator cuff testing.

### IMPRESSION:
1.    Status post left shoulder surgery with continued myofascial pain.

### PLAN:
At this point in time, secondary to the patient's inability to go to physical therapy, I would like to write him a prescription for some modalities that may give him relief. I have

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-3444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452

RE: HEFNER, RICHARD
Claim#:92004-131215222
February 27, 2001
Page 2

*259 1*

written a prescription for a cervical pillow and a home TENS unit. He continues on
Motrin. I would like to see him in four weeks.

If there are any questions regarding this patient or this report, please do not hesitate to
contact my office.

"I declare under penalty of perjury that this bill for my services is true and correct to the
best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California
Labor code Section 139.3 and that the contents of the report are true and correct to the
best of my knowledge."

Signed this _____ day of _____, 2001, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California

RMM/e
cc:   D. G. Kilcher, R.N.
      1115 Ballata Court
      Vista, California 92083



**Robert M. Maywood, M.D., P.C.**
*Orthopaedic an̄ ̄ ̄ ̄ ̄scopic Surgery*
*Fellowship Trained, Sports Medicine*
*Board Certified American Board of Orthopaedic Surgeons*
*Qualified Medical Examiner, State of California*

April 5, 2001

U. S. Department of Labor
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

**Attention:**       **Oscar Ramirez**

RE:                          **HEFNER, RICHARD**
DOI:                         **April 7, 2000**
CLAIM NO:               **92004-131215222**
SS#:                         **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**
EMPLOYER:             **Camp Pendleton (Facility Maintenance Dept.)**
DOE:                         **April 5, 2000**

### ORTHOPEDIC PERMANENT AND STATIONARY EVALUATION BY PRIMARY TREATING PHYSICIAN

Dear Mr. Ramirez:

This report is being prepared under the guidelines of the Division of Workers Compensation/Industrial Medical Council as a permanent and stationary report by the primary treating physician. The patient, Richard Hefner, was seen in my San Diego office on April 5, 2001, for re-evaluation of orthopedic complaints sustained in an industrial injury on April 7, 2000. In excess of 1 1/2 hours was spent in face-to-face patient contact, record review and report preparation.

**CURRENT COMPLAINTS:**

The patient reports continued pain in his left shoulder with activities at shoulder level or above. He also has trouble with lifting heavy weights. He also continues with neck pain, especially with the use of both arms above his head.

**INTERIM HISTORY:**

I first saw this patient on July 18, 2000, for an injury sustained on April 7, 2000. He was involved in an accident while driving a tanker truck, where he lost control of the truck and it rolled over. He had been seen at Mission Bay Hospital Emergency Room.

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-3444 • FAX (858) 874-1874
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452

293

RE: HEFNER, RICHARD
Claim: 92004-131215222
April 5, 2001
Page 2

MRI's and CT scans were performed. In addition, the patient had a C6-7 disc protrusion, for which he underwent surgery by Dr. Jeffrey Gross on April 10, 2000, including an anterior C6-7 diskectomy with arthrodesis, iliac crest bone graft and anterior instrumentation. He continued to have shoulder pain following his neck surgery.

The patient underwent arthroscopy left shoulder surgery on August 23, 2000, for impingement and intra-articular synovitis. Postoperatively, he was noted to have significant headaches and was referred for neurological consultation. He received physical therapy and other conservative treatment for his left shoulder postoperatively. Secondary to his multiple injuries, he was no longer capable of performing his usual and customary work.

PHYSICAL EXAMINATION:  *(Positive findings in italics.)*

The patient is a well-developed, well-nourished male appearing about his stated age, right-hand dominant.

Visual examination of the lower extremities demonstrates them to be grossly symmetrical. There is no evidence of motor paralysis and/or wasting.

EXAMINATION OF THE CERVICAL SPINE:

| | |
|---|---|
| TENDERNESS: | *There is notable tenderness to palpation in the left cervical paraspinal muscles.* The trapezius muscle group is nontender to palpation. |
| SPASM: | *There is spasm palpated in the left trapezius.* |
| FORAMINAL COMPRESSION: | Causes neither axial nor radicular symptoms. |
| HOFFMANS: | Negative on the right and the left. |
| SENSATION: | Sensation to pinprick is normal and equal bilaterally. |

RE: HEFNER, RICHARD
Claim: 92004-131215222
April 5, 2001
Page 3


ACTIVE RANGE OF MOTION:
EXTENSION:              100%
FLEXION:                *Limited to 2 fingerbreadths from the chest.*
LEFT ROTATION:          100%
RIGHT ROTATION:         100%
LEFT BENDING:           100%
RIGHT BENDING:          100%

LEFT UPPER EXTREMITY EXAMINATION:

*Visual examination of the left shoulder reveals well-healed arthroscopic portals scars.* There is no evidence of atrophy of the rotator cuff muscles. The acromioclavicular joint is nontender to palpation with a negative crossover. Apprehension test for instability is negative. There is no tenderness to palpation along the long head of the biceps tendon. There is no pain at the proximal biceps tendon with SLAP testing. Neer's impingement sign is negative. Distally, the extensor pollicis longus, abductor pollicis brevis, and dorsal interossei are 5/5 with 2+ radial pulse and normal sensation. *Range of motion of the shoulder is full with pain at the extremes and mild crepitus.*

DEEP TENDON REFLEXES:    2+ and symmetrical throughout the upper
                         extremities.

MANUAL MUSCLE TESTING:   5/5 except the left supraspinatus, which is 5-/5.

| RANGE OF MOTION | INJURED LEFT | RIGHT | UNINJURED NORMAL | |
|---|---|---|---|---|
| EXTENSION: | 30° | | 30° | 30° |
| FLEXION: | 180° | | 180° | 180° |
| INTERNAL ROTATION: | T10 | | T10 | T10 |
| EXTERNAL ROTATION: | 80° | | 80° | 80° |
| ABDUCTION: | 180° | | 180° | 180° |
| ADDUCTION: | 20° | | 20° | 20° |

JAMAR DYNAMOMETER TESTING AT POSITION 2:
                              POUNDS
RIGHT DOMINANT UNINJURED:  110/110/100
LEFT INJURED:              76/110/94
I believe the patient put forth maximal effort upon dynamometer testing.

*295*

**RE: HEFNER, RICHARD**
**Claim: 92004-131215222**
**April 5, 2001**
**Page 4**

## REVIEW OF MEDICAL RECORDS:

Neurological permanent and stationary report from Isaac Bakst, M.D., is noted, dated April 5, 2001, with a diagnosis of posttraumatic head syndrome, slight, status post spinal cord injury, cervical spine, with paraplegia, improved, by history. Dr. Bakst does not suggest any work restrictions due to his headaches but does suggest that the patient will be likely to continue to have headaches and should be afforded future medical care as necessary.

## DIAGNOSIS:

1.  Left shoulder impingement and labral tearing.
2.  Status post left shoulder arthroscopy with subacromial decompression and debridement, labral fraying and synovitis, August 23, 2000.
3.  Chronic cervical strain with headaches and vertigo.
4.  Status post C6-7 surgery, previously addressed by Dr. Gross.

## DISABILITY STATUS:

It is this examiner's opinion that this patient has reached a permanent and stationary level for the above stated injury, having obtained maximal benefit of medical care.

## SUBJECTIVE FACTORS OF DISABILITY:

The patient's subjective complaints would be characterized as constant slight to moderate neck pain, increasing to moderate to severe levels with repetitive neck motions and movements of the upper extremities above the shoulder level. He reports constant mild shoulder pain, increasing to slight to moderate pain with activities at shoulder level or above.

## OBJECTIVE FACTORS OF DISABILITY:

1.  Well-healed arthroscopy portals.
2.  Residual rotator cuff weakness, 1/2 grade.
3.  Glenohumeral crepitation with range of motion.

## WORK RESTRICTIONS:

The patient is restricted from work requiring repetitive neck movements as well as work at shoulder level or above with the bilateral upper extremities.

**RE: HEFNER, RICHARD**
**Claim: 92004-131215222**
**April 5, 2001**
**Page 5**

## CAUSATION:

The medical evidence available for review, the patient's current complaints and the physiological findings during my examination indicate left shoulder impingement and labral tearing, status post left shoulder arthroscopy with subacromial decompression and debridement, labral fraying and synovitis, August 23, 2000, and chronic cervical strain with headaches and vertigo.

These injuries are a direct result of the accident which occurred on April 7, 2000, and the patient's description of the mechanism of the accident as well as the findings on physical examination are consistent with the injury.

## VOCATIONAL REHABILITATION:

Vocational rehabilitation is medically indicated in this case as the patient will not be able to return to his work as a pipefitter secondary to his cervical condition as well as his left shoulder condition.

## FUTURE MEDICAL CARE:

The patient will require future medical care to cure and/or relieve the effects of the industrial injury and for pain control with exacerbations over and above the current permanent and stationary levels. This care will consist of nonsteroidal anti-inflammatories and pain medications. The patient may also need the future medical care of doctor office visits, physical therapy, diagnostic studies and/or injections.

At the present time, I do not feel that any further surgical procedures are necessary in regard to the patient's left shoulder. In the future, however, there may be a medical necessity for surgery in the form of repeat left shoulder arthroscopy if he has a recurrence of symptoms and scar tissue in the subacromial space or deterioration of the glenohumeral joint.

For future treatment of the patient's headaches, I would defer to Dr. Bakst's report.

In regard to his shoulder, the patient also has subjective and objective ratable factors of disability. Based on the "American Medical Association Guides to the Evaluation of Permanent Impairment, 4th Edition", page 59, table 19, the patient has a 10% joint impairment due to mild crepitation during range of motion, plus an additional 10% upper extremity impairment due to strength loss index based on table 34, page 65,

297

RE: HEFNER, RICHARD
Claim: 92004-131215222
April 5, 2001
Page 6


for a total of a 20% permanent partial impairment to the left upper extremity. The patient should be afforded future medical care as noted above.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

## AFFIDAVIT OF COMPLIANCE:

"I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, expect as noted herein, that I believe it to be true."

"I further declare under penalty of perjury that I personally performed the evaluation of the patient on April 5, 2001, at my San Diego office and that, except as otherwise stated herein, the evaluation was performed and the time spent performing the evaluation was in compliance with the guidelines, if any, established by the Industrial Medical Council or the administrative director pursuant to paragraph (5) of subdivision (j) of §139.2 or §5307.6 of the California Labor Code."

"Per Labor Code §4628K, 90% of my practice is devoted to direct treatment and 10% is devoted to medicolegal evaluation of injured workers."

"I verify under penalty of perjury that the total time I spent on the following activities is true and correct:

a.    Reviewing the Records                    _40_ Hours
b.    Face-to-face time with the patient      _43_ Hours
c.    Preparation of the report               _1_ Hours
d.    Any other relevant activities detailed
       in the report                          _____ Hours"

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

RE: HEFNER, RICHARD
Claim: 92004-131215222
April 5, 2001
Page 7


"I declare under penalty of perjury that I have not violated the provisions of California Labor Code §139.3 and that the contents of this report are true and correct to the best of my knowledge."

Signed this _____ day of _____, 2001, in San Diego County, California.

Yours very truly,



Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California

RMM/e

## Robert M. Maywood, M.D., P.C.
*Orthopaedic and Arthroscopic Surgery*
*Fellowship Train ~~~ Sports Medicine*
*Board Certified American Board of Orthopaedic Surgeons*
*Qualified Medical Examiner, State of California*

*299*

*CSB*

July 10, 2001

U. S. Department of Labor
Office of Workers Compensation
P. O. Box 194610
San Francisco, California 94119-4610

*50*

**Attention:**     **Oscar Ramirez**

RE:               **HEFNER, RICHARD**
DOI:              **April 7, 2000**
CLAIM NO:         **92004-131215222**
SS#:              **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**
EMPLOYER:         **Camp Pendleton (Facility Maintenance Dept.)**
DOE:              **July 10, 2000**

### PRIMARY TREATING PHYSICIAN'S PROGRESS REPORT

Dear Mr. Ramirez:

The patient, Richard Hefner, was seen in my San Diego office on July 10, 2001, for re-evaluation of orthopedic complaints sustained in an industrial injury on April 7, 2000. Follow-up multiple injuries. The patient reports constant pain in his neck. He reports intermittent numbness in his left upper extremity. He also has questions regarding work issues.

### PHYSICAL EXAMINATION:
The patient has notable left-sided paraspinal tenderness. There is also spasm in the trapezius with tenderness in that area. He has pain over the biceps area and a positive Speed's test.

### IMPRESSION:
1.     Chronic cervical strain, status post previous surgery.
2.     Left upper extremity radiculopathy.
3.     Left shoulder myofascial pain.

3444 Kearny Villa Road, Suite 202
San Diego, CA 92123
(858) 874-3444 • FAX (858) 874-1674
Hotline # (800) 800-7667

1415 Ridgeback Road, Suite 6
Chula Vista, CA 91910
(619) 421-1990 • FAX (619) 421-7452

RE: HEFNER, RICHARD
Claim: 92004-131215222
July 10, 2001
Page 2


**PLAN:**
At this point in time, I will continue the patient on a home exercise program and anti-inflammatories. In addition, the patient made me aware of documentation regarding returning him to performing the duties of a pipefitter. I do not feel that this work is appropriate for his condition. I have spoken to Dr. Bakst, neurologist, regarding this. He has agreed with me and will send a formal report addressing this. I will see the patient on an as-needed basis as he was previously made permanent and stationary.

Please note that the patient's job description materials were reviewed at this visit.

If there are any questions regarding this patient or this report, please do not hesitate to contact my office.

"I declare under penalty of perjury that this bill for my services is true and correct to the best of my knowledge."

"I declare under penalty of perjury that I have not violated the provisions of California Labor Code §139.3 and that the contents of this report are true and correct to the best of my knowledge."

Signed this _____17th_____ day of ___July_____, 2001, in San Diego County, California.

Yours very truly,

Robert M. Maywood, M.D.
Board Certified, American Board of Orthopaedic Surgeons
Qualified Medical Examiner, State of California

RMM/e

ISAAC BAKST, M.D.
A PROFESSIONAL CORPORATION
NEUROLOGY

Diplomate of American Board of
Psychiatry and Neurology

La Jolla Medical and Surgical Center
8929 University Center Lane, Suite 207, San Diego, CA 92122
Tel. (858) 552-8828     Fax (858) 552-8858

PATIENT:     Richard Hefner
DATE:          January 15, 2001
W.C. INSURANCE COMPANY: U.S. Department of Labor
EMPLOYER:  Camp Pendleton
DATE OF INJURY:  April 7, 2000
CLAIM NO.:    92004-131215222
REFERRING PHYSICIAN: Robert Maywood, M.D.

## NEUROLOGICAL CONSULTATION

Mr. Richard Hefner is a 30-year-old man referred for neurologic evaluation by Robert Maywood, M.D., because of vertigo and history of closed head injury.

HISTORY OF INJURY:  Mr. Hefner was injured on April 7, 2000, in a motor vehicle accident where he was the driver of a 40,000 pound tanker truck that went out of control. The cab swayed back and forth, and he ultimately struck a tree, he thinks, with a speed of 20 miles per hour. He struck his head against the side window or bar, but also possibly the front windscreen as well. He was able to get out of the vehicle unassisted. Paramedics came to the scene, and on the way to the hospital, he first experienced loss of sensation in his legs. Investigations followed, and apparently, a cervical spine injury was diagnosed, and he subsequently had surgery. Prior to the surgery, he was paralyzed (? waist down). He recovered, and was in rehabilitation as an outpatient for several months. He used a walker for about a month.

There have been residua, including numbness and tingling and an uncomfortable sensation in the lower extremities, as well as unsteadiness. In general, his neck is better.

SUBSEQUENT COURSE:  He has since returned to work as a pipe fitter. At the time of the injury, he was driving a truck because of extra duties because of a Class A license that he has.

Problems at present include headache, vertigo and lower extremity symptoms.

1.     Headaches: These occur on a frequent basis, often daily, lasting several hours. They generally are occipital and on the right side. They can be quite profound at times, to the point that he needs to lie down. He tries to avoid taking medications of all kinds.
2.     Vertigo: He frequently, and this is on an almost daily basis, and sometimes more than once a day, experiences a sensation that the room is tilting, either back and forth or side to side. Occasionally the symptom is present for a long duration, sometimes one to two minutes, where he feels he is moving in multiple different directions sequentially. Occasionally this is brought on by a particular movement, but generally it occurs spontaneously.
3.     He has experienced ataxia under certain conditions, feels unsteady.
4.     He has experienced nightmares.
5.     He experiences numbness and tingling from the thigh down. Sometimes it is uncomfortable to the extent that he does not know where his leg is and he has to double check to feel the ground.

302
302

Richard Hefner                                                   Page Two

PAST MEDICAL AND SURGICAL HISTORY: Orthopedic left shoulder surgery, August 23, 2000; diskectomy, April 10, 2000; appendicectomy, November 1993. No history of diabetes, thyroid disease or hypertension.

CURRENT MEDICATIONS: None.

FAMILY HISTORY: In good health as far as is understood; noncontributory.

HABITS: No cigarettes. No alcohol.

REVIEW OF SYSTEMS: The review of systems is negative and noncontributory; see chart for details.

## CLINICAL EXAMINATION

Mr. Hefner has a general healthy appearance under the conditions. Blood pressure 120/80; pulse rate 72 and regular.

Alert, attentive, with normal speech, language and comprehension.

Cranial Nerves: Normal eye movements. Pupils round and responsive. Fundi normal. Fields full to confrontation. No facial weakness. Tongue and palate central. Hearing normal to conversational tones. Tympanic membranes normal. Masseter strength normal.

Rapid change in position from the seated to the lateral recumbent induces a prominent sense of vertigo, both from recumbent to upright, right and left, left worse than right. There is no associated nystagmus.

Motor System: Normal power throughout. Tone normal. Deep tendon reflexes symmetric, 0-1+ upper extremities; 2-3+ lower extremities.

Sensation: Normal to pinprick and vibration sense in the extremities.

Romberg mildly positive; tandem mildly abnormal.

MEDICAL RECORD REVIEW:

Robert Maywood, M.D., December 8, 2000: This is a follow-up visit, noting the above-described vertigo. In addition, note an injury of October 24, 2000, where he had dizziness, fell, struck his head, was evaluated at Sharp Memorial Hospital.

Note, according to Mr. Hefner, his vertiginous symptoms are unchanged following the injury of October 24, 2000.

Richard Hefner                                                    Page Three

## DIAGNOSES:

1.      Status post closed head injury.
2.      Status post spinal cord injury, cervical spine, with paraplegia, resolved, by history.
3.      Post-traumatic vertigo and headache.

ASSESSMENT: Mr. Hefner is a 30-year-old man who was injured in a motor vehicle accident on April 7, 2000, when the truck that he was driving struck a tree. He suffered a spinal cord injury with resultant paraplegia based on his account. He improved following cervical spine surgery that took place on April 10, 2000. He required rehabilitation thereafter. He has residual lower extremity symptoms with ataxia and sensory changes.

In addition, he has other symptoms due to the closed head injury as described. This includes headache, as well as vertigo. The present examination is abnormal because of the mild ataxia, and also the easily induced vertigo. With regard to the persistent symptoms of vertigo, as well as headache, I think it is important that he undergo MR imaging of the brain to exclude unsuspected intracranial disease.

In terms of treatment, I have suggested a course of vestibular exercises.

Mr. Hefner prefers to avoid medications as far as is possible. Obviously, treatment for headache in terms of medication does exist, should he change his mind.

With respect to the symptoms in the lower extremities, I expect that these represent the residua of the spinal cord injury of the cervical spine. Medical records in this regard need to be reviewed. There is obviously a remote possibility that there are additional injuries in the spine, including thoracic and lumbar spine, that may be accounting for the lower extremity symptom persistence.

## RECOMMENDATIONS:

1.      Vestibular exercises for vertigo.
2.      MR scan, brain.
3.      Pharmacological treatment for headache and vertigo is available as an option.
4.      To return for review in four weeks.
5.      Review of past studies and additional studies of the spine, depending on the findings.

DISCLOSURE STATEMENT: I declare under penalty of perjury that the information contained in this report and its attachments, if any, are true and correct to the best of my knowledge and belief, except as to the information that I have indicated that I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me. This declaration is made and signed in the County of San Diego, California.

Isaac Bakst, M.D.

IB/lr
cc:     Robert Maywood, M.D.

# RMG®

**RADIOLOGY MEDICAL
GROUP, INC.**

**FIRST & LAUREL IMAGING CENTER
2466 FIRST AVENUE
SAN DIEGO, CA 92101
PHONE: (619) 849-XRAY (849-9729)**

DIAGNOSTIC RADIOLOGY
Hans A. Siegel, M.D., F.A.C.R.
Mark S. Schechter, M.D.
Murray A. Reicher, M.D.
John M. Doremsty, M.D.
Brian J. Moffit, M.D.
David W. Buckley, M.D.
John O. Johnson, M.D.
Lori L. Baker, M.D.
James A. Cooper, M.D.
Eric K. Lizerbram, M.D.

CENTRALIZED NUMBERS
PBN: (619) 849-XRAY (849-9729)
FAX: (619) 849-4RMG (849-4764)

DIAGNOSTIC RADIOLOGY
OFFICES

FIRST & LAUREL
IMAGING CENTER
2466 First Avenue
San Diego, CA  92101-1492
FAX: (619) 696-7859

SCRIPPS MERCY HEALTHCARE
Department of Radiology
4077 Fifth Avenue
San Diego, CA  92103-2180
FAX: (619) 543-1076

MERCY MAGNETIC
IMAGING CENTER
4077 Fifth Avenue
San Diego, CA  92103-2180
FAX: (619) 543-1076

ENCINITAS
IMAGING CENTER
477 N. El Camino Real,
Suite A102
Encinitas, CA  92024-1329
FAX: (760) 632-5389

ADMINISTRATIVE OFFICE
3366 Fifth Avenue
P. O. Box 34307
San Diego, CA  92163-4307
FAX: (619) 294-8399

Check out our website
radiologybyrmg.com

| PATIENT NAME | ACCOUNT NO | MEDICAL RECORD NUMBER |
|---|---|---|
| HEFNER, RICHARD | 2330045 | 2250805 |

| AT THE REQUEST OF | DATE OF BIRTH | AGE/SEX | DATE OF SERVICE |
|---|---|---|---|
| ISAAC BAKST M.D.
8929 UNIVERSITY LN.
SUITE 207
SAN DIEGO, CA 92122 | 07-01-70 | 30/M | 01-26-01 |

**PROCEDURE:** MAGNETIC RESONANCE IMAGING OF THE BRAIN WITHOUT AND WITH GADOLINIUM WITH DIFFUSION WEIGHTED IMAGES

**COMPARISON:** None.

**HISTORY:** Vertigo and head trauma, 4/00 following a MVA. Rule out brain stem area tumor. History of headaches.

**TECHNIQUE:** A comprehensive examination was performed utilizing a variety of imaging planes and imaging parameters to optimize visualization of suspected pathology. Images were obtained both before and after intravenous Gadolinium injection. Diffusion weighted images were also obtained.

**FINDINGS:** The brain parenchyma is normal. There is no intracranial lesion. There is no evidence of abnormal enhancement. The diffusion weighted images reveal no abnormalities.

The brain stem and cerebellum are normal. The ventricles are normal in size and configuration.

The orbits are normal. There is minimal mucosal thickening along the floor of the right maxillary sinus. The other paranasal sinuses are clear.

The cerebellar pontine angles and internal auditory canals appear within normal limits.

The mastoid air cells appear within normal limits.
**CONTINUED............**

THIS REPORT IS BASED SOLELY UPON THE RADIOLOGICAL EXAMINATION.
CORRELATION WITH THE CLINICAL EXAMINATION IS ESSENTIAL.

305



## RADIOLOGY MEDICAL GROUP, INC.

**FIRST & LAUREL IMAGING CENTER**
**2466 FIRST AVENUE**
**SAN DIEGO, CA 92101**
**PHONE: (619) 849-XRAY (849-9729)**

**DIAGNOSTIC RADIOLOGY**
Hano A. Siegel, M.D., F.A.C.R.
Mark S. Schechter, M.D.
Murray A. Reicher, M.D.
John M. Doornenmy, M.D.
Brian J. Moffit, M.D.
David W. Buckley, M.D.
John O. Johnson, M.D.
Lori L. Baker, M.D.
James A. Cooper, M.D.
Eric K. Lizerbram, M.D.

**CENTRALIZED NUMBERS**
PHN: (619) 849-XRAY (849-9729)
FAX: (619) 849-4RMG (849-4764)

**DIAGNOSTIC RADIOLOGY**
**OFFICES**

**FIRST & LAUREL**
**IMAGING CENTER**
2466 First Avenue
San Diego, CA  92101-1492
FAX:  (619) 696-7859

**SCRIPPS MERCY HEALTHCARE**
Department of Radiology
4077 Fifth Avenue
San Diego, CA  92103-2180
FAX:  (619) 543-1076

**MERCY MAGNETIC**
**IMAGING CENTER**
4077 Fifth Avenue
San Diego, CA  92103-2180
FAX:  (619) 543-1076

**ENCINITAS**
**IMAGING CENTER**
477 N. El Camino Real,
Suite A102
Encinitas, CA  92024-1329
FAX:  (760) 632-5389

**ADMINISTRATIVE OFFICE**
3366 Fifth Avenue
P. O. Box 34307
San Diego, CA  92163-4307
FAX: (619) 294-8399

**Check out our website**
radiologybyrmg.com

| PATIENT NAME | ACCOUNT NO | MEDICAL RECORD NUMBER |
|---|---|---|
| **HEFNER, RICHARD** | **2330045** | **2250805** |

**AT THE REQUEST OF**
**ISAAC BAKST M.D.**
**8929 UNIVERSITY LN.**
**SUITE 207**
**SAN DIEGO, CA 92122**

| DATE OF BIRTH | AGE/SEX | DATE OF SERVICE |
|---|---|---|
| **07-01-70** | **30/M** | **01-26-01** |

PAGE TWO:

CONCLUSION:

Normal examination.

Thank you for referring this patient,

Eric Lizerbram, M.D.
lf
Dictated: 1/26/01;  Typed:  1/26/01

THIS REPORT IS BASED SOLELY UPON THE RADIOLOGICAL EXAMINATION.
CORRELATION WITH THE CLINICAL EXAMINATION IS ESSENTIAL.

306

ISAAC ᴾAKST, M.D.
A PROFESS      L CORPORATION
NEUROLOGY

Diplomate of American Board of
Psychiatry and Neurology

La Jolla Medical and Surgical Center
8929 University Center Lane, Suite 207, San Diego, CA 92122
Tel. (858) 552-8828      Fax (858) 552-8858

**PATIENT:**     Richard Hefner
**DATE:**         February 15, 2001
**W.C. INSURANCE COMPANY:** U.S. Department of Labor
**EMPLOYER:**   Camp Pendleton
**DATE OF INJURY:** April 7, 2000
**CLAIM NO.:**     92004-131215222
**REFERRING PHYSICIAN:** Robert Maywood, M.D.

### NEUROLOGICAL RE-VISIT

Mr. Hefner is seen for reevaluation. He reports having improved, at least to some extent in terms of headache. He did the vestibular exercises as recommended for a short period, thought he might have improved, but because of the aggravation of neck symptoms, discontinued. There are no new problems. He continues working.

He still experiences lower extremity symptoms that have not progressed, but still remain disturbing to some extent.

ASSESSMENT: Unchanged; see past report.

RECOMMENDATIONS: Trial of Klonopin, 0.5 mg hs, and q 12 prn for chronic tension type headache and vertigo. Maxalt MLT for control of headache. To keep record of headache on a daily basis, and return for review in one month.

DISCLOSURE STATEMENT: I declare under penalty of perjury that the information contained in this report and its attachments, if any, are true and correct to the best of my knowledge and belief, except as to the information that I have indicated that I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me. This declaration is made and signed in the County of San Diego, California.

Isaac Bakst, M.D.

IB/lr
cc:    Robert Maywood, M.D.



ISAAC ~ \KST, M.D.
A PROFESS.    L CORPORATION
NEUROLOGY

Diplomate of American Board of
Psychiatry and Neurology

La Jolla Medical and Surgical Center
8929 University Center Lane, Suite 207, San Diego, CA 92122
Tel. (858) 552-8828    Fax (858) 552-8858

PATIENT:        Richard Hefner
DATE:           April 5, 2001
W.C. INSURANCE COMPANY: U.S. Department of Labor
EMPLOYER:       Camp Pendleton
DATE OF INJURY: April 7, 2000
CLAIM NO.:      92004-131215222
REFERRING PHYSICIAN: Robert Maywood, M.D.

## NEUROLOGICAL PERMANENT AND STATIONARY REPORT

Mr. Hefner is seen today for review. His symptoms have been stable, and are as follows:

1.      Headache occurring twice a week, lasting an hour, throbbing, severe to the point of discontinuing the particular activity that he is engaged in. Headache is reduced with an electrostimulating machine.
2.      He experiences vertigo two or three times a week, lasting seconds, until he changes position or sits.
3.      He experiences loss of balance, occasionally, two or three times a week, generally associated with stress, and worse when his neck feels tighter than usual.
4.      He experiences nightmares three times a week.
5.      He has constant abnormal sensations in the lower extremities in a sense that he cannot feel his calves properly.

## CLINICAL EXAMINATION

Speech, language, comprehension normal. Eye movements normal. No facial weakness. Tongue and palate central. Hearing normal to conversational tones.

Motor System: Normal power throughout. Tone normal. Deep tendon reflexes symmetric as follows: triceps 0; biceps 1+; brachioradialis 1+; knee jerks 2-3; ankle jerks 2-3. Romberg positive. Tandem abnormal, but able to do so independently.

Vibration sense reduced at ankles and toes.

DIAGNOSES:

1.      Post-traumatic head syndrome, slight.
2.      Status post spinal cord injury, cervical spine with paraplegia, improved, by history.

ASSESSMENT: The assessment is obviously limited in the absence of medical records that relate to the original injury. These have previously been requested from Dr. Gross, and these have not yet been received. Thus, this evaluation is based on the available information.

Richard Hefner                                              Page Two

Mr. Hefner was injured on April 7, 2000, in a motor vehicle accident when he was the driver of a tanker trunk that struck a tree. He suffered head and neck injuries and paraplegia, the latter of which has resolved with residual symptoms characterized by numbness and tingling from the thigh down, as well as an insensitivity in the calves. In this regard, the neurologic examination is abnormal because of mild ataxia and hyperreflexia.

He has had residual headaches, as well as vertigo, and has suffered from nightmares.

Based on the available information, he might be considered to be **permanent and stationary** at this point.

SUBJECTIVE FACTORS:

1.    Headache: occasionally severe.
2.    Vertigo and ataxia: occasional, slight.
3.    Lower extremity symptoms:   constantly minimal; may become slight to moderate occasionally.
4.    Nightmares: occasional.

OBJECTIVE FACTORS:

1.    Brisk deep tendon reflexes, lower extremities.
2.    Mild ataxia with a mild positive Romberg sign and abnormal tandem gait and reduced vibration sense, ankles and toes.

ADDITIONAL OBJECTIVE FACTORS:

1.    Presumed abnormal imaging studies of the cervical s

FUTURE MEDICAL CARE:

1.    Mr. Hefner is likely to continue suffering from hea
       ought to have available to him access to medical treatn
       of supervision, as well as access to medications.
2.    It is expected that the vertigo will improve witho
       exacerbation, either of vertigo or ataxia, he ought to
3.    Lower extremity symptoms:  It is presumed that th
       without intervention. The presumption is that these s
       at the level of the cervical spine. Thoracic spine ar
       been excluded, and if his symptoms worsen, then
       attention to image the entire spine, and treat accorc
       should that become necessary.
4.    Nightmares:  These are subsiding. However, he s
       addressed psychiatrically if necessary.

*P∨S ??*

Richard Hefner                                                    Page Three

NOTE:  I have not reviewed what may turn out to be relevant medical information regarding Mr. Hefner's injury and initial neurosurgical investigation and treatment.  This information is by report en route.  There is a possibility that this may alter conclusions reached in this case.

DISCLOSURE STATEMENT:  I declare under penalty of perjury that the information contained in this report and its attachments, if any, are true and correct to the best of my knowledge and belief, except as to the information that I have indicated that I received from others.  As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me.  This declaration is made and signed in the County of San Diego, California.

Isaac Bakst, M.D.

IB/lr
cc:    Robert Maywood, M.D.
       Richard Hefner



31C

**DEPARTMENT OF THE NAVY**
NAVAL LEGAL SERVICE OFFICE SOUTHWEST
BUILDING 265, NAVAL STATION
3085 DOLPHIN ALLEY
SAN DIEGO, CALIFORNIA 92136-5187

5890
Ser 351/0664
January 14, 2002

**CERTIFIED MAIL**

Richard Hefner
330 Palm Canyon Drive
Borrego Springs CA 92004

Dear Mr. Hefner:

SUBJECT:  CLAIM NUMBER 10146

     This is in reference to the administrative claim submitted by
you in the amount of $1,500,000 for injury alleged to have
resulted from an incident which occurred at Basilone Road, Camp
Pendleton, California, on April 7, 2000.

     Examination of the facts indicates that the United States of
America is not liable under the Federal Tort Claims Act for this
incident.  Claims of Federal civilian employees and their next-
of-kin for job-related injuries may not be paid under the Federal
Tort Claims Act.  The exclusive remedy is under the Federal
Employees' Compensation Act, 5 U.S.C. § 8116(c).  In addition,
your injuries did not result from negligence on the part of other
federal employees while acting in the course and scope of federal
employment.

     Accordingly, your claims are denied.  If you choose to file
suit, it must be filed in the appropriate United States District
Court within six months of the date this letter was mailed.
Failure to file suit within the six-month period will result in
the claim being forever barred.

                              Sincerely,

                              ROGER B. ATKINS
                              Claims Officer

# (H) HEALTHSOUTH.

HealthSouth Diagnostic Center of La Jolla
8929 University Center Lane, Suite 101
San Diego, CA 92122
(858) 597-2275

October 4, 2004

| | |
|---|---|
| Patient Name: | **HEFNER, RICHARD** |
| SSN: | **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** |
| Referred By: | **ROBERT MAYWOOD, M.D.** |
| Date of Birth: | **07/01/1970/M** |
| Date of Exam: | **10/04/2004** |
| Exam: | **MRI OF THE THORACIC SPINE WITHOUT CONTRAST** |

Patient was scanned on a 1.5 Tesla superconducting magnet utilizing long and short axis fat and water weighted sequences.

**Clinical:** Prior motor vehicle accident in April of 2000, with bilateral arm pain and numbness with tingling, left greater than right, and pain in T10 through T12 region.

**Technique:** Multiplanar T1 and T2-weighted imaging of the thoracic spine without contrast.

**Reference Examination:** Report of prior MRI dated 08/08/2001 from the First & Laurel Imaging Center in San Diego, California. The prior images are not available for direct comparison.

**FINDINGS:**
Thoracic alignment appears within normal limits. Vertebral body heights and marrow signal are preserved. A small central/left paracentral disc protrusion is seen at T7-T8, with associated high-intensity zone. No significant canal or foraminal narrowing, although the disc material contacts the ventral spinal cord, but does not deform it. A small left paracentral disc protrusion is also seen at T10-T11, without canal or foraminal narrowing. The thoracic spinal cord is normal in caliber and signal throughout. The spinal canal is otherwise widely patent. Paraspinal soft tissues are unremarkable.

Scout images also demonstrate prior anterior cervical fusion from C6 through C7 with associated metallic susceptibility artifact and kyphosis of the cervical spine.

**IMPRESSION:**
1) Small central/left paracentral disc protrusion at T7-T8, abutting the ventral cord. No corresponding abnormality is described in the prior report; the prior images are not available for direct comparison.
2) Small left paracentral disc protrusion at T10-T11, similar to finding described on prior report.

Preliminary report was faxed to the office of Dr. Maywood at 4:15 pm on 10/04/2004.

Thank you for your referral.

Charles Kerber, M.D.
Luis Maas, M.D.

5471 Kearny Villa Road• Suite 110 • San Diego, CA 92123      • Phone:858/560-4634 •Fax:858/573-1806
8929 University Center Lane • Suite 101• San Diego, CA 92122   • Phone:858/597-2275• Fax:858/597-0252

3 1 2

File Number: 131215222
ff-O-NO

File Number: 131215222
ff-O-NO

U.S. DEPARTMENT OF LABOR

EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMP PROGRAMS
PO BOX 8300 DISTRICT 13 SFC
LONDON, KY 40742-8300
Phone:  (415) 625-7500

June 4, 2008

Date of Injury: 04/07/2000
Employee:  RICHARD R. HEFNER

Sam Maywood, M.D.
3444 Kearny Villa Rd, SE 305
San Diego, CA 92123

Dear Dr. Maywood:

Thank you for your recent medical report dated May 15, 2008 regarding the above referenced
industrial case.

Although you have requested authorization for thoracic epidural steroid injections, this Office has not
accepted a thoracic condition in this case.  The accepted conditions are as follows:  Displacement of
Cervical Interverterbral Disc, ICD-9 code of 722.0 and Left Shoulder Impingement Syndrome with
Surgery, ICD-9 code of 726.2.

According to our records, the claimant was declared Permanent and Stationary by medical report
dated April 5, 2001.  Conservative medical treatment is limited to the above referenced industrial
conditions.

Sincerely,

Barb Nylund
Claims Examiner

RICHARD R HEFNER
PO BOX 80173
SAN DIEGO, CA 92138

DEPARTMENT OF THE NAVY
MARINE CORPS-STATIONS BASES
HUMAN RESOURCES OFFICE-SOUTHWEST
BOX 555026
CAMP PENDLETON, CA 92055

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Richard Randall Hefner
PO Box 80173
San Diego CA 92138

**DEFENDANTS**

Elaine Chao (Sec of Labor)
US Marine Corp
George W. Bush

FILED

2008 AUG 29  AM 10: 04

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** San Diego
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** Washington D.C.
(IN U.S. PLAINTIFF CASES ONLY)

BY: _____ DEPUTY

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

**ATTORNEYS (IF KNOWN)**

'08 CV 1586 L BLM

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

- X 1 U.S. Government Plaintiff
- 2 U.S. Government Defendant
- 3 Federal Question
  (U.S. Government Not a Party)
- 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
**(For Diversity Cases Only)          FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | X 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

28 : 2674

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 610 Agriculture | 422 Appeal 28 USC 158 | 400 State Reappointment |
| 120 Marine | 310 Airplane | 362 Personal Injury-Medical Malpractice | 620 Other Food & Drug | 423 Withdrawal 28 USC 157 | 410 Antitrust |
| 130 Miller Act | 315 Airplane Product Liability | X 365 Personal Injury - Product Liability | 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | 430 Banks and Banking |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 630 Liquor Laws | 820 Copyrights | 450 Commerce/ICC Rates/etc. |
| 150 Recovery of Overpayment &Enforcement of Judgment | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 640 RR & Truck | 830 Patent | 460 Deportation |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 650 Airline Regs | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| 152 Recovery of Defaulted Student Loans (Excl. Veterans) | 345 Marine Product Liability | 370 Other Fraud | 660 Occupational Safety/Health | **SOCIAL SECURITY** | 810 Selective Service |
| 153Recovery of Overpayment of Veterans Benefits | 350 Motor Vehicle | 371 Truth in Lending | 690 Other | 861 HIA (13958) | 850 Securities/Commodities Exchange |
| 160 Stockholders Suits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | **LABOR** | 862 Black Lung (923) | 875 Customer Challenge 12 USC |
| 190 Other Contract | 360 Other Personal Injury | 385 Property Damage Product Liability | 710 Fair Labor Standards Act | 863 DIWC/DIWW (405(g)) | 891 Agricultural Acts |
| 195 Contract Product Liability | | | 720 Labor/Mgmt. Relations | 864 SSID Title XVI | 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 730 Labor/Mgmt. Reporting & Disclosure Act | 865 RSI (405(g)) | 893 Environmental Matters |
| 210 Land Condemnation | 441 Voting | 510 Motions to Vacate Sentence Habeas Corpus | 740 Railway Labor Act | **FEDERAL TAX SUITS** | 894 Energy Allocation Act |
| 220 Foreclosure | 442 Employment | 530 General | 790 Other Labor Litigation | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 443 Housing/Accommodations | 535 Death Penalty | 791 Empl. Ret. Inc. | 871 IRS - Third Party 26 USC 7609 | 900 Appeal of Fee Determination Under Equal Access to Justice |
| 240 Tort to Land | 444 Welfare | 540 Mandamus & Other | Security Act | | 950 Constitutionality of State |
| 245 Tort Product Liability | 440 Other Civil Rights | 550 Civil Rights | | | 890 Other Statutory Actions |
| 290 All Other Real Property | | 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

- X 1 Original Proceeding
- 2 Removal from State Court
- 3 Remanded from Appellate Court
- 4 Reinstated or Reopened
- 5 Transferred from another district (specify)
- 6 Multidistrict Litigation
- 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

**DEMAND $** Undisclosed amount

Check YES only if demanded in complaint:
JURY DEMAND: X YES  NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**    JUDGE _____    Docket Number _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)